ACCEPTED
04-15-00606-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/28/2015 4:27:03 PM
KEITH HOTTLE
CLERK

**NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
9/28/2015 4:27:03 PM
KEITH E. HOTTLE
Clerk

No. 04-15-00606-CV

# IN THE COURT OF APPEALS
# FOR THE FOURTH DISTRICT OF TEXAS
# AT SAN ANTONIO

**IN RE JAMES DAVID HENRY,**

*Relator.*

Original Proceeding from 2011-CI-11645
Pending in the 150th Judicial District Court, Bexar County, Texas
The Honorable Karen Pozza, Presiding

## PETITION FOR WRIT OF MANDAMUS

David T. Emory
State Bar No. 06612100
*davidemory@hhzlaw.com*
HIGDON, HARDY, & ZUFLACHT, L.L.P.
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Telephone: (210) 349-9933
Fax: (210) 349-9988

*Counsel for Relator James David Henry*

RELATOR REQUESTS ORAL ARGUMENT

i

| *Party* | *Counsel* |
|---|---|
| James David Henry<br><br>*Relator* | David T. Emory<br>State Bar No. 06612100<br>Higdon, Hardy, & Zuflacht, L.L.P.<br>*davidemory@hhzlaw.com*<br>12000 Huebner Road, Suite 200<br>San Antonio, Texas 78230<br>Telephone: 210-349-9933<br>Fax: 210-349-9988<br><br>***Appellate Counsel***<br><br>David T. Emory<br>State Bar No. 06612100<br>Higdon, Hardy, & Zuflacht, L.L.P.<br>*davidemory@hhzlaw.com*<br>12000 Huebner Road, Suite 200<br>San Antonio, Texas 78230<br>Telephone: 210-349-9933<br>Fax: 210-349-9988<br><br>Charles E. Hardy<br>State Bar No. 08985550<br>Higdon, Hardy, & Zuflacht, L.L.P.<br>*charleshardy@hhzlaw.com*<br>12000 Huebner Road, Suite 200<br>San Antonio, Texas 78230<br>Telephone: 210-349-9933<br>Fax: 210-349-9988<br><br>***Trial Counsel*** |

|  *Party*  |  *Counsel*  |
|---|---|

Hon. Karen Pozza, District Judge
*kpozza@bexar.org*
407th Judicial District Court
Bexar County Courthouse
100 Dolorosa, 4th Floor
San Antonio, Texas 78205
Telephone: 210 335-2462

### *Respondent*

Stephanie Markell

Pamela R. Julian
State Bar No. 1108800

### *Respondent/Real Party in Interest*

*pjjulian@yahoo.com*
Pamela R. Julian
2420 McCullough Ave,. No. 122
San Antonio, Texas 78212
Telephone: 210-735-4910
Fax: 210-437-0084

# TABLE OF CONTENTS

Page

PETITION FOR WRIT OF MANDAMUS...............................................................................i

IDENTITY OF PARTIES AND COUNSEL.....................................................................ii, iii

TABLE OF CONTENTS................................................................................................iv, v

INDEX OF AUTHORITIES..........................................................................................vi, vii

STATEMENT OF THE CASE...........................................................................................viii

STATEMENT OF JURISDICTION......................................................................................1

ISSUE PRESENTED.............................................................................................................2

REASONS TO GRANT MANDAMUS RELIEF..................................................................3

STATEMENT OF FACTS................................................................................................4, 5

ARGUMENT..........................................................................................................................6

    A.    The Standard Governing a Writ of Mandamus Proceeding...................6

    B.    The Motion to Transfer Venue was timely filed by
            James David Henry........................................................................................7

    C.    Denial of the Motion to Transfer Venue to
            Midland County, Texas, is a Clear Abuse of Discretion.......................8

PRAYER...............................................................................................................................13

RULE 52.3(j) CERTIFICATION..........................................................................................14

CERTIFICATE OF COMPLIANCE....................................................................................14

CERTIFICATE OF SERVICE.............................................................................................15

# TABLE OF CONTENTS *(cont'd)*

Page

APPENDIX

Trial Court Pleadings (MR: 1)...............................................................Tab A

    1.     Original Petition to Adjudicate Parentage (MR:2-12)

    2.     Order Adjudicating Parentage (MR:13-16)

    3.     Motion to Transfer With Notice of Setting,
Petition for Further Relief, And
Modify Parent-Child Relationship (MR:17-40)

    4.     Motion and Order Setting Motion to Transfer (MR:41-42)

    5.     Motion and Order to Set on the Non-Jury Docket for
Temporary Orders (MR:43-44)

    6.     Citation/Return (MR:45-47)

    7.     Counter-Motion to Modify Prior Order (MR:48-53)

    8.     Judge's Notes (MR:54-55 )

    9.     Order Denying Change of Venue (MR:56-57)

Reporter's Record of September 16, 2015 (Motion to Transfer
With Notice of Setting, Petition for Further Relief, And
Modify Parent-Child Relationship) (MR:58-144)................................. Tab B

Case Law & Texas Statutes.................................................................Tab C

# INDEX OF AUTHORITIES

Page(s)

## CASES

*Alexander v. Russell*, 669 S.W.2d 209, 210 (Tex.1985)................................................7

*In re CSX Corp.*,
124 S.W.3d 149, 151 (Tex. 2003) (per curium) (orig. proceedings).....................6

*In re Leyva*,
333 S.W.3d 315 (Tex. App.—San Antonio 2010, orig. proceeding)........1, 3, 7, 9,
11, 12

*In re Nabors*,
276 S.W.3d 190 (Tex.App—Houston [14th Dist.] 2009, orig. proceeding).....3, 9

*Leonard v. Paxson*,
654 S.W.2d 440 (Tex.1983)..................................................................................3

*In re Odyssey Healthcare, Inc.*,
310 S.W.3d 419, 422 (Tex. 2010) (per curium) (orig. proceeding).....................6

*Proffer v. Yates*,
734 S.W.2d 671 (Tex.1987)..................................................................................9

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding)....................................6

*In re Reynoso*,
361 S.W.3d 719, 723 (Tex. App—Corpus Christi 2012, no pet.)
(orig. proceeding)................................................................................................7

*In re Team Rocket, L.P.*,
256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding)........................................7

*Walker v. Packer*,
827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).........................................6

*In re Wheeler*,
177 S.W.3d 350 (Tex.App.—Houston [1st Dist.] 2005, orig. proceeding......3, 10

## STATUTES

TEX. FAM. CODE ANN. § 155.201................................................................3, 5, 7, 8, 12

TEX. FAM. CODE ANN. § 155.203................................................................12

TEX. FAM. CODE ANN. § 155.204................................................................7, 8

TEX. GOV'T CODE ANN. § 22.201(e)................................................................1

TEX. GOV'T CODE ANN. § 22.221(b)(1)................................................................1

TEX. R. APP. P. 52.1................................................................1

# STATEMENT OF THE CASE

*Nature of the case*

This suit arises out of a Motion to Transfer Venue, with Notice of Setting, Petition for Further Relief, and Modify Parent-Child Relationship filed by James David Henry the adjudicated father of B.A.H. MR:17-40. James David Henry sought to transfer the underlying Bexar County proceeding to Midland County, Texas since B.A.H. the minor child and James David Henry have continuously resided in Midland County, Texas for three and one-half years. *Id.* James David Henry also filed a request to modify the terms and conditions of the prior order that was originally entered in Bexar County, Texas. *Id.*

On September 21, 2015, Bexar County Court denied James David Henry's Motion to Transfer Venue. MR:56-57.

*Respondent*

Respondent is the Honorable Karen Pozza sitting for the 150th Judicial District Court, Bexar County, Texas.

Respondent was assigned to hear James David Henry's Motion to Transfer Venue, with Notice of Setting, Petition for Further Relief, and Modify Parent-Child Relationship, which was filed in the 150th Judicial District Court, Bexar County, Texas. MR:17-40.

*Respondent's action from which Relator seeks relief*

On September 16, 2015, Respondent filed a Counter-Motion to Modify Prior Order. MR:48-53. In the Counter-Motion to Modify Prior Order, Stephanie Markell requested that the court deny James David Henry's Motion to Transfer Venue since the child subject to this suit, B.A.H., has lived with Stephanie Markell since August of 2015. *Id.*

viii

## STATEMENT OF JURISDICTION

This Court has jurisdiction under TEX. GOV'T CODE ANN. § 22.221(b)(1): "Each court of appeals for a court of appeals district may issue writs of mandamus, agreeable to the principals of law regulating those writs, against a . . . judge of a district or county court in the court of appeals district[.]" *See also* TEX. R. APP. P. 52.1 *et seq.* (governing original proceedings in the appellate courts). The 150th District Court, Bexar County, Texas is within this Court's district. TEX. GOV'T CODE ANN. § 22.201(e). This Court's mandamus authority extends to orders denying Motion to Transfer Venue in family law cases. *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, orig. proceeding).

# ISSUE PRESENTED

One: The trial court erred in denying Relator's Motion to Transfer Venue for which mandamus relief should issue.

Two: In the Motion to Transfer with Notice of Setting, Petition for Further Relief, and to Modify Parent-Child Relationship, the trial court had a mandatory duty to transfer this suit to Midland County, Texas since the father and child subject to this suit has resided in Midland County, Texas for the past three and a half years. If a suit to modify an order is filed in a court having continuing exclusive jurisdiction, the court shall transfer the proceeding to the appropriate county if a timely motion to transfer venue is filed by a party. After hearing arguments of counsel and evidence presented, the trial court denied the Motion to Transfer Venue on September 21, 2015.

## REASONS TO GRANT MANDAMUS RELIEF

In a suit to modify the parent-child relationship, the trial court has a mandatory, statutory, ministerial duty to transfer the suit to a county where the child has lived for six months or longer and when the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate. TEX. FAM. CODE ANN. § 155.201. *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, orig. proceeding).

Under TEX. FAM. CODE ANN. 155.201(b), the Legislature does not require that the children *currently reside* in the other county, only that they "have resided" there for six months or longer when the modification suit is filed.(emphasis added) *In re Nabors*, 276 S.W.3d 190 (Tex.App—Houston [14th Dist.] 2009, orig. proceeding) The trial court has no discretion but to transfer venue if the child has been living in another county for at least six months prior to the proceeding, and there is no exception to this case. *In re Wheeler*, 177 S.W.3d 350 (Tex.App.—Houston [1st Dist.] 2005, orig. proceeding *see also Leonard v. Paxson*, 654 S.W.2d 440 (Tex.1983).

Accordingly, mandamus should issue.

3

## STATEMENT OF FACTS

On July 18, 2011, James David Henry filed an Original Petition to Adjudicate Parentage of child, B.A.S., in Bexar County, Texas. MR:2-12. On August 19, 2011 the Bexar County District Court entered an Order Adjudicating Parentage declaring and adjudicating James David Henry the biological father of B.A.S. MR:13-16. The child's last name and birth certificate was amended to identify James David Henry as the father of the child and changing the name of the child to B.A.H. *Id.*

On September 4, 2015, a Motion to Transfer with Notice of Setting, Petition for Further Relief, and to Modify Parent-Child Relationship was brought by James David Henry in Bexar County, Texas requesting that the venue for the Modification of the Parent-Child Relationship be transferred to Midland County, Texas; and to modify the prior order to designate James David Henry as the conservator who has the exclusive right to designate the primary residence of the child. MR:17-40. The Motion to Transfer with Notice of Setting, Petition for Further Relief and to Modify Parent-Child Relationship was set for hearing on September 16, 2015 in the presiding District Court of Bexar County. MR:41-42.

The basis of the Motion to Transfer Venue filed by James David Henry was predicated on the fact the minor child B.A.H. had continuously resided with the father in Midland County, Texas for three and half years. MR:17-40. The Texas

4

Family Code states the trial court shall transfer the proceeding to another county in the state if the child has resided in that county for six months or longer. TEX. FAM. CODE. ANN §155.201(b) (emphasis added).

On September 5, 2015, Stephanie Markell, the mother of the child, was personally served with the Motion to Transfer with Notice of Setting, Petition for Further Relief, and to Modify Parent-Child Relationship. MR:45-47. On September 16, 2015, the presiding District Court of Bexar County called the case and assigned the Motion to Transfer with Notice of Setting, Petition for Further Relief, and to Modify Parent-Child Relationship to the Honorable Karen Pozza, sitting for the 150th Judicial District Court. MR:58-144. Prior to the hearing being assigned, Stephanie Markell filed a Counter-Motion to Modify Prior Order and judicially admitted in her pleading that the child has only lived in Bexar County for two months. MR:48-53.

Further, Stephanie Markell testified that the child has lived in Midland County, Texas for three and a one-half years and has only lived in Bexar County since August of 2015. MR:124. At the conclusion of the hearing, the Honorable Karen Pozza, by way of her judge's notes, denied the Motion to Transfer Venue and entered Temporary Orders. MR:54-55. On September 21, 2015 the trial court entered its Order Denying Change of Venue. MR:56-57.

5

## ARGUMENT

### A. The standard governing a writ of mandamus proceeding.

The standard governing mandamus proceedings is well established. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding). Mandamus relief is warranted where: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal. *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010) (per curium) (orig. proceeding). As to the first prong, a "clear abuse of discretion" occurs when the challenged ruling is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (per curium) (orig. proceedings); *see Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). It is well established, however, that the "review of a trial court's determination of the legal principles controlling its ruling is much less deferential." *Walker*, 827 S.W.2d at 840. According to the Texas Supreme Court, "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Id.* Thus, the trial court abuses its discretion if there is "a clear failure by the trial court to analyze or apply the law correctly[.]" *Id.*

As to the second prong of the mandamus standard, "the adequacy of an appellate remedy must be determined by balancing the benefits of mandamus

6

review against the detriments." *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). An appellate remedy is only adequate if the detriments to issuing mandamus relief outweigh the benefits; but if the detriments are outweighed by the benefits, "courts must consider whether the appellate remedy is adequate." *Prudential*, 148 S.W.3d at 136; *accord In re Reynoso*, 361 S.W.3d 719, 723 (Tex. App—Corpus Christi 2012, no pet.) (orig. proceeding). Texas law provides that mandamus relief is available to set aside an improper ruling of TEX. FAM. CODE ANN. § 155.201(b). *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, no pet.).

## B.     The Motion to Transfer Venue was timely filed by James David Henry.

A motion to transfer by Petitioner or Movant is timely if it is made at the time the initial pleadings are filed. TEX. FAM. CODE ANN. § 155.204(b). Absent a motion and order of transfer, the district court retains exclusive jurisdiction. *Alexander v. Russell*, 669 S.W.2d 209, 210 (Tex.1985).

The motion to transfer venue filed by James David Henry was timely filed with the Modification of the Parent-Child Relationship on September 4, 2015 and personally served on Stephanie Markell on September 5, 2015. MR:17-40, 45-47. Bexar County lost continuing exclusive jurisdiction when undisputed evidence was presented to the trial court in the hearing on the Motion to Transfer Venue establishing the fact that the minor child has resided continuously in Midland

7

County, Texas for well over six months. MR:67, 71, 72, 75, 78, 82, 84, 89, 109, 114, 123, 124, 140.

## C. Denial of the Motion to Transfer Venue to Midland County, Texas, is a Clear Abuse of Discretion.

If a suit to modify the parent-child relationship or motion to enforce an order for possession or support is filed in the court having continuing exclusive, the court must transfer the proceeding to another county if the child has resided in the other count for six months or longer and any party files a timely motion to transfer. TEX. FAM. CODE ANN. § 155.201(b); TEX. FAM. CODE. ANN. § 155.204.

Specifically, TEX. FAM. CODE ANN. § 155.201(b) provides:

> (b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by § 155.204, transfer the proceeding to another county in this state if the child has resided in the other county for *six months* or longer. (emphasis added).

Parents and children who have a right under the mandatory venue provisions to venue in a particular county should not be forced to go through a trial that is "for naught since justice demands a speedy resolution of child custody and child support issues." *Proffer v. Yates*, 734 S.W.2d 671, 672 (Tex.1987). When the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate. *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, no pet.).

8

The child subject to this suit, B.A.H., lived in Midland County, Texas until August of 2015, approximately three and half years. MR:71, 72, 123. Relator contends that Bexar County lost exclusive continuing jurisdiction to hear the Modification of the Parent-Child Relationship since B.A.H. has only lived in Bexar County since August of 2015. MR:17. Because the child has not resided in Bexar County for the requisite time, the trial court did not have discretion to deny the motion to transfer venue. MR:18.

The court in *In re Nabors*, emphasized that "the Legislature does not require that children currently reside in the other county, only that they 'have resided' there for six months or longer when the modification of the suit is filed." *In re Nabors*, 276 S.W.3d 190 (Tex.App—Houston [14th Dist.] 2009, orig. proceeding). Once it has been determined that the child has resided in a particular county for at least six months prior to the modification, a trial court has *no discretion* but to transfer venue to the county where the child has resided for at least six months. *In re Wheeler*, 177 S.W.3d 350, 353 (Tex.App.—Houston [1st Dist.] 2005, orig. proceeding) (emphasis added). The material facts, not in dispute, as determined from the parties' pleadings, supporting affidavit and testimony establish that B.A.H., the minor child, has continuously resided in Midland County, Texas from April 10, 2012 until August 20, 2015.

9

Relator draws this Court's attention to the Affidavit filed by James David Henry in which he states that he:

> "[JAMES DAVID HENRY] has had actual care, custody, and control of B.A.H in Midland, Texas since on or about April 10, 2010 (pursuant to a Temporary Order from a Bexar County Court) . . . B.A.H. has resided with me at 4005 Cardinal Lane Midland, Texas 79707 from on or about April 10, 2012 until on or about August 20, 2015, at which Stephanie Markell obtained him in the middle of the night in Tarrant County Texas without notice . . . B.A.H attended Midland Christian School in Midland for the last three years." MR:28.

Further, there are numerous references in the sworn testimony that B.A.H has lived Midland County, Texas for more than six months. MR:67, 71, 72, 75, 78, 82, 84, 89, 109, 114, 123, 124, 140. Stephanie Markell testified that James David Henry signed an affidavit stating that James David Henry has "had actual care, custody and control of B.A.H in Midland since April 10, 2012" *and* that the statements in James David Henry's Affidavit were in fact correct. MR:123. Additionally, Stephanie Markell testified that B.A.H. has attended Midland Christian School in Midland, Texas for the past three years and that his primary residence since April of 2012 has been Midland County, Texas. MR:124. Stephanie Markell further testified that B.A.H. has lived in Midland County, Texas for the past three and a one-half years, but also judicially admitted in her Counter-Motion to Modify Prior Order that B.A.H. has only lived in Bexar County since August of 2015. MR:50.

10

By further argument there exists a substantial amount of evidence and numerous witnesses including teachers, coaches and others that will testify to the issues relevant to the pending motion to modify. MR:67. All of the witnesses over the past three years are located in Midland, Texas. *Id.*

In *In re Leyva*, the trial court abused its discretion by denying the mandatory motion to transfer in a suit to modify the parent-child relationship. *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, no pet.). ("[T]rial court has no discretion in determining what the law is or applying the law to the facts, and a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion."). *Leyva* complained that the trial court abused its discretion by failing to comply with the provisions of the Texas Family Code requiring the transfer of venue to modify the parent-child relationship. *Id.* at 316. In a response, the trial judge contended that the transfer was not mandatory because Leyva's motion to transfer failed to provide sufficient facts to support a transfer. *Id.* at 318. Section 155.203 of the Family Code directs the court to look at the child's "principal residence" to determine the county of the child's residence when determining if venue must be transferred. *Id. citing* TEX. FAM. CODE ANN. § 155.203. ("[p]roviding the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence

11

during the six-month period preceding the commencement of the suit."). The Fourth Court of Appeals ruled,

> "in a suit to modify a parent-child relationship, the trial court has a mandatory statutory ministerial duty to transfer this suit to the county where the child has lived for six months or longer, and when the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate." *Id.* at 315.

Therefore, this suit should be transferred to the Midland County Court.

In sum, the trial court had a mandatory statutory ministerial duty to transfer this suit to Midland County, Texas when there was undisputed evidence that the child has lived in Midland County, Texas for more than six months. *See,* TEX. FAM. CODE ANN. § 155.201; *In re Leyva,* 333 S.W.3d 315 (Tex. App.—San Antonio 2010, no pet.). When the trial court fails to timely transfer venue, mandamus relief is appropriate since an appeal is inadequate. *Id.*

## PRAYER

WHEREFORE, Relator respectfully requests the Court to grant a writ of Mandamus requiring Respondent to vacate the Order Denying the Change of Venue. Relator further prays for all other relief to which it may be entitled at law and in equity.

Respectfully submitted,

**HIGDON, HARDY & ZUFLACHT, LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230-1210
Tel: (210) 349-9933
Fax: (210) 349-9988

By:_____
**DAVID T. EMORY**
State Bar No. 06612100
davidemory@hhzlaw.com
Attorney for Petitioner

*Counsel for Relator James David Henry*

13

## RULE 52.3(j) CERTIFICATION

I certify that I have reviewed the foregoing petitioner for writ of mandamus and concluded that every factual statement in the foregoing Petitioner is supported by competent evidence included in the Appendix or Record.

By:_____
**DAVID T. EMORY**

## CERTIFICATE OF COMPLIANCE

I certify pursuant to TEX. R. APP. P.9.4(i)(3) that this document complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.     Exclusive of the contents identified by Rule 9.4(i)(1) and inclusive of all textboxes, footnotes, and endnotes, this document contains 4,049 words as counted by the Word Count function of Microsoft Word 2010.

2.     This document has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Word 2010
Typeface Name: Times New Roman
Font Size: 14 point

By:_____
**DAVID T. EMORY**

14

# CERTIFICATE OF SERVICE

I hereby certify that on the ___th day of September 2015, a true and correct copy of the foregoing Petition, including Appendix and hyperlinked materials, is served on Real Parties in Interest through counsel of record and no Respondent as described below:

Via e-mail and e-service:
*Pamela R. Julian*
Law Office of Pamela R. Julian
2420 McCullough Ave., No. 122
San Antonio, Texas 78212


*Attorney for Real Party in Interest*
*Stephanie Markell*

Via U.S. Mail, Certified, RRR:
Hon. Karen Pozza
407th Judicial District Court
Bexar County Courthouse
100 Dolorosa, 4th Floor
San Antonio, Texas 78205


*Respondent*

No. _____

# IN THE COURT OF APPEALS
# FOR THE FOURTH DISTRICT OF TEXAS
# AT SAN ANTONIO

**IN RE JAMES DAVID HENRY,**

*Relator.*

Original Proceeding from 2011-CI-11645
Pending in the 150th Judicial District Court, Bexar County, Texas
The Honorable Karen Pozza, Presiding

## APPENDIX TO PETITION FOR WRIT OF MANDAMUS

Tab

Trial Court Pleadings (MR:1)........................................................................ A

    1.    Original Petition to Adjudicate Parentage (MR:2-12)

    2.    Order Adjudicating Parentage (MR:13-16)

    3.    Motion to Transfer With Notice of Setting,
        Petition for Further Relief, And
        Modify Parent-Child Relationship (MR:17-40)

    4.    Motion and Order Setting Motion to Transfer (MR:41-42)

    5.    Motion and Order to Set on the Non-Jury Docket for
        Temporary Orders (MR:43-44)

Appendix

6. Citation/Return (MR:45-47)

      7. Counter-Motion to Modify Prior Order (MR:48-53)

      8. Judge's Notes (MR:54-55 )

      9. Order Denying Change of Venue (MR:56-57)

Reporter's Record of September 16, 2015 (Motion to Transfer With Notice of Setting, Petition for Further Relief, And Modify Parent-Child Relationship) (MR:58-144)........................................ B

Case Law & Texas Statutes…….................................................................C

# Tab A

19

MR 000001

**STATE OF TEXAS**                                    §
                                                      §
**BEXAR COUNTY**

## VERIFICATION

Before me, the undersigned notary, on this day personally appeared David T. Emory, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.      "My name is David T. Emory. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts in this affidavit are within my personal knowledge and are true and correct.

2.      I am the attorney for relator. All of the documents included with the petition for writ of mandamus are true copies."

_____
David T. Emory

Sworn to and subscribed before me by David T. Emory on September 28, 2015.

_____

SUSI BOSS
MY COMMISSION EXPIRES
August 3, 2019

Notary Public in and for
The State of Texas

My commission expires:  8-3-2019

2011-CI-11645
150TH JUDICIAL DISTRICT COURT
INT OF BRYCE A SCHOCH VS
DATE FILED: 07/18/2011



| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE SCHOCH | § | 150TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

C R T
PROCESS DEPT

## ORIGINAL PETITION TO ADJUDICATE PARENTAGE

*1.    Discovery Level*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

*2.    Objection to Assignment of Case to Associate Judge*

Petitioner objects to the assignment of this matter to an associate judge for a trial on the merits.

*3.    Petitioner*

This suit is brought by James David Henry, Petitioner. Petitioner is a man whose paternity of the child is to be adjudicated.

The last three numbers of Petitioner's driver's license number are 327. The last three numbers of Petitioner's Social Security number are 410.

*4.    Jurisdiction*

This Court has acquired and retains continuing, exclusive jurisdiction of this suit and of the child who is the subject of this suit as a result of prior proceedings.

*5.    Child*

The following child is the subject of this suit:

Name:  Bryce Allen Schoch
Sex:  male
Birth date:  January 21, 2002

Case Number: 2011CI11645                    Document Type: ORIGINAL PETITION TO ADJUDICATE PARENTAGE

MR 000002

The child, Bryce Allen Schoch, has no current presumed, acknowledged, or adjudicated father.

6. *Persons Entitled to Citation*

The mother of the child the subject of this suit is Stephanie Suzanne Markell, f/k/a Stephanie Suzanne Martin.

No service upon Stephanie Suzanne Markell is necessary at this time.

There are no court-ordered conservatorships, court-ordered guardianships, or other court-ordered relationships affecting the child the subject of this suit.

7. *Property*

No property of consequence is owned or possessed by the child the subject of this suit.

8. *Purpose of Suit*

The purpose of this suit is to establish the parent-child relationship between James David Henry and the child the subject of this suit.

9. *Genetic Testing*

Before this suit was filed, genetic testing was done with the consent of the mother and of Petitioner. The results of this genetic test indicate that there is a 99.999% probability that Petitioner is the biological father of the child. A true and correct copy of the results of this genetic test are attached hereto as Exhibit A and incorporated herein for all purposes.

10. *Name of Child*

Good cause exists to change the name of the child known as Bryce Allen Schoch, and Petitioner requests that the child's name be changed to Bryce Allen Henry.

11. *Amendment of Birth Certificate*

Petitioner requests that the Court order the Bureau of Vital Statistics to amend the birth

MR 000003

certificate of Bryce Allen Schoch by adding James David Henry as the father of the child and

changing the child's name as specified above.

12. *Prayer*

Petitioner prays that citation and notice issue as required by law.

Petitioner prays for an order adjudicating parentage, that the court enter a final order declaring that Petitioner is the biological father of the child, and that the child's name be ordered changed as requested above.

Petitioner prays for general relief.

Fletcher Law Offices, P.C.
6 Desta Drive
Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Brad Miller
State Bar No. 14106300
Kelly A. Stapler
State Bar No. 24072363
Attorneys for Petitioner

MR 000004



# EXHIBIT A

MR 000005



# CHROMOSOMAL LABORATORIES, INC.

For Report Consultation Please Contact:
CRS Diagnostic Services
6000 E. University, Ste. 4
Odessa, TX 79762
432-367-8260

Logged 2/25/2011
Case No. PL11-02395

## Paternity Report - Legal Test

| No. | Name | Relationship | Race/Ethnicity | Collected |
|---|---|---|---|---|
| 11-09473 | Stephanie Suzanne Markell | Mother | Caucasian | 2/24/2011 |
| 11-09474 | Bryce Allen Schoch | Child | • | 2/24/2011 |
| 11-09475 | James David Henry | Alleged Father | Caucasian | 2/24/2011 |

| Genetic Marker | 11-09473 | | 11-09474 | | 11-09475 | | Paternity Index |
|---|---|---|---|---|---|---|---|
| | Allele A | Allele B | Allele A | Allele B | Allele A | Allele B | |
| D8S1179 | 14 | 16 | 13 | 16 | 10 | 13 | 1.47 |
| D21S11 | 29 | | 29 | 30 | 30 | | 4.27 |
| D7S820 | 9 | 10 | 9 | | 7 | 9 | 3.34 |
| CSF1PO | 10 | 11 | 11 | 13 | 12 | 13 | 6.78 |
| D3S1358 | 15 | 17 | 15 | 16 | 16 | 17 | 2.14 |
| TH01 | 6 | 9 | 6 | | 6 | 7 | 2.19 |
| D13S317 | 9 | 11 | 11 | | 9 | 11 | 1.56 |
| D16S539 | 10 | 12 | 10 | 12 | 11 | 12 | 1.22 |
| D2S1338 | 20 | 23 | 23 | | 23 | | 7.26 |
| D19S433 | 14 | 15.2 | 15.2 | 16 | 14 | 16 | 10.9 |
| vWA | 15 | 19 | 15 | 19 | 15 | 19 | 4.97 |
| TPOX | 8 | 11 | 8 | | 8 | 11 | 0.917 |
| D18S51 | 12 | 15 | 12 | 21 | 15 | 21 | 36.5 |
| AMEL | X | | X | Y | X | Y | 1 |
| D5S818 | 11 | 12 | 12 | | 12 | 13 | 1.41 |
| FGA | 19 | 20 | 19 | 20 | 19 | 22 | 2.43 |
| Combined Paternity Index | | | | | | 60,320,000 | |
| Probability | | | | | | >99.999% | |

The results indicate that the alleged father cannot be excluded as the biological father of the child. The reported probability of Paternity, as compared to an unrelated, untested man of the same race, is calculated assuming a prior probability of 0.5.

Chromosomal Laboratories, Inc. is an American Association of Blood Banks (AABB) Accredited Relationship Testing Facility.

Vince Miller, Ph.D. - Vice President & Chief Technical Officer
Gidget Hudson, Ph.D., Ed Kot, Ph.D. - Assistant Paternity Laboratory Director

Page 1 of 2

OFFICIAL SEAL
Sasha Taniguchi
Notary Public - Arizona
Maricopa County
My Commission Expires 3/28/2014

STATE OF ARIZONA
COUNTY OF MARICOPA
Sworn to before me          3/ 1 /2011

Notary Public

1825 W. Crest Lane • Phoenix AZ 85027 • 623.434.0202 Fax 623.321.4118 • www.chromosomallabs.com

MR 000006

The following warning is required by the IRS whenever tax advice is given. If this email contains no direct or indirect tax advice, the warning is not applicable. As a result of perceived abuses, the Treasury has recently promulgated Regulations for practice before the IRS. These Circular 230 regulations require all attorneys, enrolled agents and accountants to provide extensive disclosure when providing certain written tax communications to clients. In order to comply with our obligations under these Regulations, we would like to inform you that since this document does not contain all of such disclosures, you may not rely on any tax advice contained in this document to avoid tax penalties.

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



# EXHIBIT A

MR 000009



# CHROMOSOMAL LABORATORIES, INC.

For Report Consultation Please Contact:
CRS Diagnostic Services
5000 E. University, Ste. 4
Odessa, TX 79762
432-367-8260

## Paternity Report - Legal Test

| No. | Name | Relationship | Race/Ethnicity | Collected |
|---|---|---|---|---|
| 11-09473 | Stephanie Suzanne Markell | Mother | Caucasian | 2/24/2011 |
| 11-09474 | Bryce Allen Schoch | Child | | 2/24/2011 |
| 11-09475 | James David Henry | Alleged Father | Caucasian | 2/24/2011 |

| Genetic Marker | 11-09473 | | 11-09474 | | 11-09475 | | Paternity Index |
|---|---|---|---|---|---|---|---|
| | Allele A | Allele B | Allele A | Allele B | Allele A | Allele B | |
| D8S1179 | 14 | 16 | 13 | 16 | 10 | 13 | 1.47 |
| D21S11 | 28 | | 29 | 30 | 30 | | 4.27 |
| D7S820 | 9 | 10 | 9 | | 7 | 9 | 3.34 |
| CSF1PO | 10 | 11 | 11 | 13 | 12 | 13 | 6.76 |
| D3S1358 | 15 | 17 | 15 | 16 | 16 | 17 | 2.14 |
| TH01 | 6 | 9 | 6 | | 6 | 7 | 2.19 |
| D13S317 | 9 | 11 | 11 | | 9 | 11 | 1.56 |
| D16S539 | 10 | 12 | 10 | 12 | 11 | 12 | 1.22 |
| D2S1338 | 20 | 23 | 23 | | 23 | | 7.26 |
| D19S433 | 14 | 15.2 | 15.2 | 16 | 14 | 16 | 10.9 |
| vWA | 15 | 19 | 15 | 19 | 15 | 19 | 4.97 |
| TPOX | 8 | 11 | 8 | | 8 | 11 | 0.917 |
| D18S51 | 12 | 16 | 12 | 21 | 16 | 21 | 36.5 |
| AMEL | X | | X | Y | X | Y | 1 |
| D5S818 | 11 | 12 | 12 | | 12 | 13 | 1.41 |
| FGA | 19 | 20 | 19 | 20 | 19 | 22 | 2.43 |
| Combined Paternity Index | | | | | | | 60,320,000 |
| Probability | | | | | | | >99.999% |

The results indicate that the alleged father cannot be excluded as the biological father of the child. The reported probability of Paternity, as compared to an unrelated, untested man of the same race, is calculated assuming a prior probability of 0.5.

Chromosomal Laboratories, Inc. is an American Association of Blood Banks (AABB) Accredited Relationship Testing Facility.

Vince Miller, Ph.D. - Vice President & Chief Technical Officer
Gidget Hudson, Ph.D., Ed Kot, Ph.D. - Assistant Paternity Laboratory Director

STATE OF ARIZONA
COUNTY OF MARICOPA

Sworn to before me     3/ 1 /2011

Notary Public

1825 W. Crest Lane • Phoenix AZ 85027 • 623-434-0202 fax 623-434-5115 www.chromosomallabs.com

Case Number: 2011CI01645    Document Type: ORIGINAL PETITION TO ADJUDICATE PARENTAGE

MR 000010

The following warning is required by the IRS whenever tax advice is given. If this email contains no direct or indirect tax advice, the warning is not applicable. As a result of perceived abuses, the Treasury has recently promulgated Regulations for practice before the IRS. These Circular 230 regulations require all attorneys, enrolled agents and accountants to provide extensive disclosure when providing certain written tax communications to clients. In order to comply with our obligations under these Regulations, we would like to inform you that since this document does not contain all of such disclosures, you may not rely on any tax advice contained in this document to avoid tax penalties.

MR 000011

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By: _____

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



Case Number: 2011CI11648    Document Type: ORIGINAL PETITION TO ADJUDICATE PARENTAGE

MR 000012



2011CI11645 -D150

## CAUSE NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE SCHOCH | § | 150TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ADJUDICATING PARENTAGE

On **AUG 1 9 2011**, the Court heard this case.

*Appearances*

Petitioner, James David Henry, appeared in person and through attorney of record, Richard R. Fletcher, and announced ready for trial.

Respondent, Stephanie Markell, f/k/a Stephanie Martin, has made a general appearance and has agreed to the terms of this order, as evidenced by the signature of Respondent below.

*Jurisdiction*

The Court, after examining the record and hearing the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All questions of fact and of law were submitted to the Court. All persons entitled to citation were properly cited.

*Record*

The record of testimony was duly reported by the court reporter for the 150th Judicial District Court.

*Child*

The Court finds that the following child is the subject of this suit:

Name: Bryce Allen Schoch
Sex: Male
Birth date: January 21, 2002
Home state: Texas

*Parentage Findings*

The Court finds that the results of genetic testing show James David Henry to be the biological father of Bryce Allen Schoch.

*Adjudication of Parentage*

IT IS ORDERED that James David Henry is, and he is adjudicated to be, the father of Bryce Allen Schoch, born on January 21, 2002 to Stephanie Markell, f/k/a Stephanie Martin, and that the parent-child relationship between the father and the child is established for all purposes.

*Name of Child*

IT IS ORDERED that the child formerly known as Bryce Allen Schoch shall hereafter be named Bryce Allen Henry. The court finds that the change of the child's name is in the best interest of the child.

*Amendment of Birth Certificate*

IT IS ORDERED that the Bureau of Vital Statistics shall amend the birth record of the child formerly known as Bryce Allen Schoch, by adding James David Henry, identified as the father by this order as the father of the child and changing the child's name as specified above.

*Attorney's Fees*

IT IS ORDERED that attorney's fees are to be borne by the party who incurred them.

*Costs*

IT IS ORDERED that costs of court are to be borne by the party who incurred them, for which let no execution issue.

*Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

*Date of Order*

**AUG 19 2011**

SIGNED on _____,

JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

Fletcher Law Offices, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Brad Miller
State Bar No. 14106300
Kelly A. Stapler
State Bar No. 24072363
ATTORNEYS FOR PETITIONER

APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____
James David Henry, Petitioner

_____
Stephanie Markell, Respondent

Case Number: 2011CI11645                   Document Type: ORDER ADJUDICATING PARENTAGE

MR 000015

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

ENTERED / CASHIER



NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## MOTION TO TRANSFER WITH NOTICE OF SETTING, PETITION FOR FURTHER RELIEF, AND MODIFY PARENT-CHILD RELATIONSHIP

I.

### Motion to Transfer

This Motion to Transfer is brought by JAMES DAVID HENRY, Petitioner, who requests transfer of this proceeding.

1. *Jurisdiction*

This Court has acquired and retains continuing, exclusive jurisdiction of this suit and of the child the subject of this suit as a result of a prior Order Adjudicating Parentage in the above referenced style and cause number.

2. *Grounds for Transfer*

The principal residence of the child is in Midland County, Texas, and has been in that county during the three years and at least a six-month period preceding the commencement of this suit. Venue is proper in Midland County, Texas.

1

DOCUMENT SCANNED AS FILED    MR 000017

3.        *Authorities*

**§ 155.201. Mandatory Transfer**
   (a).......
   (b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155. 204, transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer. *(emphasis added)*
   (c).....

Added by Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995. Amended by Acts 1999, 76th Leg., ch. 1195, § 1, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 916, § 14, eff. June 18, 2005.

In a suit to modify the parent-child relationship, the trial court has a mandatory statutory ministerial duty to transfer the suit to a county where the child has lived for six months or longer, and, when the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate. V.T.C.A., Family Code § 155.201, *In re Leyva*, 333 S.W.3d 315 (Tex. App.—San Antonio 2010, orig. proceeding).

4.    *Relief Requested on Petitioner's Motion to Transfer*

JAMES DAVID HENRY prays that notice be issued as required by law. JAMES DAVID HENRY prays that the Court order the transfer of this proceeding in accordance with the allegations of this motion.

II.

**PETITION FOR FURTHER RELIEF,
MODIFY PARENT-CHILD RELATIONSHIP**

5.    *Discovery Level*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

2

DOCUMENT SCANNED AS FILED     MR 000018

6. *Parties and Order to Be Modified*

This suit for further relief and modification of a prior order is brought by JAMES DAVID HENRY, Petitioner. The last three numbers of JAMES DAVID HENRY's driver's license number are XXX327. The last three numbers of JAMES DAVID HENRY's Social Security number are XXX410. Petitioner is the adjudicated father of the child and has standing to bring this suit. The requested further relief and modification will be in the best interest of the child.

Respondent is STEPHANIE MARKELL.

The order to be modified is entitled Order Adjudicating Parentage and was rendered on August 19, 2011 and found in volume 3729 page 0922- 0924 of the Bexar County District Court Records.

7. *Jurisdiction*

This Court has continuing, exclusive jurisdiction of this suit.

8. *Child*

The following child is the subject of this suit:

Name: BRYCE ALLEN HENRY
Sex: Male
Birth date: January 21, 2002
County of residence: Midland

9. *Parties Affected*

The following parties may be affected by this suit:

Name: STEPHANIE MARKELL

Relationship: mother

Process should be served at 3515 Canyon Parkway, Apt. 11104, San Antonio, Texas 78259.

3

DOCUMENT SCANNED AS FILED      MR 000019

10.  *Health Insurance Information*

Information required by section 154.181(b) of the Texas Family Code will be provided.

11.  *Child's Property*

There has been no change of consequence in the status of the child's property since the prior order was rendered.

12.  *Conservatorship, Possession and Access*

STEPHANIE MARKELL has voluntarily relinquished the actual care, control, and possession of the child . JAMES DAVID HENRY has physical custody of the child for at least six months.

The parents of the child are separated. The appointment of the parents as joint managing conservators would be in the best interest of the child. It is in the best interest of the child that JAMES DAVID HENRY, Petitioner and STEPHANIE MARKELL, Respondent be appointed joint managing conservators of the child.

JAMES DAVID HENRY, Petitioner should be designated as the conservator who has the exclusive right to designate the primary residence of the child.

13.  *Support*

STEPHANIE MARKELL, Respondent, is obligated to support the child and should be ordered by the Court to make payments for the support of the child and to provide medical child support in the manner specified by the Court.

14.  *Request for Temporary Orders*

JAMES DAVID HENRY, Petitioner requests the Court, after notice and hearing, to make temporary orders for the safety and welfare of the child, including but not limited to the following:

4

DOCUMENT SCANNED AS FILED    MR 000020

Appointing JAMES DAVID HENRY, Petitioner and STEPHANIE MARKEL HENRY, Respondent, temporary joint managing conservators, and designating Petitioner as the conservator who has the exclusive right to designate the primary residence of the child.

Ordering Respondent to pay child support while this case is pending.

Denying Respondent access to the child or, alternatively, rendering a possession order.

15.  *Request for Temporary Orders and Injunction*

Petitioner requests the Court to dispense with the necessity of a bond, and Petitioner requests that, after notice and hearing, Respondent be further restrained and enjoined, pending the further order of the Court, from:

Disturbing the child or Petitioner or interfering in any way with Petitioner's possession of the child by taking or attempting to take possession of the child, directly or through any other person, from the residence, school, or any other place.

Withdrawing the child from enrollment in the school or day-care facility where the child is presently enrolled.

Hiding or secreting the child from Petitioner.

Making disparaging remarks regarding Petitioner or Petitioner's family in the presence or within the hearing of the child.

Consuming alcohol within the 12 hours before or during the period of possession of or access to the child.

Canceling, altering, failing to pay premiums, or in any manner affecting the present level of coverage of any health insurance policy insuring the child.

16.  *Request for Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Petitioner to secure the services of DAVID T. EMORY and CHARLES E. HARDY, a licensed attorney, to preserve and protect the child's rights. Respondent should be ordered to pay reasonable attorney's fees, expenses, and costs through trial and appeal, and a judgment should be rendered in favor of this attorney and against Respondent

5

DOCUMENT SCANNED AS FILED   MR 000021

and be ordered paid directly to Petitioner's attorney, who may enforce the judgment in the attorney's own name. Petitioner requests postjudgment interest as allowed by law.

17.   *Prayer*

Petitioner prays that citation and notice issue as required by law and that the Court enter its orders in accordance with the allegations contained in this petition.

Petitioner prays that the Court, after notice and hearing, grant a temporary injunction enjoining Respondent, in conformity with the allegations of this petition, from the acts set forth above while this case is pending.

Petitioner prays for attorney's fees, expenses, costs, and interest as requested above.

Petitioner prays for general relief.

The Court is requested to set the child support order to provide that JAMES DAVID HENRY shall have the right to receive and give receipt for payments of support for the child and to hold or disburse money for the benefit of the child.

Respectfully submitted,

**HIGDON, HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By:

DAVID T. EMORY
State Bar No. 06612100
davidemory@hhzlaw.com
Attorney for Petitioner

6

DOCUMENT SCANNED AS FILED          MR 000022

HIGDON, HARDY & ZUFLACHT, P.C.
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By: _____
CHARLES E. HARDY
State Bar No. 08985550
CharlesHardy@hhzlaw.com
Attorney for Petitioner

7

DOCUMENT SCANNED AS FILED

MR 000023

CAUSE NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | ' IN THE DISTRICT COURT |
| | § | |
| BRYCE SCHOCH | § | 150TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ADJUDICATING PARENTAGE

On <u>AUG 1 9 2011</u>, the Court heard this case.

*Appearances*

Petitioner, James David Henry, appeared in person and through attorney of record, Richard R. Fletcher, and announced ready for trial.

Respondent, Stephanie Markell, f/k/a Stephanie Martin, has made a general appearance and has agreed to the terms of this order, as evidenced by the signature of Respondent below.

*Jurisdiction*

The Court, after examining the record and hearing the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All questions of fact and of law were submitted to the Court. All persons entitled to citation were properly cited.

*Record*

The record of testimony was duly reported by the court reporter for the 150th Judicial District Court.

*Child*

The Court finds that the following child is the subject of this suit:

Name: Bryce Allen Schoch
Sex: Male
Birth date: January 21, 2002
Home state: Texas

Case Number: 2011CI11645            Document Type: MOTION TO TRANSFER, MOTION TO MODIFY Page 8 of R4

DOCUMENT SCANNED AS FILED    MR 000024

*Parentage Findings*

The Court finds that the results of genetic testing show James David Henry to be the biological father of Bryce Allen Schoch.

*Adjudication of Parentage*

IT IS ORDERED that James David Henry is, and he is adjudicated to be, the father of Bryce Allen Schoch, born on January 21, 2002 to Stephanie Markell, f/k/a Stephanie Martin, and that the parent-child relationship between the father and the child is established for all purposes.

*Name of Child*

IT IS ORDERED that the child formerly known as Bryce Allen Schoch shall hereafter be named Bryce Allen Henry. The court finds that the change of the child's name is in the best interest of the child.

*Amendment of Birth Certificate*

IT IS ORDERED that the Bureau of Vital Statistics shall amend the birth record of the child formerly known as Bryce Allen Schoch, by adding James David Henry, identified as the father by this order as the father of the child and changing the child's name as specified above.

*Attorney's Fees*

IT IS ORDERED that attorney's fees are to be borne by the party who incurred them.

*Costs*

IT IS ORDERED that costs of court are to be borne by the party who incurred them, for which let no execution issue.

Case Number: 2011-CI-11845          Document Type: ORDER

Page 2 of 4

DOCUMENT SCANNED AS FILED          MR 000025

, *Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

*Date of Order*

AUG 1 9 2011

SIGNED on _____

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

Fletcher Law Offices, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Brad Miller
State Bar No. 14106300
Kelly A. Stapler
State Bar No. 24072363
ATTORNEYS FOR PETITIONER

APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____
James David Henry, Petitioner

_____
Stephanie Markell, Respondent

Case Number: 2011-CI-11645          Document Type: ORDER

Page 3 of 4

Case Number: 2011CI11645          Document Type: MOTION TO TRANSFER, MOTION TO MODIFY ORDER          Page 3 of 4

DOCUMENT SCANNED AS FILED     MR 000026

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*July 03, 2012*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By:

Tony Ozuna, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

DOCUMENT SCANNED AS FILED          MR 000027

NO. _____

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 45TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT OF JAMES D. HENRY

Before me, the undersigned notary, on this day personally appeared James D. Henry, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

"My name is James D. Henry. I am above the age of eighteen years, of sound mind, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

"I have had actual care, custody and control of Bryce Henry in Midland, Texas since on or about April 10, 2012 (pursuant to a Temporary Order from a Bexar County Court*). Bryce has resided with me at 4005 Cardinal Lane Midland, Texas 79707 from on or about April 10, 2012 until on or about August 20, 2015, at which time Stephanie Markell obtained him in the middle of the night in Tarrant County Texas without notice. (At the time, I was in the process of moving to Flower Mound, Texas.)

"Bryce Henry attended the Midland Christian School in Midland Texas for the last three years. Bryce Henry has attended and participated football, basketball, and track at Midland Christian School while he was living in Midland Texas. The primary residence of Bryce Henry since 2012 has been in Midland County, Texas.

*The Temporary Orders were in a case that was dismissed for want of prosecution. I only recently learned that the case had been dismissed.

JAMES D. HENRY

SIGNED under oath before me on September 4, 2015.

Notary Public, State of Texas

DEBORAH V. ORTEGA
MY COMMISSION EXPIRES
May 1, 2017

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



MR 000030

CAUSE NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE SCHOCH | § | 150TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ADJUDICATING PARENTAGE

On _____ **AUG 1 9 2011** _____, the Court heard this case.

*Appearances*

Petitioner, James David Henry, appeared in person and through attorney of record, Richard R. Fletcher, and announced ready for trial.

Respondent, Stephanie Markell, f/k/a Stephanie Martin, has made a general appearance and has agreed to the terms of this order, as evidenced by the signature of Respondent below.

*Jurisdiction*

The Court, after examining the record and hearing the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All questions of fact and of law were submitted to the Court. All persons entitled to citation were properly cited.

*Record*

The record of testimony was duly reported by the court reporter for the 150th Judicial District Court.

*Child*

The Court finds that the following child is the subject of this suit:

Name: Bryce Allen Schoch
Sex: Male
Birth date: January 21, 2002
Home state: Texas

Case Number: 2011-CI-11645       Document Type: ORDER

Page 1 of 4

DOCUMENT SCANNED AS FILED    MR 000031

*Parentage Findings*

The Court finds that the results of genetic testing show James David Henry to be the biological father of Bryce Allen Schoch.

*Adjudication of Parentage*

IT IS ORDERED that James David Henry is, and he is adjudicated to be, the father of Bryce Allen Schoch, born on January 21, 2002 to Stephanie Markell, f/k/a Stephanie Martin, and that the parent-child relationship between the father and the child is established for all purposes.

*Name of Child*

IT IS ORDERED that the child formerly known as Bryce Allen Schoch shall hereafter be named Bryce Allen Henry. The court finds that the change of the child's name is in the best interest of the child.

*Amendment of Birth Certificate*

IT IS ORDERED that the Bureau of Vital Statistics shall amend the birth record of the child formerly known as Bryce Allen Schoch, by adding James David Henry, identified as the father by this order as the father of the child and changing the child's name as specified above.

*Attorney's Fees*

IT IS ORDERED that attorney's fees are to be borne by the party who incurred them.

*Costs*

IT IS ORDERED that costs of court are to be borne by the party who incurred them, for which let no execution issue.

DOCUMENT SCANNED AS FILED          MR 000032

· *Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

*Date of Order*

AUG 1 9 2011

SIGNED on _____

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

Fletcher Law Offices, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Brad Miller
State Bar No. 14106300
Kelly A. Stapler
State Bar No. 24072363
ATTORNEYS FOR PETITIONER

APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____
James David Henry, Petitioner

_____
Stephanie Markell, Respondent

Case Number: 2011-CI-11645          Document Type: ORDER

Page 3 of 4

Case Number: 2011CI11645          Document Type: MOTION TO TRANSFER, MOTION TO MODIFY Page 3 of 4

CERTIFIED COPY CERTIFICATE STATE OF TEXAS.
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*July 03, 2012*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By:

Tony Ozuna, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERK'S ORIGINAL SIGNATURE.)*

NO. _____

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 45TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT OF JAMES D. HENRY

Before me, the undersigned notary, on this day personally appeared James D. Henry, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

"My name is James D. Henry. I am above the age of eighteen years, of sound mind, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

"I have had actual care, custody and control of Bryce Henry in Midland, Texas since on or about April 10, 2012 (pursuant to a Temporary Order from a Bexar County Court*). Bryce has resided with me at 4005 Cardinal Lane Midland, Texas 79707 from on or about April 10, 2012 until on or about August 20, 2015, at which time Stephanie Markell obtained him in the middle of the night in Tarrant County Texas without notice. (At the time, I was in the process of moving to Flower Mound, Texas.)

"Bryce Henry attended the Midland Christian School in Midland Texas for the last three years. Bryce Henry has attended and participated football, basketball, and track at Midland Christian School while he was living in Midland Texas. The primary residence of Bryce Henry since 2012 has been in Midland County, Texas.

*The Temporary Orders were in a case that was dismissed for want of prosecution. I only recently learned that the case had been dismissed.

DOCUMENT SCANNED AS FILED   MR 000035

JAMES D. HENRY

SIGNED under oath before me on September 4, 2015.



Notary Public, State of Texas

DEBORAH V. ORTEGA
MY COMMISSION EXPIRES
May 1, 2017

DOCUMENT SCANNED AS FILED    MR 000036

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

NO. _____

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| BRYCE ALLEN HENRY | § | 45TH JUDICIAL DISTRICT |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT OF JAMES D. HENRY

Before me, the undersigned notary, on this day personally appeared James D. Henry, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

"My name is James D. Henry. I am above the age of eighteen years, of sound mind, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

"I have had actual care, custody and control of Bryce Henry in Midland, Texas since on or about April 10, 2012 (pursuant to a Temporary Order from a Bexar County Court*). Bryce has resided with me at 4005 Cardinal Lane Midland, Texas 79707 from on or about April 10, 2012 until on or about August 20, 2015, at which time Stephanie Markell obtained him in the middle of the night in Tarrant County Texas without notice. (At the time, I was in the process of moving to Flower Mound, Texas.)

"Bryce Henry attended the Midland Christian School in Midland Texas for the last three years. Bryce Henry has attended and participated football, basketball, and track at Midland Christian School while he was living in Midland Texas. The primary residence of Bryce Henry since 2012 has been in Midland County, Texas.

*The Temporary Orders were in a case that was dismissed for want of prosecution. I only recently learned that the case had been dismissed.

DOCUMENT SCANNED AS FILED

MR 000038



JAMES D. HENRY

SIGNED under oath before me on September 4, 2015.



Notary Public, State of Texas

DEBORAH V. ORTEGA
MY COMMISSION EXPIRES
May 1, 2017

DOCUMENT SCANNED AS FILED

MR 000039

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY, WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By: _____

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

Case Number: 2011CI11845          Document Type: MOTION TO TRANSFER, MOTION TO MODIFY

MR 000040

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

## NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## MOTION TO SET MOTION TO TRANSFER

This Motion to Set Motion to Transfer is brought by JAMES DAVID HENRY, Petitioner, who shows in support:

1. Petitioner hereby requests that the above-entitled and numbered cause be set for trial on the Motion to Transfer on September 16, 2015 at 9:00 a.m.

2. Petitioner prays that the Court grant this Motion to Set Motion to Transfer.

Respectfully submitted,

**HIGDON, HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By:_____
**DAVID T. EMORY**
State Bar No. 06612100
davidemory@hhzlaw.com
Attorney for Petitioner

### Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on September 4, 2015.

_____
**DAVID T. EMORY**
Attorney for Petitioner

FILED
DONNA KAY McKINNEY
DISTRICT CLERK
BEXAR COUNTY
2015 SEP -4 PM 4: 10
BY_____ DEPUTY

MR 000041

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER SETTING MOTION TO TRANSFER

On this day, the Court considered Petitioner's Motion to Transfer.

Petitioner hereby requests that the above-entitled and numbered cause be set for hearing

for the Motion to Transfer on September 16, 2015 at 9:00 a.m. *And Orders Respondent Stephanie Mitchell To Appear at the presiding District ct Bx cty court house Room 109 100*
IT IS HEREBY ORDERED that the Motion to Transfer is Set on September 16, 2015 at *Dolozura Street San Antonio TX 78203*
9:00 a.m.

SIGNED on _____ *9-4-15* _____.

_____ SOL CASSEB III
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

**HIGDON, HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By: _____
**DAVID T. EMORY**
Attorney for Petitioner
State Bar No. 06612100
davidemory@hhzlaw.com

MR 000042

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

## NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## MOTION TO SET ON THE NON-JURY DOCKET FOR TEMPORARY ORDER

This Motion to Set on the Non-Jury Docket for Temporary Orders is brought by JAMES DAVID HENRY, Petitioner, who shows in support:

1.    Petitioner hereby requests that the above-entitled and numbered cause be set for trial on the Non-Jury Docket for Temporary Orders on September 16, 2015 at 9:00 a.m.

2.    Petitioner prays that the Court grant this Motion to Set on the Non-Jury Docket for Temporary Orders.

Respectfully submitted,

**HIGDON, HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By: _____
DAVID T. EMORY
State Bar No. 06612100
davidemory@hhzlaw.com
Attorney for Petitioner

FILED
DONNA KAY McKINNEY
DISTRICT CLERK
BEXAR COUNTY
2015 SEP -4 PM 4: 10
DEPUTY
BY

### Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on September 4, 2015.

_____
DAVID T. EMORY
Attorney for Petitioner

MR 000043

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

NO. 2011-CI-11645

| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER SETTING CAUSE TO NON-JURY TRIAL DOCKET FOR TEMPORARY ORDERS

On this day, the Court considered Petitioner's Motion to Set on the Non-Jury Docket for

Temporary Orders.

Petitioner hereby requests that the above-entitled and numbered cause be set for trial on

the Non-Jury Docket for Temporary Orders is September 16, 2015 at 9:00 p.m. *And Orders Stephanie Maxwell, Respondent To Appear at the presiding District court, Room 109, Bexar County Courthouse, 100 Dolorosa, San Antonio TX 78205*

IT IS HEREBY ORDERED that the above cause be set on the Non-Jury Docket for

Temporary Orders on September 16, 2015 at 9:00 a.m.

SIGNED on _____ 7- 4- 15 _____.

SOL CASSEB III

JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

**HIGDON, HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933
Fax: (210) 349-9988

By: _____
**DAVID T. EMORY**
Attorney for Petitioner
State Bar No. 06612100
davidemory@hhzlaw.com

MR 000044

PRIVATE PROCESS                Case Number: 2011-CI-11645
INT OF BRYCE A SCHOCH      DONNA KAY McKINNEY
VS.                            DISTRICT CLERK
                               BEXAR COUNTY

15 SEP -8 AM II: 17
(Note:Attached Document May Contain Additional Litigants.)

                    DEPUTY        CITATION

"THE STATE OF TEXAS"
                    BY _____
Directed To: STEPHANIE MARKELL

IN THE DISTRICT COURT
150th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

2011CI11645 S00003

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the 4th day of September, 2015.

ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 4TH DAY OF SEPTEMBER A.D., 2015.

MOTION TO MODIFY/CUSTODY
MOTION TO TRANSFER WITH NOTICE OF SETTING, PETITION FOR FURTHER RELIEF

DAVID TOWNSEND EMORY
ATTORNEY FOR PETITIONER
12000 HUEBNER RD 200
SAN ANTONIO, TX 78230-1213



Donna Kay McKinney
Bexar County District Clerk
101 W. Nueva, Suite 217
San Antonio, Texas 78205

By: *Xavier Duran*, Deputy

OFFICER'S RETURN

I received this citation on 9-5-15 at 900 o'clock AM. and:( )executed it by delivering a copy of the citation with the date of delivery endorsed on it to the defendant, Stephanie Markell in person on the 9-5-15 at 930 o'clock AM. at: 8515 Canyon Pkwy #1104 SA or ( ) not executed because N/A Fees: Badge/PPS #:

Date certification expires:

JOEY HURT
SCH 658
EXP. 07-31-17

_____ County, Texas

OR: VERIFICATION OF RETURN (If not served by a peace officer) SWORN TO this

Sept 16 2015

T DAVID
Notary Public State of Texas
My Commission Expires
JUNE 04 201  NOTARY PUBLIC, STATE OF TEXAS

OR: My name is _____, my date of birth is _____, and my address is _____, _____ (County). I declare under penalty of perjury that the foregoing is true and correct. Executed in _____ County, State of Texas, on the _____ day of _____, 20_____.

_____
Declarant                    RETURN TO COURT (DK002)

MR 000045

PRIVATE PROCESS

"The State of Texas" NO. 2011-CI-11646

FILED
DONNA KAY MCKINNEY
DISTRICT CLERK
BEXAR COUNTY

15 SEP -8 AM 11:17

_____ DEPUTY

INT OF BRYCE A SCHOOL
Plaintiff
Vs.
_____
Defendant
Notice Directed to: STEPHANIE MARKELL

BY _____

IN THE DISTRICT COURT

150th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

YOU ARE HEREBY NOTIFIED TO APPEAR before the __PRESIDING__ Judicial District Court, in and for Bexar County, Texas, at the Courthouse in San Antonio, Texas, on __16th__ day of __September__, __2015__, at __9:00__ o'clock, __A__.M., in room __109__, then and there to answer to said application and accompanying orders attached hereto.

This Notice may be served by any Peace Officer of the State of Texas. Said officer shall herein fail not, but make due return hereof as the law requires.

WITNESS, DONNA KAY MCKINNEY, CLERK OF THE DISTRICT COURTS OF BEXAR COUNTY, TEXAS, ISSUED AND GIVEN UNDER MY HAND AND SEAL OF SAID COURT AT OFFICE IN THE CITY OF SAN ANTONIO, TEXAS THIS __4th__ DAY OF __September__, __2015__.

DAVID TOWNSEND EMORY
Attorney/ PETITIONER
address
12000 HUEBNER RD 200
SAN ANTONIO, TX 78230-1213

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By: _____ Deputy
XAVIER DURAN

MOTION TO
SET ON THE NON-JURY DOCKET FOR TEMPORARY ORDER/ORDER SETTING CAUSE TO
NON-JURY TRIAL DOCKET FOR TEMPORARY ORDERS

Officer's Return

Came to hand __5__ day of __September__ A.D. 2015, at __9:00__ o'clock __A__.M.
and executed the __5__ day of __September__ A.D. 2015, in __Bexar__
at __9:30__ o'clock __A__.M. by delivering to __Stephanie Markell__ __state of service__
in person a true copy of this notice together with the accompanying copy of __Stu of service__
_____, Served at __3513 Canyon Pkwy #104 SA-TX__
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage Total $ _____
Badge/PPS # _____

JOEY HURT
SCH 668
EXP 07-31-19 County, Texas

The State of Texas By _____
NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this __6__ day of __Sept__ _____

NOTARY PUBLIC, STATE OF TEXAS

T DAVID
Notary Public State of Texas
My Commission Expires
JUNE 04 2017

RETURN TO COURT

(DK012)

MR 000046

(PRIVATE PROCESS

"The State of Texas"

INT OF BRYCE A SCHOCH
Plaintiff
vs.

Defendant

FILED  2011-CI-11645
DONNA KAY MCKINNEY
DISTRICT CLERK
BEXAR COUNTY

15 SEP -8 AM 11: 17

DEPUTY

Notice Directed to: STEPHANIE MARKELL

BY_____

2011CI11645 -S00005

IN THE DISTRICT COURT

150th JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

YOU ARE HEREBY NOTIFIED TO APPEAR before the __PRESIDING__ Judicial District Court, in and for Bexar County, Texas, at the Courthouse in San Antonio, Texas, on __16th__ day of __September__, __2015__, at __9:00__ o'clock, __A__.M., in room __109__, then and there to answer to said application and accompanying orders attached hereto.

This Notice may be served by any Peace Officer of the State of Texas. Said officer shall herein fail not, but make due return hereof as the law requires.

WITNESS, DONNA KAY MCKINNEY, CLERK OF THE DISTRICT COURTS OF BEXAR COUNTY, TEXAS, ISSUED AND GIVEN UNDER MY HAND AND SEAL OF SAID COURT AT OFFICE IN THE CITY OF SAN ANTONIO, TEXAS THIS __4th__ DAY OF __September__, __2015__.

DAVID TOWNSEND EMORY
Attorney/ PETITIONER
address
12000 HUEBNER RD 200
SAN ANTONIO, TX 78230-1213

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By: _____ Deputy
XAVIER DURAN

MOTION TO
SET MOTION TO TRANSFER/ORDER SETTING MOTION TO TRANSFER

Officer's Return

Came to hand ____ day of __Sept__, A.D. 2015, at 9:00 o'clock __ .M. and executed the __ day of __Sept__, A.D. 2015, in __Bexar Co__ at 930 o'clock A .M. by delivering to __Stephanie Markell__ in person a true copy of this notice together with the accompanying copy of ____ . Served at __3725 Canyon Pkwy #1100 SA TX__

I traveled ____ miles in the execution of this citation. fees: ____
$ ____ Mileage        Total $ ____
Badge/PPS # ____

JOEY HURT
SCH 655
EXP. 07-31-17

Serving citation

_____ County, Texas

The State of Texas                    By
                    NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this __ day of __Sept__

NOTARY PUBLIC, STATE OF TEXAS

T DAVID
Notary Public State of Texas
My Commission Expires
JUNE 04 2017

RETURN TO COURT

(DK012)

MR 000047



CAUSE NO. 2011-CI-11645

| IN THE INTEREST OF | ) | IN THE DISTRICT COURT OF |
| | ) | |
| B. A. H. | ) | BEXAR COUNTY, TEXAS |
| | ) | |
| A CHILD | ) | 150TH JUDICIAL DISTRICT |

## COUNTER-MOTION TO MODIFY PRIOR ORDER

**TO THE HONORABLE COURT:**

Respondent and Counter-Movant is STEPHANIE MARKELL, who is the Mother and primary caretaker of BRYCE ALLEN HENRY, the subject minor child referenced above, and resides in Bexar County, Texas with said child.

Movant and Counter-Respondent is JAMES DAVID HENRY, who is the Father of BRYCE ALLEN HENRY, and resides in Bexar County, Texas.

**Jurisdiction**

This Court has acquired continuing jurisdiction over the parties and subject matter of this suit, as a result of a prior final order having been entered; and, no other court has established jurisdiction by operation of law.

**Court Order**

The Court Order Counter-Movant seeks to have modified is entitled "Order Adjudicating Parentage", which was rendered herein on August 19, 2011.

**Objection**

Counter-Movant objects to this case being assigned to any Master, visiting Judge, Associate Judge, Referee or other non-elected official.

DOCUMENT SCANNED AS FILED

MR 000048

**Child**

STEPHANIE MARKELL and JAMES DAVID HENRY are parents of the following minor child who is the subject of this suit:

        NAME:           BRYCE ALLEN HENRY, Male

        BIRTHDATE:        January 21, 2002

**Modification**

There has been a material and substantial change of circumstances involving the parties to this suit and their minor child, since the above-referenced court order was entered; and, upon final trial, it would be in the child's best interest to modify said order by:

1. Increasing the child support obligation of JAMES DAVID HENRY, with said increase being retroactive to the earliest date allowed by law; and,

2. Making all future visitation between JAMES DAVID HENRY and the subject minor child, supervised, with the cost ordered paid by JAMES DAVID HENRY; and,

3. Entering orders for payment of the child's health care expenses; and,

4. Entering any additional orders the court finds to be in the subject child's best interest, based on testimony and evidence presented.

**Temporary Orders**

After notice and hearing, STEPHANIE MARKELL requests the court enter temporary orders, including, but not limited to:

1. Restricting JAMES DAVID HENRY's visitation periods to supervised at kids exchange, with the cost to be paid by him; and,

2. Ordering the parties to exchange income/financial information by a date and time certain; and,

MR 000049

3. Ordering JAMES DAVID HENRY to pay interim legal fees for the benefit of STEPHANIE MARKELL; and,

4. Increasing the child support obligation of JAMES DAVID HENRY; and,

5. Meeting in chambers with the subject minor child; and,

6. Entering any additional Temporary Orders the court finds to be in the subject child's best Interest.

**Transfer of Venue**

After notice and hearing STEPHANIE MARKELL requests the court deny the Motion to Transfer Venue filed herein by JAMES DAVID HENRY, for which she would show that:

1. The child has lived in Bexar County, Texas, with his mother, for at least two months; and,

2. STEPHANIE MARKELL is the parent with exclusive right to determine the child's residence; and,

3. Prior to moving to Bexar County, Texas with his Mother, BRYCE ALLEN HENRY was illegally residing with his father, JAMES DAVID HENRY, who had removed him from the rightful possession of his Mother, and refused to return him to her; and,

4. JAMES DAVID HENRY seeks to have venue transferred to Midland, Texas even though the child no longer resides there - legally or not; and, JAMES DAVID HENRY no longer resides there; and,

5. The Family Code assumes venue is proper in the county where the subject child has resided for six months; however, there is an underlying presumption that the parent seeking to transfer venue ALSO RESIDES IN THAT COUNTY; and,

6. All else considered, no periods of residency can be considered for the purpose of

DOCUMENT SCANNED AS FILED   MR 000050

determining venue, when the child has been residing illegally in that county.

**Legal Fees/Costs**

Upon final hearing STEPHANIE MARKELL requests the Court order all her legal fees and costs be paid by JAMES DAVID HENRY.

**Prayer**

Counter-Movant prays for the relief requested herein.

Counter-Movant prays for her legal fees and court costs.

Counter-Movant prays for general relief.

Respectfully submitted,

PAMELA R. JULIAN
State Bar No. 11048800
2420 McCullough Ave., No. 122
San Antonio, Texas 78212
(210) 735-4910 - OFC
(210) 437-0084 - FAX
(210) 875-8411 - CELL

STATE OF TEXAS )
)
COUNTY OF BEXAR )

BEFORE ME, a duly authorized Notary Public, personnally appeared STEPHANIE MARKELL, who after first being sworn, upon oath stated:

"I am STEPHANIE MARKELL. I am the Counter-Movant and Respondent in connection with this cause of action. I have read my Response to Motion to Transfer Venue; and, it is true and correct and within my personal knowledge."

STEPHANIE MARKELL

DOCUMENT SCANNED AS FILED    MR 000051

SWORN and SUBSCRIBED to before me, by STEPHANIE MARKELL on the __/5ᵗᴴ__ day of September, 2014

_____
NOTARY PUBLIC, STATE OF TEXAS.

## NOTICE OF HEARING

Counter-Movant's Request for Temporary Orders is set for hearing at 9:00 a.m. on ___9-14-15___, 2015 in Presiding Court, room 109, first floor, Bexar County District Clerk,

Larry Noll
Presiding Judge
408th District Court
Bexar County, Texas

_____
JUDGE PRESIDING

## CERTIFICATE OF SERVICE

I certify that a true copy of this Counter-Motion To Modify, with notice of hearing date and time, was provided to opposing counsel, on September 16, 2015 in Presiding Court.

_____
PAMELA R. JULIAN

DOCUMENT SCANNED AS FILED     MR 000052

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

Post Interest of C. A. H., a Child — 2 HRS

**JUDGE'S NOTES** Page____

CASE NO. 2011CI11645 COURT 150

All future Judge's notations must be done on this form.

2011CI11645 -P00026

| DATE OF NOTE/S | NOTE — Mot to Transfer & Temp Orders | JUDGE INITIALS |
|---|---|---|
| 9/16/15 | MTV - ~~illegible~~ - ~~illegible~~ denied | |
| | Poor record - Troy Ray Plummer | |
| | TO - ~~illegible~~ M - RTSPR | |
| | TJMC ~~illegible~~ F - SPO | |
| | Ech. w/ ~~illegible~~ 10 TCS | |
| | F to pay ex. attly | |
| | Dan Murphay | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | BY _____ DEPUTY _____ |
| | | 19 SEP 16 AM 4: 13 |
| | | FILED DONNA KAY McKINNEY DISTRICT CLERK BEXAR COUNTY |
| Attys: | Charles Hardy - David Henry | Father |
| | David Emory - | |
| | Pamela Julian - Stephanie Markell | |
| | Bryce Henry - 13 ep | |

SEP 16 2015

Mary Vallarez

DOCUMENT SCANNED AS FILED

MR 000054

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



MR 000055

2011CI11645 -D150

NO. 2011-CI-11645

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| B.A.H. | § | 150TH. JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER DENYING CHANGE OF VENUE

On September 16, 2015 the Court considered the Motion for Change of Venue of JAMES DAVID HENRY.

IT IS ORDERED that the Motion to Transfer Venue is hereby DENIED

SIGNED on _____ 9/21/15 _____.

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

HIGDON, HARDY & ZUFLACHT LLP
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Tel: (210) 349-9933; Fax: (210) 349-9988

By: _____
DAVID T. EMORY
Attorney for Petitioner
State Bar No. 06612100
DavidEmory@hhzlaw.com

PAMELA R. JULIAN
Attorney at Law
2420 McCullough Ave. No. 122
San Antonio, Texas 78212
Tel: (210) 735-4910; Fax: (210) 437-0084

By: _____
PAMELA R. JULIAN
Attorney for Respondent
State Bar No. 1104880

MR 000056

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*September 21, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**


By: _____

ROSANNE MEDELLIN, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

# Tab B

20

MR 000058

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 2011-CI-11645

IN THE INTEREST OF       ) IN THE   DISTRICT   COURT
B.A.H., A CHILD          )
                         ) BEXAR     COUNTY,    TEXAS
                         )
                         ) 150TH JUDICIAL DISTRICT

*********************************
HEARING SEPTEMBER 16, 2015
*********************************

On the 16TH day of SEPTEMBER, 2015 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Karen Pozza, Judge of the 407th District Court of Bexar County, Texas:

Proceedings reported by Machine Shorthand.

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000059

A P P E A R A N C E S

MR. CHARLES HARDY & MR. DAVID EMORY
12000 HUEBNER ROAD, STE. 200
SAN ANTONIO, TX  78230
SBOT # 08985550 & 06612100
Phone:  210-349-9933
ATTORNEY FOR MR. JAMES DAVID HENRY


MS. PAM JULIAN
2420 MCCULLOUGH, STE. 122
SAN ANTONIO, TX  78212
SBOT # 11048800
Phone:  210-735-4910
ATTORNEY FOR MS. STEPHANIE MARKELL

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000060

INDEX

                                                        PAGE

CAPTION -------------------------------------------  1

APPEARANCES ---------------------------------------  2

INDEX ---------------------------------------------  3

PROCEEDINGS ---------------------------------------  4

REPORTER'S CERTIFICATE ----------------------------  86

MR 000061

WITNESS INDEX

| WITNESS | DIR | CR | RED | REC |
|---|---|---|---|---|
| JOHN HENRY | 13/28 | 22 | | |
| DR. DINA TREVINO | 30 | 47 | | |
| STEPHANIE MARKELL | 53/74 | 66/80 | | |

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000062

EXHIBIT INDEX

|  | OFFER | ADMIT |
|---|---|---|
| Petitioner's Ex. 1 | 18 | |
| Petitioner's Ex. 3 | 34 | 34 |
| Petitioner's Ex. 4 | 34 | 35 |
| Petitioner's Ex. 5 | 38 | |

MR 000063

(Proceedings)

THE COURT: 2011-CI-11645. So we have a Motion to Transfer and temporary orders?

MR. HARDY: Yes, Your Honor. Charles Hardy here on behalf of David Henry, the Movant. We are ready.

THE COURT: Okay. And are we hearing everything or just where the child goes for right now?

MS. JULIAN: Just a Band-aid and the Motion to Transfer, I guess.

THE COURT: Just the Band-aid, okay.

MR. HARDY: And Judge, we filed a Motion to Transfer and a Motion to Modify for temporary orders. That's before the Court. Would you like a copy of it?

THE COURT: Yes, sir. Thank you. Okay. On the Motion to Transfer?

MR. HARDY: Did you want to hear that first, Judge?

THE COURT: I will hear that first, but I think we are still going to hear the temporary, temporary order part. Right?

MR. HARDY: Yes, ma'am.

THE COURT: Okay.

MR. EMORY: Judge, in regards to the Motion to Transfer, I would like to call Mr. Henry to

MR 000064

the stand.

THE COURT: Okay.

MR. HARDY: Judge, did you want to hear opening remarks on the case?

THE COURT: I will hear brief remarks and then I will just hear everything all at the same time, since I'm going to have to decide both issues anyway. Okay?

MR. HARDY: That would be great. Thank you, Judge.

MS. JULIAN: Judge, we also have the child here.

THE COURT: Okay. I'm going to hear it all together since I have to decide both issues anyway. Yes, sir?

MR. HARDY: If it please the Court, as I mentioned this morning, this is a case involving the custody of a 13 year old boy. I represent David Henry, who is the father, who has had custody of this child for the last three and a half years. So the Court will understand, attached to my motion is a copy of the order establishing his paternity of the child. There was a subsequent action filed about four years ago in this matter, that appointed my client as the temporary sole managing conservator. That action was Dismissed for

MR 000065

Want of Prosecution. My client had a lawyer from out of town and he was not aware that it was set on the dismissal docket and apparently it was dismissed in December. What happened was the father and the child lived with his wife and other children in Midland, Odessa -- in Midland, Texas. The child was attending school out there and they moved to Flower Mound, unbeknownst to my client about three and a half weeks ago, the mother drove from San Antonio, we think, to Dallas, and picked up the child in the middle of the night, at about midnight in the parking lot of the hotel they were staying in. I guess that's all going to come out, as far as what happened. And the mom has had the child under the circumstance for the last three and a half weeks. The child, prior to Dad taking custody three and a half years ago, was a chronic truant. He was about to be held back a year in high school. He had terrible disruptive problems in class. His goal was to be a gang member. That was his goal in life. And he had made several suicide threats that he was actually hospitalized for. The mother at the time of that temporary conservatorship, sole managing conservatorship, was a chronic prescription drug abuser and had a history of mental illness. She did not have a car at the time or even a driver's license. Apparently

MR 000066

it had been suspended. Dad has enrolled the child in a another private school in Flower Mound, where he lives now, and has paid for the year, and obviously our goal is to get the child back immediately and maintain the status quo of this situation. We got -- The fact that the case was Dismissed for Want of Prosecution, does not impact the fact that Dad has had custody of this child for the last three and a half years and has done a good job with the child, has turned his life around. His grades are better, he's no longer having the problems that he had before. We have to testify today, my client, who is concerned about his son. We have Doctor Dina Trevino, who has pored through the medical records, investigative reports, that are on file. We understand that the child is here, as well.

Judge, the other issue that needs to be decided today is the venue issue. Now, all the witnesses in this case over the last three and a half years, are in Midland. As a matter of fact, I think Doctor Trevino is going to testify that she's spoken with the teachers in Midland who have known this child for the last three and a half years. I believe there's been mental health professionals in Midland. Everything is in Midland. And David Emory is going to address that issue on the Motion to Transfer venue. But we believe

MR 000067

it is appropriate, although my client has moved to Flower Mound, we believe it is appropriate for this case to be transferred to Midland, to proceed after today's hearing. So what we are asking the Court to do is to immediately return the child to status quo and to make such other orders as may be in the child's best interest, as far as evaluations and so forth. But subsequently to transfer this case to Midland. Thank you.

MS. JULIAN: May I, Your Honor?

THE COURT: Yes, ma'am.

MS. JULIAN: I'm sorry. As I told the Court this morning, I was just retained, and so I'm probably not nearly as fresh as Mr. Hardy. But there have been a few things that I managed to determine. I managed to determine that this is a very bright 13 year old boy. They want to talk about custody. Dad has custody. Oh, yeah, he has custody. He's taken the child, he's brought him out of being on near drugs and gangs and took away from Mom, who is totally unreliable. None of that is true. He never -- He does not have custody. This whole case was DWOPed for want of prosecution. And as part of the case that was DWOPed, from what you see they filed with the Court attached to their petition, as well as their amended petition, is a

MR 000068

copy of the order that was entered within that case, that was filed originally a long time ago, that subsequently was DWOPed, in order to establish his paternity. When that was all dismissed, it was all dismissed. All right. Now, for three years, when he got temporary custody, the father takes off with this child and refuses to let the mother have any kind of possession, see or speak with her son. He blocked his phone number. The child cannot speak to mom and the mom has not been able to speak with the child. She's been up to his home in Midland on several occasions, with the police, and they will not get involved. There has been absolutely no contact until about a month ago. About a month ago at 10:00 at night, mother is in San Antonio and child is in, supposedly, Midland. She gets a call at 10:00 at night from her son. Her son had gotten off of his grandfather's telephone, and gotten a phone number of his mother. Called his mother from a hotel room late at night, and begged her to come and get him. Mom gets in the car here in San Antonio, and picks up the son, unattended and alone, in a hotel room, in Dallas. She brought him back here, he's been in school ever since. He is in every athletic thing there is a boy can be in, in school. His grades are good and he's doing great. The allegations made against Mom in the

MR 000069

original proceeding are unfounded. The allegations made about the son are unfounded. It was part of a massive hoax to get custody wrestled away from mother. And just as a little added thing, Your Honor, there was a legal father and an order was entered that made him the father. And after that, they had to file a paternity suit, get all of that squared away. But it was dismissed. And my client took advantage of the fact that it was dismissed, not able to see her son, not able to do anything. And when he called, she went to his aid. And he is going to -- he is going to parrot that very same story. Being left alone, he has a father who never goes to a single practice, never goes to a single ballgame, never does anything and he is happy here with his mother for the first time in years. And I think that will bear out when you speak with him, no matter how many lawyers you have and no matter how many psychologists you have, this little boy is an exceptional young man, and I know the Court is going to see that right away.

THE COURT: Okay. Your first witness?

MR. HARDY: We call David Henry.

THE COURT: Good afternoon. Raise your right hand, please.

(Judge swore in the witness).

MR 000070

13

THE WITNESS:  I do.

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MR. HARDY:

Q   State your full name for the Court please, sir.

A   James David Henry.

Q   Mr. Henry, what is your address?

A   It is 2505 Pelican Court, Flower Mound, Texas.

Q   Pull the microphone a little bit closer.

A   2505 Pelican Court, Flower Mound, Texas.

Q   What is your occupation?

A   I'm in private equity.  So I buy companies and run them.

Q   And what do you do outside of your work?

A   I have a family.  I have -- I'm on the board of United Way.  I'm a founding member of Rotary in our town, and I'm on two foundations.

Q   Sir, how long have you had custody of Bryce?

A   About three and a half years.

MS. JULIAN:  Objection, Your Honor, he does not have custody, he has possession.

THE COURT:  Okay.  Well, non-legal custody whatever.

BY MR. HARDY:

Q   How long have you had possession of Bryce?

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000071

A   About three and a half years.

Q   At what point did you know that you had a son?

A   When he was nine, I get a call from Stephanie, she thought she was talking to my Dad, but she was asking about a thyroid disorder, and if it ran in my family. And that's when I found out about Bryce, when he was nine years old.

Q   Sir, what were his circumstances when you sued for custody?

A   I was really worried about him. He was doing bad in school. He had -- I recall the number somewhere around 40 unexcused absences, and I was concerned for his well-being. One, he was in -- first he was living with Stephanie's stepmom and dad, and -- Rick Woody - Rick Woody had hit Bryce, and so they moved out. And then he was moved into a house on the Country Club in Midland. And at that point there was -- we did a background check on the owners, and there was a convicted child molester in that house, and I was concerned about that. And then from there --

MS. JULIAN:   Objection, Your Honor, assuming facts not in evidence. When it talks about he did a check in there, he discovered --

THE COURT:   Hearsay sustained.

MR 000072

BY MR. HARDY:

Q   Other than that, what other concerns did you have about his situation?

A   Well, then from there she moved him to San Antonio, and in San Antonio she was moved into a house that she wasn't up on the payments on, later got foreclosed on, and she moved him into -- His room had a wasp nest in it. The windows were broken around the house and I came and checked on him several times, and you know, for over a month the windows were never replaced. I was, you know, concerned for his safety, honestly. I mean, anybody could walk into that house. They were ground floor windows that were broken out.

Q   Is it your contention at that point that she had a prescription drug abuse issue?

A   Yes.

Q   Is it your contention that she had mental health issues?

A   Yes.

Q   When you were granted sole managing conservatorship of Bryce, when you took custody of him, can you tell the Court what you did to help him?

A   Well, you know, my wife and I really had to work with him, and my wife is a saint for doing this. He had, you know, psychological issues, we got him to

MR 000073

see a psychologist. We did --

Q   In Midland?

A   In Midland. We did a neurotherapy sessions with him.

Q   Was that in Midland, too?

A   Uh-huh. And he had some repressed memory issues, and things like that. And you know, just general bad behavior. And he, you know, kind of lacked empathy and there were a lot of issues. So we worked through those and, you know, he started doing better in school. His grades improved, his demeanor improved. You know, like, he didn't want to be touched and, you know, if you patted him on the shoulder, he would just kind of freeze up. And he was, you know, hording food. We had to stop him from overeating, because he would get a plate of food or, you know, we'd have food in the middle of the table, and he would just keep and keep eating, you know, stuffing himself, and just was really concerned, in general, about him.

Q   Was he a discipline problem when you took custody?

A   Yes. He definitely was.

Q   Yes, sir.

A   And so -- sorry -- to deal with those, you know, at school, if he got in trouble at school, he got

MR 000074

in trouble at home, also. And so, you know, like when I was growing up, my dad made me pull weeds in the garden if I got in trouble. So I did the same thing with him. If he got in trouble, I get him to pull weeds. One, it teaches a work ethic, but also it, you know, helped him, burn off some energy. He was a hyper kid. But also, you know, I noticed significant decreases in his disciplinary issues at school.

Q   Now, where did you put him in school in Midland?

A   At Midland Christian.

Q   Midland Christian?

A   Uh-huh.

Q   And they have all the grade reports of how he's done over the last three and a half years?

A   Yes.

Q   I want to hand you what's been marked Exhibit 1 and ask if you can identify that as his cumulative grade record for it appears, was this last year?

A   Yeah. This -- Yeah, it looks to be.

Q   And this is from Midland Christian University; is that correct?

A   Yes. Midland Christian School. Yes.

Q   This is for the 2014, 2015 year?

A   Yes.

MR 000075

MR. HARDY: We'll offer Exhibit 1.

THE WITNESS: Yes. And it is, you know, A's and B's, some hundreds, 90.

MR. HARDY: Yes, sir. Hold on one second.

MS. JULIAN: Objection, hearsay.

THE COURT: Sustained. He can use it to refresh his memory and testify from it.

MR. HARDY: That's fine.

BY MR. HARDY:

Q   Sir, what are his -- How has he been doing last year in school?

A   He's done great. I mean, the problems have gotten less and less and, you know, you are not getting calls from the principal about having to talk to him about it. He is doing real well.

Q   How are his grades?

A   His grades have done well.

Q   I'm sorry?

A   He's done well in his grades. He is getting A's and B's. You still have to work with him every once in awhile, he will get, you know -- you have to push him like you would any teenage kid, but you know, hey, his grades are not high enough on -- so you know, my wife and I will talk to him and hey, you know.

MR 000076

Q    Was he having emotional outbursts in school before you took custody?

A    Yes.

Q    Is he having emotional outbursts with you?

A    No.

Q    Was he throwing chairs at school before you took custody?

A    Yes.

Q    Is he throwing chairs now?

A    No.

Q    Have there been any suicide threats since you've had him?

A    No.

Q    Were there suicide threats before you took custody?

A    Yes.

Q    Sir, what were his aspirations when you first took custody?

A    He was kind of enamored, wanted to be a gangster.

Q    A gangster or a gang member?

A    A gang member. He -- he -- he -- you know, when we got him at the Court, when they did the writ of attachment, he showed up in Court in a hoody and just kind of looked like -- I mean, a thug, honestly.

MR 000077

Q   Was he wearing a hoody in the court?

A   Yes.

Q   Okay.  And what are his aspirations now?

A   He wants to play pro football.

Q   Is he involved in sports?

A   Yes.  He is in football, basketball and track.

Q   Was he sent to a mental health facility before you took custody?

A   Yes.

Q   Has that been necessary since then?

A   No.

Q   Was he about to be dropped back a grade before you took custody?

A   Yes.

Q   Has that been the issue since you have had him for the last three and a half years?

A   If I would not have taken him -- When I transferred him to Midland Christian, it wiped out his unexcused absences, otherwise, he would have failed the grade.

Q   Describe your house in Midland for the Court.

A   It is a four bedroom, five bath house.  It is on four acres.  We have a garden, we have a shop, we have a pool.  So it is a nice place to live.  We've got gates on the front, so the kids can ride their bikes

MR 000078

around on the driveway, without having go in the street.

Q   And you are moving to Flower Mound now?

A   Yes.

Q   Describe the house that you are moving into in Flower Mound.

A   It is -- I don't know how many bathrooms.  It has six or seven bedrooms.  It is in a gated community.

Q   He'll have his own bedroom?

A   Yes, he will.

Q   And where have you enrolled him to attend school in Dallas?

A   Liberty Christian.  So he doesn't do well with change, so I was trying to put him in a school as close to Midland Christian as I could, so....

Q   Have you -- have you paid for the year for him to attend there?

A   Yes.  Would you mind, Judge, if I grabbed my water?  My mouth is a little dry.

THE COURT:  Not at all.

THE WITNESS:  Thank you.

BY MR. HARDY:

Q   Sir, is it your contention that it is in the best interest of your son at least for now to move back to Flower Mound with you and the family?

A   Yes.  I'm very concerned if he stays here, the

MR 000079

same problems are going to pop up again.

Q   Would you ever use self help methods that she used in this case?

A   No.  I'm not in the habit of doing -- taking off with kids in the middle of the night.

Q   Are you asking the Court to let you take your son back to Dallas today?

A   Yes, please.

MR. HARDY:  I will pass the witness.

MS. JULIAN:  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. JULIAN:

Q   How many hours a week do you work at your regular job?

A   It varies.

Q   Okay.  Have you looked at his grades, his current grades, since he started school here?

A   No, I have not.

Q   Would you be surprised to learn that they are considerably better than they were in Midland?

A   Well, it might be an easier school.

Q   You no longer live in Midland.  Correct?

A   No.

Q   Why did you move?

A   For work.

MR 000080

Q   For work?

A   Uh-huh.

Q   The -- all of the various foundations and other activities that you belong to, --

A   Uh-huh.

Q   -- how many nights a week do you devote to that?

A   They are usually at lunch.

Q   Just lunches?

A   Yeah.

Q   Are you coaching any of his teams or activities?

A   No, I'm not.  But it is through the school, they have paid coaches.

Q   Isn't it true that you blocked my client's phone from having access to your phone or her son's phone?

A   Yes.

Q   Yes or no?

A   When we originally got him --

Q   Just yes or no.  Excuse me, just yes or no.

A   Yes.

Q   You did?  And she's been -- You know that she's been to your door numerous occasions with the police.  Correct?

MR 000081

A    Two or three times, yeah.

Q    Wanting to see her son?

A    Uh-huh.

Q    What did you do to enable her to see her son on those occasions?

A    I didn't let her.

Q    You didn't let her, did you?

A    Uh-uh.

Q    Now, this past three years that you maintained possession, you have since discovered that this case that was originally filed here, was DWOPed, Dismissed for Want of Prosecution, didn't you?

A    I did not know about that until she came and got him.  I didn't know about it.

Q    So you had no Court order giving you temporary custody or any kind of custody.  Correct?

A    I had a temporary orders, yes.

Q    Well, when this case was dis WOPed -- DWOPed, those temporary orders went bye-bye?

A    I didn't know about them.

Q    But they have, haven't they?

A    Yes.

Q    Even though you didn't know it, they've gone bye-bye, so she had every legal right to come and get her child?

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000082

MR. HARDY: Excuse me, Judge, I object. I think that calls for a legal conclusion on the part of the witness.

MS. JULIAN: I will rephrase, Your Honor.

BY MS. JULIAN:

Q   Mr. Henry, the night your child was picked up by his mother at the hotel --

A   Uh-huh.

Q   -- in Dallas, where were you?

A   We were moving our office and the house at the same time, and I was going on my way to go back to Midland to move the office. He was with my family.

Q   Well, he was in a hotel, who was in that hotel with him?

A   My parents, my wife's parents, my wife, our other children.

Q   They were all in the hotel?

A   Yes, they were all staying there.

Q   Well, then how could they not know that he called his mother and his mother came and got him?

A   My father-in-law had gone down to get some medicine. I guess he was sick or something.

Q   Mr. Henry, nobody knew he was gone until after 2:00 in the morning. Where were all these people?

A   Well, the police called us, and when the police

MR 000083

notified us, that's when we found out.

Q    That's because my client took the child to the police station, correct, and they phoned you?

A    Uh-huh.

Q    How often do you leave him alone in hotel rooms or alone anywhere?

A    Well, we don't leave him alone very often.

Q    Let me just ask you:  You moved to another place all together?

A    Uh-huh.

Q    This is the Court of continuing jurisdiction. My client lives here.  You now have moved from Midland, correct?

A    Uh-huh.

Q    Why are you wanting this case to be transferred to Midland?

A    We maintain the residence in Midland and all the witnesses are there.

Q    How much money do you earn a year?

A    It varies.

Q    How much money did you earn in 2014?

A    We haven't filed a tax return yet, so I don't know.

Q    How much did you earn in 2013?

A    I would have to look.

MR 000084

Q   How much did you pay your lawyers a retainer for this suit?

A   $20,000.

Q   What did you bring psychologists to court with you this afternoon for?

A   On the recommendation of my attorneys and to look over -- there were so many medical files and things like that.

Q   Medical files and things like that.  Do you recall when this was -- you filed this originally several years ago, you wanted the Court to have my client undergo psychological evaluation.  Do you recall that?

A   Yes.

Q   Have you looked at that psychological evaluation?

A   I don't believe I ever did.  Our psychologist did.

Q   You never asked to look at it?  I mean, after the psychological evaluation came back perfectly normal, you never thought about saying, hey, listen, maybe mom would like to have some visitation?  That thought never crossed your mind?

A   I don't recall.

Q   Okay.  Do you want the Court to order your son

MR 000085

to go back and live with you even if he doesn't want to?

A    Yes.  I think it is a better place for him.

Q    Do you know anything about my client's life, how she lives, where she lives, where she works?  Anything?

A    The past few years I don't know much about what she's been doing.

Q    And you made it impossible for her to contact you or stay in touch with you.  Correct?

A    She's called.

Q    I thought you blocked her number?

A    She called the house.

Q    When was that?

A    Let's see.  She called about a year ago, and then about a month ago, a little over.

MS. JULIAN:  Pass the Witness.

REDIRECT EXAMINATION

BY MR. HARDY:

Q    Okay.  Why did you block her phone?

A    I was busy at work and she called me, I counted it one day, 16 times in a day, and you know, I didn't have -- Bryce was at home or at school.  I didn't have the time to answer all these phonecalls.

Q    So she was calling you at work while Bryce was at home trying to talk to Bryce.  Did you explain to her

MR 000086

that he was not with you?

A    Yes.

Q    Would she call multiple times?

A    Yes.

Q    Was it harassing?

A    Yes.

Q    Was it in violation -- Well, did she ever go back to court to ask for visitation?

A    No.

Q    Did the order appointing you sole managing conservator, limit her access?

A    It gave me full authority.

Q    Okay.  And she's never come to court, to your knowledge?

A    No.

Q    She just laid behind the log and found out the case was dismissed and used some self help --

MR. HARDY:  Objection, Your Honor. Leading the witness.

THE COURT:  Sustained.

MR. HARDY:  I have nothing else for this witness, Judge.

THE COURT:  Thank you, sir.

MR. HARDY:  I call Dina Trevino.

THE WITNESS:  Do I come down?

MR 000087

THE COURT: Yes, sir. Good afternoon.

(Judge swore in the Witness).

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for the Court, please.

A Dina Trevino.

Q And what is your occupation?

A I'm a psychologist licensed in Texas.

MR. HARDY: Do you waive qualifications, counsel?

MS. JULIAN: Yes.

BY MR. HARDY:

Q Okay. What have you've been retained in this case to do?

A I was asked to review the records for Bryce Henry prior to living with his father, and during the time he was living with his father, and also to review medical records and other data I was provided on the mother, Ms. Stephanie Markell.

Q Are they voluminous?

A Yes, I did hours of --

Q Lots of medical records, lots of school records, school reports, psychological records and so

MR 000088

forth; is that correct?

A    Multiple medical records than anything.  Also school records, some psychological records on mother, yes.

Q    So we are clear, the records regarding Stephanie, the mom in this case, all refer back to her condition three and a half years ago when dad was appointed sole managing conservator and took possession of this child; is that correct?

A    They referred to a period of time between 2005 and 2012 when father took possession.

Q    What are your concerns with what you've seen?

A    The records that I reviewed and I have not met any of the parties, I've not met mother and I have not met Bryce, and I talked to father and I reviewed records, reveal mother being on a number of different medications, pain medications that didn't seem to resolve chronic pain issues, back fusions.  She was on hydrocodone, she was on Narco, she was on Valium -- excuse me, Xanax, Valium.  These were relatively high doses, but in all together, it was a great deal of medication.  She had a number of brain scans, she had a chronic pain consult.  She complained of the medication not being able to control her symptoms.  She was on anti-depressant medications.  Just -- I reviewed text

MR 000089

messages showing mother to be on such, so many medications that she couldn't be awoken. She couldn't be -- she was nonresponsive, unable to take care of the child. I saw some police reports where the older two children that mother had from two other men, were wandering the streets, so people requested help because mother was passed out and was not able to be responsive.

Q  In fairness, do you know her medical condition now?

A  I do not. I have no idea of what has been the resolution of the chronic pain or back fusion issue, since 2012.

Q  You don't know if things have improved in her life or not?

A  And I don't know mother and I have no information, even if these are accurate records. They are all hospital and doctor's records that you provided, Yes.

Q  I'm sorry?

A  That you provided me.

Q  Was there actually a doctor who rejected her as a patient, at this point?

A  Yes, too difficult to manage, yes.

Q  I'm sorry?

A  Too difficult to manage.

MR 000090

Q     That she was too difficult to manage?

A     Or her case.  I'm not sure.  Yes.

Q     Okay.  Do you have concerns about her mental health during this time period?

A     Well, she was referred to Doctor John Reid for a psychological evaluation.  It was referred three times, and she eventually -- this was all in 2012.  She was eventually seen by Doctor Reid, but the evaluation was incomplete.  Doctor Reid's report describes some real serious concerns about loss of reality testing.  That was later that I corroborated through reading police reports, where she seems to be either hallucinating or having some sort of medical, psychological reaction.  Doctor Reid said he wasn't able to finish the evaluation as the order is written in a way that he wasn't able to meet all the parties.

MR. HARDY:  May I approach the witness, Judge?

THE COURT:  Yes, sir.

BY MR. HARDY:

Q     I'm going to hand you what's been marked as Exhibit 3 and ask if you can identify the exhibit is an order on a Motion for Medical Examination of Stephanie Suzanne Markell?

A     Yes.  This is an order -- this is the first

MR 000091

order. I think there were two orders all together. This was the first order in January of 2012, where there was a long paragraph about what needed to be evaluated, and Doctor John Reid, it says Kenneth Reid, but Doctor John Reid was appointed to do it.

MR. HARDY: We'll offer Exhibit 3, Judge.

MS. JULIAN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Petitioner's Exhibit 3 admitted)

BY MR. HARDY:

Q Now, ma'am, was this order -- As a psychologist, if you received an order of this type, was this sufficient to do what was necessary to be done and intended to be done in this case?

A No, it was not.

Q And why is that, ma'am?

A Well, Judge Littlejohn signed the order, but in all fairness to Judge Littlejohn, in 2012, we were writing orders as we kind of saw them. The attorneys, were, I think were a lot tighter than how we write orders now, but it says we need a physical and psychological evaluation to establish whether or not she should be a JMC, whether she should have supervised visits, and whether the child's relationship with mother is in the best interest. And it didn't -- it didn't

MR 000092

allow for father to be ordered to be a part of that. That's essentially a custody evaluation. And the child was involved in it, so Doctor Reid really wasn't able to do what the Court ordered. What he did was a little bit of testing and some parenting assessment.

Q    Okay. I will hand you what has been marked Exhibit Number 4.

A    I have two 4's.

Q    And ask if you can identify that as the psychological evaluation that Doctor Reid conducted?

A    Yes. This was a psychological evaluation that Doctor Reid did in April and May of 2012.

MR. HARDY: Judge, we'll offer Number 4.

MS. JULIAN: No objection.

(Petitioner's Exhibit 4 admitted)

BY MR. HARDY:

Q    Now, this was -- and so just so we understand, there were actually several orders, subsequent orders for mental examination when she failed to first appear, there was at least one other order for mental examination compelling her to appear; is that correct?

A    Yes.

Q    What do you find significant about the evaluation that was prepared by Doctor Reid, or not significant?

MR 000093

A    Well, there were no collateral, and again, I'm not, this isn't a criticism of the -- of the evaluation, but this is sufficient for psychological evaluation. But it -- there was material that it didn't seem that Doctor Reid had access to somehow, the multiple medications that she was on through various physicians at that same time, was one. The other thing is that it talks -- one of the concerns are that -- I'm trying to find here -- I'm missing a page.

Q    Whoops.

A    On this one, I got page 2, 3 and 6. The one I looked at was six pages.

Q    Let me continue while he is finding that. We'll come back to that. Was there anything else that you recall?

A    Well, the part that's really concerning in that report, there were two in the file, there was the one was six pages and it is in the file with the medical school records. Doctor Reid talks about problems with reality testing, difficulty living in a fantasy life, difficulty in assessing reality. And that was based on an MMPI and a Rorschach, and so really, more testing would have been helpful and more collateral information would have been helpful, but he talks about inability to maintain ahold on reality, which is very concerning.

MR 000094

Q   He talks -- say that again.

A   He talks about a difficulty in maintaining ahold of reality, living in a fantasy life, which was very concerning, especially in the light of some police reports around that same time.

Q   Did you have the opportunity to review a police report involving this lady?

A   Several police reports, I did review.  One in particular, yes.

Q   I'm going to hand you what's been marked Exhibit 5.

A   That was by the -- the Converse Police Department.

Q   And ask if you can identify this as a copy of police report?

A   Yes.

Q   Issued by the Converse Police Department?

A   Yes.

Q   And have you had an opportunity to review that report?

A   Yes.

Q   Does it give rise to an opinion you have in this case?

A   Yes.

MR. HARDY:  We'll offer Exhibit 5, Judge.

MR 000095

MS. JULIAN: Objection, Your Honor, hearsay.

MR. HARDY: Judge, this is a police report that gives -- that offers a basis for an opinion that this expert has and we believe that's an exception.

THE COURT: Well, she can rely on it in forming the basis of her opinion, but I don't think that makes it admissible, so she can testify if --

MR. HARDY: Thank you, Judge.

BY MR. HARDY:

Q   Ma'am, can you tell the Court what concerns you have about this police report?

A   Well, this was in June 2011, and the oldest daughter, from a relationship that mother had in high school named -- the oldest daughter was named Sierra, was trying to flag down a police officer in the middle of the street and said that her mother had gone into a closet and was talking to herself and couldn't get her mother out of the closet and she had been sitting on the floor in the closet, talking to herself being very upset. The child was -- the young adolescent was very upset. The police went to the house, went into the closet, moved some clothes around, found a person, mother, spent some time really trying to talk her out of some hysteria. Was able -- Mother didn't seem to know

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000096

where she was. Mother didn't know she had daughters. Mother didn't know -- it was around the time that a grandfather, I don't know if it is mother's grandfather or the mother's father, someone had died. She looked as though she was in some kind of psychiatric distress. She was talking about voices in a box, telling her to do bad things, to telling her bad things. They transported her to the hospital to have a psychiatric evaluation. She didn't know who she was, where she was, what year it was. She was paranoid, thought people were trying to hurt her. She had some sort of acute psychotic break at that time.

Q Do you know if her situation has improved since then?

A I don't know.

Q You don't know anything about her circumstance?

A No.

Q Do you have other -- any other concerns about her mental health situation?

A Aside from the multiple pain medications that I think can cause all sort of emotional distress and the possibility of anything else that could be contributing to this, that what happened in 2012, I have no other knowledge.

Q Do you have any opinion as to whether this

MR 000097

lady's ability to care for this child is any different today than it was three and a half years ago when dad took possession of this child?

A   I don't know anything, no.

Q   Okay.

MR. HARDY:   Judge, if I could replace that exhibit with --

THE COURT:   Okay.

BY MR. HARDY:

Q   Did you want to glance over number 4 again?

A   Sure.  Yes, this is a six page psychological evaluation that Doctor Reid did in April and May of 2012.

Q   Okay.  Is there anything else that stands out in that report?

A   Other than that we talk about the impairment of her reality testing, which is really, really serious, it is difficulties separating reality from fantasy, that he talks about, that she maintains such strict control over emotion, that she has a hard time relating to people, has a time hard time reacting to situations and has a tendency to misperceive events for mistaken impressions of people, and to have significance of their actions. Having had an impairment -- an impairment in reality testing, is probably one of the most concerning things

MR 000098

that could happen, although I can't tell you what it comes from. It could come from extreme stress, it could come from medication overuse. I don't know.

Q Now, ma'am, have you had an opportunity to look at Bryce's grade situation from three and a half years ago, versus now?

A I did, and some -- there is some school records he was in danger of failing a class -- failing a grade. I'm still confused about where and how he went to school with mother and father, a third grade, when father found out about him, father had him in school at the Christian school. I spoke to the Christian school principal, teacher, of the third grade. Fourth grade and fifth grade he was back with mother. The records show that he was in danger of failing, he had had so many absences, I don't remember the number, but it was an incredible, I mean, over 30 absences and --

Q Was it more like 40?

A It was a lot, yes. And I don't know -- He had had voluminous medical records. I don't know if his absences were related to medical records, medical issues. There were concerns about his thyroid issues, attention deficit. He had behavior problems, he was acting out.

Q Throwing chairs at school?

MR 000099

A     Engaging in acting out, yes.  I also talked to the, let's see, sixth grade he was back with father in the Christian School.  I spoke to the sixth grade principal.  And seventh grade he was back, he was with father in a Christian school, and I spoke to that principal.  Now he is in the eighth grade and I believe he attends Hill Middle School in Northeast ISD, would be my belief.

Q     Okay.  So he had -- and I'm going to ask you to look at number 2, again, his grade report.

A     I have number 1.

Q     Is that number 1?

A     I'm sorry.  Number 1, the grade report.

Q     And did you review that in --

A     I did.  This was seventh grade last academic year.

Q     Last year.  How did he do last year?

A     His grades were really fairly good.  He had a low of 86, 82 in English.  He had 90s, 87.  He was fairly a high B, low A student.

Q     Couple of hundreds?

A     Well, yes, in P.E., but yes.

Q     Football?

A     Yes.

Q     Was there any indication from the teachers that

MR 000100

there were any discipline problems over the last three years?

A    Two years would be sixth and seventh grade.  In talking to the teachers, the principal of sixth grade and seventh grade at Midland Christian school, they said he --

MS. JULIAN:  Objection, Your Honor, hearsay.

MR. HARDY:  I will withdraw it.  I will change the question, Judge.

BY MR. HARDY:

Q    Overall, from a psychological standpoint, is his educational situation improved over the last three years, as opposed to that part of the last three and a half years?

A    There were no concerns about his functioning at the Christian school.

Q    Three and a half years ago?

A    Correct.

Q    Has the situation improved drastically over the last three and a half years?

A    Based on the records I reviewed and based on talking to the teachers, yes.

Q    Okay.  Ma'am, can you explain to the Court how a change of Bryce's custody or possession to his mother,

MR 000101

will effect his -- effect him structurally?

A I can't. I can't talk about -- about what a change would do. I can talk about, because I don't know, I don't know Bryce, I don't know his mother, I don't know what kind of situation they are in now. I can just say that there was such chaos and concerns about this young boy's behavior and listening to father's statements, it sounded as though there were signs that he may have had some kind of reactive attachment kind of symptomology that was really concerning, and that he seemed to do so well with his father, that I just have concerns about how -- what the situation is like returning to his mother and wondering if it is the same as it was before.

Q Is regression a valid concern of the father?

A Father's concerned about him regressing, if he is not with father. I would have those same concerns based on the limited data I have.

Q Ma'am, if a dad does not coach football, does that make him a bad father?

A Not necessarily.

Q What -- And I realize you can't testify as the best interest, the ultimate question in this case, but I would like to know what recommendations you do have in this case, as far as proceeding.

MR 000102

A    Well, I think it would be important, I do have recommendations. Doctor Reid's report raises some serious concerns, and I think it would be helpful to have that updated and to find out if there are indeed still concerns, and to have that done in a way that Doctor Reid can do a full evaluation, either of everybody or of mother, but it sounds as though he attempted to do a little bit of each and really wasn't able to. I also would have some concerns based on what father described as his son's behaviors when he got him, the things that they have done with him, his ADD, his period of time in some neurofeedback kind of therapy, to do an evaluation of the child to see what particular needs he has either therapeutically or in terms of living structure.

Q    So your recommendation is mental examination of the mother?

A    Yes.

Q    Or an update of her examination; is that correct?

A    Yes.

Q    And how would you recommend it be done differently than Doctor Reid was ordered to do it?

A    Just either a full psychological evaluation of mother or full psychological evaluation of everyone.

MR 000103

Q   I'm sorry?

A   It was asked -- The way I would recommend it differently is just that the order says a full psychological evaluation of mother to make custody recommendations, and you can't do it based on one person.

Q   I understand.  Do you recommend that the child be evaluated, as well?

A   I do have some concerns about Bryce, particularly being 13 years old, whether he's had access to his mother, what kind of relationship with both parents, what would be most helpful to him.  If he has -- Based on what I hear, and based on what I know about psychological theory, it is not good for a child to be away from either parent, particularly, and what his treatment needs and educational needs are unknown, in my opinion.

Q   Now, ma'am, you testified that you have read the records dealing with Bryce's absences three and a half years ago.

A   Yes.

Q   Are you aware of his -- Where did you say he was attending school now?

A   He is at Hill Middle School Northeast ISD.

Q   This was where mom enrolled him three weeks

MR 000104

ago?

A    I don't know.  I just looked up the address, looked up what school that would be, called the school and got attendance records.

Q    Okay.  Are you familiar with his attendance situation over the last three weeks?

A    He has two absences.  One is unexcused, and one is excused.  So 15 days of school, approximately, he's had two absences.

MR. HARDY:  Thank you, I will pass the witness.

CROSS EXAMINATION

BY MS. JULIAN:

Q    Doctor Trevino, have you ever met with my client?

A    No, ma'am.

Q    So you were hired by Mr. Hardy.  Correct?

A    Yes.

Q    And you were hired by Mr. Hardy four years ago, correct, when that original suit was filed?

A    I don't think so.

Q    You don't think so.  So you were just hired to just review things?

A    Yes.  I don't think -- It is possible, I forget, but I don't think so.  I don't think I've

MR 000105

ever --

MR. HARDY: Judge, if I can help, I've been involved in this case for three weeks.

BY MS. JULIAN:

Q How do you know that this child has missed two days of school since he's been with mother?

A Father called the school and asked them, and she was on speaker phone and I heard.

Q Father got the school on the phone?

A Yes.

Q And put it up to your ear?

A Put it on speaker phone.

Q And they said that he's missed two days?

A Yes, ma'am. It might have been another Bryce Henry, I don't know.

Q It might have been another what?

A Bryce Henry. He said this is Mr. Henry, I'm Bryce's father, can you give me his attendance information, and she did.

Q Who paid you to do all this work today?

A Father.

Q So your objective is to kind of help dad get custody. Right?

A No, no. My objective is to provide information about the records that I've seen. Neither of these

MR 000106

people are worth my license, no.

Q   Have you talked with Bryce?

A   No, never have.

Q   So you don't really know what his life has been like?

A   No, exactly.  I don't know what his life has been like.

Q   And you don't know over the past three or four years what mother's life has been like either, do you?

A   I don't.

Q   You don't know if she has a stable home and a work history.  Correct?

A   Correct.

Q   You don't know if medications were previously prescribed for her for a reason?

A   Well, I'm sure they were prescribed for a reason, the medical records say that she's had some significant --

Q   Oh, I thought maybe you were suggesting that she was out buying drugs from various people.

A   No, no, no.  No, no, prescribed Hydrocodone, medication for back fusion.  It sounds like it was a serious pain issue.

Q   Thank you.  She has since had at least one point some ailment that caused a severe pain problem?

MR 000107

A    Yes.

Q    That needed to be dealt with?

A    Yes, yes.  No, I know nothing about anything illegal or no.

Q    Were you aware of the fact that for the past over three years, the father has blocked mother's phone and prevented any phone contact at all?

A    I did not know that he had blocked him until I heard it on the stand today.  I did know that he discouraged phonecalls., and did not believe that when Bryce talked to his mother, that it made Bryce upset and worried about his mother, and anxious, and didn't see that as helpful.  That's what I knew.  I'm not saying I agreed with that, but that was the information I had.

Q    Have you looked at Bryce -- When you had the principal on the phone, did you ask about his grades at his current school?

A    I didn't have the principal on the phone.  Dad talked to the attendance clerk, and the attendance clerk gave him the attendance records.  That's all.

Q    Just the attendance records?

A    Yes, ma'am.

MS. JULIAN:  May I approach the witness?

THE COURT:  Yes, ma'am.

MR 000108

BY MS. JULIAN:

Q    I believe this is the document you looked at previously. Correct?

A    Yes.

Q    Now, this is his grades current to date, the past three years of his current school. Would you have a look at those?

A    Past three weeks?

Q    Uh-huh.

A    Of his current school?

Q    Uh-huh.

A    Semester one, semester two. Wait a second. So this was -- Oh, grade 6, grade 7, this is grade 8.

Q    That's grade 8, week one, week two.

A    So S1 and S2, I'm not sure what that means.

Q    But the grades are all in the 90's and high 80's. Correct?

A    This is comparing a final year of school and this is comparing three weeks.

Q    Certainly.

A    I'm just trying to make sense.

Q    Certainly. But he's not skipping school, he is not flunking out? The grades are quite admirable, aren't they?

A    The grades are comparable, yes, to -- the three

MR 000109

weeks in the eighth grade are comparable to all year of the seventh grade, yes.

Q   Actually a little better, correct?

A   As low as 85 in English and the other year around year's grade is an 82 in English. Tiny bit, but not sure it is significant.

Q   Not significant. But not enough to say mom never gets to visit him again or see him or maybe have him live with her. Correct?

A   Yes, grades look good.

Q   Are you aware of how mother got possession of this child after this three year period?

A   Only what I heard, and that was essentially the same thing I heard when I talked to father.

MS. JULIAN:  Pass the witness.

MR. HARDY:  Nothing else.

THE COURT:   Thank you.

MR. HARDY:  Thank you.

THE COURT:  Your next witness?

MR. HARDY:  Could I have just a moment?

THE COURT:  Yes, sir.

MR. HARDY:  We call Stephanie Markell to the stand.

MS. JULIAN:  You rest?

MR. HARDY:  No, we call your client to

MR 000110

the stand.

THE COURT: Good afternoon. Raise your right hand, please.

(Judge swore in the witness).

THE WITNESS: I do.

MR. HARDY: May I proceed?

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for the record, please, ma'am.

A Stephanie Markell.

Q I cannot hear you. I'm so sorry.

A Stephanie Markell.

Q You are the mother of Bryce in this case; is that correct?

A Yes, sir.

Q Ma'am, you have heard the testimony of several witnesses regarding your mental health of three and a half years ago. Is that testimony correct?

A No, sir.

Q Did you have prescription medication addiction three and a half years ago?

A No, sir. I was on -- I was prescribed medication, but I actually didn't even take as much as the doctor prescribed me, because he did prescribe me an

MR 000111

insane amount. I had just had a back fusion, but I did not take as much as he prescribed for me to take, and I have actually taken a drug test to prove that I did not have a pain prescription problem.

Q   When did you take drug tests?

A   When I believe David called Child Protective Services saying that I was addicted to my pain medication. They sent people out like two or three different times to check and they even said that it doesn't mean you come back saying that you take as much as you are prescribed.

Q   What timeframe was this, ma'am?

A   It was back during that time, probably 2011, 2012. I have not been on any of that medication. I was seen by Doctor Kingman and he kind of -- he wouldn't listen to me and I kept telling him the medicines weren't what I needed, so I have not taken any of that medication since 2012, and I stopped seeing that doctor. And since then, and since I quit taking what little bit I did take, I have felt so much better.

Q   What medication are you taking now, ma'am?

A   I'm -- Advil, if necessary.

Q   Pay for any prescription medication?

A   No, sir.

Q   Ma'am, you've heard the testimony regarding

MR 000112

your son's situation at school; is that correct?

A   Uh-huh.

Q   Did he have 40 absences from school?

A   I do not believe he did, but he did have doctor's notes for every time he was absent. I never allowed him just to be absent, to be absent. Every time there was truly something wrong, he did have a thyroid problem, his thyroid was going up and down, and we were in the process of trying to get that under control. And he was seeing a psychologist, and so he had doctor's notes for all of those absences, and he had a psychologist that was coming to the house to talk with him and meet with him, because he was upset during that time, because David was trying to take him away and that's not what he wanted.

Q   Were they preparing to put him in alternative school?

A   No, they were not.

Q   Did you put him in a mental health facility?

A   Yes, I did several years before that.

Q   And where was that?

A   In San Angelo.

Q   What was the name of the mental health facility?

A   I don't remember off the top of my head.

MR 000113

Q    Okay.  And how long was he there?

A    Like two weeks.

Q    I'm sorry?

A    Like two weeks.

Q    What was the nature of the reason for that institutional or that hospitalization?

A    We had went through some severe family changes and he was having a hard time dealing with them, and he was having panic attacks.  And I was concerned about him.  If I wasn't concerned about him, I would have never done it.  And he did try to harm himself, and the doctors told me then, it was because his thyroid was out of wack and stuff like that, and once they got that under control he was doing much better.  He did have some behavior problems and stuff, but we were working through that.  And that's part of why he was seeing a counselor and why the counselor was coming to the house.  I have two other children that don't have those issues and we were all working together to try to get him where he needed to be.

Q    He has had vast improvement in grades over the past three and a half years?

A    He had good grades before.

Q    It is your testimony he had good grades before the last three and a half years?

MR 000114

A    They weren't perfect, no, but he was trying. He was having a hard time concentrating and that last year when he was in third grade at Crestview Elementary, the teacher that he had, it happened to be her first year teaching, and instead of teaching him, she would send him straight to the office, so he wasn't learning what he needed to learn. And I was voicing those concerns with the school at that time.

Q    So her complaints and the school's complaints about frequent outbursts were not valid?

A    I didn't say he didn't have frequent outbursts. That's why he was seeing a counselor and that's why we were trying to do what we needed to do to get him where he needed to be.

Q    And there were complaints about him throwing furniture in the middle of class, was that valid?

A    I don't recall there was a time where he threw furniture. There was a time that he got upset and he kicked his desk, but he didn't throw anything from what I was -- what I remember.

Q    And there are complaints about his repeated disruptive behavior; is that correct?

A    Yes. He would be playing with his pencil in his desk and she would say he was disrupting class.

Q    Ma'am, there was a report -- well, have there

MR 000115

been several police reports involving him?

A   There was a report, yes.

Q   Okay.  Can you tell the Court what happened in Converse that we discussed with the Converse Police Department, police report?

A   Honestly, my grandfather had just passed away and I did have a panic attack.  It wasn't like the end of the world, I was still -- I mean, I did.  I had a panic attack.  I had a very bad panic attack.  I went to the hospital, I was able to calm down, and I was fine after that.  But I did have a very bad panic attack.  My grandfather raised me.  He was the only male figure I ever had in my life, and it was very hard on me.  But I just -- it was a hard -- I mean, it is like your parent passing away.  You know, we all get sad, things happen and sometimes we may not -- I may not have handled it the best way.  I did have a panic attack and I regret that, but it was never an intentional thing.  And it wasn't like I tried to hurt my son or hurt my kids or threaten to kill myself or anything like that, because I would have never done that.

Q   Is it true that you were sitting with your knees to your stomach and your head in front of your legs behind the clothes in the closet?

A   I was sitting in the closet.

MR 000116

Q   Is it true that you told the police you weren't aware that you had two daughters?

A   That is not what I told them.

Q   So when the police said --

A   I told them I didn't know where they were.

Q   When they said -- when they asked you about your daughters, is it true or false that you said, quote, I have a daughter, unquote?

A   Well, of course I have daughters.  I have two daughters and a son.  Of course I could tell them I had a daughter.

Q   Is it true or false that you told the police, the voices inside the box keep telling me all these bad things?

A   That is not what I said, no.

Q   Were you on prescription medication at that time, ma'am?

A   I was taking the medications I was prescribed, yes.

Q   Okay.  Were you abusing those medications?

A   No, sir.  Never have I abused my medication.

Q   Now, ma'am, I understand that you learned that -- the case that the temporary orders were issued in, that appointed David as sole managing conservator and gave you limited access was dismissed in December of

MR 000117

2014; is that correct?

A    Yes.

Q    And I'm guessing that you were notified of this dismissal in December of 2014; is that correct?

A    No, sir.

Q    You weren't notified of that?

A    No.

Q    How did you find out?

A    I went to the Court to find out what was going on, because I was trying to figure out what I needed to do to get my son back, because I was tired of him being hid from me and kept from me, so -- But attorneys are expensive.

Q    Yes, ma'am.  When was that?

A    In August.

Q    Okay.  And it was at that point you decided to go to Dallas to pick up Bryce?

A    Actually, no.

Q    Tell the Court what happened.

A    What happened was I spoke to an attorney and I took him all the papers that I had and showed her what I had, and she told me that technically I had custody of my son, and on her advice she said --

Q    I don't want to hear what the lawyer told you I'm fascinated or another attorney?

MR 000118

A    A different attorney.

Q    When did you first talk with Pam Julian?

A    A couple of weeks ago.

Q    Okay.  So you talked to Pam Julian several weeks ago?

A    Yeah.

Q    Okay.  When did you hire her?

A    Just this last weekend.

Q    Okay.  Okay.  So tell me what happened as far as you're going to Dallas and picking up Bryce in the middle of the night.

A    Okay.  So I spoke to this attorney and she said that actually you have custody of your son, and she suggested that --

Q    Yes, ma'am.  I'm asking that you not repeat what your lawyer told me, although I'm fascinated by that, thank you.  I want to know what happened as far as with regard to your going to Dallas.

A    Okay.  So I went to Midland actually to get -- to try and find my son, and when we got to Midland, we found out that they were in the process of moving to Dallas, and we went several places and called several people.  And it was they were gone.  And so we actually came back to San Antonio and I didn't think I was going to be able to find him, I didn't know where he was.

MR 000119

Somebody at Midland Christian happened to tell us that he was going to start school at Liberty Hill and I was like, well, I'll try --

Q  Ma'am, I don't want to know what somebody told you.  I'm just trying to figure out what happened.

A  Okay.  And that's what I'm trying to tell you.

Q  Thank you.

A  So we came home, and Wednesday afternoon, about 5:00, Bryce called me and says, Mama, I was like, yes, he was like, what are y'all doing, I was like, nothing, we are sitting here, what's going on.  And he goes, well I got your message off my grandpa's phone and it finally gave me your phone number and I wanted to call you.  And I told him, I said, are you doing okay, how are you, and everything, and he is like, I want to come home, I really want to come home.

Q  I don't want to hear what Bryce told you. Trying to figure out the circumstances --

A  Bryce asked me to come get him.

Q  I don't want you to tell me what Bryce told you outside of the courtroom.  What I want to know is, where did you meet him?

A  I met him at his hotel.  He called me, asked me to get on the highway to pick him up.  Yes, I understand.

MR 000120

Q   And I just want to know the circumstances --

A   I picked him up at his hotel at 10:00 p.m, he was in a room by himself, I picked him up at his hotel at 10:00 p.m, and we went straight to the Grapevine Police Department.   I gave them all my court papers, I gave them everything I had, showing -- they tried knocking on all the Henry's doors, they tried phone calling everybody.

Q   Now, were you there when that happened?

A   Yes.

Q   You were there when they went around knocking on doors?

A   No, I was not there.

Q   Okay.

A   I was there when they were trying to call him.

Q   Yes, ma'am.  Again, I don't know to know what somebody outside the courtroom told you, I'm just trying to establish what happened.  So you picked up Bryce and you went to the Police Department at 10:00 at night; is that your testimony?

A   Yes.

Q   And where did you go next?

A   After they released us around 2:00, we came home.

Q   Okay.  And you've enrolled him in school?

MR 000121

A   Yes.

Q   And where is he attending school?

A   He goes to Tex Hill Middle School.

Q   What's it called?

A   Tex Hill.

Q   And he has already missed two days of school.

A   No, sir, he has not.  He was late one day because we went to get a copy of his Social Security card.

Q   Okay.

A   And that was it.  But he had to be there for that and that was the only time that he has been absent.

Q   Do you know why the school would tell his Dad that --

A   I have no idea.

Q   Do you know why the school would tell his Dad that he's already had two absences?

A   I have no idea.  He has not been absent.

Q   Where do you reside, ma'am?

A   In Stone Oak.

Q   And where is that, ma'am?

A   Off of Bulverde, at Bulverde Oaks.  We live in an apartment.

Q   Okay.  What is your occupation?

MR 000122

A    I am a manager for Academy.

Q    And which Academy?

A    One off of 410.

Q    At Vance Jackson?

A    No, military.

Q    Okay.  So you took Bryce and enrolled him in school.  Did they allow you to enroll him in school?

A    Yes.

Q    What records did you use to get him enrolled?

A    His records from Midland Christian.

Q    Did you obtain those records from that school?

A    Yes.

Q    Just a moment.  And just so we are clear, you understand that David signed an affidavit that he's had actual care, custody and control of Bryce in Midland since on or about April 10, 2012; is that correct?

A    Yes, I know he signed that.

Q    Ma'am?

A    Yes, I know he signed it.

Q    Yes, ma'am.  But those statements are correct; is that right?

A    Yeah, he had him until August.

Q    And he resided there until on or about August 20th of 2015; is that correct?

A    Actually from what I was told, they moved

MR 000123

before then, but I don't know that for a fact.

Q If it was not August 20th, it was August? You don't know the date?

A That David and them moved from Midland, no. I know that they were gone. We got there on August 16 and they were already gone.

Q And Bryce attended Midland Christian School in Midland for the last three years; is that correct?

A Yes.

Q His primary residence since 2012 has been Midland County; is that correct?

A It was, but it is not any longer.

Q Okay. But during that time period he was attending school at that school; is that correct?

A Yes.

MR. HARDY: Thank you. Pass the witness.

CROSS EXAMINATION

BY MS. JULIAN:

Q Stephanie, do you have a criminal record?

A No, ma'am.

Q Have you ever done anything that has harmed your child?

A No, ma'am.

Q When you first discovered you were pregnant, did you tell Mr. Henry?

MR 000124

A   Yes, ma'am.

Q   And what was his response?

A   He told me he wanted nothing to do with him.

Q   And how long was it that he held good on that word of having nothing to do with his son?

A   Nine years.

Q   Nine years. Didn't see him?

A   No, ma'am.

Q   Call him?

A   No, ma'am.

Q   Send him a present?

A   No, ma'am.

Q   Support him?

A   No, ma'am.

Q   Pay for any of his medical bills?

A   No, ma'am.

Q   Attend any of his school activities?

A   No, ma'am.

Q   Do anything at all as a parent?

A   No, ma'am.

Q   When you got into this lawsuit with him -- When he finally decided he wanted to be a parent and you got into this lawsuit with him, did you have a lawyer?

A   No, ma'am.

Q   Who was his lawyer?

MR 000125

A    Rick Fletcher.

Q    Okay. So he had a lawyer and you had no lawyer?

A    Yes, ma'am.

Q    Were you in court the day they ordered -- gave him managing conservatorship?

A    No, ma'am.

Q    What happened on that day?

MR. HARDY:    Well, Judge, excuse me, I think if she wasn't there, it would be speculation on her part.

MS. JULIAN:    Let me rephrase that, Judge.

THE COURT:    Yes, ma'am.

BY MS. JULIAN:

Q    How come you weren't there?

A    Because I wasn't notified. I was asked to take -- to do the psychological exam. I had contacted Rick Fletcher on several occasions to get the name of the doctor, because David Henry was supposed to pay for it, and they refused to give me that information. And that is why --

MR. HARDY:    Judge, I think her testimony that they refused to give me that information, is clearly hearsay.

THE COURT:    Sustained.

MR 000126

MS. JULIAN: I will go on, Your Honor.

BY MS. JULIAN:

Q So then you discovered -- How did you discover that he had been given temporary custody?

A They showed up at my house with the police.

Q And took your son?

A No, my son actually ran away, because he didn't want to go with David.

Q How did they get ahold of him?

A My son hid in the woods for two days, and then he came home. And once he came home, I called Converse PD and I had a conversation with them, and at that point, after them talking to Bryce on his own, they were not going to make Bryce go with him, but then --

MR. HARDY: And I think that calls for hearsay, Judge.

BY MS. JULIAN:

Q Did Bryce eventually go?

A Yes.

Q Now, after Bryce went with his father, when was the next time that you had visitation with him?

A I was never allowed to see him again.

Q Never allowed to see him again. What about talk to him on the phone?

A I talked to him a couple of times, and then he

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000127

blocked our numbers. I only called at night, and I called just to talk to him, and he either wouldn't answer or if it was a time, because we set up a time so I could call on Tuesdays and Thursday, and the next thing I know my phone number is blocked and I can't talk to him, I can't anything. So at that point I started having the police go do well checks. David is very affluent individual in Midland, and the police wouldn't even call me back on the well checks.

Q So how many times do you think you tried to get your son from Midland?

A I don't think I can count. A bunch. I went several times to try to see him, try and talk to him. Even just be able to see how he was doing. Me and both my daughters, my oldest is away at college right now, but my other daughter here in the hallway, we tried several times -- we tried calling from other phone numbers, and they would never answer and it would just go to voicemail. And I would leave voice messages and voice messages, just begging for him to let us talk to Bryce. And if Bryce didn't want to come home, my intention was never to make him come home. He asked me, please, I want to come home, I want to live with y'all.

Q Okay. So you have -- You're living in an apartment?

MR 000128

A  Yes.

Q  How many bedrooms?

A  It is currently two bedroom. We are in the process of transferring to a three bedroom as soon as it opens up, but I have given him my room and I'm staying in Taylor's room.

Q  How is Bryce doing in school?

A  He is doing great. He really loves it. He's playing football. He had a game last night. He was excited. They won 28 to 6.

Q  What other activities is he planning on being in?

A  He plans on playing basketball, and he's excited for track. He says that's his favorite, because he is really fast and nobody can catch him. He is thinking about whether he wants to play soccer again. I coached his soccer his entire time growing up, like every single year, even when they took him, no matter how much I hurt or how much pain I had been in, because I did have two back surgeries, I still coached his team. I was still on the Board of Directors for SAYSA, which is San Antonio Youth Soccer Association for over ten years.

Q  Okay. So he is with you now and he is doing well?

MR 000129

A    Yes, ma'am.

Q    And been there nearly four weeks?

A    Yes, ma'am.

Q    How many times has his father called him?

A    He hadn't, and then I had my daughter try to get ahold of him, because we had been trying to call and all our numbers were still blocked. He did finally call Bryce after Sierra text him -- David several times to call, that Bryce just wanted to let him know that he was doing okay, it was less than a five minute conversation, he didn't tell Bryce he loved him or how he was, he just was like, I think you made a bad decision, and that was it. And Bryce felt really defeated after that. He was like I just want him to accept that I want to live here. He still wants to see them, he still wants to be a part of their life. I have no intentions of keeping them out of his life. I think we should be parents, but he wants to live with me, so that's -- and that's where we would love for him to live.

Q    So if he tells the Judge he really doesn't, he just want didn't want to hurt your feelings, he really wants to live with dad, are you willing to do that?

A    If that's what he tells the Judge he wants to do. Bryce is old enough to talk for himself and speak for himself. You've spoken with him. He is a smart

MR 000130

kid. Even when he was having problems in school, he was still a very smart kid. And I would respect that decision. I mean, he knows what's okay and he is old enough to say, hey, that's not right, or hey, you know, I would never want him to do something or be somewhere he doesn't want to be.

Q How much money do you earn?

A How much money do I earn? Approximately 50,000 a year.

Q Okay. So do you actually have the disposable money to hire a fancy law firm and psychologists?

A No, I do not. My oldest goes to Rice University, which she has a full -- she did get a full academic scholarship, but it still costs a lot of money. And his sister cheers and tumbles. She's on the top world's team. She's one of the top gymnasts in her category. So all of my disposable income is put back into my children.

Q So you can't really afford this, can you?

A Not really. It is taking away from them.

Q Okay. Do you make anywhere near the same money that Mr. Henry does?

A No.

Q Okay. Are you asking the Court as part of the order that they order Mr. Henry to pay interim legal

MR 000131

fees for your benefit to even out the playing fields and allow you to get --

A  No, ma'am.  I don't even -- at this point, I don't even care if he pays child support.  I just want my son.  My son wants to be at home, that's all I want.

Q  You want the Court to speak with your son in chambers?

A  I would love for the Court to speak alone with my son in chambers.

MS. JULIAN:  Pass the Witness.

REDIRECT EXAMINATION

BY MR. HARDY:

Q  Ma'am, you testified about Bryce's grades and you said that he is doing just as well now as he was three and a half years ago.  Is that your testimony?

A  No.  He is -- his grades are better.  I'm not saying he was struggling.  He was having a hard time.  He was having a hard time with that teacher, but he does -- he is very smart.  Were his grades perfect?  No.  He probably had several C's.  He wasn't failing, I mean, he may have been failing, but it was because he forgot to turn in his work and he would always turn in his work at the last minute.  But it wasn't -- it is not like I could go to school and hold his hand, and be like, make sure you turn this in.  You know, instead it

MR 000132

was like, okay, seriously, you have to turn this in, and you could go through the backpack and the work would be there, and then he'd turn it in.

Q   I may have misunderstood your answer.  I thought you said he was doing the same, when I asked if he was doing considerably better?  Is he doing --

A   He is making really good grades now.  He's got A's and B's.  I never said he didn't.  He was struggling.  He was having medical issues and stuff like that.  He was absent, because he had medical issues.  So and then he would be in class for five minutes and he would be playing with his pencil and she would send him to the office.  So no, his grades weren't as grades in the third grade, but the years before that, he did do okay.  He made A's, B's, C's.  They weren't perfect, but at the same time, he grew up.

Q   Keep going.  He was making C's and D's back then?

A   But he's grown up.

Q   He is an A/B student since he's been living with his father; is that right?

A   I am assuming so, yes.  He is now, too.

Q   Yes, ma'am.  And additionally, as far as his rating on the scale of one to five, he was rated as having a one, which is a poor behavior, regarding his

MR 000133

ability to cooperate with others and comply with teacher requests, one, is adapting to new situations without getting upset, a one, that's poor; is that right?

A   He was having problems, yes, I never said he wasn't --

THE COURT:  Wait.  Wait.  Wait.

MR. HARDY:  Okay.  Let me finish.

BY MR. HARDY:

Q   Accepting responsibility for his own actions.

MS. JULIAN:  Objection, Your Honor, assuming facts not in evidence, if he would like to offer it into evidence, we can look at it.

MR. HARDY:  What exhibit are we up to?

BY MR. HARDY:

Q   I will hand you what's been marked Exhibit 7 and ask if you can identify that as a grade report from school when Bryce was living with you?

A   I have not seen this.

Q   Does that appear to be Bryce's grade report from one of his teachers in 2010?

A   It is educational screening.

Q   Okay.  And how is he doing?

A   According to this --

Q   Did I describe the one as being correct?

A   I guess so.

MR 000134

Q   So although you testified that he was doing pretty well back then --

A   I didn't say he was doing.  I -- We all know, like I said several times, he was having problems.  We had had a major -- some major life changes, that he had a hard time dealing with, and I was getting him the help, he was seeing a counselor, and I was working very closely with the teachers and the school to get him back on track where he needed to be.

Q   Yes, ma'am.  And when I asked you about his being about to be sent to an alternative school, do you recall that?

A   Yes.

Q   And do you recall he was about to be sent to an alternative school?

A   He was not.  Not -- They never told me he was going to be sent to an alternative school, so if they told David he was going to be sent to an alternative school, that's different.  I have every school paper that was ever sent to me and I don't have anything on him being sent to alternative school.

Q   You have every school paper and you are not aware that he was sent to an alternative school, and you decided to withdraw him from school and homeschool him for the last several weeks of school?  That doesn't ring

MR 000135

a bell?

A   He wasn't going to an alternative school. I did withdraw him, and I was going to homeschool him because I was at home and I had the homeschooling knowledge, I had to homeschool his older sister, because so I had all the books and stuff, because his older sister has an immune deficiency disorder, so she had spent some time at home, where the school itself had put her on homebound. So I pulled him because he had missed so much. Due to the fact that he was going to the doctor, he was, I was trying to get him where he needed to be and he was having a hard time adjusting and he had this new teacher that didn't know how to handle kids like that.

Q   Okay, ma'am, just so we are clear on this, withdrawing and homeschooling in the alternative school designation, are you aware that he was supposed to report to DAEP alternative school for 20 days, starting Monday on April 2nd, but he never showed up? And that you called and said you were withdrawing Bryce and planning to homeschool him and actually withdrew him on April 2nd, 2012?

A   I did not -- I did not know that he was supposed to appear there. That was a decision I made after talking with his counselor at the time that had

MR 000136

been coming to the house, and he wasn't getting where he needed to be at school, and the counselor was going to start coming and visiting with him more and working with him more. So that was a decision that I had made at that time, because I did have the books for him to do. And I figured at that point because we were having such issues with his behavior and stuff, I knew how to control it, I knew how to control him. Contrary to what he says, I did, you know, what David says, he does listen to me.

Q   Now, ma'am, did David know how to contact Bryce over the last three weeks?

A   Yes.

Q   And how was that?

A   Because we had the same phone number forever. I've given David my phone number so many times. I tried to e-mail him, I left my phone number everywhere, he still has our phones blocked. Bryce still has -- Bryce has had his own phone that he had, I kept his line --

Q   I'm sorry. I just asked a simple question, it needs a yes or no.

A   Yes.

Q   Okay. And you testified that he called within the last three weeks to check on Bryce?

A   He did call one time after my daughter

MR 000137

contacted him.

Q And I think you testified that he didn't tell him he loved him?

A He did not. Bryce had the phone on speaker phone. He did not.

Q Okay. And he told him he made a bad decision?

A He did tell him that.

Q And you monitored that entire conversation?

A I did.

Q Did you think that was appropriate, ma'am?

A Do you think it was appropriate that David monitored every conversation -- the couple of conversations I got to talk with Bryce?

Q So you're paying him back, I guess?

A No, it wasn't that. Bryce asked me to sit there. He was scared to talk to him. He was terrified to talk to him. But Bryce has talked to his grandpa, his grandpa had his number, he's been texting with his sister, Hope, who sent Bryce text messages saying that she was sorry, but she just didn't feel that David loved them, and David knew how to be a dad, and she felt that David hated both of them.

MR. HARDY: Thank you, ma'am. I have nothing else.

MR 000138

RECROSS EXAMINATION

BY MS. JULIAN:

Q   Are you asking the Court to name you the primary caretaker of your son?

A   Yes, ma'am.

Q   And allow him to stay here with you?

A   Yes, ma'am.

Q   Allow him to continue school here?

A   Yes, ma'am.

MS. JULIAN:  Pass the Witness.

MR. HARDY:  Nothing else, Judge.  We rest.

MS. JULIAN:   I rest, Your Honor.

THE COURT:  Okay.  You can make your closing remarks and then I will meet briefly with Bryce.

CLOSING STATEMENTS

MR. HARDY:  Judge, our close is brief.  I think we've addressed the issues in this case.  The child has been living with his father for the last three and a half years.  We think that -- I personally think that kids should be allowed to make a decision that's important as to where they are going to live when they turn 30.  I realize the law allows children to make their wishes known to the Court at the age of 12.  It is still a best interest test, and we have to look at

MR 000139

what's in the best interest of Bryce. And clearly it is Bryce's best interest to continue to live where he's lived for the last three and a half years with his father. I will defer to my co-counsel on the issue of venue, if that's okay with the Court.

MR. EMORY: Your Honor, if it please the Court, my name is David Emory, along with co-counsel, Mr. Hardy, I've been asked to do the closing argument dealing with venue only. I want the Court to take the -- drawing the Court's attention to our Motion to Transfer in that we make reference to the Texas Family Code, Section 155.201, whereby the statute in our Family Code makes it a mandatory transfer, if at the time of filing a Motion to Modify, the child has resided in another county, other than the county of the exclusive continuing jurisdiction county for a period of six months. I draw your attention to our pleadings and the supporting affidavit. I also draw the Court's attention to the fact that Mr. Henry, by way of affidavit, has represented to this Court that the child has had actual care, custody and control of the child, since two and a half -- three and a half years. It's also as you noticed with the testimony before the Court, that that issue is undisputed. Now, I bring the Court's attention to opposing counsel's counter petition, whereby she

MR 000140

states in her sworn affidavit or sworn pleading that the child has only lived in Bexar County for two months; however, evidence has shown that the child only lived here for approximately three or four weeks, at best. I then would like to present to the Court if I may the case of In Re: Leyva. I present to the Court that case now, --

THE COURT: Thank you.

MR. EMORY: -- and tender to opposing counsel. This is a San Antonio Fourth Court of Appeals case, in which the 45th District Court here in Bexar County accidentally denied the mandatory Motion to Transfer, and the Fourth Court read, and I quote, In a suit to modify a parent/child relationship, the trial court has mandatory, statutory, ministerial duty to transfer this suit to the county where the child has lived for six months or longer, or when the trial court fails a timely transfer, a mandamus relief is appropriate. Our feeling, Judge, is the facts before this Court, the statute and the case law brings forward the mandatory request that this case gets transferred to Midland, and allow the Midland Court to sort this out. Thank you.

MS. JULIAN: May I?

THE COURT: Yes.

MR 000141

MS. JULIAN: I would like to first address the Motion to Transfer venue. I understand and I've read just like the Court has read probably a million times that statute, but there's got to be more to that statute, including some common sense. Father did not have custody, not really, and to hide the child from the mother and to secrete him away from Bexar County, the Court of continuing jurisdiction, up to another county, and keep him from mother, keep him away from any other court proceeding, and then say, it wasn't controverted, he lived with dad, and he was having a wonderful little life. It was controverted. It was controverted every time my client went to that child's door step, went to the police and had them go to that child's doorstep, tried to get him on the phone. It was controverted from day one. Secondly, he doesn't even live there. He doesn't even live there. He has moved. That would be tantamount to say, well, yeah, I lived there for six months, that was about three years ago. Where do you draw the line? Lived there three years ago, now you want the child to move back there, because they lived there three years ago? He has moved. He is in Dallas or some place else. That is ridiculous. This is the Court of continuing jurisdiction. It is a child that has been taken away, not voluntarily given away.

MR 000142

Taken away. I think also going back to the original proceeding four years ago, remember, my client did not have a lawyer. Mr. Henry had a lawyer, had the money to hire psychologists, had the money to do all kinds of testing, to have hearings that she didn't even know about. And knowing that she didn't know about these hearings and they are talking back and forth about where do I go for my psych eval, no one is talking to her about hey, you got a hearing next Tuesday, you need to come prepared. None of this stuff. So they are sitting here today and they are presenting a case based on all the stuff from four years ago -- three to four years ago, when all of this happened, when my client never had a chance to present anything. This was all ramrodded. I think that the Court is going to see a very clear picture when you talk to this boy. I started to call him -- when you talk to this little boy, but you are going to see he is a very mature young man. Thank you.

THE COURT: Okay. Thank you for excellent presentations. I'm going to let you withdraw your exhibits and your copies and hold those as officers of the Court and the parties can take a drug test on three while I am talking to Bryce.

(Proceedings adjourned)

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000143

STATE OF TEXAS    )

COUNTY OF BEXAR   )

I, TRACY RAY PLUMMER, official court Reporter in and for the 407th District court of Bexar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

TRACY RAY PLUMMER, Texas CSR #3586
Expiration Date 12/31/15
Official court Reporter, 407th District
Bexar County, Texas
100 Dolorosa Street
San Antonio, Texas  78205
(210) 335-2895

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000144

# Tab C

KeyCite Yellow Flag - Negative Treatment
Distinguished by In Interest of N.A. A., Tex.App.-Dallas, January 14, 2015

699 S.W.2d 209
Supreme Court of Texas.

Melvin Lee ALEXANDER, Petitioner,
v.
Patricia A. RUSSELL, Respondent.

No. C–3808. | Nov. 6, 1985.

Mother filed petition to terminate parent-child relationship between natural father and child. The District Court 347, El Paso County, Enrique Pena, J., granted petition to terminate. The Court of Appeals, 682 S.W.2d 370, affirmed, concluding that judgment terminating parental rights was issued by court of continuing jurisdiction. Father petitioned for review. The Supreme Court held that record did not show that court with continuing and exclusive jurisdiction was actually court which exercised jurisdiction in terminating father's parental rights.

Reversed and remanded.

West Headnotes (3)

[1] **Infants**
⬥➡Jurisdiction and venue

Court which established conservatorship of child retained exclusive jurisdiction and jurisdiction could not be transferred to another district court absent motion and order of transfer. V.T.C.A., Family Code §§ 11.05, 11.05(a).

18 Cases that cite this headnote

[2] **Judges**
⬥➡Nature and effect in general

If judge of court which established conservatorship of child found it necessary to recuse himself, the proper procedure was to have another district judge preside in district court, and not transfer the cause. V.T.C.A., Family Code §§ 11.05, 11.05(a).

13 Cases that cite this headnote

[3] **Judges**
⬥➡Exercise of powers in different courts

The 327th Judicial District Court judge's signature as "Judge" did not conclusively prove that he was acting as judge of the 243rd District Court, which had established conservatorship of child and had retained exclusive jurisdiction, at time he signed judgment terminating parental rights. Vernon's Ann.Texas Rules Civ.Proc., Rule 483; V.T.C.A., Family Code § 11.05(a).

15 Cases that cite this headnote

**Attorneys and Law Firms**

*209 Merkin & Hines, Stephan A. Hines and Terry G. Pasqualone, El Paso, for petitioner.

Anchondo & Armendariz, Daniel Anchondo and Robert S. Anchondo, El Paso, Richard Barajas, Fort Stockton, David Duran, El Paso, for respondent.

**Opinion**

PER CURIAM.

The question in this appeal from a judgment terminating parental rights is whether the judgment was issued by the court of continuing jurisdiction. The court of appeals affirmed the trial court judgment, concluding that the termination proceeding had been conducted in the 243rd District Court, and that Judge Enrique Pena was acting as

judge of the 243rd District Court at the time he signed the judgment of termination.[1] 682 S.W.2d 370. Pursuant to Rule 483, Tex.R.Civ.P., we grant the writ of error and, without hearing oral argument, reverse the judgment of the court of appeals and remand the cause to the 243rd District Court for a new trial.

Melvin Alexander and Patricia Russell were divorced in 1978 by judgment of the 243rd District Court. Patricia was appointed managing conservator of their minor child. In 1980, Melvin filed a motion in the 243rd District Court to change conservatorship. By final order in that matter Patricia remained managing conservator. That order states, "the 243rd Judicial District Court disqualified itself from hearing said cause, transferring the same to the 327th Family District Court, with consent of all parties." It further states: "Jurisdiction of the 327th Family District Court is not in issue nor is it being challenged by any party to the lawsuit."

In 1982, Patricia filed a petition to terminate the parent-child relationship between Melvin and the child. The caption on the *210 petition reads: "327th Judicial District Court." The termination judgment is also captioned "327th Judicial District Court." Someone, somehow, and at some unknown time, however, changed the caption on the petition and termination judgment to read "243rd Judicial District Court." Other orders in this suit captioned "327th Judicial District Court" remain unchanged. Even the bond in this cause was approved by the District Clerk as being an appeal from the 327th District Court. The termination judgment is signed by Judge Pena simply as "Judge."

Melvin filed his appeal in the 327th District Court and argued that the 327th District Court was without jurisdiction to hear the cause. Patricia argued that the 327th District Court had jurisdiction to hear the cause because the judge of the 243rd District Court disqualified himself and transferred the cause to the 327th District Court. The court of appeals, with one justice dissenting, affirmed the termination, holding that regardless of the recitals in the conservatorship order, the 243rd District Court had retained exclusive jurisdiction in this cause, and the judgment of termination was out of that court.

The court of appeals concluded that as far as the court's record was concerned, the petition and judgment were filed and rendered in the proper 243rd District Court. The court of appeals also concluded Judge Pena was acting as judge of the 243rd District Court, even though he did not state his capacity, at the time he signed the judgment of

termination. Nevertheless, the court of appeals recognized that district judges sitting in a multi-district court county should exercise extreme caution and should sign their judgments in their proper capacity.

The action of the district judge in this cause conflicts with section 11.05 of the Texas Family Code.

[1] [2] The Texas Family Code states in pertinent part:

> [W]hen a court acquires jurisdiction of a suit affecting the parent-child relationship, that court retains continuing, exclusive jurisdiction of all parties and matters provided for under this subtitle in connection with the child. No other court of this state has jurisdiction of a suit affecting the parent-child relationship with regard to that child except on transfer as provided in Section 11.06 or 17.06 of this code.

TEX. FAM. CODE ANN. § 11.05(a) (Vernon Supp.1985). Section 11.06 requires a timely motion by any party to the suit to transfer the proceedings. Absent a motion and order of transfer, the 243rd District Court retained exclusive jurisdiction. Despite what the conservatorship order says about the 327th District Court having jurisdiction, there is no order transferring the cause to the 327th District Court. Thus, the 243rd District Court retained jurisdiction. Any attempted transfer of this cause to the 327th District Court was not for a reason authorized under section 11.06 and therefore the judge had no authority to transfer the cause. If the judge of the 243rd District Court found it necessary to recuse himself, the proper procedure was to have another district judge preside in the 243rd District Court; not to transfer the cause.

[3] We agree that jurisdiction was proper in the 243rd District Court. We do not agree with the court of appeals that the record conclusively proves that the petition and judgment were filed and rendered in the proper district court or that Judge Pena's signature as "Judge" conclusively proves he was acting as judge of the 243rd District Court at the time he signed the termination judgment.

We hold that because the record does not show that the

court with continuing and exclusive jurisdiction was actually the court which exercised jurisdiction in terminating Melvin's parental rights, the cause must be reversed and remanded.

Accordingly, because the court of appeals' opinion conflicts with TEX. FAM. CODE ANN. § 11.05(a) (Vernon Supp.1985), pursuant to TEX.R.CIV.P. 483, and without hearing oral argument, we reverse *211 the judgment of the court of appeals and remand the cause to

the 243rd Judicial District Court for a new trial.

**All Citations**

699 S.W.2d 209

Footnotes

1       Judge Pena is judge of the 327th Judicial District Court.

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** In re Waste Management of Texas, Inc.,
Tex.App.-Texarkana, January 18, 2013

124 S.W.3d 149
Supreme Court of Texas.
In Re CSX CORPORATION, National Marine Inc.,
and Vectura Group.

No. 03–0381. | Oct. 3, 2003.

Company that acquired employee's former employer, and
company's subsidiaries, petitioned for writ of mandamus
to challenge trial court's grant of motion to compel
discovery of information regarding safety employees and
company physicians from the previous 30 years for
purposes of negligence action alleging exposure to toxic
chemicals. The Supreme Court held that discovery request
was overbroad.

Writ conditionally granted.

West Headnotes (9)

**[1]** **Mandamus**
⟜Remedy by Appeal or Writ of Error
**Mandamus**
⟜Matters of discretion

Mandamus relief is appropriate only if a trial
court abuses its discretion, and there is no
adequate appellate remedy.

97 Cases that cite this headnote

**[2]** **Mandamus**
⟜Nature of acts to be commanded
**Mandamus**
⟜Presumptions and burden of proof

The burden of establishing an abuse of
discretion and an inadequate appellate remedy,
for purposes of mandamus, is on the party

resisting discovery, and this burden is a heavy
one; a clear abuse of discretion occurs when an
action is so arbitrary and unreasonable as to
amount to a clear and prejudicial error of law.

154 Cases that cite this headnote

**[3]** **Pretrial Procedure**
⟜Discretion of court
**Pretrial Procedure**
⟜Scope of Discovery

Generally, the scope of discovery is within the
trial court's discretion; however, the trial court
must make an effort to impose reasonable
discovery limits.

45 Cases that cite this headnote

**[4]** **Pretrial Procedure**
⟜Scope of Discovery

The trial court abuses its discretion by ordering
discovery that exceeds that permitted by the
rules of procedure.

36 Cases that cite this headnote

**[5]** **Pretrial Procedure**
⟜Relevancy and materiality

Although the scope of discovery is broad,
requests must show a reasonable expectation of
obtaining information that will aid the dispute's
resolution; thus, discovery requests must be
reasonably tailored to include only relevant
matters. Vernon's Ann.Texas Rules Civ.Proc.,
Rule 192.3(a, c).

65 Cases that cite this headnote

32 Cases that cite this headnote

**[6]** **Pretrial Procedure**
⬤▬Request, notice, or motion and response or objection

Employee's discovery request for corporate information on safety employees and physicians from the previous 30 years, in his negligence action against company that acquired former employer, and company's subsidiaries, was overbroad; 30-year period was unreasonably long, and request included businesses that never employed employee. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.3(a, c).

12 Cases that cite this headnote

**[7]** **Pretrial Procedure**
⬤▬Availability in general; nature and scope of remedy

Discovery orders requiring document production from an unreasonably long time period or from distant and unrelated locales are impermissibly overbroad. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.3(a, c).

17 Cases that cite this headnote

**[8]** **Pretrial Procedure**
⬤▬Objections and protective orders

A central consideration in determining overbreadth of a discovery request is whether the request could have been more narrowly tailored to avoid including tenuous information and still obtain the necessary, pertinent information. Vernon's Ann.Texas Rules Civ.Proc., Rule 192.3(a, c).

**[9]** **Mandamus**
⬤▬Modification or vacation of judgment or order
**Mandamus**
⬤▬Proceedings in civil actions in general

If a reviewing court concludes that a trial court's discovery order is overbroad, the trial court has abused its discretion, and the order must be vacated and mandamus granted if there is no adequate remedy on appeal.

32 Cases that cite this headnote

**Attorneys and Law Firms**

**\*150** Marion E. McDaniel, Jr., S. Shawn Stephens, Harold K. Watson, John H. Hempfling II, Locke Liddell & Sapp, Houston, for relators.

Joseph J. Fisher II, John Andrew Cowan, J. Keith Hyde, Rodney Barnwell, Provost & Umphrey, Beaumont, for respondent.

**Opinion**

**\*151** PER CURIAM.

Relators filed a petition for writ of mandamus to challenge the trial court's discovery ruling in the underlying negligence litigation. Relators complain that certain interrogatories are overbroad and irrelevant. We agree and conditionally grant mandamus relief.

Real party in interest, Donald Ward, worked periodically as a mechanic, tankerman, and seaman from 1958 to 1998. He worked at National Marine Services for part of 1958 and from 1972 to 1977. In 1998, American Commercial Barge Line acquired National Marine Services. Ward sued American Commercial Barge Line and its subsidiaries—American Commercial Lines, CSX Corporation, National Marine, Inc., and Vectura

Group—in 2002. Ward claims that exposure to benzene and other carcinogenic chemicals throughout his career caused him to contract refractory anemia/myelodysplastic syndrome.

During discovery, Ward served interrogatories on all defendants that included the following:

> (16) For the time period 1973 to present, please identify and give last known address and telephone number for all persons in the safety and/or industrial hygiene department who had any responsibility for the safety and/or industrial hygiene and/or assessment of the hazards of benzene for this Defendant.

> (17) For the time period 1970 to present, please identify and give last known address and telephone number for all safety department workers employed by Defendant.

> (18) For the time period 1970 to present, please identify and give last known address and telephone number for all corporate physicians employed by this Defendant.

Relators CSX Corporation, National Marine, Inc., and Vectura Group objected to these interrogatories on the grounds that they are "overbroad, harassing, and seek information that is not relevant and will not lead to the discovery of admissible evidence." Ward then moved the trial court to compel Relators to answer the interrogatories. After a hearing, the trial court modified Interrogatory 17 to exclude purely clerical safety workers. Subject to this modification, the trial court ordered Relators to answer Interrogatories 16, 17, and 18. The court of appeals denied Relators' petition for mandamus relief.

Relators complain that these interrogatories are overbroad for two reasons. First, Relators never employed Ward. They are subsidiaries of American Commercial Barge Line, which also never directly employed Ward, but acquired Ward's former employer, National Marine Services. Therefore, the identity of relators' managerial safety and hygiene personnel and corporate physicians is not relevant to Ward's claims. Second, the requested time period extends twenty-five years beyond the time Ward was employed by American Commercial Barge Line's predecessor in interest, National Marine Services.

[1] [2] Mandamus relief is appropriate only if a trial court

abuses its discretion, and there is no adequate appellate remedy. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992); *CSR Ltd. v. Link,* 925 S.W.2d 591, 596 (Tex.1996). The burden of establishing an abuse of discretion and an inadequate appellate remedy is on the party resisting discovery, and this burden is a heavy one. *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 305 (Tex.1994). A clear abuse of discretion occurs when an action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *CSR,* 925 S.W.2d at 596.

*152 [3] [4] Generally, the scope of discovery is within the trial court's discretion. *Dillard Dep't Stores, Inc. v. Hall,* 909 S.W.2d 491, 492 (Tex.1995). However, the trial court must make an effort to impose reasonable discovery limits. *In re American Optical,* 988 S.W.2d 711, 713 (Tex.1998). The trial court abuses its discretion by ordering discovery that exceeds that permitted by the rules of procedure. *Texaco, Inc. v. Sanderson,* 898 S.W.2d 813, 815 (Tex.1995).

[5] Our procedural rules define the general scope of discovery as any unprivileged information that is relevant to the subject of the action, even if it would be inadmissible at trial, as long as the information sought is "reasonably calculated to lead to the discovery of admissible evidence." TEX.R. CIV. P. 192.3(a); *see also Eli Lilly & Co. v. Marshall,* 850 S.W.2d 155, 160 (Tex.1993). Also, a party may obtain discovery of the name, address, and telephone number of persons who have or may have knowledge of any discoverable matter. TEX.R. CIV. P. 192.3(c). Although the scope of discovery is broad, requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution. *American Optical,* 988 S.W.2d at 713. Thus, discovery requests must be "reasonably tailored" to include only relevant matters. *Id.*

[6] Ward argues that Relators have not shown the trial court's order was so arbitrary and unreasonable as to constitute a clear abuse of discretion. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). According to Ward, the information these interrogatories seek is within the scope of permissible discovery. Ward contends that relevant evidence is not limited to what National Marine Services's employees knew. Ward also argues that employees from Relator's subsidiaries may have information about barge industry custom that is relevant to a negligence claim. *See Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 748 (Tex.1980) (in negligence cases, evidence of industry

custom at the time of manufacture is admissible to compare the defendant's conduct with industry custom).

[7] We do not find Ward's argument persuasive. Discovery orders requiring document production from an unreasonably long time period or from distant and unrelated locales are impermissibly overbroad. *See American Optical*, 988 S.W.2d at 713; *Dillard*, 909 S.W.2d at 492; *Texaco*, 898 S.W.2d at 815. For example, in *American Optical*, an asbestos-litigation case, the trial court ordered the defendant to turn over every document ever produced relating to asbestos. *American Optical*, 988 S.W.2d at 713. We held the order was overbroad, because "ordering a defendant to produce virtually all documents regarding its products for a fifty-year period is an abuse of ... discretion." *Id.* In *Dillard*, we held the trial court's order was overly broad, because it required Dillard to produce every incident report filed between 1985 and 1990 in all 227 Dillard stores nationwide. *Dillard*, 909 S.W.2d at 492. The Court explained that "requests for document production may not be used simply to explore." *Dillard*, 909 S.W.2d at 492 (citing *Loftin v. Martin*, 776 S.W.2d 145, 148 (Tex.1989)). Finally, in *Texaco*, the plaintiffs claimed injurious workplace exposure to benzene and requested all safety and toxicology documents written by the corporate safety director, including those documents regarding other employees' exposure and plants where the plaintiffs never worked. *Texaco*, 898 S.W.2d at 814. The request also extended into a time period during which the plaintiffs did not work with the company. *Id.* This Court held the request was overbroad, because it was "not merely *153 an impermissible fishing expedition; it [was] an effort to dredge the lake in hopes of finding a fish." *Id.* at 815.

[8] A central consideration in determining overbreadth is whether the request could have been more narrowly tailored to avoid including tenuous information and still obtain the necessary, pertinent information. *See American Optical*, 988 S.W.2d at 713. A request to identify all safety employees who worked for Relators over a 30–year period, even though Ward never worked for Relators or for their parent company for that length of time, qualifies as the kind of "fishing expedition" this Court has repeatedly struck down. *See, e.g., Texaco*, 898 S.W.2d at 815. Accordingly, the discovery request at issue here is overly broad.

Ward additionally argues that the cases involving requests for document production are distinguishable, because such requests are characteristically more burdensome than providing a list of names and addresses. But, as Relators

note, this Court has not identified different standards for evaluating various discovery methods. *See K Mart Corp. v. Sanderson*, 937 S.W.2d 429, 431 (Tex.1996) (relying on cases involving document production requests to reverse a trial court's order compelling K–Mart to answer interrogatories). In *K Mart*, we "reject[ed] the notion that any discovery device can be used to 'fish.' " *Id.*

Finally, Ward claims he needs the identities of thirty years' worth of safety and industrial hygiene employees, as well as the names of corporate physicians, because they might have information on barge industry custom from the applicable time period. *See Bailey*, 609 S.W.2d at 748. Although Ward may discover evidence of industry custom at the time Ward was employed, the interrogatories at issue here impermissibly request information for twenty-five years beyond the applicable time period. *See Texaco*, 898 S.W.2d at 815 (rejecting plaintiff's argument that an overbroad discovery request lacking appropriate limitations as to time, place, or subject matter was relevant to establish defendant's "corporate strategy to ignore safety laws").

[9] If a reviewing court concludes that a trial court's discovery order is overbroad, the trial court has abused its discretion, and the order must be vacated if there is no adequate remedy on appeal. *See American Optical*, 988 S.W.2d at 713; *see also Walker*, 827 S.W.2d at 840. Here, no adequate appellate remedy exists. We have said that where a discovery order compels production of "patently irrelevant or duplicative documents," as this order undoubtedly does, there is no adequate remedy by appeal because the order "imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *Walker*, 827 S.W.2d at 843; *see also General Motors Corp. v. Lawrence*, 651 S.W.2d 732, 734 (Tex.1983). Ward's request could easily be narrowly tailored to obtain information pertinent to the time period during which Ward was employed by National Marine Services.

As written, interrogatories 16, 17, and 18 are overbroad. The interrogatories lack reasonable limitations as to time and subject matter. *See Texaco*, 898 S.W.2d at 815. Accordingly, without hearing oral argument, we conditionally grant mandamus relief and direct the trial court to vacate its order compelling CSX Corporation, National Marine, Inc. and Vectura Group to answer interrogatories 16, 17, and 18. TEX.R.APP. P. 59.1. The writ will issue only if the trial court fails to act promptly in accord with this opinion.

**All Citations**

124 S.W.3d 149, 47 Tex. Sup. Ct. J. 24

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

333 S.W.3d 315
Court of Appeals of Texas, San Antonio.

In re Megan LEYVA.

No. 04–10–00608–CV. | Sept. 29, 2010.

**Synopsis**
**Background:** Real party in interest filed a petition to modify parent–child relationship. Relator filed an original answer and a motion to transfer. Relator subsequently filed a petition for writ of mandamus, complaining of the failure of the 45th Judicial District Court, Bexar County, Barbara Hanson Nellermoe, J., to transfer venue in a suit to modify the order in a suit affecting the parent-child relationship.

**[Holding:]** The Court of Appeals, Phylis J. Speedlin, J., held that mandamus relief was appropriate and not premature.

Writ of mandamus conditionally granted.

West Headnotes (4)

[1]      **Appeal and Error**
⬦═Nature and Extent of Discretionary Power
**Appeal and Error**
⬦═Abuse of discretion

Trial court has no discretion in determining what the law is or applying the law to the facts, and a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.

Cases that cite this headnote

[2]      **Child Custody**
⬦═Change of venue
**Mandamus**
⬦═Remedy by Appeal or Writ of Error
**Mandamus**
⬦═Change of venue and transfer of causes

In a suit to modify the parent-child relationship, the trial court has a mandatory statutory ministerial duty to transfer the suit to a county where the child has lived for six months or longer, and, when the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate. V.T.C.A., Family Code § 155.201.

Cases that cite this headnote

[3]      **Child Custody**
⬦═Change of venue

Because the real party in interest failed to timely file a controverting affidavit, after he was served with relator's motion to transfer venue in suit to modify parent–child relationship, statute governing procedure to transfer venue in suits affecting the parent-child relationship required the trial court to transfer venue of the proceeding, without a hearing, to the county which had been principal residence of the child during the six-month period preceding the commencement of the suit. V.T.C.A., Family Code § 155.204(c).

1 Cases that cite this headnote

[4]      **Child Custody**
⬦═Change of venue
**Mandamus**
⬦═Change of venue and transfer of causes

Mandamus relief, requiring trial court to transfer venue in suit to modify parent-child relationship

from Bexar to Lubbock County, was appropriate and not premature because trial court was statutorily required to transfer venue, but failed to do so; allegations in motion to transfer venue were sufficient to comply with statute governing procedure to transfer venue in suits affecting parent-child relationship by alleging that child's principal residence was in Lubbock County and had been in that county during six-month period preceding commencement of suit, and in light of failure of real party in interest to timely file controverting affidavit, trial court was statutorily required to transfer venue in compliance with statute without holding hearing. V.T.C.A., Family Code §§ 155.201(b), 155.204(c).

Cases that cite this headnote

*316 Original Mandamus Proceeding.[1]

**Attorneys and Law Firms**

Travis Scott Ware, Attorney at Law, Susan Dawn Shay, Lubbock, TX, for Appellant.

Omar Cura Jr., Lawrence L. Garcia & Associates, P.C., San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice, PHYLIS SPEEDLIN, Justice.

**OPINION**

Opinion by: PHYLIS J. SPEEDLIN, Justice.

On August 23, 2010, relator Megan Leyva filed a petition for writ of mandamus, complaining of the trial court's failure to transfer venue in a suit to modify the order in a suit affecting the parent-child relationship. We conditionally grant mandamus relief.

**BACKGROUND**

On June 1, 2010, real party in interest Dominique Arvizu filed a Petition to Modify Parent-Child Relationship in Bexar County. Relator Megan Leyva filed an original answer and a motion to transfer on June 21, 2010. The motion to transfer alleged: "The principal residence of the *317 child is in Lubbock County, Texas, and has been in that county during the six-month period preceding the commencement of this suit. Venue is proper in that county." The record indicates the motion to transfer was sent to Arvizu's counsel on June 21, 2010. On July 21, 2010, Leyva's counsel sent to the trial court a draft order transferring the modification suit. Thereafter, Arvizu filed a controverting affidavit on August 3, 2010. On August 5, 2010, Leyva's counsel wrote to the trial judge, requesting that she transfer venue due to Arvizu's failure to timely file a controverting affidavit. To date, the trial court has not ruled on the motion to transfer venue. Leyva now complains the trial court has abused its discretion in refusing to transfer the modification suit to Lubbock County.

**ANALYSIS**

[1] [2] Mandamus will issue only to correct a clear abuse of discretion for which the relator has no adequate remedy at law. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135 (Tex.2004) (orig. proceeding); *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992) (orig. proceeding). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts," and "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker,* 827 S.W.2d at 840. In a suit to modify the parent-child relationship, the trial court has a mandatory ministerial duty under Family Code section 155.201 to transfer the suit to a county where the child has lived for six months or longer. *See In re Kramer,* 9 S.W.3d 449, 450 (Tex.App.-San Antonio 1999, orig. proceeding) (citing *Proffer v. Yates,* 734 S.W.2d 671, 673 (Tex.1987)). When the trial court fails to timely transfer venue, mandamus relief is appropriate because an appeal is inadequate. *See Proffer,* 734 S.W.2d at 673.

Leyva complains the trial court abused its discretion by failing to comply with the provisions of the Texas Family Code requiring the transfer of venue. *See* TEX. FAM.CODE §§ 155.201, 155.204 (West 2008). A transfer becomes mandatory as follows:

If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155.204, transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer.

*Id.* § 155.201(b). A party seeking to contest the motion to transfer venue must file a controverting affidavit denying that grounds for the transfer exist "[o]n or before the first Monday after the 20th day after the date of notice of a motion to transfer is served ..." *Id.* § 155.204(d). "If a timely motion to transfer has been filed and no controverting affidavit is filed within the period allowed for its filing, the proceeding shall, not later than the 21st day after the final date of the period allowed for the filing of a controverting affidavit, be transferred without a hearing to the proper court." *Id.* § 155.204(c).

[3] Arvizu does not contest he was served with Leyva's motion to transfer venue on June 21, 2010. Therefore, Arvizu was required to file his controverting affidavit on or before July 12, 2010, but he did not file his controverting affidavit until August 3, 2010. Because Arvizu failed to timely file a controverting affidavit, section 155.204(c) required the trial court to transfer the proceeding, without a hearing, no later than August 2, 2010. *Id.* To date, the trial court has failed to transfer venue to Lubbock County.

In a response filed with this court, the trial judge contends the transfer was not mandatory because Leyva's motion to **\*318** transfer failed to provide sufficient facts to support a transfer. Specifically, the trial judge asserts the motion (1) fails to state the date the child began living in Lubbock County; and (2) only provides that the "principal residence" is in Lubbock County instead of asserting the child has resided in Lubbock County for six months or

longer. As a result, the trial judge contends the mandamus is premature because she has not yet denied the motion to transfer venue, and a hearing should be held to determine if the transfer is mandatory.

[4] Section 155.203 of the Family Code directs the court to look at the child's "principal residence" to determine the county of the child's residence when determining if venue must be transferred. *Id.* § 155.203 (providing "the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence during the six-month period preceding the commencement of the suit"). We find the allegations in the motion were sufficient to comply with section 155.201(b) by alleging the child's principal residence is in Lubbock County, Texas and "has been in that county during the six-month period preceding the commencement of this suit." *See id.* § 155.201(b). Therefore, in light of Arvizu's failure to timely file a controverting affidavit, the trial court was required to transfer venue in compliance with section 155.204(c) without holding a hearing. *See id.* § 155.204(C). As a result of the foregoing, mandamus relief is appropriate and not premature.

## CONCLUSION

Because we conclude the trial court abused its discretion in failing to transfer the suit to Lubbock County, we conditionally grant the writ of mandamus. The writ will issue only if the trial court fails to transfer the suit within fourteen days.

**All Citations**

333 S.W.3d 315

Footnotes

1    This proceeding arises out of Cause No. 2009–CI–03536, styled *In the Interest of G.L.,* pending in the 45th Judicial District Court, Bexar County, Texas, the Honorable Barbara Hanson Nellermoe presiding.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

276 S.W.3d 190
Court of Appeals of Texas,
Houston (14th Dist.).

In re James Madison NABORS and Julia Nabors,
Relators.

No. 14–08–00380–CV. | Jan. 16, 2009.

**Synopsis**
**Background:** After Texas Department of Family Protective Services (TDFPS), which had removed children from foster parents' home, concluded foster parents had no role in the alleged abuse, foster parents filed petition for adoption, motion to modify parent-child relationship, and motion to transfer venue. The 315th District Court, Harris County, Michael Schneider, J., denied motion to transfer venue, and foster parents filed petition for writ of mandamus.

**Holdings:** The Court of Appeals, Charles Seymore, J., held that:

[1] mandamus was available to compel a transfer of a suit affecting a parent-child relationship to the county in which child had resided more than six months, and

[2] children's residence was foster parents' home, for purposes of motion to transfer venue to county in which children resided more than six months, as children had lived with foster parents for 17 months before TDFPS removed them.

Petition conditionally granted.

Kem Thompson Frost, J., dissented and filed opinion.

West Headnotes (8)

[1]     **Appeal and Error**
        Interlocutory Motions, Orders, and Judgments

An oral ruling on the record satisfies requirement in rules of appellate procedure for a certified or sworn copy of any order complained of, or any other document showing the matter complained of. Rules App.Proc., Rule 52.3(j)(1)(A) (2007).

1 Cases that cite this headnote

[2]     **Mandamus**
        Remedy by Appeal or Writ of Error
        **Mandamus**
        Matters of discretion

In order to obtain mandamus relief, the relator must show that the trial court clearly abused its discretion, and the relator has no adequate remedy by appeal.

1 Cases that cite this headnote

[3]     **Appeal and Error**
        Nature and Extent of Discretionary Power

A trial court has no discretion in determining what the law is or applying the law to facts.

Cases that cite this headnote

[4]     **Infants**
        Jurisdiction and venue
        **Mandamus**
        Change of venue and transfer of causes

The transfer of a suit affecting the child-parent relationship to a county where the child has resided for more than six months is a mandatory ministerial duty, and therefore mandamus is available to compel such a transfer. V.T.C.A.,

Family Code §§ 103.001(c), 155.201(b).

5 Cases that cite this headnote

**[5]**  **Infants**
⟷Jurisdiction and venue

Transfer procedures under the Texas Family Code are the exclusive mechanism for transferring suits affecting the parent-child relationship and are designed to supplant the regular venue rules. V.T.C.A., Family Code §§ 103.001(a), 155.201, 155.204.

6 Cases that cite this headnote

**[6]**  **Infants**
⟷Jurisdiction and venue

A motion to transfer a suit affecting the parent-child relationship does not have to be verified or supported by an affidavit. V.T.C.A., Family Code § 155.204.

2 Cases that cite this headnote

**[7]**  **Infants**
⟷Jurisdiction and venue

Children's residence was foster parents' home, for purposes of motion filed by foster parents to transfer venue of suit affecting parent-child relationship to county in which children resided for more than six months after Texas Department of Family Protective Services (TDFPS), which had removed children from foster parents' home, concluded that foster parents had no role in alleged abuse but did not return children; though TDFPS was the appointed sole managing conservator for the children and children had resided in another

county for two weeks before foster parents filed change in venue motion, children had lived with foster parents for 17 months before TDFPS removed them, and change in venue statute did not require that the affected children currently reside in the county to which the change in venue was sought. V.T.C.A., Family Code §§ 103.001(c), 155.201(b), 155.202(a), 155.203.

1 Cases that cite this headnote

**[8]**  **Infants**
⟷Jurisdiction and venue

In determining the county of principal residence for children, on a motion to transfer venue of suit affecting parent-child relationship to county in which the children resided for more than six months, courts focus on elements of permanency for the children which are critical to establishing residency for venue purposes. V.T.C.A., Family Code §§ 155.201(b), 155.202(a), 155.203.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*192** David Perwin, Rosenberg, for Appellants.

Sarah Stallberg, Houston, Trevor A. Woodruff, Austin, for Appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## MAJORITY OPINION

CHARLES SEYMORE, Justice.

In this original proceeding, relators, James Madison

Nabors and Julia Nabors, seek a writ of mandamus ordering the respondent, the Honorable Michael Schneider, to transfer the underlying case from Harris County to Fort Bend County. We conditionally grant the writ.

## BACKGROUND

On May 16, 2006, the Texas Department of Family Protective Services ("TDFPS") placed T.D.P. and D.E.P. with the Naborses, who became their foster parents. On August 22, 2007, the trial court signed a final order in a suit to terminate the parental rights of T.D.P. and D.E.P.'s biological parents. TDFPS was named the sole managing conservator. On October 26, 2007, the children were removed from the Naborses' home on allegations of abuse. TDFPS informed the Naborses that "[b]ased on the information gathered, it was determined that you had no role and the investigation was closed." The children were not returned to the Naborses' home.

[1] On November 9, 2007, the Naborses filed, in Harris County, a petition for adoption and motion to modify the parent-child relationship with an accompanying motion to transfer venue to Fort Bend County.[1] In their motion, the Naborses alleged that Fort Bend County has been the children's principal residence and "has been in that county during the six-month period preceding the commencement of this suit."[2] On December 19, 2007, TDFPS filed an answer. Prior to a hearing on February 4, 2008, TDFPS filed a response to the motion to transfer supported by an affidavit. The trial court denied the motion to transfer venue.[3]

## *193 STANDARD OF REVIEW

[2] [3] [4] In order to obtain mandamus relief, the relator must show that the trial court clearly abused its discretion, and the relator has no adequate remedy by appeal. *In re Sw. Bell Tele. Co., L.P.,* 226 S.W.3d 400, 403 (Tex.2007) (orig.proceeding). A trial court has no discretion in determining what the law is or applying the law to facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). The transfer of a suit-affecting the child-parent relationship to a county where the child has resided for more than six months is a mandatory ministerial duty. *Proffer v. Yates,*

734 S.W.2d 671, 673 (Tex.1987). Therefore, a writ of mandamus is available to compel the mandatory transfer of a suit affecting the parent-child relationship. *Id.* at 672.

## MOTION TO TRANSFER VENUE

Because the 315th District Court of Harris County was the court of continuing jurisdiction based on the suit to terminate parental rights, the Naborses filed their motion to modify, petition for adoption, and motions to transfer in that court. *See* Tex. Fam.Code Ann. §§ 103.001(a) (Vernon 2002) (an original suit shall be filed in the county where the child resides unless another court has continuing exclusive jurisdiction); 155.001 (Vernon 2002) (a court acquires continuing, exclusive jurisdiction over the matters provided for by this title in connection with a child on the rendition of a final order). The Naborses sought to transfer the case to Fort Bend County on the assertion that the children had resided there for more than six months preceding the filing of the motion to modify and the petition for adoption. Section 155.201 of the Texas Family Code provides for the mandatory transfer of a proceeding on a motion to modify as follows:

> (b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155.204, transfer the proceeding to another county in this state if the child has resided in the other county *for six months or longer.*

Tex. Fam.Code Ann. § 155.201(b) (Vernon Supp.2008) (emphasis added).

The Naborses contend the trial court had a ministerial duty to sever and transfer all proceedings pertaining to the children to Fort Bend County because the children had lived with them in Fort Bend County for the requisite length of time. TDFPS contends the Naborses did not present any evidence to support their motion to transfer venue to Fort Bend County, arguing that the Naborses failed to submit an affidavit that contained sufficient averments.

## VENUE RULES

[5] TDFPS contends the rules governing transfer of venue in a suit affecting parent-child relationship are a combination of the Texas Family Code, the Texas Civil Practice & Remedies Code, and the Texas Rules of Civil Procedure. Relying on the venue statute found in Chapter 15 of the *194 Texas Civil Practice & Remedies Code and the Texas Rules of Civil Procedure, TDFPS asserts that venue questions are decided solely on the pleadings and affidavits, not on live testimony. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.064 (Vernon 2002) ("The court shall determine venue questions from the pleadings and affidavits."); *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 n. 4 (Tex.1992) (orig.proceeding) (explaining that live testimony may not be considered at a venue hearing under Rules 87 and 88 of the Texas Rules of Civil Procedure). However, transfer procedures under the Texas Family Code are the *exclusive* mechanism for transferring suits affecting the parent-child relationship and were designed to supplant the regular venue rules.[4] Therefore, we need not consider the Naborses' motions to transfer venue under other statutes or the Rules of Civil Procedure. *See Mendez*, 761 S.W.2d at 521 (rejecting contention that trial court should have considered motion to transfer, which was filed in contempt proceeding for failure to pay child support, under Rule 86 of the Texas Rule of Civil Procedure and Chapter 15 of the Texas Civil Practice and Remedies Code).

[6] Section 155.204 of the Family Code provides that the "motion must contain a certification that all other parties, including the attorney general, if applicable, have been informed of the filing of the motion." Tex. Fam.Code Ann. § 155.204(a) (Vernon 2002). Section 155.204 does not require that the motion be verified or supported by an affidavit. *See In re Sanchez*, 1 S.W.3d 912, 915 (Tex.App.-Waco 1999, orig. proceeding) ("[A] motion to transfer [under section 155.204] does not have to be verified nor must it be supported by an affidavit.").[5]

## THE CHILDREN'S RESIDENCE

At the hearing on the motion to transfer, relator, James Nabors, testified that TDFPS placed the children with him and his wife on May 16, 2006, and the children resided with them in Fort Bend County for seventeen months. The Naborses contend TDFPS failed to controvert their venue averments.

[7] TDFPS contends its affidavit controverts the Naborses' venue facts. We note that TDFPS did aver that the children were "not currently residing with the Naborses, and have not since October 26, 2007." However, there is no dispute that the children resided in Fort Bend County for approximately seventeen months before TDFPS removed them from the Naborses' household. TDFPS contends that it designated the Naborses' home as the children's residence on a temporary basis only. The TDFPS bases a major portion of its venue argument on the assertion that the "principal residence" of the children has always been Harris County because *195 section 103.001(c) provides that a "child resides in the county where the child's parents reside." Tex. Fam.Code Ann. § 103.001(c). TDFPS contends it should be denominated the "parent" of the children because it was appointed sole managing conservator.

However, the Texarkana and the Amarillo Courts of Appeals have rejected similar arguments made by TDFPS. First, *In re Kerst*, 237 S.W.3d 441, 442 (Tex.App.-Texarkana 2007, orig. proceeding), presents a somewhat similar scenario in which TDFPS sought and obtained termination of the parental rights. TDFPS placed the children with the Kersts who lived in Bowie county. *Id.* After a disagreement arose between TDFPS and the Kersts, the children were removed from the Kersts' home. *Id.* Subsequently, the Kersts filed a motion to modify the conservatorship and motion to transfer venue from Hopkins county (where the court had continuing jurisdiction) to Bowie County. *Id.* In their motion, the Kersts alleged that the children had lived in Bowie County for more than six months. *Id.* It was undisputed that the children had lived with the Kersts, in Bowie County, for approximately seventeen months prior to the date the Kersts filed their motion to transfer venue, which the trial court denied. *Id.*

The court of appeals rejected TDFPS's assertion that the Legislature never intended for the proceedings to be transferred to the county where the foster parents resided with the children. *Id.* at 443-44. TDFPS argued that, until the statute was amended, foster parents had no standing to assert these rights and, when the Legislature granted such standing, it was not contemplated that foster parents would be allowed to seek and obtain a transfer to the county where they resided with the children. *Id.* But, the court of appeals concluded that the statute requiring the mandatory transfer of a suit affecting the parent-child relationship to the county where the child has resided for six months or longer is straightforward and clear, and

declined to accept TDFPS's invitation to surmise that the statute has some other meaning. *Id.* at 444.

The appellate court further rejected TDFPS's argument that the children had not "resided" in Bowie County, but were placed there merely for foster care, reasoning "[i]t cannot be argued that they were only temporarily absent from another, more permanent residence, since these children had no other home or residence." *Id.* at 444–45. The court of appeals held that the children had resided in Bowie County for more than six months and directed the trial court to transfer the proceedings. *Id.* at 445.

Second, *In re Gore* presents the same scenario in which the original court of continuing jurisdiction in Potter County named TDFPS the managing conservator. No. 07–07–0290–CV, 2007 WL 2403366, at *1 (Tex.App.-Amarillo Aug. 23, 2007, orig. proceeding) (mem.op.). TDFPS placed the child in the foster care of the Gores in Swisher County. *Id.* After the child had lived with the Gores for more than six years, the Gores filed a petition seeking termination of the parent-child relationship between the child and her parents in the court in Potter County. *Id.* After the case had been transferred to Swisher County, TDFPS sought and received a discretionary transfer of the case back to Potter County. *Id.* Because it was undisputed that the child had resided in Swisher County more than six months, the court of appeals held that Swisher County was the only county of proper venue and the case should not have been transferred back to Potter County. *Id.* at *2.

Similar to *Kerst* and *Gore*, it is undisputed that the children had resided in Fort *196 Bend County with the Naborses for more than six months preceding the date the motion to modify and petition for adoption were filed. Therefore, we reject TDFPS's argument that the children resided in Harris County and their residence in Fort Bend County was temporary. *See Kerst,* 237 S.W.3d at 444–45.

## CONVENIENCE OF THE PARTIES

The Naborses pleaded, alternatively, that the district court in Fort Bend County would be more convenient because all parties and witnesses reside in Fort Bend County. Section 155.202(b) provides that, "[f]or the convenience of the parties and witnesses and in the interest of justice, the court, on the timely motion of a party, may transfer the proceeding to a proper court in another county in the

state." Tex. Fam.Code Ann. § 155.202(b) (Vernon 2002). At the hearing, the trial court stated that the motion to transfer was discretionary, and it was denied. However, as we have concluded, the issue in this case is mandatory venue transfer because it is undisputed that the children lived with the Naborses in Fort Bend County for six months or longer. *See Kerst,* 237 S.W.3d at 443 (rejecting TDFPS's argument that forum non conveniens may be relied upon to deny mandatory transfer of proceedings).

## CONSTRUCTION OF SECTION 155.201(B)

TDFPS focused its appellate argument on the contention that this court should deny the petition because relators failed to comply with applicable rules of procedure. In other words, TDFPS argues that the trial court could not consider anything other than the contentions in the Naborses' motion to transfer venue supported by timely filed affidavits. We have addressed those arguments, however, the dissent opines that our disposition violates certain venue provisions in the family code because the children did not reside in Fort Bend County on the day or at the moment the Naborses filed their motion to transfer venue. *See post* at 199. We respectfully disagree.

The children resided with the Naborses for approximately seventeen months before TDFPS moved them to Harris County. They were placed in Harris County approximately two weeks before the Naborses filed their motion to transfer venue. Obviously, at the time of the hearing, the children had resided in the "other county for six months or longer." Tex. Fam.Code Ann. § 155.201(b); *see also Kerst,* 237 S.W.3d at 445 n. 6. ("Generally, one designates residence by selecting a home and living in it. Here, the Department designated that the children would live at the Kersts' home, where they remained for seventeen months. It was their principal residence for the six-month period preceding the commencement of the suit to modify.").[6]

*197 In support of her proposed interpretation of venue provisions in the family code, our dissenting colleague analyzes and compares the verb tense *"has resided "* in the last phrase in the provision for mandatory venue under section 155.201(b) with the verb tense *"resides "* in the provision for discretionary venue under section 155.202(a). The dissent relies heavily on verb tense employed by the Legislature in section 155.202(a)—the discretionary venue transfer provision—to support her conclusion that a section 155.201(b) mandatory transfer is necessarily based on an allegation that " 'the child *resides* in another county.' " *See post* at 202–03. First, in

interpreting the express provisions of section 155.201(b), we have not supplied additional words.[7] In section 155.201(b), the Legislature conspicuously did not express any requirement that the children presently or currently reside in the other county. If the Legislature had desired that the child currently reside in the other county at the time a proceeding is commenced, it could have included such language. Second, any attempt to interpose additional requirements for mandatory venue by suggesting that legislative intent is implicit because of a verb tense employed in the discretionary transfer subsection, strains the rules of statutory construction.[8] Under the plain language in section 155.201(b) the Legislature does not require that the children *currently reside* in the other county, only that they *"have resided"* there for six months or longer when the modification suit is filed. *See id.*[9]

The majority chooses to follow the Legislature's clear instructions for determining the county of the children's residence prescribed as follows:

[8] Determining County of Child's Residence

> In computing the time during which the child has resided in a county, the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence during the six-month period preceding the commencement of the suit.

Tex. Fam.Code Ann. § 155.203 (Vernon Supp.2008)

Our interpretation and application of the above language properly focuses on determination of the children's *"principal residence"* during the six month period. We duly regard the Legislature's instructions not to focus on time and location of the children on a particular day. In determining the county of principal residence we focus on elements of permanency for the children which are critical to establishing residency for venue purposes. *See Martinez* *198 820 S.W.2d at 940–41 (applying former section 11.06(b), which had language similar to sections 155.201(b), 155.202(a) and 155.203, and opining that child's principal residence is not determined by this six-month period, but six-month period may be a guide in determining whether new county of residence is intended to be principal, as opposed to merely temporary residence). The record in this case indicates the Naborses fed, clothed and provided a home for the children in Fort Bend County during the relevant period of time. Our dissenting colleague places emphasis on the last phrase in

section 155.203 in order to justify her verb tense analysis of sections 155.201(b) and 155.202(a) with the suggestion that *"during the six month period preceding the commencement of the suit "* means the children must currently reside in the other county or venue will not be mandatory in the other county. The dissent's interpretation is repugnant to the purpose of section 155.203. The dissent implicitly concludes that the children's principal residence will never be in the county where they were actually residing during the statutory six month period if they are simply spirited away from that residence to another county before a motion to transfer venue is filed.

The dissent contends our interpretation of section 155.201(b) conflicts with *In re T.J.L.*, 97 S.W.3d 257 (Tex.App.-Houston [14th Dist.] 2002, no pet.). We are referred to page 264 of that opinion with our dissenting colleagues's statement that this court construed section 155.201(b) to "require that the child be a resident of the other county at the time the suit to modify was filed." *See post* at 205. First, *T.L.J.*, pertained to the question of whether transfer of venue as to one child is required when not all children of a marriage live in the county to which transfer is sought. Our court concluded that Section 155.207(b) of the Family Code requires a court to transfer the proceedings affecting a child to the county where the child resides, even if it retains jurisdiction over another child of the marriage who does not live in the transferee county. The *T.L.J.* court did not interpret or apply section 155.201(b) to answer the specific question presented in this case. Moreover, the court relied on *Cassidy v. Fuller*, 568 S.W.2d 845 (Tex.1978) when it referred to section 155.201(b).[10]

Finally, our dissenting colleague's effort to construe sections 155.201(b) and 155.203 by relying on certain language in *Blacklock v. Miller* is likewise misplaced. 693 S.W.2d 651 (Tex.App.-Dallas 1985, orig. proceeding). In that case, the Dallas Court of Appeals cited and relied on *Chem–Spray Aerosols, Inc. v. Edwards*[11] to support its conclusion that "[t]he critical time with regard to the existence of venue *199 facts is the time of filing suit." *Id.* at 652. However, *Chem–Spray Aerosols* is not a family law case,[12] and it is well-established that the Family Code's transfer provisions supplant the rules of procedure and statutes governing venue challenges in other types of civil cases. *See Leonard*, 654 S.W.2d at 441. Therefore, the general rules for establishing venue in civil cases are not applicable to suits affecting the parent-child relationship. *See, e.g., In re Sanchez*, 1 S.W.3d at 914–15 (rejecting argument that motion to transfer venue was

untimely because affidavit in support of motion was not served until long after answer date as Family Code does not require that motion to transfer be verified or supported by affidavit); *Mendez*, 761 S.W.2d at 521 (refusing argument that trial court should have considered motion to transfer venue under Rule 86 of Texas Rules of Civil Procedure and Chapter 15 of Texas Civil Practice and Remedies Code).

## CONCLUSION

We hold venue for these proceedings is mandatory in Fort Bend County. Once the Naborses established that the children continuously resided in Fort Bend County for more than six months preceding the filing of the motion to modify and petition for adoption, the trial court had a ministerial duty to transfer the underlying case to Fort Bend County under section 155.201(b) of the Family Code. *See Proffer*, 734 S.W.2d at 673. We therefore conditionally grant the petition for a writ of mandamus and direct the trial court to vacate its order denying the Naborses' motion to transfer, and grant the same.

The writ will issue only if the trial court fails to act in accordance with this opinion.

FROST, J., dissenting.

## DISSENTING OPINION

KEM THOMPSON FROST, Justice.

The majority correctly determines that relators James Madison Nabors and Julia Nabors were not required to present an affidavit in support of their motion to transfer venue and that the Texas Department of Family Protective Services ("Department") is not the "parent" of T.D.P. and D.E.P. (hereinafter the "Children"). But the majority incorrectly determines that the Naborses are entitled to a mandatory venue transfer upon a showing that the Children's principal residence was in Fort Bend County

for more than six months at any time in the past. Instead, under the applicable statute as well as precedent from the Supreme Court of Texas and this court, to have been entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code, the Naborses had to prove that the Children's principal residence was in Fort Bend County throughout the six-month period ending on the date the Naborses filed the suit to modify. Because the uncontroverted evidence shows that the Children's principal residence was in Harris County during the last fourteen days of this period, the Naborses did not show entitlement to a mandatory venue transfer under the only ground asserted in their motion or under the applicable statute. Accordingly, the trial court did not clearly abuse its discretion by denying the Naborses' motion to transfer, and this court should deny the petition for writ of mandamus.

## *200 FACTUAL AND PROCEDURAL BACKGROUND

The Naborses filed both their suit to modify and their motion to transfer venue on November 9, 2007 (the "Filing Date"). In their motion, the Naborses correctly stated the legal standard for a mandatory venue transfer under section 155.201(b) of the Texas Family Code: "[t]he principal residence of the children **is in Fort Bend County, Texas,** and has been in that county during the six-month period preceding the commencement of this suit."[1] This is the only basis upon which the Naborses sought a transfer; yet, they presented no proof that the principal residence of the Children was in Fort Bend County through the Filing Date. Rather, the undisputed evidence before the trial court on February 4, 2008, the date the trial court denied the motion to transfer venue, showed the following:

- Between May 16, 2006 and October 26, 2007, the principal residence of the Children was in Fort Bend County, Texas, with the Naborses.

  - Between October 26, 2007, and February 4, 2008, the principal residence of the Children was in Harris County, Texas.

The Children's supervisor at Harris County Children's Protective Services testified as follows:

- The Department has been the sole managing

conservator of the Children since August 8, 2007.

• The Department placed the Children with the Naborses as foster parents.

• On October 26, 2007, the Department removed the children from the Naborses' home due to allegations of physical abuse and policy violations that were later validated.

• The Children were then placed in a home in Harris County.

• The Children have not resided with the Naborses since October 26, 2007.

• Since October 26, 2007, the Children have continuously resided in Harris County.

This testimony was not controverted. The evidence before the trial court showed that, from October 26, 2007 forward, including on the Filing Date, the Children's principal residence was in Harris County. Simply stated, the Naborses did not prove the factual predicate asserted in their motion to transfer venue.

## THE NABORSES' BURDEN OF PROOF

The Naborses are relators in this original mandamus proceeding. As such, they have the "heavy" burden of presenting a record and petition that show they are entitled to mandamus relief to correct a clear abuse of discretion by the trial court.[2] The inquiry mandated by precedent *201 is whether the Naborses have established their entitlement to the extraordinary relief of a writ of mandamus, not whether the real party in interest (the Department) has shown that the relators are not entitled to mandamus relief.[3] Indeed, though a court of appeals may not grant mandamus relief without requesting a response, a real party in interest is not required to file a response, and any action or inaction on their part in responding to the mandamus petition is not a proper basis for granting mandamus relief.[4]

According to the majority, the only arguments that the Department asserts in its briefing as to why mandamus should be denied are its arguments as to why the procedures from Chapter 15 of the Texas Civil Practice and Remedies Code apply.[5] The majority states that, even though the Department "limited its appellate argument" to

these matters, the majority addresses the proper interpretation of section 155.201(b) because this issue is raised in this dissenting opinion.[6] There is both a factual defect and a legal defect in this reasoning.

Factually, the Department's procedural argument is not the only argument the Department has asserted in this court. Though the Department stresses its procedural argument, it also asserts that Harris County should be considered the Children's county of residence because the Department should be treated as a parent of the Children. In addition, in its briefing, the Department notes that, in its response in the trial court, the Department pointed out the fact that the Children have been residing in Harris County since October 26, 2007, and have not been residing with the Naborses since that date.

Legally, the majority's reasoning reverses the burden of proof in a mandamus proceeding from the burden imposed by mandatory precedent. There are several possibilities when an appellate court asks a real party to file a response: (1) a real party may brief one or more arguments showing why the relators are not entitled to mandamus relief; (2) a real party may brief one or more arguments in opposition to mandamus relief, none of which have merit; or (3) a real party may exercise its right not to file a response at all. Regardless of which course the real party takes, the relator keeps the "heavy" burden of presenting a record and petition that show the relator is entitled to mandamus relief to correct a clear abuse of discretion by the trial court.[7] The Naborses assert that the trial court clearly abused its discretion by not granting their motion to transfer venue to Fort Bend County under section 155.201(b) of the Texas Family Code. The Naborses have the burden to show that the denial of their motion was a clear abuse of discretion and that they are entitled to mandamus relief to correct it. Therefore, this court needs to address the issue of the proper construction of section 155.201(b) of the Texas Family Code, regardless *202 of the arguments asserted by the Department.

## THE LANGUAGE OF SECTION 155.201(B)

When a party files a modification suit and a motion for mandatory transfer, the party is entitled to a mandatory transfer "if the child has resided in the other county for six months or longer."[8] Therefore, for the Naborses to be entitled to a mandatory transfer to Fort Bend County, the Children must "have resided" in Fort Bend County for six months or longer as of the Filing Date. The verb forms "has resided" and "have resided" are in the present perfect

tense. This tense either (1) represents an action as having been completed at some indefinite time in the past, or (2) indicates that an action continues to the present.[9] If the first sense of the present perfect tense applies to section 155.201(b), then a child may have resided in various counties for at least six months at some indefinite time in past, prior to the filing of the modification suit. If the second sense of the present perfect tense applies, then the child would have had to reside in the other county for at least six months up to and including the date on which the modification suit was filed.[10] To see which sense was intended, this court should look to other parts of the statute.

Under section 155.202(a), "[i]f the basis of a motion to transfer a proceeding under this subchapter is that the child *resides* in another county, the court may deny the motion if it is shown that the child has resided in that county for less than six months at the time the proceeding is commenced."[11] Section 155.201(b) provides the only basis for transferring a proceeding under this subchapter that is based on the residence of the child. Therefore, in section 155.202, the legislature describes a transfer under section 155.201(b) as being based on an allegation that "the child *resides* in another county."[12] Thus, section 155.202(a) is strong support that the legislature intended the second sense of the present perfect tense in section 155.201(b).

The language in section 155.201(b) "if the child has resided in *the other county* for six months or longer" shows that the legislature envisioned that there would be only one other county.[13] This language is consistent with the legislature intending the second sense of the present perfect tense in section 155.201(b), and it is inconsistent with the legislature intending the first sense of the present perfect tense in section 155.201(b).

Under section 155.203, courts determining a child's residence must examine the child's principal residence throughout the six-month period preceding the commencement of suit.[14] Section 155.203 shows that the legislature intended the second sense of the present perfect tense in *203 section 155.201(b), rather than the first sense.[15] The majority incorrectly concludes that the legislature intended the first sense of the present perfect tense, which would mean that the child only has to have resided in the other county for at least six months at some indefinite time in the past, before the modification suit was filed.[16]

Based on the language of Texas Family Code section

155.201(b) and related statutory provisions, for the trial court to have been required to transfer venue to Fort Bend County, the Children's principal residence must have been in Fort Bend County throughout the six-month period ending on the Filing Date.[17] The majority states that this analysis adds to the statute words not contained therein and that, if the legislature wanted to require the child to be residing in the transferee county when suit was filed, it could have said so.[18] However, no words have been added to the statute in this dissenting opinion; rather, the objective of this statutory analysis is to seek the meaning of the words used. Courts should not ignore what is, based on what might have been.[19] That is, the fact that the legislature could have used more precise or clearer words does not change the court's mission to give effect to the words actually used. Because there is sufficient evidence to support an implied finding *204 that the Children's principal residence was not in Fort Bend County for the last fourteen days of this period, the trial court did not abuse its discretion by denying the motion to transfer.[20] Therefore, this court should deny the mandamus petition.[21]

## CONFLICT WITH PRECEDENT FROM THE SUPREME COURT OF TEXAS

The majority's analysis and disposition conflicts with the Supreme Court of Texas's decision in *Cassidy v. Fuller.*[22] In *Cassidy*, a father filed a motion to modify the divorce decree slightly more than six months after the decree was rendered in Reeves County.[23] At the same time, the father filed a motion to transfer venue of the proceeding to Clay County based on the undisputed fact that his children resided there and had resided there for more than six months.[24] The trial court denied the motion to transfer, but the *Cassidy* court held that the trial court clearly abused its discretion in doing so.[25] The *Cassidy* court concluded that the legislature intended venue for suits affecting the parent-child relationship to generally be in the county in which the child resides.[26] The high court stated that usually the current circumstances affecting the child may be best shown in the county in which the child resides.[27]

When *Cassidy* was decided, former section 11.06(b) contained language similar to the language now contained in sections 155.201(b), 155.202(a), and 155.203 of the Texas Family Code.[28] The *Cassidy* court held that former section 11.06(b) required transfer of the proceeding to the county in which the child was residing and had resided for

more than six months; however, the trial court had discretion to deny motions for change of venue based on the child's residence in another county if the child had resided in the other county for less than six months.[29] The *Cassidy* court noted that this provision operated to "forestall *205 forum shopping."[30] Though the *Cassidy* court did not explicitly state how this statute did so, it is clear from the opinion that the high court concluded that the statute forestalled forum shopping by preventing a party from changing the child's residence for a brief period to obtain a mandatory venue transfer.[31] Instead, to obtain a mandatory venue transfer, the movant would be required to show the child was residing in the other county and had been residing in that county for at least six months at the time the petition to modify was filed.[32]

Under the majority's interpretation of section 155.201(b), instead of preventing forum shopping, the statute is construed to promote forum shopping, by allowing a party to obtain a mandatory venue transfer to any county in which the child resided for at least six months at some time in the past. Given our increasingly mobile society, children very well may reside in a number of different Texas counties for at least six months before they reach adulthood. Today's interpretation allows a party to shop among all of these counties before choosing which county the party would like to be the county in which the court of continuing, exclusive jurisdiction is located. In addition, if a party is not pleased with the trial judge in the first county to which the case is transferred, the party then could file a motion to enforce or perhaps a second petition to modify and invoke section 155.201(c) to mandate a second transfer to one of the other counties in which the child resided in the past for at least six months.[33] The majority's statutory construction conflicts with the *Cassidy* decision.

## CONFLICT WITH THIS COURT'S PRECEDENT

In addition, in *In re T.J.L.*, this court construed section 155.201(b) to require that the child be a resident of the other county at the time the suit to modify was filed before a party could be entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code.[34] This court held that the trial court erred in denying a party's motion to transfer under section 155.201(b) based on the allegation and undisputed evidence that the child resided in another county during the six-month period ending on the date the petition to modify was

filed.[35] By holding that section 155.201(b) does not require the child to reside in the other county when the petition to modify is filed, the majority creates a conflict with this court's prior decision in *In re T.J.L.*[36]

## CONFLICT WITH THE LANGUAGE OF THE STATUTE

In section 155.202(a), the legislature described a transfer under section 155.201(b) as being based on an allegation that "the child *resides* in another county."[37] By holding that section 155.201(b) does not require the child's principal residence to be in the other county when the petition to *206 modify is filed, the majority renders meaningless this language in section 155.202(a).

The majority's analysis also conflicts with language in section 155.201(b): "if the child has resided in *the other county* for six months or longer."[38] The italicized words clearly show that the legislature envisioned that there would be only one "other county." This is consistent with the requirement that the child be a resident of the other county at the time the suit to modify is filed before a party could be entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code. It is inconsistent with the majority's analysis.

The majority's analysis also conflicts with the following emphasized language in section 155.203:

> In computing the time during which the child has resided in a county, the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence *during the six-month period preceding the commencement of the suit.*[39]

In their motion, the Naborses asserted that the Children's principal residence was in Fort Bend County throughout the six-month period preceding commencement of the modification suit; however, the majority applies a different and incorrect standard, namely, whether the Children had a principal residence in Fort Bend County during any six-month period before commencement of the suit.[40]

Under section 155.203, courts determining a child's

residence must examine the child's principal residence throughout the six-month period preceding the commencement of suit and must not require uninterrupted or continuous presence.[41] Under the plain meaning of section 155.203, there may be more than one county of principal residence during the six months preceding the commencement of suit.[42] In this case, *207 the Children had a principal residence in Fort Bend County for most of the six-month period before commencement of suit; notably, however, they did not have a principal residence in Fort Bend County during the last fourteen days of this period.[43] Therefore, the trial court had discretion to deny the motion to transfer.[44] The trial court's denial does not constitute an abuse of discretion.

**CONCLUSION**

The Naborses stated the correct legal standard in their motion to transfer venue but failed to establish the necessary factual predicate to prevail on their motion. Based on the evidence before it, the trial court did not abuse its discretion in denying their motion to transfer venue. Today, this court constructs a new legal standard that contradicts the language of the applicable statute as well as decisions from the Supreme Court of Texas and this court. Under the correct legal standard, the Naborses have not established their entitlement to mandamus relief. Therefore, this court should deny their mandamus petition. Because it does not, I respectfully dissent.

**All Citations**

276 S.W.3d 190

**Footnotes**

1    The original petition for adoption and the motion to transfer venue were filed under the original cause number—2005–07431J. On November 12, 2007, the Harris County District Clerk notified the Naborses' attorney that it was assigning a new cause number to the petition for adoption—2007–69035. The Naborses filed another motion to transfer under the new cause number. The motion to modify the parent-child relationship and the accompanying motion to transfer were filed under the original cause number—2005–07431J. It appears that the trial court proceeded on the motion to transfer filed with the motion to modify.

2    The Naborses averred that the children's principal place of residence *has been* Fort Bend County during the six month period preceding commencement of the suit. They did not allege or aver that the children currently reside in Fort Bend County.

3    We have not found the trial court's written order denying the Naborses' motion to transfer venue in the appellate record. However, at the end of the hearing, the trial court stated, "Okay. Then I'm going to deny your motion to transfer ... I am going to not transfer the case." Texas Rule of Appellate Procedure 52.3(j)(1)(A) requires "a certified or sworn copy of any order complained of, *or any other document showing the matter complained of ...*" Tex.R.App. P. 52.3(j)(1)(A) (emphasis added). An oral ruling on the record satisfies the requirements of Rule 52.3(j)(1)(A). *In re Bill Heard Chevrolet, Ltd.,* 209 S.W.3d 311, 314 (Tex.App.-Houston [1st Dist.] 2006, orig. proceeding); *In re Bledsoe,* 41 S.W.3d 807, 811 (Tex.App.-Fort Worth 2001, orig. proceeding); *In re Hamrick,* 979 S.W.2d 851, 852 n. 3 (Tex.App.-Houston [14th Dist.] 1998, orig. proceeding).

4    *See Leonard v. Paxson,* 654 S.W.2d 440, 441 (Tex.1983) (orig.proceeding); *In re Leder,* 263 S.W.3d 283, 286 (Tex.App.-Houston [1st Dist.] 2007, orig. proceeding); *Kirby v. Chapman,* 917 S.W.2d 902, 907 (Tex.App.-Fort Worth 1996, no writ); *Martinez v. Flores,* 820 S.W.2d 937, 938 (Tex.App.-Corpus Christi 1991, orig. proceeding); *Johnson v. Pettigrew,* 786 S.W.2d 45, 48 (Tex.App.-Dallas 1990, no writ); *Mendez v. Attorney Gen. of Tex.,* 761 S.W.2d 519, 521 (Tex.App.-Corpus Christi 1988, no writ); *Beyer v. Diaz,* 585 S.W.2d 359, 360 (Tex.Civ.App.-Dallas 1979, no writ).

5    The Naborses prepared and filed an affidavit in support of their petition for writ of mandamus. However, we do not consider this affidavit because it was not submitted to the trial court. *Cf. Nguyen v. Intertex, Inc.,* 93 S.W.3d 288, 293 (Tex.App.-Houston [14th Dist.] 2002, no pet.) ("The attachment of documents as exhibits or appendices to briefs is not formal inclusion in the record on appeal and, therefore, the documents cannot be considered.").

6    The dissent opines that our interpretation conflicts with the plain language in section 155.201(b) because the Legislature envisioned there would be "only one other county." *See post* at 206. Our colleague erroneously suggests

the majority's interpretation contemplates that a transfer of venue includes any county in which a child had resided for a period of six months no matter how remote in time to commencement of the proceeding. Contrary to the dissent's criticism, our interpretation limits rather than "promotes" forum shopping. Apparently, in applying section 155.201(b), the dissent would conclude that a party could thwart a motion to transfer venue by removing children from one county to the other for few days or even a few hours. We disagree. If, as the dissent suggests, a motion to transfer should be denied because a child has resided in the county where the court has continuing jurisdiction for a single day, then the result may be altered by a battle or race to remove a child from one county to the other. Our dissenting colleague would allow the TDFPS to venue shop from one county to the other by exercising its authority to remove a child from any foster home in advance of adoption proceedings.

7       Notwithstanding the concerns of our dissenting colleague, there is no language militating that the children reside in the other county *"throughout"* the six month period or at the moment the motion to transfer is filed Apparently, the dissent is willing to add the word *"throughout"* to the statute. *See post* at 199.

8       Consistent with the legislature's instruction under the Code Construction Act, we should not focus on verb tense in determining legislative intent because words in the present tense include the future tense. *See* Tex. Gov't Code Ann. § 311.012 (Vernon 2005).

9       Under the Texas Code Construction Act, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011 (Vernon 2005). Our dissenting colleague ignores this basic rule by engaging in grammatical semantics. We choose to follow the legislative admonition and presumption that, "a just and reasonable result is intended," when a statute is enacted. *Id.*

10      In *Cassidy v. Fuller,* the Supreme Court addressed the predecessor statute to section 155.201(b)—section 11.06(b). 568 S.W.2d 845 (Tex.1978). When the Supreme Court issued *Cassidy,* section 11.06(b) required a showing that venue was proper in another county. *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414. Former section 11.04, which is currently section 103.001, required that an original suit affecting the parent-child relationship "shall be brought in the county where the child resides." *Id.* at 1413. The current section 155.201(b) does not require that the party seeking a transfer to show venue is proper in the transferee county and does not require that the child reside in the transferee county on the same day a motion to modify is filed. Tex. Fam.Code Ann. § 155.201(b). Here, a motion to modify and petition for adoption were filed, not an original suit affecting the parent-child relationship. Consequently, we see no conflict with our interpretation of the statutory language applicable to this case and the Supreme Court's opinion in *Cassidy.*

11      576 S.W.2d 478 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ dism'd).

12      *Id.* at 480. The general venue statute at the time of the *Chem–Spray Aerosols* opinion was located at Tex.Rev.Civ. Stat. Ann. art.1995, and is currently found in Section 15.002 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. § 15.002 (Vernon 2002).

1       (Emphasis added). In quoting from the ground in the motion, the majority omits the part in which the Naborses allege that the "[t]he principal residence of the children is in Fort Bend County, Texas...." *See ante* at 192. The majority later states that the Naborses moved for a transfer based on the ground that the Children had resided in Fort Bend County for more than six months preceding the filing of the motion to modify. *See ante* at 193. These statements are incorrect. The Naborses did not request a venue transfer on these bases. The Nabors requested a venue transfer based on their allegation that the principal residence of the Children was in Fort Bend County, Texas, on the Filing Date and had been in that county during the six-month period preceding the Filing Date.

2       *See* TEX.R.APP. P. 52.3, 52.7; *Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 305 (Tex.1994) (orig.proceeding); *Walker v. Packer,* 827 S.W.2d 833, 837 (Tex.1992) (orig.proceeding); *In re Nelson,* No. 14–04–00578–CV, 2004 WL 1516156, at *1 (Tex.App.-Houston [14th Dist.] July 8, 2004, orig. proceeding) (mem.op.).

3       *See Canadian Helicopters, Ltd.,* 876 S.W.2d at 305; *In re Yamin,* No. 14–07–01035–CV, 2008 WL 442575, at *1 (Tex.App.-Houston [14th Dist.] Feb. 19, 2008, orig. proceeding) (mem.op.).

4       *See* TEX.R.APP. P. 52.4; *In re Yamin,* 2008 WL 442575, at *1 (denying mandamus petition because "[r]elator has not established his entitlement to the extraordinary relief of a writ of mandamus").

5    See *ante* at 196.

6    See *id.*

7    See TEX.R.APP. P. 52.3, 52.7; *Canadian Helicopters, Ltd.,* 876 S.W.2d at 305; *Walker,* 827 S.W.2d at 837; *In re Nelson,* 2004 WL 1516156, at *1.

8    TEX. FAM.CODE ANN. § 155.201(b) (Vernon 2008).

9    Bryan A. Garner, *Garner's Modern American Usage* 779 (Oxford University Press 2003).

10   While the majority criticizes this grammatical analysis of the applicable statute, it also cites the part of the Code Construction Act, in which the legislature states that "words and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX. GOV.CODE ANN. § 311.011(a) (Vernon 2005); *see ante* at 197.

11   See TEX. FAM.CODE ANN. § 155.202(a) (Vernon 2008) (emphasis added).

12   See *id.* (emphasis added).

13   See TEX. FAM.CODE ANN. § 155.201(b) (emphasis added).

14   TEX. FAM.CODE ANN. § 155.203 (Vernon 2008) (emphasis added).

15   The majority states that courts should not base their construction of a statute on the verb tense used by the legislature because the Code Construction Act states that "words in the present tense include the future tense." TEX. GOV.CODE ANN. § 311.012(a) (Vernon 2005); *see ante* at 197, n. 8. However, if section 155.201(b) also includes the future tense, then the part of the statute focusing the inquiry on the six-month period before filing of the suit would be rendered meaningless. Though the Code Construction Act was in effect when the Supreme Court of Texas decided *Cassidy v. Fuller,* the high court still construed the applicable statutes as requiring a transfer to the county in which the child resides and has resided for at least six months; the *Cassidy* court did not conclude that under the Code Construction Act, a transfer is also required to the county in which the child will have resided for more than six months in the future. *See* Act of May 24, 1967, 60th Leg., R.S., ch. 455, § 2.02, 1967 Tex. Gen. Laws 1036, 1037; *Cassidy v. Fuller,* 568 S.W.2d 845, 846–47 (Tex.1978). Research has not revealed any Texas case that has used section 311.012(a) of the Texas Government Code in interpreting a statute. *See Brown v. Blum,* 9 S.W.3d 840, 845–46 (Tex.App.-Houston [14th Dist.] 1999, pet dism'd w.o.j.) (declining to use section 311.012(a) of the Texas Government Code in interpreting a statute).

16   This is the principal legal standard articulated in the majority opinion. *See ante* at 193, 194, 196, 199 (stating that, for the Naborses to be entitled to a mandatory transfer to Fort Bend County, the Children must have resided in Fort Bend County for six months or longer "preceding" the filing of the modification suit).

17   See TEX. FAM.CODE ANN. §§ 155.201(b), 155.204(b); *Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d 257, 263–65 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *In re Wheeler,* 177 S.W.3d 350, 353–54 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding); *Blacklock v. Miller,* 693 S.W.2d 651, 652 (Tex.App.-Dallas 1985, orig. proceeding) (denying mandamus relief because, even though children's principal residence may have been in different county for more than six months in the past, the children's principal residence changed from that county 12 days before filing of suit to modify and therefore, their principal residence was not in that county on the day suit was filed). The majority suggests that the *Blacklock* court erroneously applied general venue principles that conflicted with the Family Code. *See ante* at 199. This is incorrect. The *Blacklock* court quoted and applied former section 11.06(b); it did not apply general venue principles that are contrary to the requirements of the Family Code. *See Blacklock,* 693 S.W.2d at 652.

18 *See ante* at 196–97.

19 *See Air Routing Int'l Corp. (Canada) v. Britannia,* 150 S.W.3d 682, 700 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

20 *See* TEX. FAM.CODE ANN. § 155.201(b); *Blacklock,* 693 S.W.2d at 652. The majority relies on *In re Kerst* and *In re Gore;* however, these cases involved children whose principal residence was in the other county during the six-month period preceding the commencement of suit. *See In re Kerst,* 237 S.W.3d 441, 442, 444–45 (Tex.App.-Texarkana 2007, no pet.); *In re Gore,* No. 07–07–0290–CV, 2007 WL 2403366, at *1–2 (Tex.App.-Amarillo Aug.23, 2007, orig. proceeding) (mem.op.). Therefore, these cases are consistent with the analysis in this dissenting opinion.

21 In the same motion to transfer, the Naborses asserted in the alternative that they were entitled to a discretionary transfer under section 155.202(b). Though the Naborses seek mandamus as to the trial court's denial of their motion, which would include the denial of this relief, the Naborses' petition does not contain any argument, analysis, record citations or legal authority in support of the proposition that the trial court clearly abused its discretion in denying this part of the motion. *See* TEX.R.APP. P. 52.3(h). Therefore, they have waived this issue. *See In re Citizens Supporting Metro Solutions, Inc.,* No. 14–07–00190–CV, 2007 WL 4277850, at *4 (Tex.App.-Houston [14th Dist.] Oct. 18, 2007, orig. proceeding).

22 *See* 568 S.W.2d at 846–47.

23 *See id.*

24 *See id.*

25 *See id.*

26 *See id.* at 847 (relying on statutory language similar to that currently codified at section 103.001 of the Texas Family Code).

27 *See id.*

28 *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414 (amended 1981, recodified 1995, amended 1999) (current version at TEX. FAM.CODE ANN. §§ 155.201(b), 155.202(a), 155.203).

29 *See Cassidy,* 568 S.W.2d at 847.

30 *Id.*

31 *See id.*

32 *See id.*

33 *See* TEX. FAM.CODE ANN. § 155.201(c).

34 *See In re T.J.L.,* 97 S.W.3d at 264.

35 *See id.* at 260, 264–65.

36  *See id.* In *In re Wheeler,* the First Court of Appeals adopted this court's analysis in *In re T.J.L. See* 177 S.W.3d 350, 353–54 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding). Therefore, the majority's analysis also conflicts with the First Court of Appeals's decision in *In re Wheeler. See id.*

37  *See* TEX. FAM.CODE ANN. § 155.202(a) (emphasis added).

38  *See* TEX. FAM.CODE ANN. § 155.201(b) (emphasis added).

39  TEX. FAM.CODE ANN. § 155.203 (Vernon 2008) (emphasis added).

40  *See ante* at 193, 194, 196, 199.

41  For example, if prior to October 26, 2007, the Naborses had spent two weeks visiting relatives in Harris County, that would not mean that the Children's principal residence would switch to Harris County during this period. In this case, the uncontroverted evidence shows that the Children were continuously present in Fort Bend County from May 16, 2006 through October 26, 2007, and continuously present in Harris County after October 26, 2007. Therefore, the trial court had no occasion to require continuous presence in the county of residence. The majority cites *Martinez v. Flores.* See 820 S.W.2d 937 (Tex.App.-Corpus Christi 1991, no writ). The *Martinez* court held that the children's extended visitation period with their father, who did not have the right to designate their residence, did not change the children's residence from the county designated by the Children's mother. *See id.* at 939–41. This holding is consistent with the analysis in this dissenting opinion. The *Martinez* court does state in an obiter dictum that the six-month period stated in the predecessor statute to section 155.201(b) is meant as a "guide" and that courts can look beyond the six-month period to determine whether the children's residence has changed to a new county. *See id.* at 940. This dictum is contrary to the plain meaning of the statute, and, prior to today's decision, had not been cited by any court.

42  *See* TEX. FAM.CODE ANN. § 155.203; *Blacklock,* 693 S.W.2d at 652 (denying mandamus relief because, even though children's principal residence may have been in different county for more than six months in the past, the children's principal residence changed from that county 12 days before filing of suit to modify and therefore, their principal residence was not in that county on the day suit was filed).
    In part of its opinion, the majority suggests that, under section 155.203, this court should look to the six-month period preceding suit and determine which county was the child's principal residence for the majority of this period. *See ante* at 197–98. This construction conflicts with the plain meaning of the statute and the *Blacklock* decision. *See* TEX. FAM.CODE ANN. § 155.203; *Blacklock,* 693 S.W.2d at 652. In addition, language substantially similar to the language of section 155.203 was contained in former section 11.06(b). *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414. Therefore, this construction also conflicts with *Cassidy* and *In re T.J.L.,* which require the child to be currently residing in the other county, rather than to have a principal residence in that county for a majority of the six-month period prior to suit. *See Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d at 263–65.

43  The majority is simply wrong when it states that, under the analysis in this dissenting opinion, removing children from one county to another for a few days or a few hours would thwart an otherwise meritorious motion to transfer venue under section 155.201(b). *See ante* at 196–97, n. 6, 198. If parties were to engage in such manipulative behavior, the trial court would be justified in concluding that the children's principal residence had not changed. Of course, if the evidence shows that children in a particular case had a bona fide change of their principal residence back to the county of the original court of continuing jurisdiction shortly before a timely motion to transfer was filed, then the facts simply would not satisfy the bright-line rule established by the legislature for determining when the county for the court of continuing jurisdiction must be changed. *See* TEX. FAM.CODE ANN. § 155.201(b); *Blacklock,* 693 S.W.2d at 652.

44  *See* TEX. FAM.CODE ANN. § 155.201(b); *Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d at 263–65; *In re Wheeler,* 177 S.W.3d at 353–54; *Blacklock,* 693 S.W.2d at 652.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Greenwood v. Tillamook Country Smoker, Inc., Tex.App.-Hous. (1 Dist.), May 27, 1993

654 S.W.2d 440
Supreme Court of Texas.

Sheryl LEONARD, Relator,
v.
Honorable Sam PAXSON, Judge et al.,
Respondents.

No. C–2005. | July 20, 1983.

Movant for modification of child support provisions of divorce decree sought writ of mandamus directing trial judge to transfer venue of such proceedings. The Supreme Court, McGee, J., held that: (1) trial judge had mandatory statutory duty to transfer venue to county where the children resided, notwithstanding contrary provision of divorce agreement, and (2) provisions of statute creating exception to general venue rule for contracts in writing did not apply.

Writ conditionally granted.

West Headnotes (3)

[1] **Child Support**
⟺Time for Proceedings

Motion seeking modification of child support provisions of divorce decree was "suit affecting parent-child relationship," within statute providing that suit affecting parent-child relationship shall be brought in county where child resides, and thus, trial judge had mandatory duty to transfer proceeding to Galveston County, where the children were residing, notwithstanding provision of divorce agreement that all acts contemplated by such agreement would be performed in El Paso County. V.T.C.A., Family Code §§ 11.01(5), 11.04(a), 11.06(b), 14.08(a); Vernon's Ann.Texas Civ.St. art. 1995, subd. 5.

22 Cases that cite this headnote

[2] **Contracts**
⟺Agreement as to Place of Bringing Suit

Fixing of venue by contract, except in such instances as permitted by statutory exception for a contract in writing, is invalid and cannot be subject of private contract. Vernon's Ann.Texas Civ.St. art. 1995, subd. 5.

5 Cases that cite this headnote

[3] **Child Support**
⟺Venue

Provisions of statute creating exception to general venue rule for contracts in writing did not apply to proceeding on motion to modify child support provisions of divorce decree. Vernon's Ann.Texas Civ.St. art. 1995, subd. 5.

15 Cases that cite this headnote

**Attorneys and Law Firms**

*440 Schwartz, Earp, McClure, Cohen & Stewart, Larry H. Schwartz and Gordon Stewart, El Paso, for relator.

Mark Howell, El Paso, for respondent.

**Opinion**

McGEE, Justice.

Relator, Sheryl Leonard, seeks a writ of mandamus directing the Honorable Sam Paxson, Judge of the 210th District Court of El Paso County, to transfer proceedings

on her motion to modify the child support provisions of a previous divorce decree to Galveston County. We conditionally grant the writ.

*441 In 1981, Sheryl and her former husband, Morton Leonard, entered into an "Agreement Incident to Divorce" which was approved by Judge Paxson and was incorporated into the court's final decree of divorce. Paragraph 6.09 of the Agreement states that the child support provisions contained therein are to be considered as a binding contract. Paragraph 11.02 of the Agreement provides as follows:

> *Venue of Suits.* All acts contemplated by this Agreement shall be performed in El Paso County, Texas, and all sums of money payable under this Agreement shall be payable in El Paso, Texas.

In 1982, Sheryl instituted a proceeding to modify the child support provisions of the divorce decree. *See* Tex.Fam. Code Ann. § 14.08(a). In addition, she filed a motion to transfer the proceeding to Galveston County on the grounds that the children had resided in Galveston County for more than six months prior to the institution of the motion to modify. *See id.* §§ 11.04(a), 11.06(b).[1] Morton contested the motion to transfer and filed a controverting affidavit, alleging that venue was proper in El Paso County based on paragraph 11.02 of the Agreement. *See* Tex.Rev.Civ.Stat.Ann. art. 1995(5). Following a hearing on the motion to transfer, Judge Paxson found that the children had indeed resided in Galveston County for more than six months, but concluded that venue was nonetheless proper in El Paso County by virtue of the parties' agreement. Accordingly, Sheryl's motion to transfer was denied.

[1] The question before us is whether the proceeding filed by Sheryl in Judge Paxson's court is a "suit affecting the parent-child relationship" under section 11.01(5) of the Family Code. We conclude that it is, and hold that it was Judge Paxson's mandatory duty under section 11.06(b) of the Family Code to transfer the proceeding to Galveston County. *Arias v. Spector,* 623 S.W.2d 312 (Tex.1981) (per curiam); *Brines v. McIlhaney,* 596 S.W.2d 519 (Tex.1980); *Brod v. Baker,* 591 S.W.2d 457 (Tex.1979); *Cassidy v. Fuller,* 568 S.W.2d 845, 847 (Tex.1978).

The venue provisions of the Family Code remove suits affecting the parent-child relationship from the operation of the general venue statute, Tex.Rev.Civ.Stat.Ann. art. 1995, and the transfer provisions set forth in section 11.06(b) supplant the Rules of Civil Procedure governing pleas of privilege. *Rogers v. Rogers,* 536 S.W.2d 442, 443–44 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ). Section 11.01(5) of the Code defines a "suit affecting the parent-child relationship" as, among other things, "a suit ... in which ... support of a child ... is sought." Sheryl's motion, which seeks modification of the child support provisions of the decree, is clearly a "suit affecting the parent-child relationship."

[2] Morton's reliance on paragraph 11.02 of the Agreement is misplaced. In *Fidelity Union Life Insurance Co. v. Evans,* 477 S.W.2d 535, 537 (Tex.1972), we held "that the fixing of venue by contract, except in such instances as permitted by Article 1995, § 5, is invalid and cannot be the subject of private contract." Our holding in *Fidelity Union* controls the instant case.

[3] The underlying proceeding is a motion to modify the child support provisions of a divorce decree, not a suit on a contract. Sheryl does not allege that Morton has breached the Agreement, nor does she seek a money judgment for support payments due her under the contract. In this situation, the provisions of article 1995(5) are not applicable. Instead, the mandatory venue and transfer provisions of the Family Code *442 control and cannot be negated by contract. To hold otherwise would defeat the legislature's intent that matters affecting the parent-child relationship be heard in the county where the child resides, and would promote forum shopping by contract. *Cassidy v. Fuller,* 568 S.W.2d at 847.

It is expected that Judge Paxson will transfer the proceeding in accordance with this opinion. The writ of mandamus will issue only in the event he does not do so.

**All Citations**

654 S.W.2d 440

Footnotes

1    Section 11.04(a) provides that "a suit affecting the parent-child relationship shall be brought in the county where the child resides." Section 11.06(b) provides:

If ... a motion to modify or enforce a decree is filed in a court having continuing jurisdiction of the suit, on the motion of any party, the court shall transfer the proceeding to the county where venue is proper on the basis of either a supporting uncontroverted affidavit or after a hearing when a controverting affidavit contesting the venue has been filed.... If the child has resided in another county for six months or longer, the court shall transfer the proceeding to that county.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Peleg v. Neiman Marcus Group, Inc., Cal.App.
2 Dist., April 17, 2012

310 S.W.3d 419
Supreme Court of Texas.

In re ODYSSEY HEALTHCARE, INC. and George
Portillo, Relators.

No. 09–0786. | May 7, 2010.

**Synopsis**
**Background:** Employee brought negligence action
against employer, arising from employee's work-related
injury. The County Court at Law No. 5, El Paso County,
Carlos Villa, J., denied employer's motion to compel
arbitration. Employer petitioned for writ of mandamus.
The Court of Appeals, denied the petition. Employer
petitioned for writ of mandamus in Supreme Court.

**Holdings:** The Supreme Court held that:

[1] arbitration agreement was not unconscionable;

[2] workers' compensation act did not preclude
enforcement of agreement; and

[3] agreement was not illusory.

Writ of mandamus conditionally granted.

West Headnotes (13)

[1] **Mandamus**
⬥Remedy by Appeal or Writ of Error
**Mandamus**
⬥Nature of acts to be commanded

Mandamus will issue if the relator establishes a
clear abuse of discretion for which there is no
adequate remedy by appeal.

18 Cases that cite this headnote

[2] **Mandamus**
⬥Civil proceedings other than actions

A trial court that refuses to compel arbitration
under a valid and enforceable arbitration
agreement has clearly abused its discretion, so
as to entitle the party seeking to compel
arbitration to mandamus relief.

10 Cases that cite this headnote

[3] **Alternative Dispute Resolution**
⬥Validity

A party seeking to compel arbitration must
establish the existence of a valid arbitration
agreement between the parties.

15 Cases that cite this headnote

[4] **Alternative Dispute Resolution**
⬥Evidence

The party seeking to avoid arbitration, once
existence of a valid arbitration agreement has
been shown, bears the burden of proving its
defenses against enforcing an otherwise valid
arbitration provision.

3 Cases that cite this headnote

[5] **Alternative Dispute Resolution**
⬥Unconscionability

Provision of arbitration agreement between employee and employer, requiring selection of arbitrator from a panel located in a city hundreds of miles away from employee's residence and workplace, was not substantively unconscionable, as a defense to enforcement of agreement to require arbitration of employee's negligence claim arising from work-related injury; employee failed to make specific showing as to what costs she would incur, provision did not require arbitration to occur in city that arbitrator was selected from, and arbitrator had power to modify agreement if costs would hinder vindication of employee's rights.

7 Cases that cite this headnote

[6] **Alternative Dispute Resolution**
⟡Unconscionability

"Substantive unconscionability," as a defense to enforcement of an arbitration agreement, refers to whether the arbitration provision ensures preservation of the substantive rights and remedies of a litigant.

5 Cases that cite this headnote

[7] **Alternative Dispute Resolution**
⟡Evidence

When a party contests arbitration due to substantial expense, that party bears the burden of proving the likelihood of incurring such costs, and must provide some specific information concerning those future costs.

5 Cases that cite this headnote

[8] **Alternative Dispute Resolution**

⟡Employment disputes

Section of workers' compensation act prohibiting pre-injury waiver of an employee's personal injury claims against a non-subscribing employer did not preclude enforcement of agreement requiring employee to arbitrate her negligence claim against employer arising from work-related injury. V.T.C.A., Labor Code § 406.033(e).

1 Cases that cite this headnote

[9] **Alternative Dispute Resolution**
⟡Constitutional and statutory provisions and rules of court
**States**
⟡Federal laws invading state powers

Federal Arbitration Act (FAA) did not violate Tenth Amendment by encroaching on state power to enact and regulate its own workers' compensation system, and thus agreement between employee and non-subscribing employer, requiring arbitration of employee's work-injury-related negligence claims pursuant to FAA, was not unenforceable; compliance with the FAA did not directly impair Texas's ability to structure integral operations in areas of traditional government functions. U.S.C.A. Const.Amend. 10; 9 U.S.C.A. § 1 et seq.

4 Cases that cite this headnote

[10] **States**
⟡Federal laws invading state powers

Tenth Amendment is a limitation upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to regulate commerce. U.S.C.A. Const.Amend. 10.

Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**
⌖In general; formation of agreement

Agreement requiring arbitration of employee's negligence claim against employer limited employer's right to avoid arbitration of disputes by amendment or termination of agreement, and thus agreement was not illusory, as a defense to its enforcement.

15 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**
⌖Consideration

Mutual promises to submit all employment disputes to arbitration is sufficient consideration for such agreements.

5 Cases that cite this headnote

**[13]** **Alternative Dispute Resolution**
⌖In general; formation of agreement

An arbitration clause is not illusory, as a defense to its enforcement, unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether.

17 Cases that cite this headnote

**Attorneys and Law Firms**

**\*421** Gerard Fazio, R. Michael Perez, Owen & Fazio, P.C., Dallas, TX, for Relator.

Joseph Gabriel Isaac, Scherr & Legate, PLLC, El Paso, TX, for Real Party in Interest.

**Opinion**

PER CURIAM.

In this negligence case, we must decide whether the trial court abused its discretion by refusing to grant the relator's motion to compel arbitration. We conclude that it did. Here, the real party in interest failed to prove a valid defense against enforcement of her agreement to arbitrate disputes with her employer. Accordingly, we conclude the trial court abused its discretion in failing to compel arbitration, and we conditionally grant the writ of mandamus.

Guadalupe Morales worked in El Paso for Odyssey Healthcare, Inc., which provides hospice care. Morales alleges that she was injured at work when she tripped on an uneven step at a patient's home. She sued Odyssey and her supervisor, George Portillo, for negligence.

Odyssey is a non-subscriber and, in lieu of workers' compensation insurance, it provided its workers with an "Occupational Injury Benefit Plan." Morales enrolled in this plan as a condition of her employment. Upon being sued, Odyssey moved to compel arbitration, relying on the arbitration clause contained in the plan.

The agreement between Morales and Odyssey provides in relevant part:

• All claims or disputes described below [including injury caused by negligence] that cannot otherwise be resolved between the Company and you are subject to **final and binding** arbitration. *This binding arbitration is the only method for resolving any such claim or dispute.* (emphasis in original)

• The Company is engaged in transactions involving interstate commerce ... and your employment involves such commerce. The Federal Arbitration Act will govern the interpretation, enforcement, and proceedings under this arbitration requirement.

• Unless otherwise agreed to in writing by the parties, the arbitrator selected by the parties ... shall be selected from a panel of arbitrators located in Dallas County, Texas.

• Adequate consideration for this arbitration requirement is represented by, among other things, your eligibility for (and not necessarily any receipt of) benefits under this Plan and the fact that it is mutually binding on both the Company and you.

• [T]he Company reserves the right to amend, modify, or terminate the Plan at any time; provided, however, that no such amendment or termination will alter the arbitration provisions incorporated into this booklet with respect to, or reduce the amount of any benefit payable to or with respect to you under the Plan in connection with, an Injury occurring prior to the date of such amendment or termination. In addition, any such amendment or termination of the arbitration provisions incorporated into this booklet shall not be effective until at least 14 days after written notice has been provided to you.

After a hearing, the trial court denied Odyssey's motion to compel arbitration. The court found that the arbitration provision forcing Morales to arbitrate in Dallas *422 was unconscionable.[1] The court of appeals denied Odyssey's petition for writ of mandamus. 310 S.W.3d 464 (Tex.App.-El Paso 2009).

[1] [2] [3] [4] Mandamus will issue if the relator establishes a clear abuse of discretion for which there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004). A trial court that refuses to compel arbitration under a valid and enforceable arbitration agreement has clearly abused its discretion. *See In re Halliburton Co.*, 80 S.W.3d 566, 573 (Tex.2002). A party seeking to compel arbitration must establish the existence of a valid arbitration agreement between the parties. *Cantella Co. v. Goodwin*, 924 S.W.2d 943, 945 (Tex.1996) (orig. proceeding) (per curiam). The party seeking to avoid arbitration then bears the burden of proving its defenses against enforcing an otherwise valid arbitration provision. *FirstMerit Bank*, 52 S.W.3d at 756. Morales does not dispute that her claims are covered by the agreement and subject to arbitration if the arbitration clause is valid and enforceable.

Morales asserts several grounds for why the arbitration clause here is invalid and unenforceable, including substantive unconscionability, a non-waiver provision of the Texas Workers' Compensation Act, a Tenth Amendment violation by the Federal Arbitration Act, and illusory promises or lack of mutual consideration. We address these arguments in turn.

[5] [6] [7] First, we conclude that Morales failed to establish that the arbitration clause is unconscionable. Substantive unconscionability refers to whether the arbitration provision ensures preservation of the substantive rights and remedies of a litigant. *Halliburton*, 80 S.W.3d at 572. Morales contends the arbitration clause is unconscionable because it will force her to arbitrate in Dallas, and she will incur substantial expense by having to produce witnesses in Dallas. Testimony from an Odyssey representative showed that Odyssey intended to arbitrate all employee claims covered by this agreement in Dallas, and it had never agreed to arbitrate any claims elsewhere. Regardless, when a party contests arbitration due to substantial expense, that party bears the burden of proving the likelihood of incurring such costs, and must provide some specific information concerning those future costs. *See FirstMerit Bank*, 52 S.W.3d at 756 ("[T]here is no doubt that *some* specific information of future costs is required."). Here, the record fails to show any specific information or evidence about what costs Morales would likely incur. Her conclusory assertions about costs relating to witnesses and medical experts are thus "legally insufficient evidence that [Morales] would be denied access to arbitration based on excessive costs." *Id.* at 757. Moreover, nothing in the agreement requires the arbitration to occur in Dallas. The agreement simply provides that (absent agreement otherwise) the arbitrator must be selected from a Dallas panel of arbitrators. Finally, even if the arbitrator were to conduct arbitration in Dallas, and even if this would cause Morales to incur *423 substantial expense, the arbitrator may still "assess whether the cost provision in this case will hinder effective vindication of [the employee's] statutory rights and, if so, ... modify the contract's terms accordingly." *In re Poly–America, L.P.*, 262 S.W.3d 337, 357 (Tex.2008).

[8] Next, Morales is incorrect that a certain non-waiver provision of the Texas Workers' Compensation Act defeats the arbitration provision. Texas Labor Code section 406.033(e), which applies to non-subscribers such as Odyssey, states: "A cause of action described in Subsection (a) may not be waived by an employee before the employee's injury or death. Any agreement by an employee to waive a cause of action or any right described in Subsection (a) before the employee's injury or death is void and unenforceable."[2] However, we have held that section 406.033(e) does not render an arbitration agreement void. *In re Golden Peanut Co., LLC*, 298 S.W.3d 629, 631 (Tex.2009) (per curiam) ("[A]n agreement to arbitrate is a waiver of neither a cause of action nor the rights provided under section 406.033(a), but rather an agreement that those claims should be tried

in a specific forum. Accordingly, section 406.033(e) does not render the arbitration agreement void." (internal citations omitted)).

[9] [10] Third, we conclude that the Federal Arbitration Act does not violate the Tenth Amendment by encroaching on a state power to enact and regulate its own workers' compensation system. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. The Tenth Amendment is a limitation "upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to ... regulate commerce." *Nat'l League of Cities v. Usery,* 426 U.S. 833, 842, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The United States Supreme Court has stated that there are three requirements to show that a statute violates the Tenth Amendment: (1) a showing that the challenged statute regulates the states as states; (2) the federal regulation must address matters that are indisputable attributes of state sovereignty; and (3) it must be apparent that the states' compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional government functions. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 287–88, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Even if all three are met, "[t]here are situations in which the nature of the federal interest advanced may be such that it justifies state submission." *Id.* at 288 n. 29, 101 S.Ct. 2352.

We have recognized that a state has a Tenth Amendment power to enact and regulate its own workers' compensation system, protecting workers' claims against employers. *Ruiz v. Miller Curtain Co., Inc.,* 702 S.W.2d 183, 185 (Tex.1985). However, we have also held that statutory claims under the Texas Workers' Compensation Act are arbitrable. *See Poly–America,* 262 S.W.3d at 352 ("An arbitration agreement covering statutory claims [including workers' compensation claims] is valid so long as the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory *424 rights." (internal citation omitted)). Thus, we conclude that compliance with the Federal Arbitration Act would not "directly impair [Texas's] ability to structure integral operations in areas of traditional government functions," *Hodel,* 452 U.S. at 288, 101 S.Ct. 2352 (internal quotation omitted).

[11] [12] [13] Finally, Morales is incorrect that the arbitration provision lacks consideration and is illusory for lack of mutual obligation. Mutual promises to submit all employment disputes to arbitration is sufficient consideration for such agreements. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 228 (Tex.2003). Such mutual obligations existed here. Moreover, an arbitration clause is not illusory unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether. *Halliburton,* 80 S.W.3d at 570. In *Halliburton,* we considered a very similar arbitration clause, which provided that "no amendment shall apply to a Dispute of which the Sponsor [Halliburton] had actual notice on the date of amendment," and that "termination shall not be effective until 10 days after reasonable notice of termination is given to Employees or as to Disputes which arose prior to the date of termination." *Id.* at 569–70. Here, too, the agreement provided that "no such amendment or termination [by Odyssey] will alter the arbitration provisions incorporated into this booklet with respect to, or reduce the amount of any benefit payable to ... you under the Plan in connection with, an Injury occurring prior to the date of such amendment or termination," and that "any such amendment or termination of the arbitration provisions incorporated into this booklet shall not be effective until at least 14 days after written notice has been provided to you." Thus, because of these limitations on Odyssey's right to amend or terminate the agreement, the arbitration agreement did not contain an illusory promise by Odyssey.

For these reasons, we conclude that the arbitration clause at issue was valid and enforceable, and the trial court abused its discretion by failing to grant Odyssey's motion to compel arbitration. Mandamus relief is appropriate because Odyssey has no adequate remedy by appeal. *See id.* at 573. Therefore, without hearing oral argument, TEX R.APP. P. 52.8(c), we conditionally grant the writ of mandamus and direct the trial court to vacate its prior order and grant Odyssey's motion to compel arbitration. We are confident the trial court will comply, and the writ will issue only if it fails to do so.

**All Citations**

310 S.W.3d 419, 30 IER Cases 1197, 53 Tex. Sup. Ct. J. 717

Footnotes

1     The trial court also found unconscionable a provision in the agreement that employees must "allow an authorized representative of the Company to go with you to appointments with health care providers." However, in considering an arbitration clause, unconscionability "must specifically relate to the [arbitration clause] itself, not the contract as a whole, if [unconscionability is] to defeat arbitration." *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 756 (Tex.2001). Therefore, we express no opinion as to this determination of unconscionability, as it does not relate to whether to enforce the arbitration clause at issue.

2     Texas Labor Code section 406.033(a) refers to causes of action against a non-subscriber employer "to recover damages for personal injuries or death sustained by an employee in the course and scope of the employment."

---

**End of Document**            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Disagreement Recognized by** In re Colonial Cas. Ins. Co.,
Tex.App.-Texarkana, November 10, 2000
734 S.W.2d 671
Supreme Court of Texas.

Sally PROFFER, Relator,
v.
The Honorable John G. YATES, Judge, et al.,
Respondents.

No. C–6140. | July 15, 1987. | Rehearing Denied
Sept. 16, 1987.

Mother petitioned for a writ of mandamus to compel the trial court to transfer child support matter to the county in which the child was residing. The Court of Appeals, Fourth Supreme Judicial District, San Antonio, 723 S.W.2d 345, denied the petition. Mother then commenced to an original mandamus action in the Supreme Court. The Supreme Court held that transfer of a case to the county in which the child had resided for more than six months was a mandatory ministerial duty and remedy by appeal, although available, was frequently inadequate to protect the rights of parents and children to a trial in a particular venue and, therefore, mandamus was available to compel transfer.

Writ of mandamus granted conditionally.

West Headnotes (2)

[1]     **Mandamus**
        ✪Remedy by Appeal or Writ of Error
        **Mandamus**
        ✪Exercise of Judicial Powers and Functions in General

        Mandamus relief is available when under circumstances of case the facts and law permit trial court to make but one decision, and trial court has refused to make that decision, and where remedy by appeal to correct ruling is inadequate.

53 Cases that cite this headnote

[2]     **Mandamus**
        ✪Motions and Orders in General
        **Mandamus**
        ✪Change of Venue and Transfer of Causes

        Transfer of child support case to county in which child had resided for more than six months was mandatory ministerial duty and appeal was frequently inadequate to protect rights of parents and children to trial in particular venue and, therefore, mandamus was available to compel trial court to transfer proceeding. V.T.C.A., Family Code § 11.06(b, i).

112 Cases that cite this headnote

**Attorneys and Law Firms**

*672 Bluford B. Sanders, Jr., Sanders, Moffeit & Associates, P.C., El Paso, for relator.

Gary Howard, Samuel Bayless, Leon and Bayless, San Antonio, for respondents.

**Opinion**

PER CURIAM.

This is an original mandamus action. Relator, Sally Proffer, seeks a writ of mandamus directing the Honorable John G. Yates, sitting as Judge of the 150th Judicial District Court of Bexar County, to render an order transferring to the district court of El Paso County a cause styled *In the Interest of Jack Paul Leon, Jr., A Child.* We conditionally grant the writ.

Sally and Jack Leon, Sr. were divorced in Bexar County in 1974. Sally was named managing conservator of the parties' minor child. In 1981 the district court modified

the decree by appointing Sally and Jack joint managing conservators. A further modification of the decree occurred in 1982, when Sally's former husband Richard Starnes was named possessory conservator. This order also provided that Jack "shall delegate that the domicile of the minor child ... shall be with his mother who presently resides" in Bay City, Texas.

In September 1986 Sally filed a motion to modify child support and a motion to transfer venue to the El Paso County district court. Sally alleged, and it is uncontested, that the minor child had lived in El Paso with her for over fifteen months. She argued that the trial court had a mandatory duty to transfer the cause to El Paso. She relied on TEX.FAM.CODE ANN. § 11.06(b), which provides that if the child has resided in another county for six months or longer, "the court shall transfer the proceeding to that county."

The Bexar County district judge denied Sally's request to transfer venue. Sally then filed an original mandamus proceeding in the Court of Appeals for the Fourth Supreme Judicial District of Texas. That court wrote an opinion in which it recognized that the trial court is under a mandatory duty to transfer under the circumstances present in this case. 723 S.W.2d 345. However, the court of appeals denied Sally's petition for writ of mandamus on the ground that she has an adequate remedy by appeal. We disagree.

The writ of mandamus has been available to compel mandatory transfer in suits affecting the parent-child relationship for a number of years. In *Cassidy v. Fuller*, 568 S.W.2d 845 (Tex.1978), this court granted mandamus relief to compel transfer of such a suit to a county in which the children had resided for more than six months. In granting mandamus relief, the court recognized the mandatory nature of section 11.06(b), the section which provides that the trial court "shall" transfer when the child has lived for over six months in the county to which transfer is requested. In 1983 this court issued its most recent opinion granting mandamus relief to compel mandatory transfer in a suit affecting the parent-child relationship. In *Leonard v. Paxson*, 654 S.W.2d 440 (Tex.1983), the court again granted mandamus relief to

compel transfer to a county where the children had been residing for more than six months.

[1] At the time of *Cassidy*, the Family Code provided that orders regarding transfer of suits affecting the parent-child relationship were "not appealable." TEX.FAM.CODE § 11.06(f) (1975). At the time of *Leonard*, the Code had been amended to provide that orders regarding transfer are not "subject to interlocutory appeal." TEX.FAM.CODE ANN. § 11.06(i) (1986). The provisions regarding appeal were not *673 mentioned in either *Cassidy* or *Leonard*, but the rationale underlying the grant of mandamus relief in each case is the same. Mandamus relief is available when under the circumstances of the case the facts and law permit the trial court to make but one decision—and the trial court has refused to make that decision—and remedy by appeal to correct the ruling is inadequate. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).

[2] Transfer of a case to a county where the child has resided for more than six months is a mandatory ministerial duty under section 11.06(b). And remedy by appeal, though available, is frequently inadequate to protect the rights of parents and children to a trial in a particular venue. Parents and children who have a right under the mandatory venue provisions to venue in a particular county should not be forced to go through a trial that is for naught. Justice demands a speedy resolution of child custody and child support issues.

We hold that the trial court's order denying transfer conflicts with our decisions in *Cassidy* and *Leonard*. Pursuant to TEX.R.APP.P. 122, without hearing oral argument, a majority of the court conditionally grants the writ of mandamus. The writ of mandamus will issue only in the event the trial court fails to transfer the proceeding in accordance with this opinion.

**All Citations**

734 S.W.2d 671

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re Credit Suisse First Boston Mortg. Capital, L.L.C., Tex.App.-Hous. (14 Dist.), June 17, 2008

148 S.W.3d 124

Supreme Court of Texas.

In re The PRUDENTIAL INSURANCE CO. OF AMERICA and Four Partners, L.L.C., d/b/a Prizm Partners, Relators.

No. 02–0690. | Argued April 2, 2003. | Decided Sept. 3, 2004. | Rehearing Denied Dec. 3, 2004.

**Synopsis**

**Background:** Landlord petitioned for writ of mandamus to compel trial court to enforce tenant's waiver of right to jury trial in tenant's suit for rescission of lease.

**Holdings:** The Supreme Court, Hecht, J., held as a matter of first impression that:

[1] the lease provision waiving right to trial by jury was not contrary to the public policy expressed in jury trial rule and state constitutional provisions on trial by jury, access to the courts, and due course of law;

[2] the pre-suit waiver was enforceable; and

[3] landlord was entitled to mandamus relief.

Writ conditionally granted.

Phillips, C.J., dissented and filed opinion joined by O'Neill, Jefferson, and Schneider, JJ.

West Headnotes (23)

[1]    **Contracts**
       ⟶Freedom of contract
       **Contracts**
       ⟶Public Policy in General

As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.

26 Cases that cite this headnote

[2]    **Estoppel**
       ⟶Rights subject to waiver

For the most part, personal rights can be waived, at least under certain conditions.

Cases that cite this headnote

[3]    **Jury**
       ⟶Necessity for demand
       **Jury**
       ⟶Payment or deposit of jury fees
       **Jury**
       ⟶Form and sufficiency of waiver

Rule which states that no jury trial may be had in any civil suit, unless a timely demand is made and a jury fee is paid, does not prescribe the only way in which trial by jury can be waived; by the rule's express language, those conditions are prerequisites to a jury trial, not guarantees of one. Vernon's Ann.Texas Rules Civ.Proc., Rule 216.

2 Cases that cite this headnote

[4]    **Jury**
       ⟶Form and sufficiency of waiver

Lease provision waiving right to trial by jury was not contrary to the public policy expressed in jury trial rule and state constitutional provisions on trial by jury, access to the courts, and due course of law; public policy favoring

arbitration permitted waiver of trial altogether, and the tenant could thus waive right to trial by jury in future disputes. Vernon's Ann.Texas Const. Art. 1, §§ 13, 15, 19; Art. 5, § 10; Vernon's Ann.Texas Rules Civ.Proc., Rule 216.

10 Cases that cite this headnote

[5]     **Constitutional Law**
        Waiver in general

A waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness of the legal consequences.

4 Cases that cite this headnote

[6]     **Constitutional Law**
        Waiver in general

Waivers of constitutional rights not only must be voluntary, but also must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.

5 Cases that cite this headnote

[7]     **Jury**
        Right to waive jury in general

Parties may agree to waive their right to trial by jury in certain future disputes. Vernon's Ann.Texas Const. Art. 1, § 15; Art. 5, § 10.

1 Cases that cite this headnote

[8]     **Jury**

Form and sufficiency of waiver

Tenant's pre-suit waiver of trial by jury was knowing and voluntary and enforceable, even though the waiver was in the 53rd paragraph of a sixty–seven–paragraph document, seven pages before the signature page and the caption referred to a jury trial not a jury waiver; the tenant's owners had previously negotiated commercial leases, one owner went over the lease with lawyer, the waiver was not printed in small type or hidden in lengthy text and was conspicuous, the caption could not reasonably have misled the owners, and although the owners did not read the paragraph, they were charged with knowledge of all lease provisions.

12 Cases that cite this headnote

[9]     **Jury**
        Form and sufficiency of waiver

Tenant's claim for rescission of lease as fraudulently induced did not preclude enforcement of waiver of right to jury trial in any action between the parties; the tenant did not claim fraudulent inducement of the jury waiver itself.

5 Cases that cite this headnote

[10]    **Jury**
        Form and sufficiency of waiver

A waiver of a right to a jury trial is enforceable, even if it is part of an agreement alleged to have been fraudulently induced.

11 Cases that cite this headnote

[11]    **Jury**

♦⇒Form and sufficiency of waiver

Guaranty stating promise by tenant's owners to faithfully perform and fulfill all terms, covenants, conditions, provisions, and agreements of the lease incorporated the lease provision waiving right to jury trial in action between the parties.

4 Cases that cite this headnote

[12]    **Contracts**
♦⇒Matters annexed or referred to as part of contract

An unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged; the language used is not important provided the document signed plainly refers to another writing.

9 Cases that cite this headnote

[13]    **Contracts**
♦⇒Construing instruments together

Agreements executed at the same time, with the same purpose, and as part of the same transaction, are construed together.

13 Cases that cite this headnote

[14]    **Mandamus**
♦⇒Modification or vacation of judgment or order
**Mandamus**
♦⇒Trial by jury

Landlord's petition for writ of mandamus to compel enforcement of tenant's waiver of right to jury trial required showing that the trial court clearly abused its discretion and that the

landlord lacked adequate remedy by appeal.

776 Cases that cite this headnote

[15]    **Mandamus**
♦⇒Remedy by Appeal or Writ of Error

The word "adequate" has no comprehensive definition with regard to mandamus and its requirement of no adequate remedy by appeal; the word is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts.

141 Cases that cite this headnote

[16]    **Mandamus**
♦⇒Remedy by Appeal or Writ of Error

An appellate remedy is "adequate" when any benefits to mandamus review are outweighed by the detriments; when the benefits outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate.

333 Cases that cite this headnote

[17]    **Mandamus**
♦⇒Remedy by Appeal or Writ of Error

Whether an appellate remedy is adequate so as to preclude mandamus review depends heavily on the circumstances presented and is better guided by general principles than by simple rules.

104 Cases that cite this headnote

14 Cases that cite this headnote

[18]     **Mandamus**
         ←Nature and scope of remedy in general

The consideration whether to grant mandamus review is not confined to private concerns.

1 Cases that cite this headnote

[19]     **Mandamus**
         ←Nature and scope of remedy in general
         **Mandamus**
         ←Discretion as to grant of writ

Mandamus is an extraordinary remedy, not issued as a matter of right, but at the discretion of the court.

70 Cases that cite this headnote

[20]     **Mandamus**
         ←Nature and scope of remedy in general

Although mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles.

6 Cases that cite this headnote

[21]     **Mandamus**
         ←Nature and scope of remedy in general

As a selective procedure, mandamus can correct clear errors in exceptional cases and afford appropriate guidance to the law without the disruption and burden of interlocutory appeal.

[22]     **Mandamus**
         ←Nature and scope of remedy in general

Appellate courts must be mindful that the benefits of mandamus review are easily lost by overuse.

65 Cases that cite this headnote

[23]     **Mandamus**
         ←Modification or vacation of judgment or order

Trial court's erroneous refusal to enforce tenant's pre-suit waiver of right to jury trial entitled landlord to mandamus relief; denial of the landlord's right could not be rectified by appeal, and even if the landlord could seek damages for breach of contract, a separate lawsuit was not an appellate remedy.

17 Cases that cite this headnote

**Attorneys and Law Firms**

*127 Gino John Rossini, John A. Mackintosh Jr., G. Luke Ashley and Camille Knight, Thompson & Knight, L.L.P., Dallas, for Relators.

Luke Madole, Russell F. Nelms, Dena Jean Denooyer, Carrington Coleman Sloman & Blumenthal, Dallas, for Respondents.

**Opinion**

Justice HECHT delivered the opinion of the Court, in which Justice OWEN, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

The parties to a commercial lease agreed to waive trial by jury in any future lawsuit involving the lease, but when the tenant and its guarantors later sued for rescission and damages, they nevertheless demanded a jury trial. The trial court denied the landlord's motion to quash the demand. In this original proceeding, the landlord petitions for mandamus relief directing the trial court to enforce the parties' contractual jury waiver. We conditionally grant relief.

## I

Francesco Secchi, a native of Italy, and his wife Jane, a native of England, moved to Dallas in 1981, where they have lived ever since and have become naturalized citizens. The Secchis have been in the restaurant business since 1983, and they (or entities controlled by them) own and operate two Dallas restaurants, Ferrari's and Il Grano. In October 2000, a limited partnership the Secchis controlled, Italian Cowboy Partners, Ltd., leased space in a Dallas shopping center for another restaurant. The lease agreement was the product of six months' active negotiations with the landlord, The Prudential Insurance Co. of America, and its agent, Four Partners L.L.C. doing business as Prizm Partners (collectively, "Prudential"). The Secchis had negotiated at least two other leases over the years, and they and their lawyer successfully insisted on a number of changes in Prudential's proposals. Offers went back and forth, and the agreement went through seven drafts. Francesco, whose formal education extended only to about the eighth grade, did not read the lease but left that to Jane, whose educational background was similar but whose English was better. Jane went over the agreement with their attorney but focused on the economic terms. When the Secchis and Prudential finally reached an understanding, Francesco signed the lease as manager of the partnership's general partner, Secchi, L.L.C. Prudential insisted that the Secchis personally guarantee the lease, and that agreement was also negotiated and changed by the Secchis before they signed it.

The lease contains the following paragraph:

> *Counterclaim and Jury Trial.* In the event that the Landlord commences any summary proceeding or action for nonpayment of rent or other charges provided for in this Lease, Tenant shall not interpose

any counterclaim of any nature or description in any such proceeding or action. Tenant and Landlord both waive a trial by jury of any or all issues arising in any action or proceeding between the parties hereto or their *128 successors, under or connected with this Lease, or any of its provisions.

Prudential did not specifically point out this provision to the Secchis, and Jane testified that she never noticed it. She also testified that notwithstanding the clear meaning of the second sentence, she never intended to waive a jury trial in any future litigation. The guaranty agreement does not contain a similar waiver but does state that the Secchis agree to guarantee the tenant's "full and timely performance and observance of all the covenants, terms, conditions, provisions, and agreements" in the lease, and in the event of the tenant's default, to "faithfully perform and fulfill all of such terms, covenants, conditions, provisions, and agreements".

Some nine months after the lease was executed, the Secchis and their limited partnership (collectively, "ICP") sued Prudential in statutory county court, claiming in part that it was impossible to do business on the premises because of a persistent odor of sewage. Prudential counterclaimed for amounts allegedly due under the lease and guaranty. When the trial court notified the parties that a date for non-jury trial had been set, ICP filed a jury demand and paid the jury fee, as required by Rule 216 of the Texas Rules of Civil Procedure.[1] The court then notified the parties that a date for jury trial had been set. Prudential moved to quash the jury demand, based on the waiver in the lease. ICP responded that contractual jury waivers in general, and the waiver in the lease in particular, are unenforceable. Specifically, ICP asserted that:

(1) in general, contractual jury waivers
    (a) violate five provisions of the Texas Constitution—article I, sections 13 (open courts),[2] 15 (right to trial by jury),[3] 19 (due course of law),[4] and 29 (Bill of Rights inviolate),[5] and article V, section 10 (trial by jury in district courts),[6]

    *129 (b) are inconsistent with Rule 216 of the Texas Rules of Civil Procedure (request and fee for jury trial), and

        (c) are against the broader public policy expressed in all of those provisions; and

(2) the waiver of jury trial in the lease agreement

> (a) was not knowingly and voluntarily made, and was therefore unenforceable, because the provision was inconspicuous and mislabeled, and Prudential had greater bargaining power than the Secchis,

> (b) cannot be enforced in an action to rescind the lease agreement, and

> (c) does not apply to the Secchis, who only guaranteed the lease.

> After a hearing, the court denied the motion in a brief order without explanation.

Prudential petitioned the court of appeals for mandamus relief, which that court denied with a short memorandum opinion, 2002 WL 1608233, explaining only that "the relators have not shown themselves entitled to the relief requested." Prudential then petitioned for relief from this Court, and we agreed to hear argument.[7] When we learned that the trial judge who denied Prudential's motion to quash had left office, we abated our proceeding to allow the parties to seek reconsideration by the current judge,[8] as required by Rule 7.2(b) of the Texas Rules of Appellate Procedure.[9] After a hearing, the judge denied reconsideration, concluding in a lengthy order that contractual jury waivers are against public policy in Texas (ICP's argument (1)(c) above) and that the waiver in this case was unenforceable for all of the reasons urged by ICP (ICP's argument (2) above). The trial court's order was filed with this Court, and we reinstated the case to our active docket.[10]

## II

[1] As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.[11] ICP argues that a contractual *130 jury waiver does both. We consider each of ICP's arguments, first with respect to all such waivers, and then with respect to the waiver in this case.

## A

[2] We need not dwell on ICP's argument that contractual jury waivers violate various provisions of the Texas Constitution, an argument the trial court did not endorse. The five provisions ICP cites guarantee various personal rights—trial by jury,[12] access to the courts,[13] due course of law,[14] and the Bill of Rights in general.[15] The provisions say nothing about whether and under what conditions such rights can be waived. For the most part, personal rights can be waived, at least under certain conditions.[16] ICP concedes that the right to trial by jury can be waived by failure to comply with the procedures prescribed by Rule 216. Nothing in the constitutional provisions themselves suggests that parties are powerless to waive trial by jury under any other circumstances, before or after suit is filed.

[3] ICP argues that Rule 216 prescribes the *only* way in which trial by jury can be waived, but it plainly does not. Rule 216 states that "[n]o jury trial shall be had in any civil suit, *unless* " a timely demand is made and jury fee paid.[17] By the rule's express language, those conditions are prerequisites to a jury trial, not guarantees of one.

[4] ICP's principal argument, and the one accepted by the trial court, is that an agreement to waive trial by jury is contrary *131 to the public policy expressed in the constitutional provisions and Rule 216. This is so, ICP contends, because to allow such waivers gives parties the power to alter the fundamental nature of the civil justice system by private agreement. But parties already have power to agree to important aspects of how prospective disputes will be resolved. They can, with some restrictions, agree that the law of a certain jurisdiction will apply,[18] designate the forum in which future litigation will be conducted,[19] and waive in personam jurisdiction, a requirement of due process.[20] Furthermore, parties can agree to opt out of the civil justice system altogether and submit future disputes to arbitration. State and federal law not only permit but favor arbitration agreements.[21] ICP argues that while it does not offend public policy for parties to agree to a private dispute resolution method like arbitration, an agreement to waive trial by jury is different because it purports to manipulate the prescribed public justice system. We are not persuaded. Public policy that permits parties to waive trial altogether surely does not forbid waiver of trial by jury.

ICP argues that contractual jury waivers are no different from cognovit or confession-of-judgment clauses by which a debtor agrees in the event of default on an obligation to waive notice of suit and to authorize the lender or its designee to confess judgment, which have

long been outlawed in Texas.[22] In *Worsham v. Stevens,* *132 we held that a statute passed after such an agreement had been made nevertheless prevented its enforcement, operating not to impair the parties' contract but to deprive the creditor of a remedy previously available.[23] *Worsham* stands for the unsurprising proposition that the Legislature is not obliged to continue a remedy in effect merely because parties have contracted for it. No statute forbids contractual waivers of the right to trial by jury.

ICP argues that trial by jury affords such fundamental private and public benefits that it cannot be waived by agreement. We certainly agree with ICP that juries in civil cases provide an important public participation in the civil justice system. But as ICP acknowledges, trial by jury can be waived and often is, and we do not see why waiver by agreement is more harmful to public interests than waiver simply because no party requests a jury. ICP argues that parties are more likely to trust the fairness of a jury verdict. But we think that parties who agree to trial before a judge have already indicated by their choice that they prefer judicial resolution of the dispute.

[5] [6] ICP argues that if contractual jury waivers are permitted, some parties will attempt to take unfair advantage of others, using bargaining position, sophistication, or other leverage to extract waivers from the reluctant or unwitting. We agree, of course, that agreements made in such circumstances cannot be enforced. As we have said in another context, a waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness of the legal consequences.[24] We echo the United States Supreme Court's admonition that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."[25] Under those conditions, however, a party's right to trial by jury is afforded the same protections as other constitutional rights.

Furthermore, if parties are willing to agree to a non-jury trial, we think it preferable to enforce that agreement rather than leave them with arbitration as their only enforceable option. By agreeing to arbitration, parties waive not only their right to trial by jury but their right to appeal, whereas by agreeing to waive only the former right, they take advantage of the reduced expense and delay of a bench trial, avoid the expense of arbitration, and retain their right to appeal. The parties obtain dispute resolution of their own choosing in a manner already

afforded to litigants in their courts. Their rights, and the orderly development of the law, are further protected by appeal. And even if the option appeals only to a few, some of the tide away from the civil justice system to alternate dispute resolution is stemmed.

[7] Finally, we note that nearly every state court that has considered the issue has held that parties may agree to waive their right to trial by jury in certain future disputes,[26] including the supreme courts in *133 Alabama,[27] Connecticut,[28] Missouri,[29] Nevada,[30] and Rhode Island.[31] The same is true of federal courts.[32] One Texas court of appeals has also reached this conclusion.[33] Only one state supreme court, the Supreme Court of Georgia, has reached a contrary conclusion.[34] We believe this overwhelming weight of authority is correct.

## B

[8] ICP argues that even if some contractual jury waivers are enforceable, for three reasons the one in this case is not.

First, ICP contends, and the trial court found, that ICP's assent to a commercial lease that included a sentence waiving trial by jury does not satisfy the high standard that a waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness of the legal consequences[35] because—

- the sentence was in the 53rd paragraph of a 67–paragraph document, 7 pages before the signature page;

- the paragraph was misleadingly captioned "Jury Trial" instead of "Jury Waiver";

- *134 • the bargaining power of Prudential, with "assets exceeding a quarter of a trillion dollars", greatly exceeded that of the Secchis, "neither of whom were educated beyond the 8th grade, [and who] are immigrants to the United States who operate two local restaurants"; and

- the Secchis did not read the jury waiver, were not told that it was included, and did not bargain for it.

The Secchis admitted, however, that they had

negotiated commercial leases before, that they had previously been represented by counsel, that they had legal counsel in their negotiations with Prudential, that Jane went over this lease with their lawyer, and that they negotiated a number of changes with Prudential over a period of six months.

Based on these facts, all of which are undisputed, we conclude that ICP's waiver of trial by jury was knowing and voluntary as a matter of law. The waiver was crystal clear, and ICP does not contend otherwise. While it came toward the end of a long document, it was not printed in small type or hidden in lengthy text. The paragraph was captioned in bold type, and though "jury waiver" might have been clearer than "jury trial", we do not agree that the caption could reasonably have diverted the Secchis' attention or misled them into thinking that the provision meant the opposite of what it clearly said. Assuming that a jury waiver provision must be conspicuous, an issue we need not decide here, this one was.[36] Although the Secchis did not read the paragraph, they are charged with knowledge of all of the lease provisions absent some claim that they were tricked into agreeing to them,[37] which they do not assert. In sum, we conclude that the Secchis' waiver was knowing and voluntary.

[9] Next, ICP alleges that it was fraudulently induced to execute the lease due to Prudential's concealment of the fact that the premises suffered a recurring odor of sewage. It would be anomalous, ICP argues, to conclude that it was entitled to rescission and yet enforce the jury waiver the lease contains. Accordingly, ICP argues, a jury waiver should not be enforced when it is part of an agreement that is alleged to have been fraudulently induced.

[10] Any provision relating to the resolution of future disputes, included as part of a larger agreement, would rarely be enforced if the provision could be avoided by a general allegation of fraud directed at the entire agreement. The purpose of such provisions—to control resolution of future disputes—would be almost entirely defeated if the assertion of fraud common to such disputes were enough to bar enforcement. The United States Supreme Court has explained that arbitration and forum-selection clauses should be enforced, even if they are part of an agreement alleged to have been fraudulently induced, as long as the specific clauses were not themselves the product of fraud or coercion. *135 [38] We have applied the same rule in the context of arbitration.[39] The Supreme Court of Connecticut has taken the same approach to contractual jury waivers.[40] We agree that the rule should be the same for all similar dispute resolution agreements.

Prudential and the Secchis agreed that any disputes that might arise between them should be resolved without a jury. They did not except disputes over whether the lease was fraudulently induced. The Secchis do not argue that the jury waiver itself was fraudulently induced. Accordingly, their claim for rescission does not preclude enforcement of the jury waiver.

[11] [12] [13] Finally, the Secchis argue that because the jury waiver is contained in the lease only and not in their guaranty, it cannot be enforced against them. Prudential argues that the jury waiver is incorporated into the guaranty by the Secchis' promise in the latter to "faithfully perform and fulfill all of [the] terms, covenants, conditions, provisions, and agreements" of the lease in the event of the partnership's default. We agree with Prudential. We have said before that "an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the document signed ... plainly refers to another writing."[41] Furthermore, agreements executed at the same time, with the same purpose, and as part of the same transaction, are construed together.[42] Applying these rules, and construing the guaranty's express terms, we conclude that the guaranty incorporated the jury waiver in the lease. We note that at least two other supreme courts have reached the same conclusion in similar circumstances.[43]

## III

[14] Having concluded that the parties' contractual jury waiver is enforceable, we turn to whether Prudential is entitled to relief by mandamus. Prudential must meet two requirements. One is to show that the trial court clearly abused its discretion.[44] We have concluded as a matter of law that Prudential was entitled to enforcement of the jury waiver. Since "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts",[45] even when the law is unsettled,[46] the trial court's refusal to enforce the jury waiver was a clear abuse of discretion. Thus, Prudential has met the first requirement.

[15] [16] The other requirement Prudential must meet is to show that it has no *136 adequate remedy by appeal.[47] The operative word, "adequate", has no comprehensive definition; it is simply a proxy for the careful balance of jurisprudential considerations that determine when

appellate courts will use original mandamus proceedings to review the actions of lower courts. These considerations implicate both public and private interests. Mandamus review of incidental, interlocutory rulings by the trial courts unduly interferes with trial court proceedings, distracts appellate court attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and adds unproductively to the expense and delay of civil litigation. Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. An appellate remedy is "adequate" when any benefits to mandamus review are outweighed by the detriments. When the benefits outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate.

[17] This determination is not an abstract or formulaic one; it is practical and prudential. It resists categorization, as our own decisions demonstrate. Although this Court has tried to give more concrete direction for determining the availability of mandamus review, rigid rules are necessarily inconsistent with the flexibility that is the remedy's principal virtue. Thus, we wrote in *Walker v. Packer* that "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ."[48] While this is certainly true, the word "merely" carries heavy freight. In *In re E.I. duPont de Nemours & Co.*, we concluded that defending the claims of more than 8,000 plaintiffs in litigation that would last for years was not *mere* expense and delay, and that mandamus review of the denial of duPont's special appearance was justified, even though duPont could eventually appeal and did not appear to be in any danger of succumbing to the burden of the litigation.[49] In *Travelers Indemnity Co. v. Mayfield*, we granted mandamus review of an order requiring a carrier to pay the plaintiff's attorney fees as incurred in a compensation case, even though the carrier could have appealed from the final judgment and won recovery for the amounts paid, because the order not only cost the carrier money but "radically skew[ed] the procedural dynamics of the case"[50] by requiring the defendant to fund the plaintiff's prosecution of her claims. In *In re Masonite Corp.*, the trial court on its own motion and without any authority whatever, split two cases into sixteen and transferred

venue of fourteen of them to other counties.[51] We held that the defendants were not required to wait until appeal to complain:

> *Walker* does not require us to turn a blind eye to blatant injustice nor does it mandate that we be an accomplice to sixteen trials that will amount to little more than a fiction. Appeal may be adequate for a particular party, but it is *137 no remedy at all for the irreversible waste of judicial and public resources that would be required here if mandamus does not issue.[52]

These cases, among a great many others that could be cited, serve to illustrate that whether an appellate remedy is "adequate" so as to preclude mandamus review depends heavily on the circumstances presented and is better guided by general principles than by simple rules.[53]

[18] Nor is the consideration whether to grant mandamus review confined to private concerns. No one suggested in *Masonite* that any individual party would suffer more by waiting to complain on appeal of the venue order than would any other party complaining of any other venue order in any other case. Two factors drove our decision in *Masonite*: the complete lack of authority for the trial court's order, and the impact on the legal system. We simply could not justify putting the civil justice system itself to the trouble of grinding through proceedings that were certain to be "little more than a fiction." The trial court's ruling in *Travelers* was novel but might easily have become a repeated error. Either way, the error was clear enough, and correction simple enough, that mandamus review was appropriate.

[19] [20] [21] [22] Prudent mandamus relief is also preferable to legislative enlargement of interlocutory appeals.[54] The unavailability of mandamus relief increases the pressure for expanded interlocutory appeals. For example, when this Court refused to review venue decisions by mandamus,[55] the Legislature responded by authorizing mandamus review of all decisions involving mandatory venue provisions.[56] When we held that the denial of a special appearance would ordinarily not warrant mandamus review,[57] the Legislature responded by creating an interlocutory appeal from the denial of a special appearance.[58] When questions arose concerning *138 the availability of mandamus to review the sufficiency of expert reports required in medical malpractice cases,[59] the Legislature responded by creating an interlocutory appeal from the denial of dismissals of such cases for insufficient expert reports.[60] Interlocutory appeals lie as of right and must be decided on the merits, increasing the burden on the appellate system. "Mandamus," on the other hand, "is

an extraordinary remedy, not issued as a matter of right, but at the discretion of the court. Although mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles."[61] As a selective procedure, mandamus can correct clear errors in exceptional cases and afford appropriate guidance to the law without the disruption and burden of interlocutory appeal. Appellate courts must be mindful, however, that the benefits of mandamus review are easily lost by overuse.

[23] The issue before us in the present case—whether a pre-suit waiver of trial by jury is enforceable—fits well within the types of issues for which mandamus review is not only appropriate but necessary. It is an issue of law, one of first impression for us, but likely to recur (it has already arisen in another case in the court of appeals, also on petition for mandamus[62]). It eludes answer by appeal. In no real sense can the trial court's denial of Prudential's contractual right to have the Secchis waive a jury ever be rectified on appeal. If Prudential were to obtain judgment on a favorable jury verdict, it could not appeal, and its contractual right would be lost forever. If Prudential suffered judgment on an unfavorable verdict, Prudential could not obtain reversal for the incorrect denial of its contractual right "unless the court of appeals concludes that the error complained of ... probably caused the rendition of an improper judgment".[63] Even if Prudential could somehow obtain reversal based on the denial of its contractual right, it would already have lost a part of it by having been subject to the procedure it agreed to waive.

For this latter reason, we have granted mandamus relief for the trial court's wrongful refusal to compel arbitration. In *Jack B. Anglin Co. v. Tipps*, we stated that even if the refusal were eventually corrected on appeal, the party seeking arbitration "would be deprived of the benefits of the arbitration clause it contracted for, and the purpose of providing a rapid, inexpensive alternative to traditional litigation would be defeated."[64] This is at least as true, perhaps more so, when the benefit denied is a non-jury trial.

Only if a contractual waiver of trial by jury is enforced in the trial court can its propriety effectively be reviewed on appeal. The denial of trial by jury is harmless error only if there are no material fact *139 issues to submit to a jury.[65] But the denial of trial by jury is also reviewable by mandamus.[66] A sentence in our opinion in *General Motors Corp. v. Gayle* suggests that this is not true,[67] but we granted mandamus in that case to correct the trial court's denial of a jury trial,[68] and we cited without disapproval three courts of appeals that we said "ha[d] reviewed jury

trial orders by mandamus."[69] To afford relief for the denial of a jury trial both by mandamus and by appeal, and to deny relief by either means for the refusal to enforce a jury waiver, unacceptably contorts review of the issue. Mandamus relief in a situation like this, in Professor Charles Alan Wright's words, "provides a valuable ad hoc relief valve for the pressures that are imperfectly contained by the statutes permitting appeals from final judgments and interlocutory orders."[70]

Finally, we note that other courts have granted mandamus relief to enforce contractual jury waivers,[71] including the only other Texas court to have addressed the issue.[72] We are not aware of a published decision denying such relief.

The dissent argues that Prudential has an adequate remedy by appeal because it can "seek damages directly from the breaching party as in any other contract case."[73] But a separate lawsuit is simply not an *appellate* remedy. Even if it were, Prudential could not vindicate its contractual rights by a suit for damages if it won the lease-dispute case. In that situation, Prudential could not appeal from a favorable judgment and could not collaterally attack in a separate suit the trial court's refusal to enforce the jury waiver. To deny Prudential enforcement of the jury *140 waiver by mandamus is to deny it any remedy at all. The dissent cannot point to any authority that would allow the suit for damages it hypothesizes or consider it a viable alternative to mandamus relief.

The dissent suggests that mandamus relief should not be used to enforce contractual rights, but we used it for precisely that purpose only recently in *In re Allstate County Mutual Insurance Co.* to enforce the parties' agreement to submit to an appraisal process for determining the value of a vehicle claimed to be a total loss.[74]

The dissent states that we took "the United States Supreme Court's pronouncement that appellate delays defeated the 'core purpose' of contracts to arbitrate" as a "mandate ... to provide an extraordinary remedy."[75] Perhaps so, but the Supreme Court's "pronouncement" was also a statement of fact: lawsuits followed by appeals defeat the core purpose of arbitration agreements. For exactly the same reason, trial to a jury followed by appeal, if one were even allowed, defeats the reasons for agreeing to waive a jury in the first place.

The dissent argues that "authorizing mandamus relief to enforce a contractual jury waiver while relegating a party to its appellate remedy when denied its constitutional

right to a jury trial" creates a procedural anomaly.[76] If the premise were true, an anomaly would exist; but the premise is not true. We have never held that the denial of a jury trial, which can certainly be reviewed by appeal, cannot also be reviewed by mandamus. As we have already noted, we have faced the issue only once, in *General Motors Corp. v. Gayle,* and while one sentence of that opinion states that mandamus is "generally not available" to review the denial of a jury trial,[77] we nevertheless directed the trial court to abort or mistry the nonjury trial it had commenced and to set the case on its jury docket.[78] We also cited three court of appeals cases that had "reviewed jury trials by mandamus."[79] *General Motors* does not preclude review of the denial of a jury trial by mandamus.

Finally, the dissent argues that "[e]ven if parties may freely waive their right to trial by jury, there is no public policy reason for encouraging them to do so."[80] Of course, enforcing an agreement is not the same as encouraging parties to make it. By enforcing contractual jury waivers, we no more encourage them than we encourage arbitration by enforcing arbitration agreements. Parties are free to agree to such remedies as they choose, and as we have noted, they may have good reasons for agreeing to waive a jury trial. What the dissent ignores is that there is a compelling public policy reason to enforce legal agreements freely made. The dissent does not find the jury trial waiver in this case illegal or contrary to public policy, yet it would deny all viable means of enforcement.

\* \* \* \* \*

For these reasons, we direct respondent, the Honorable Sally Montgomery, to vacate her order of June 6, 2003, and the prior order of June 19, 2002, to grant Prudential's motion to quash the jury demand and payment of jury fee, and to \*141 return the case to the nonjury docket. We are confident she will promptly comply. Our writ will issue only if she does not.

Chief Justice PHILLIPS filed a dissenting opinion, in which Justice O'NEILL, Justice JEFFERSON, and Justice SCHNEIDER joined.

Chief Justice PHILLIPS, joined by Justice O'NEILL, Justice JEFFERSON, and Justice SCHNEIDER, dissenting.

Mandamus is an extraordinary remedy available "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). To obtain mandamus relief, the relator must satisfy a two-prong test. Relator must demonstrate (1) that the lower court committed a clear abuse of discretion (2) for which there is no adequate remedy at law, such as a normal appeal. *Id.* at 839–40. Although the Court's mandamus jurisprudence has not always strictly adhered to these tenets, we have endeavored to apply them more consistently since our decision in *Walker.* Because the Court retreats from that approach today, I respectfully dissent.

Under the second prong, the Court concludes that we must grant mandamus relief here because "the trial court's denial of Prudential's contractual right to have the Secchis waive a jury [cannot] be rectified on appeal." 148 S.W.3d at 138. I, of course, agree that an appellate remedy is inadequate if it comes too late to cure the trial court's error. *Walker,* 827 S.W.2d at 843. As we have said, a party establishes that its appellate remedy is inadequate by showing that it is in real danger of permanently losing its substantial rights. *Perry v. Del Rio,* 66 S.W.3d 239, 257 (Tex.2001); *Walker,* 827 S.W.2d at 842; *Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 306 (Tex.1994). But that is not the present case.

The Court suggests, however, that if we do not act immediately Prudential's contractual right will be lost forever. I disagree. The Court confuses the adequacy of Prudential's appellate remedy with the damages Prudential may suffer as a consequence of its tenant's breach of contract. The purpose of the appellate remedy is not to compensate Prudential for this contractual breach, but to correct the trial court's error. If Prudential has been otherwise damaged, it should seek damages directly from the breaching party as in any other contract case.

The Court further suggests that Prudential's appellate remedy is inadequate because the burden of showing harmful error in this instance is simply too great. This is also wrong. Texas courts have readily found harm when a party has been denied its right to present disputed questions of fact to a jury. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 667 (Tex.1996). In this instance, even if the evidence greatly preponderates in favor of the

judgment, the judgment must nevertheless be reversed if there is any evidence on which a jury could have reached a different result. *See id.; Wm. D. Cleveland & Sons v. Smith,* 102 Tex. 490, 119 S.W. 843, 843–44 (1909). Our harmful error analysis in these cases reflects the importance our justice system accords the right to trial by jury. *See Gen. Motors Corp.,* 951 S.W.2d at 476 (right to jury trial is "one of our most precious rights"). If a pre-dispute jury waiver is enforceable, an issue I would not decide here, then logic dictates that a wrongful failure to honor the agreement should be reviewed under the same appellate standard. Thus, a trial court's erroneous decision about who is to determine the facts in a case is harmful error if there are material facts in dispute. *142 *See Halsell v. Dehoyos,* 810 S.W.2d 371, 372 (Tex.1991).

The Court finally compares this case to those cases in which we have enforced arbitration agreements through mandamus. *See In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 551 (Tex.2002) (per curiam); *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001); *Prudential Securities, Inc. v. Marshall,* 909 S.W.2d 896, 900 (Tex.1995) (per curiam); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272–73 (Tex.1992). Our choice of the mandamus remedy in *Jack B. Anglin Co.* and the other Federal Arbitration Act cases was influenced by three factors: (1) the strong public policy of both Texas and the federal government favoring arbitration, 842 S.W.2d at 268, (2) the procedural anomaly that permitted an interlocutory appeal under the state arbitration act but not the federal act, *id.* at 272, and (3) the United States Supreme Court's pronouncement that appellate delays defeated the "core purpose" of contracts to arbitrate, *id.* at 273 n. 14 (citing *Southland Corp. v. Keating,* 465 U.S. 1, 7–8, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)), which we took as a mandate from our nation's highest court to provide an extraordinary remedy. None of these factors are in the case before us.

Even if parties may freely waive their right to trial by jury, there is no public policy reason for encouraging them to do so. *See generally Bell Helicopter Textron, Inc. v. Abbott,* 863 S.W.2d 139, 141 (Tex.App.-Texarkana 1993, *writ denied* ) (restrictions on right to jury subject to utmost scrutiny). Furthermore, whereas the mandamus remedy in *Jack B. Anglin Co.* corrected a procedural anomaly, its use here creates one, authorizing mandamus relief to enforce a contractual jury waiver while relegating a party to its appellate remedy when denied its constitutional right to a jury trial. *See Gen. Motors Corp.,* 951 S.W.2d at 477 ("Because the denial of a jury trial can be reviewed by ordinary appeal, mandamus is generally

not available to review such a ruling."). Finally, as I have explained, an appeal will not destroy Prudential's contractual right; it merely postpones its application. Because any error in submitting this case to a jury may be corrected on appeal, mandamus relief is therefore inappropriate. *See Walker,* 827 S.W.2d at 842 (quoting *Iley v. Hughes,* 158 Tex. 362, 311 S.W.2d 648, 652 (1958) (appellate remedy inadequate " 'when parties stand to lose their substantial rights' ")); *see also McDaniel v. Yarbrough,* 898 S.W.2d 251, 253 (Tex.1995) (erroneous decision on right to jury trial is reversible error).

Admittedly, Prudential's appellate remedy is not as efficient or economical as mandamus, but that has never been the test. It is not enough to show that mandamus is a quicker or more beneficial remedy because the writ's purpose is not merely to expedite the correction of legal errors. *See In re Ford Motor Co.,* 988 S.W.2d 714, 721 (Tex.1998); *Walker,* 827 S.W.2d at 842; *Bell Helicopter Textron, Inc. v. Walker,* 787 S.W.2d 954, 955 (Tex.1990) (per curiam). If the writ were available to correct every reversible error as it occurred in the trial court, the writ would cease to be extraordinary, and appellate courts would soon find themselves embroiled in the management of the trial court's docket. *See Pope v. Ferguson,* 445 S.W.2d 950, 954 (Tex.1969). Thus, we have not granted mandamus relief to correct rulings incidental to the trial process that do not involve the permanent deprivation of a substantial right. *Polaris Inv. Mgmt. Corp. v. Abascal,* 892 S.W.2d 860, 862 (Tex.1995) (per curiam).

But the Court now surprisingly suggests that the second prong of our mandamus standard has no fixed meaning. 148 S.W.3d at 136 (The word " 'adequate' has no comprehensive definition."). Instead, *143 the Court says we must weigh all the public and private interests implicated by the lower court ruling at issue and then decide on balance whether a remedy other than mandamus is adequate or not. *Id.* at 136. And although the Court ultimately does not apply its new ad hoc balancing test here, it calls into question much of our jurisprudence in this area.

I see no need to inject even greater uncertainty into an already difficult and frequently subjective process. In the past, we have emphasized that the writ of mandamus should not issue absent "compelling circumstances." *See, e.g., Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex.1996); *Geary v. Peavy,* 878 S.W.2d 602, 603 (Tex.1994) (per curiam). But today, in circumstances far from compelling, the Court uses mandamus as a substitute for appeal, an

approach rejected even by the federal procedure the Court purports to emulate. *See In re Avantel, S.A.,* 343 F.3d 311, 317 (5th Cir.2003) (Writ of mandamus is not a substitute for appeal; relator must show that the "clear and indisputable" error is irremediable on ordinary appeal.); *In re Ramu Corp.,* 903 F.2d 312, 318 (5th Cir.1990) ("Although it may obviate the need for improper or unwarranted proceedings, mandamus cannot be used as substitute for appeal, even when hardship may result from delay or unnecessary trial."). Whether today's ruling has fundamentally altered these traditional rules, or is merely an anomaly, remains to be seen.

Because Prudential has failed to demonstrate that the trial

court's refusal to quash the jury setting involves the deprivation of a substantial right that cannot be corrected on appeal, I would, without reference to the merits of the case, deny the petition for writ of mandamus.

**All Citations**

148 S.W.3d 124, 47 Tex. Sup. Ct. J. 1104, 48 Tex. Sup. Ct. J. 31

Footnotes

1 TEX.R. CIV. P. 216 ("a. **Request.** No jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance. b. **Jury Fee.** Unless otherwise provided by law, a fee of ten dollars if in the district court and five dollars if in the county court must be deposited with the clerk of the court within the time for making a written request for a jury trial. The clerk shall promptly enter a notation of the payment of such fee upon the court's docket sheet.").

2 TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

3 *Id.* art. I, § 15 ("The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.").

4 *Id.* art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

5 *Id.* art. I, § 29 ("To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.").

6 *Id.* art. V, § 10 ("In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury; but no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee be paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature."). ICP argues that this provision applies by statute in the statutory county court of Dallas County, where it filed suit. *See* TEX. GOV'T CODE § 25.0007 ("practice, procedure, rules of evidence, issuance of process and writs, and all other matters pertaining to the conduct of trials and hearings in the statutory county courts, other than the number of jurors, that involve those matters of concurrent jurisdiction with district courts are governed by the laws and rules pertaining to district courts"); *id.* § 25.0592(a) ("a county court at law in Dallas County has concurrent jurisdiction with the district court in civil cases regardless of the amount in controversy").

7 46 Tex. Sup.Ct. J. 394 (Jan. 16, 2003).

8 46 Tex. Sup.Ct. J. 546 (Apr. 3, 2003).

9 TEX.R.APP. P. 7.2(b) (providing that if, during an original proceeding against a public officer in an official capacity, the officer ceases to hold office, the officer's successor is automatically substituted as a party and "the court must abate the proceeding to allow the successor to reconsider the original party's decision"). *See also Jampole v. Touchy,* 673

S.W.2d 569, 572 (Tex.1984); *State v. Olsen,* 163 Tex. 449, 360 S.W.2d 402, 403 (1962).

10    46 Tex. Sup.Ct. J. 794 (June 19, 2003).

11    *E.g., Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex.2001) ("[W]e have long recognized a strong public policy in favor of preserving the freedom of contract."); *Sonny Arnold, Inc. v. Sentry Sav. Ass'n,* 633 S.W.2d 811, 815 (Tex.1982) (recognizing "the parties' right to contract with regard to their property as they see fit, so long as the contract does not offend public policy and is not illegal"); *Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951) (" '[I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.' ") (quoting *Printing and Numerical Registering Co. v. Sampson,* 19 L.R.-Eq. 462, 465 (1875)); *Curlee v. Walker,* 112 Tex. 40, 244 S.W. 497, 498 (1922) ("The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal.").

12    TEX. CONST. art. I, § 15; art. V, § 10.

13    *Id.* art. I, § 13.

14    *Id.* art. I, §§ 13, 19.

15    *Id.* art. I (Bill of Rights), § 29 (excepting everything in Bill of Rights out of the general powers of government).

16    *E.g., Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848–849, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (holding that respondents waived any right they may have had to the full trial of petitioner's counterclaims before an Article III court, noting that "personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried" are subject to waiver, and citing as examples the rights to trial by jury in civil and criminal cases); *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703–704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (upholding a sanction consisting of a finding of personal jurisdiction, noting that there are a "variety of legal arrangements" by which a litigant may give "express or implied consent to the personal jurisdiction of the court" and that " 'parties to a contract may agree in advance to submit to the jurisdiction of a given court' ") (quoting *National Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964)); *Marin v. State,* 851 S.W.2d 275, 279 (Tex.Crim.App.1993) ("[O]ur system may be thought to contain rules of three distinct kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request. In the present context, the most important thing to remember about the Texas law of procedural default is that it only applies to the last category."), *overruled in part on other grounds by Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997); *Brown v. McLennan County Children's Protective Servs.,* 627 S.W.2d 390, 393 (Tex.1982) (upholding a pre-suit waiver of citation in an affidavit relinquishing parental rights as a permissible exception, under the Family Code, to the otherwise applicable prohibition of such waivers); *Williams v. Williams,* 569 S.W.2d 867, 868–870 (Tex.1978) (upholding the validity of a premarital agreement to waive the constitutional and statutory homestead rights of a surviving spouse).

17    TEX.R. CIV. P. 216(a) (emphasis added).

18    *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex.1990) ( "[Parties] may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations. This conflict of laws concept has come to be referred to as party autonomy. However, the parties' freedom to choose what jurisdiction's law will apply to their agreement cannot be unlimited. They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply. So limited, party autonomy furthers the basic policy of contract law." (citation omitted)).

19    *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (Florida forum selection clause on cruise line tickets); *The M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10–11, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clause in towage contract). *See Haynsworth v. The Corporation.*, 121 F.3d 956, 961–964 (5th Cir.1997) (applying federal law in a diversity case); *My Cafe–CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 864–65 (Tex.App.-Dallas 2003, no pet.); *Holeman v. Nat'l Bus. Inst., Inc.*, 94 S.W.3d 91, 96 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *Barnett v. Network Solutions, Inc.*, 38 S.W.3d 200, 203 (Tex.App.-Eastland 2001, pet. denied); *Stobaugh v. Norwegian Cruise Line Ltd.*, 5 S.W.3d 232, 236 (Tex.App.-Houston [14th Dist.] 1999, pet. denied); *Southwest Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324 (Tex.App.-Austin 1999, pet. denied); *Abacan Technical Servs. Ltd. v. Global Marine Int'l Servs. Corp.*, 994 S.W.2d 839, 844 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66, 70–71 (Tex.App.-Dallas 1996, no writ); *Busse v. Pac.Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 812 (Tex.App.-Texarkana 1995, writ denied); *Greenwood v. Tillamook Country Smoker, Inc.*, 857 S.W.2d 654, 656 (Tex.App.-Houston [1st Dist.] 1993, no writ); *Barnette v. United Research Co.*, 823 S.W.2d 368, 370 (Tex.App.-Dallas 1991, writ denied).

20    *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

21    *E.g., Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex.1995).

22    Act of March 18, 1885, 19th Leg., R.S., ch. 34, § 1, 1885 Tex. Gen. Laws 33, 33–34, *reprinted in* 9 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, 653, 653–654 (Austin, Gammel Book Co. 1898), now codified in *Tex. Fin.Code* § 342.504 ("A lender may not take a confession of judgment or a power of attorney authorizing the lender or a third person to confess judgment or to appear for a borrower in a judicial proceeding.").

23    66 Tex. 89, 17 S.W. 404, 404–405 (1886).

24    *Brown v. McLennan County Children's Protective Servs.*, 627 S.W.2d 390, 393 (Tex.1982).

25    *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

26    *See generally* Jay M. Zitter, *Contractual Jury Trial Waivers in State Civil Cases*, 42 A.L.R.5th 53, 71 (1996) ("[T]he vast majority of courts have held, at least in the abstract, that if the parties entered into a contract containing a jury trial waiver clause, such clause will be enforced as not being unreasonable. Moreover, some of these courts have observed that these jury trial waivers are appropriate since in many commercial transactions, advance assurance that any disputes that might arise would be subject to expeditious resolution in a court trial would best serve the needs of the contracting parties as well as those of the overburdened judicial system. However, such view is qualified by the additional statement in many cases that since the right to a jury trial is highly favored, independent contractual waivers of jury trials, entered into independent of specific litigation, will be strictly construed and will not be lightly inferred or extended." (internal references omitted)).

27    *Mall, Inc. v. Robbins*, 412 So.2d 1197, 1200 (Ala.1982) (applied in *Ex parte Cupps*, 782 So.2d 772 (Ala.2000)).

28    *L & R Realty v. Connecticut Nat'l Bank*, 246 Conn. 1, 715 A.2d 748, 754–755 (1998).

29    *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 626–627 (Mo.1997) (en banc) (per curiam).

30    *Lowe Enters. Residential Partners, L.P. v. Eighth Judicial Dist. Court*, 118 Nev. 92, 40 P.3d 405 (2002).

31    *Rhode Island Depositors Econ. Prot. Corp. v. Coffey and Martinelli, Ltd.*, 821 A.2d 222, 226 (R.I.2003).

32     *See, e.g., Leasing Serv. Corp. v. Crane,* 804 F.2d 828, 832 (4th Cir.1986) ("The seventh amendment right is of course a fundamental one, but it is one that can be knowingly and intentionally waived by contract."); *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 755 (6th Cir.1985) ("It is clear that the parties to a contract may by prior written agreement waive the right to jury trial."); *Rodenbur v. Kaufmann,* 320 F.2d 679, 683 (D.C.Cir.1963) ("Without pausing to explore the many nuances inherent in varying situations, we observe simply that a jury trial lawfully may be waived, both before and after a given cause of action shall arise."); *RDO Fin. Servs. Co. v. Powell,* 191 F.Supp.2d 811, 813 (N.D.Tex.2002) ( "Although the right of trial by jury in civil actions is protected by the Seventh Amendment to the Constitution, that right, like other constitutional rights, may be waived by prior written agreement of the parties."); *see generally Debra T. Landis, Contractual Jury Trial Waivers in Federal Civil Cases,* 92 A.L.R. Fed. 688 (2003) ("The cases herein uniformly support the view that, with knowing and voluntary consent, the right to a jury trial in a federal civil action may be waived by a contract that was not made in, or as an incident of, any particular litigation.").

33     *In re Wells Fargo Bank Minnesota N.A.,* 115 S.W.3d 600, 606–608 (Tex.App.-Houston [14 Dist.] 2003).

34     *Bank South, N.A. v. Howard,* 264 Ga. 339, 444 S.E.2d 799 (1994).

35     *Brown v. McLennan County Children's Protective Servs.,* 627 S.W.2d 390, 393 (Tex.1982).

36     *Cf.* TEX. BUS. & COM.CODE § 1.201(b)(10) (stating that for purposes of the Uniform Commercial Code, "conspicuous" means "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court.' ").

37     *See Town N. Nat'l Bank v. Broaddus,* 569 S.W.2d 489, 492 (Tex.1978); *Estes v. Republic Nat'l Bank,* 462 S.W.2d 273, 276 (Tex.1970) ("the general rule is that in the absence of a showing of fraud or imposition, a party's failure to read an instrument before signing it is not a ground for avoiding it"); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) ("parties to a contract have an obligation to protect themselves by reading what they sign").

38     *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

39     *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 756 (Tex.2001).

40     *L & R Realty v. Connecticut Nat'l Bank,* 246 Conn. 1, 715 A.2d 748, 755 (1998).

41     *Owen v. Hendricks,* 433 S.W.2d 164, 166 (Tex.1968).

42     *Jim Walter Homes, Inc. v. Schuenemann,* 668 S.W.2d 324, 327 (Tex.1984).

43     *L & R Realty v. Connecticut Nat'l Bank,* 246 Conn. 1, 715 A.2d 748, 756 n. 11 (1998); *Rhode Island Depositors Econ. Prot. Corp. v. Coffey and Martinelli, Ltd.,* 821 A.2d 222, 227 (R.I.2003).

44     *E.g., Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

45     *Id.*

46     *Huie v. DeShazo,* 922 S.W.2d 920, 927–928 (Tex.1996) (quoting *Walker v. Packer,* 827 S.W.2d at 840).

47     *Walker,* 827 S.W.2d at 840.

48     *Walker,* 827 S.W.2d at 842.

49    92 S.W.3d 517, 523–524 (Tex.2002).

50    923 S.W.2d 590, 595 (Tex.1996).

51    997 S.W.2d 194, 195–196 (Tex.1999).

52    *Id.* at 198.

53    *See also* 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3934.1, at 572, 574 (1996) (stating that "[w]rit review that responds to occasional special needs provides a valuable ad hoc relief valve for the pressures that are imperfectly contained by the statutes permitting appeals from final judgments and interlocutory orders", and that "[i]mportant questions of procedure often are difficult to review by appeal, and at times may demand appellate intervention to secure uniformity between different judges, or simply to bring the balancing perspective that appellate review is intended to provide in controlling the practices as well as the substantive decisions of trial courts.").

54    *See also* George C. Pratt, *Extraordinary Writs,* in 19 MOORE'S FEDERAL PRACTICE § 204.01[2][b], at 204–7 (3d ed. 2004) ("In order to meet the demands of justice in individual cases, discretionary review is preferable to enlarging by judicial interpretation the categories of interlocutory orders that are appealable as of right. General categories of orders that are appealable as of right often include many orders that should not be appealable at all. Review by extraordinary writ allows the circuit courts to retain the final judgment rule and avoid piecemeal appeals, yet be able to respond to the exceptional case that should be reviewed prior to final judgment. Thus, [mandamus] affords an avenue of relief to litigants and a tool for the courts to supervise the proper administration of justice.").

55    *Polaris Inv. Mgmt. Corp. v. Abascal,* 892 S.W.2d 860 (Tex.1995) (per curiam).

56    Act of May 8, 1995, 74th Leg., R.S., ch. 138, § 5, 1995 Tex. Gen. Laws 978, 981 (codified as TEX. CIV. PRAC. & REM.CODE § 15.0642).

57    *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304 (Tex.1994).

58    Act of May 27, 1997, 75th Leg., R.S., ch. 1296, 1997 Tex. Gen. Laws 4936 (codified as TEX. CIV. PRAC. & REM.CODE § 51.014(a)(7)).

59    *See In re Woman's Hosp.,* 141 S.W.3d 144 (Tex.2004) (Owen, J., dissenting).

60    TEX. CIV. PRAC. & REM.CODE § 51.014(9).

61    *Rivercenter Assocs. v. Rivera,* 858 S.W.2d 366, 367 (Tex.1993).

62    *In re Wells Fargo Bank Minnesota N.A.,* 115 S.W.3d 600, 606–608 (Tex.App.-Houston [14 Dist.] 2003).

63    TEX.R.APP. P. 44.1(a)(1). *Cf. Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 667 (Tex.1996) ("The wrongful denial of a jury trial is harmful when the case contains material fact questions."); *Halsell v. Dehoyos,* 810 S.W.2d 371, 372 (Tex.1991) (per curiam) ("A refusal to grant a jury trial is harmless error only if the record shows that no material issues of fact exist and an instructed verdict would have been justified."); *William. D. Cleveland & Sons v. Smith,* 102 Tex. 490, 119 S.W. 843, 843–844 (1909) (same).

64    842 S.W.2d 266, 272–273 (Tex.1992).

65    *See Halsell v. Dehoyos,* 810 S.W.2d 371, 372 (Tex.1991) (per curiam).

66    *See In re Bradle,* 83 S.W.3d 923, 928 (Tex.App.-Austin 2002, orig. proceeding), pet. for mandamus denied in *In re Rosiland Roemer,* No. 02–0935, 46 Tex. Sup.Ct. J. 232 (Dec. 12, 2002); *Granger v. Folk,* 931 S.W.2d 390, 394 (Tex.App.-Beaumont 1996, orig. proceeding), pet. for mandamus denied in *Folk v. Ninth Court of Appeals,* No. 97–0039, 40 Tex. Sup.Ct. J. 472 (April 18, 1997); *Union Pac. Fuels, Inc. v. Johnson,* 909 S.W.2d 130, 133 (Tex.App.-Houston [14th Dist.] 1995, orig. proceeding); *Rosenthal v. Ottis,* 865 S.W.2d 525, 529 (Tex.App.-Corpus Christi 1993, orig. proceeding).

67    951 S.W.2d 469, 477 (Tex.1997) ("Because the denial of a jury trial can be reviewed by ordinary appeal, mandamus is generally not available to review such a ruling." (citations omitted)).

68    *Id.* (stating that because we had already reviewed one of the trial court's interlocutory rulings by mandamus, "the interests of judicial economy dictate that we should also remedy the trial court's denial of the right of jury trial by mandamus").

69    *Id.* n. 1 ("Since we reaffirmed in *Walker v. Packer,* 827 S.W.2d 833, 842 (Tex.1992), that mandamus is unavailable where there is an adequate remedy by appeal, at least three courts of appeals have reviewed jury trial orders by mandamus. *See Granger v. Folk,* 931 S.W.2d 390, 394 (Tex.App.-Beaumont 1996, orig. proceeding); *Union Pac. Fuels, Inc. v. Johnson,* 909 S.W.2d 130, 133 (Tex.App.-Houston [14th Dist.] 1995, orig. proceeding); *Rosenthal v. Ottis,* 865 S.W.2d 525, 529 (Tex.App.-Corpus Christi 1993, orig. proceeding). We express no opinion on the correctness of these decisions.").

70    16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3934.1, at 572 (1996).

71    *E.g., Lowe Enters. Residential Partners, L.P. v. Eighth Judicial Dist. Court,* 118 Nev. 92, 40 P.3d 405, 408 (2002); *Trizec Props. Inc. v. Superior Court,* 229 Cal.App.3d 1616, 280 Cal.Rptr. 885, 886–87 (1991).

72    *In re Wells Fargo Bank Minnesota N.A.,* 115 S.W.3d 600, 606–608 (Tex.App.-Houston [14 Dist.] 2003).

73    *Post* at 141.

74    85 S.W.3d 193 (Tex.2002).

75    *Post* at 142.

76    *Post* at 142.

77    951 S.W.2d at 477.

78    *Id.*

79    *Id.* n. 1.

80    *Post* at 142.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

361 S.W.3d 719
Court of Appeals of Texas,
Corpus Christi–Edinburg.

In re Ricardo REYNOSO.

No. 13–11–00668–CV. | Jan. 12, 2012. | Rehearing
Overruled Feb. 9, 2012.

**Synopsis**
**Background:** In original mandamus proceeding, landlord sought to challenge order disqualifying his attorney of record in underlying lawsuit involving dispute between landlord and tenant over use of insurance proceeds toward leased commercial property.

**Holdings:** The Court of Appeals, Perkes, J., held that:

[1] mandamus was not an available remedy given disputed factual issues, and

[2] attorney was subject to disqualification in light of his prior communication with tenant while representing bank to which landlord and tenant had allegedly presented a forged multiple-party insurance check.

Petition for writ of mandamus denied.

West Headnotes (12)

[1]     **Mandamus**
        ⬢⇒Remedy by Appeal or Writ of Error
        **Mandamus**
        ⬢⇒Matters of discretion

        To be entitled to the extraordinary relief of a writ of mandamus, relator must show that the trial court abused its discretion and that there is no adequate remedy by appeal.

        Cases that cite this headnote

[2]     **Mandamus**
        ⬢⇒Matters of discretion

        A trial court abuses its discretion, for mandamus purposes, if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law.

        Cases that cite this headnote

[3]     **Mandamus**
        ⬢⇒Matters of discretion

        To satisfy the clear abuse of discretion standard in mandamus action, the relator must show that the trial court could reasonably have reached only one decision.

        Cases that cite this headnote

[4]     **Mandamus**
        ⬢⇒Remedy by Appeal or Writ of Error

        In determining whether appeal is an adequate remedy, the reviewing court considers whether the benefits outweigh the detriments of mandamus review.

        Cases that cite this headnote

[5]     **Mandamus**
        ⬢⇒Modification or vacation of judgment or order

        Appeal is an inadequate remedy, thus permitting issuance of mandamus relief, when a trial court

abuses its discretion in the disqualification of counsel.

Cases that cite this headnote

[6] **Attorney and Client**
⚖=Disqualification in general

Disqualification is a severe remedy which can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice.

1 Cases that cite this headnote

[7] **Attorney and Client**
⚖=Disqualification in general

In considering a motion to disqualify opposing counsel, the trial court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory trial tactic.

Cases that cite this headnote

[8] **Attorney and Client**
⚖=Disqualification proceedings; standing

The party seeking disqualification of opposing counsel bears the burden of establishing conduct that warrants disqualification; mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice to merit disqualification.

1 Cases that cite this headnote

[9] **Mandamus**
⚖=Scope of inquiry and powers of court

Where there are disputed areas of fact, mandamus relief is not appropriate.

Cases that cite this headnote

[10] **Mandamus**
⚖=Scope of inquiry and powers of court

Conflicting testimony of attorney and tenant concerning the extent to which the two had previously communicated and the nature of the information shared, while attorney represented bank in a prior action against both landlord and tenant, presented disputed issues of fact that were material to the legal issues surrounding attorney's disqualification as landlord's counsel in subsequent action against tenant for misuse of insurance proceeds toward leased commercial property, thus precluding issuance of mandamus relief from order disqualifying attorney as landlord's counsel.

Cases that cite this headnote

[11] **Attorney and Client**
⚖=Particular Cases and Problems

Attorney who had initially represented bank in action against landlord and tenant for allegedly presenting a forged multiple-party insurance check was later subject to disqualification as landlord's counsel in subsequent action involving dispute between landlord and tenant over use of insurance proceeds on leased commercial property; tenant testified that he had disclosed confidential information to attorney concerning his intentions of exercising option to buy the commercial property from landlord, while operating under assumption that attorney was acting as an intermediary, and tenant had

the right not to see attorney on the opposite side of subsequent litigation to which confidential information was highly pertinent.

Cases that cite this headnote

[12]    **Attorney and Client**
       ⊙=Interests of former clients

Disqualification of an attorney is based, not on the attorney's former representation of an opposing party, but on the attorney's duty to the party to preserve its confidences.

Cases that cite this headnote

**Attorneys and Law Firms**

*720 Jose R. Guerrero, Ramirez & Guerrero, San Juan, for Appellant.

Orlando Jimenez, Pharr, for Appellee.

Before Justices RODRIGUEZ, VELA, and PERKES.

**OPINION**

Opinion by Justice PERKES.[1]

In this original proceeding, relator, Ricardo Reynoso, seeks to set aside an order disqualifying his attorney of record, Jesus *721 Ramirez.[2] We deny the petition for writ of mandamus.

**I. BACKGROUND**

Armando Gamboa entered a commercial lease with an option to purchase real estate from Reynoso. The property subject to the lease included a hotel. Gamboa planned to utilize the property as both a nightclub and hotel and began making modifications to the property. Reynoso terminated the lease and began eviction proceedings on grounds Gamboa did not have the right to modify the premises. In response, Gamboa filed a petition for declaratory judgment and an application for a temporary restraining order against Reynoso asserting that the lease gave Gamboa the right to make modifications. Gamboa's causes of action included fraud and requests for specific performance of the lease with option to purchase. In these initial proceedings, attorney Fabian Guerrero represented Gamboa and attorney Glenn W. Devino represented Reynoso. At some point during these proceedings, the improvements on the property suffered fire damage.

Lone Star National Bank ("Lone Star"), represented by Ramirez, intervened in the lawsuit. According to Lone Star's petition in intervention, the insurer for the realty had issued a multi-party check for the fire damage drawn from J.P. Morgan Chase Bank to, among others, Gamboa and Reynoso. Gamboa presented the insurance check to Lone Star for payment, with the alleged endorsements of the payees, and Lone Star paid the insurance check to Gamboa. J.P. Morgan Chase Bank thereafter alleged to Lone Star that one or more of the endorsements on the check had been forged and demanded repayment of the check amount from Lone Star. In terms of Lone Star's claims against Gamboa and Reynoso, Lone Star sought recoupment of any amounts for which it might be found liable to J.P. Morgan Chase Bank as a result of the allegedly forged instrument. Lone Star also sought the recovery of costs, attorney's fees, and pre- and post-judgment interest.

During the course of these proceedings, Guerrero moved to withdraw as counsel for Gamboa. Devino, the initial attorney for Reynoso, also moved to withdraw as counsel. The trial court granted Devino's motion to withdraw on June 29, 2011. The record before us reflects no ruling on Guerrero's motion to withdraw.

After resolution of the issues presented in its intervention, Lone Star filed a notice of nonsuit on July 8, 2011, and the trial court granted the nonsuit by written order signed on July 11, 2011.

On July 14, 2011, Ramirez again appeared in the lawsuit as an attorney of record, although now he represented Reynoso rather than Lone Star. On this date, Reynoso filed a third party petition and application for temporary

restraining order, temporary injunction, and permanent injunction against Gamboa. Reynoso alleged that Gamboa took the insurance money but failed to repair the improvements on the property. According to the petition, Reynoso suffered damages because the improvements had not been repaired or rebuilt and this omission substantially lowered the value of the property. On August 1, 2011, Reynoso sent discovery to Lone Star requesting the production of essentially all of Lone Star's records pertaining to Gamboa. Reynoso also sent a subpeona *722 duces tecum to Gamboa requesting his financial records.[3]

Gamboa[4] filed a motion to disqualify Ramirez. The motion was neither verified nor supported by affidavit. The motion to disqualify asserts that Ramirez should be disqualified for these reasons: Ramirez would be called as a witness; because Ramirez's representation of Reynoso created a risk that the confidential communications of Gamboa and Gamboa Construction would be revealed; and that Ramirez's representation of Reynoso would otherwise damage the interests of Gamboa and Gamboa Construction. According to the motion, when Ramirez represented Lone Star during the lawsuit, he conveyed to both Gamboa and Reynoso that he could help resolve the issues between them without the need of other attorneys. The motion asserts that Ramirez communicated this during a time when Gamboa and Gamboa Construction were not represented by counsel. The motion asserts that, as a direct result, Gamboa confided and trusted Ramirez with certain "confidential and perhaps privileged data."

On August 31, 2011, the trial court held an evidentiary hearing on the motion to disqualify. Ramirez testified that he represented Lone Star in this case from March 24, 2011, when the petition in intervention was filed, until the trial court entered the order of nonsuit on July 11, 2011. Ramirez testified that Reynoso hired him as his attorney when Ramirez terminated the relationship with Lone Star in June or July of 2011. Ramirez remembered speaking to "somebody who identified himself as Gamboa" "about the matter." Ramirez stated that he could not recall whether the conversation involved issues pertaining to Lone Star's intervention or matters regarding the lease with option to purchase. Ramirez thought he made contact with Gamboa about the allegedly forged check, although he may have spoken with Gamboa again after speaking with him about the forged check. Ramirez testified that he did not recall talking to Gamboa about settling the matter. Ramirez testified that, at some time, the attorneys for both Reynoso and Gamboa withdrew and both of them authorized Ramirez to talk to Reynoso and Gamboa

directly. Reynoso showed Ramirez a contract for deed and Ramirez suggested different documents—a promissory note and a deed of trust with a vendor's lien. He sent the closing documents to Guerrero. "At no time did this gentleman confide in me in any manner, any fact, any privilege, any confidence and any secrets that I can tell you he provided to me."

In contrast, Gamboa testified that Ramirez told him that he was "solely representing" Lone Star. Gamboa testified that he spoke with Ramirez about resolving issues pertaining to the allegedly forged check, then spoke with him again in May regarding the forged check and drafting papers for the property. Gamboa testified expressly as follows:

> What my understanding was basically he wanted to pull Lone Star out of the lawsuit so that they are completely out and then help myself and Mr. Reynoso come to an agreement to move forward the project. And he even told me and *723 told also Mr. Reynoso—a previous attorney was charging us $3,000 to draw up all the documents. He had told us that he would do it for free.
>
> ....
>
> I confided that some of the information I was telling him as far as what my plans were, how much I was willing to pay for the property and stuff like that—I was under the impression, you know, he was kind of a referee in the matter and not the coach for the opposing team basically ....

Additionally, Gamboa testified that he told Ramirez what he was willing to pay for the building and what he was willing to do with the building. He entered an agreement with Reynoso in May or June to move forward with the project, and Ramirez helped facilitate that contract. Gamboa testified that Ramirez never told him he was representing Reynoso.

After the hearing, Reynoso filed a reply to the motion to disqualify. The reply was neither verified nor supported by affidavit. Reynoso alleged that Gamboa failed to carry his burden to present evidence of actual prejudice and failed to show that Ramirez's testimony was necessary to establish any "essential" fact in the case.

On September 12, 2011, the trial court granted the motion to disqualify. This original proceeding ensued. The Court requested and received a response to the petition for writ of mandamus.

## II. STANDARD OF REVIEW

[1] [2] [3] To be entitled to the extraordinary relief of a writ of mandamus, relator must show that the trial court abused its discretion and that there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004) (orig. proceeding). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. *In re Cerberus Capital Mgmt., LP,* 164 S.W.3d 379, 382 (Tex.2005) (per curiam) (orig. proceeding); *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). "To satisfy the clear abuse of discretion standard, the relator must show 'that the trial court could reasonably have reached only one decision.'" *Liberty Nat'l First Ins. Co. v. Akin,* 927 S.W.2d 627, 630 (Tex.1996) (orig. proceeding) (quoting *Walker,* 827 S.W.2d at 840).

[4] [5] In determining whether appeal is an adequate remedy, we consider whether the benefits outweigh the detriments of mandamus review. *In re BP Prods. N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex.2008) (orig. proceeding); *In re Prudential Ins. Co.,* 148 S.W.3d 124, 135–36 (Tex.2004) (orig. proceeding). Appeal is an inadequate remedy when a trial court abuses its discretion in the disqualification of counsel. *In re Guar. Ins. Servs.,* 343 S.W.3d 130, 132 (Tex.2011) (orig. proceeding); *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 383 (Tex.2005) (orig. proceeding); *In re Sanders,* 153 S.W.3d 54, 56 (Tex.2004) (orig. proceeding) (per curiam); *NCNB Tex. Nat'l Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989) (orig. proceeding). Consequently, the only issue we must consider is whether the respondent abused his discretion by disqualifying Ramirez. *See In re Nitla S.A. de C.V.,* 92 S.W.3d 419, 423 (Tex.2002) (orig. proceeding).

[6] [7] [8] Disqualification is a "severe" remedy which can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice. *See id.* "In considering a motion to disqualify, the trial court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory trial tactic." *Id.* *724 The party seeking disqualification bears the burden of establishing conduct that warrants disqualification. *Id.* Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice to merit disqualification. *See Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990).

## III. ANALYSIS

Ramirez represented Lone Star against Gamboa in its cause of action for breach of warranty for unauthorized endorsement of the check for insurance proceeds. After Lone Star nonsuited its causes of action against Gamboa and others, Ramirez then, in the same case, represented Reynoso in his claims against Gamboa for, inter alia, fraud and negligent misrepresentation regarding Gamboa's actions pertaining to the check for insurance proceeds and Gamboa's alleged failure to use the proceeds to repair the property.

[9] As an initial matter, we note that the trial court had before it conflicting evidence regarding the communications between Ramirez and Gamboa. Where there are disputed areas of fact, mandamus relief is not appropriate. *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670, 676 (Tex.2007) (orig. proceeding); *In re Angelini,* 186 S.W.3d 558, 560 (Tex.2006) (orig. proceeding).

[10] Although Ramirez testified that he did not recall talking to Gamboa about settling the lawsuit, Gamboa testified that he spoke to Ramirez about "drawing up papers for the property" and that Ramirez told Gamboa he would prepare the papers without charge. Gamboa testified that he spoke with Ramirez regarding Ramirez's plan and desire to withdraw Lone Star from the lawsuit so that he could "then help myself and Mr. Reynoso come to an agreement to move forward the project." Although Ramirez testified that "[a]t no time did this gentleman confide in me in any manner, any fact, any privilege, any confidence and any secrets that I can tell you he provided to me," Gamboa provided contrary testimony and stated that he told Ramirez his future plans for the disputed property, including how much he was willing to pay Reynoso for the property and what he was willing to do with the building on the subject property. These disputed issues of fact are material to the legal issues presented for our review in this case and preclude mandamus relief. *See In re Pirelli Tire, L.L.C.,* 247 S.W.3d at 676.

[11] [12] Nevertheless, even if we were to review the

substance of this original proceeding, we would still conclude that the petition should be denied. The Supreme Court of Texas has held that an attorney has an implicit duty to protect a nonclient's confidences that is no less binding than a duty undertaken expressly in a joint defense agreement. *Nat'l Med. Enters. v. Godbey*, 924 S.W.2d 123, 129–131 (Tex.1996). In such cases, disqualification of the attorney is based, not on the attorney's former representation of an opposing party, but on the attorney's duty to the party to preserve its confidences. *See id.* In reaching this conclusion, the supreme court examined cases from the Fifth and Seventh Circuits:

> When information is exchanged between various co-defendants and their attorneys[,] this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in the common cause. In such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment *725 of one of the co-defendants. Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.* (discussing *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir.1977) (per curiam)). The supreme court concluded that the disqualification analysis in *Armco Steel* was based on the

duty to preserve confidences implied in the circumstances of a joint defense. *See id.* The supreme court examined other cases in the context of determining that where confidential information that is related to claims in a lawsuit has been shared with an attorney by a non-client, the attorney has a fiduciary obligation, or an implied professional relationship, with that non-client, which requires disqualification. *See id.* (discussing *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir.1983); *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311 (7th Cir.1978); *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 750 (2d Cir.1981)).

In this case, Gamboa testified that he furnished confidential information relating to the subject matter of the lawsuit between Reynoso and Gamboa to Ramirez. Although the confidences were not shared in the context of a joint defense between co-defendants, the confidences were instead shared for the purpose of the "common cause" of resolving the claims of Lone Star against Gamboa and Reynoso and attempting to resolve the legal matters in dispute between Gamboa and Reynoso. We conclude that the trial court did not abuse its discretion in disqualifying Ramirez on the grounds that Gamboa has the right not to see Ramirez on the opposite side of the litigation to which the confidential information that Gamboa shared with Ramirez is highly pertinent.

## IV. CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus and the response thereto under the applicable standard of review, is of the opinion that relators have not shown themselves entitled to the relief sought. Accordingly, the stay previously imposed by this Court is LIFTED. *See* TEX.R.APP. P. 52.10(b) ("Unless vacated or modified, an order granting temporary relief is effective until the case is finally decided."). The petition for writ of mandamus is DENIED. *See* TEX.R.APP. P. 52.8(a).

**All Citations**

361 S.W.3d 719

Footnotes

1   *See* TEX.R.APP. P. 52.8(d) ("When granting relief, the court must hand down an opinion as in any other case," but when "denying relief, the court may hand down an opinion but is not required to do so."); TEX.R.APP. P. 47.4 (distinguishing opinions and memorandum opinions).

2   This original proceeding arises from trial court cause number CL–10–1900–A in County Court at Law Number One of Hidalgo County, Texas. The respondent in this case is the Honorable Rudy Gonzalez.

3   Gamboa filed a motion to quash the subpoena alleging, inter alia, that Ramirez "will likely be a witness to this matter and ... JESUS RAMIREZ will use confidential information received by Movant to Movant's detriment."

4   The motion to disqualify was filed by Gamboa and Gamboa Construction. The pleadings by which Gamboa Construction joined the underlying litigation are not part of the record before us. Nevertheless, both Gamboa and Gamboa Construction are real parties in interest herein.

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** In re Adan Volpe Properties, Ltd.,
Tex.App.-Corpus Christi, February 12, 2010

256 S.W.3d 257
Supreme Court of Texas.

In re TEAM ROCKET, L.P., MLF Airframes, Inc.,
and Mark L. Frederick, Relators.

No. 06–0414. | Argued Feb. 15, 2007. | Decided May
23, 2008.

**Synopsis**
**Background:** Pilot's family brought wrongful death
action, in Harris County, against manufacturers/sellers of
plane kit purchased by pilot. The trial court granted
defendants' motion to transfer venue to Williamson
County. Plaintiffs nonsuited and refiled the same claims
in Fort Bend County. The 240th District Court, Fort Bend
County, Thomas R. Culver III, J., denied defendants'
motion to transfer venue to Williamson County.
Defendants petitioned for writ of mandamus. The
Houston Court of Appeals, 14th District, 2006 WL
1071213, denied the petition. Defendants petitioned for
writ of mandamus.

**Holdings:** The Supreme Court, Paul W. Green, J., held
that:

[1] order granting motion to transfer venue was final, and
could not be vitiated through voluntary nonsuit, and

[2] mandamus relief was available, abrogating *Hendrick
Med. Ctr. v. Howell*, 690 S.W.2d 42.

Writ conditionally granted.

J. Dale Wainwright, J., filed a concurring opinion, in
which Jefferson, C.J., and O'Neill, J., joined.

West Headnotes (10)

[1] **Mandamus**
    ⟺Remedy by Appeal or Writ of Error
    **Mandamus**
    ⟺Matters of Discretion

    Extraordinary relief of mandamus is granted
    only when the trial court has clearly abused its
    discretion and the relator lacks an adequate
    appellate remedy.

    121 Cases that cite this headnote

[2] **Pretrial Procedure**
    ⟺Effect

    Subject to certain conditions, a plaintiff who
    takes a nonsuit is not precluded from filing a
    subsequent suit seeking the same relief.
    Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

    3 Cases that cite this headnote

[3] **Venue**
    ⟺Right of Defendant to Change
    **Venue**
    ⟺Action Not Brought in Proper County or
    District

    The plaintiff gets the first choice of venue by
    filing suit, but the defendant may challenge that
    venue selection, and a court must transfer an
    action to another county of proper venue if the
    county in which the action is pending is not a
    proper county. V.T.C.A., Civil Practice &
    Remedies Code § 15.063(1).

    7 Cases that cite this headnote

[4] **Appeal and Error**
    ⟺Relating to Time, Place, or Conduct of Trial

**Venue**
⟜Order Granting or Refusing Change
**Venue**
⟜Operation and Effect of Order

Although a trial court's ruling transferring venue is interlocutory for the parties, and thus not subject to immediate appeal, the order is final for the transferring court as long as it is not altered within the court's 30-day plenary jurisdiction, and such finality precludes a party from vitiating the ruling by nonsuiting and refiling the case in another county. V.T.C.A., Civil Practice & Remedies Code § 15.064(a); Vernon's Ann.Texas Rules Civ.Proc., Rules 87(5, 6), 162.

8 Cases that cite this headnote

[5]   **Pretrial Procedure**
⟜Effect

Once a ruling is made on the merits, as in a summary judgment, that decision becomes final as to that issue and cannot be vitiated by nonsuiting and refiling the case. Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

2 Cases that cite this headnote

[6]   **Judgment**
⟜Nature and Requisites of Former Recovery as Bar in General
**Judgment**
⟜Nature and Requisites of Former Adjudication as Ground of Estoppel in General

The judicial doctrines of res judicata and collateral estoppel promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of matters that have already been decided or could have been litigated in a prior

suit.

3 Cases that cite this headnote

[7]   **Mandamus**
⟜Remedy by Appeal or Writ of Error

When determining whether mandamus review is available, the adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments.

70 Cases that cite this headnote

[8]   **Mandamus**
⟜Remedy by Appeal or Writ of Error

In evaluating the benefits and detriments of mandamus review, the court considers whether mandamus will preserve important substantive and procedural rights from impairment or loss, whether mandamus will allow the court to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and whether mandamus will spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.

68 Cases that cite this headnote

[9]   **Mandamus**
⟜Modification or Vacation of Judgment or Order
**Mandamus**
⟜Change of Venue and Transfer of Causes

Defendants in civil action, which plaintiffs had nonsuited and refiled in Fort Bend County after a trial court in Harris County had granted defendants' motion to transfer venue to

Williamson County, lacked adequate appellate remedy as to trial court's order, in refiled action, denying defendants' motion to transfer venue to Williamson County, and thus, mandamus relief was available; plaintiffs impaired defendants' important procedural rights, the issue was a legal issue, involving the construction of Texas venue statutes and related rules in the context of voluntary nonsuit, that was likely to recur, and mandamus review would spare litigants and the public the time and money utterly wasted in improperly conducted proceedings that would be subject to reversal; abrogating *Hendrick Med. Ctr. v. Howell*, 690 S.W.2d 42. Vernon's Ann.Texas Rules Civ.Proc., Rules 87(5), 162.

48 Cases that cite this headnote

[10]    **Mandamus**
&#x2015;Remedy by Appeal or Writ of Error

An appellate remedy is not inadequate, as element for mandamus relief, merely because it may involve more expense or delay than obtaining an extraordinary writ, but extraordinary relief in mandamus can be warranted when a trial court subjects taxpayers, defendants, and all of the state's district courts to meaningless proceedings and trials.

52 Cases that cite this headnote

**Attorneys and Law Firms**

*258 Robert C. McCreary, Law Offices of Lou McCreary, Austin, Cynthia T. Sheppard, Cuero, Mahon B. Garry Jr., Wright & Greenhill, Austin, TX, for Relator.

Gary L. Evans, George Andrew Coats, Coats & Evans, The Woodlands, TX, for Real Party In Interest.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this case, we decide whether a plaintiff who was denied his initial venue of choice can nonsuit his case in the transferee county and refile in a third county. We hold that a plaintiff cannot avoid a venue ruling in such a way. Because the trial court in the third county refused to enforce the prior order setting venue in the transferee county, we conditionally grant the writ of mandamus.

**I**

Thomas Creekmore died when the airplane he was flying crashed in Fort Bend County. His family brought negligence, strict liability, survival, and wrongful death claims in Harris County against Team Rocket, L.P., MLF Airframes, Inc., and Mark L. Frederick (collectively, Team Rocket), related to Team Rocket's manufacture and sale of the plane kit that Creekmore had purchased. Team Rocket *259 moved to transfer venue, arguing that venue was improper in Harris County because they did not deliver the kit parts to Creekmore's residence there. The Harris County trial court agreed and transferred the case to Williamson County, Team Rocket's principal place of business and the residence of its representative. After the transfer, the Creekmores voluntarily nonsuited the case and immediately refiled the same claims against the same defendants in Fort Bend County. Team Rocket moved to transfer venue to Williamson County based on the Harris County trial court's prior venue order and the doctrine of collateral estoppel. The Fort Bend County trial court denied the motion. Team Rocket then sought mandamus relief in the court of appeals, which denied the petition. 256 S.W.3d 314, 2006 WL 1071213 (Tex.App.-Houston [14th Dist.] 2006).

**II**

[1] We grant the extraordinary relief of mandamus only when the trial court has clearly abused its discretion and the relator lacks an adequate appellate remedy. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–40 (Tex.2004) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992)). In this case, Team Rocket argues that they are entitled to mandamus relief because collateral estoppel bars reconsideration of the Harris County trial court's final venue ruling, and because the Fort Bend

County trial court's refusal to transfer the case back to Williamson County violated Texas Rule of Civil Procedure 87(5). Team Rocket also argues that, rather than requiring the parties to proceed to trial following an erroneous venue ruling, exceptional circumstances exist to justify granting mandamus relief. The Creekmores contend that they had an absolute right to nonsuit their case and refile in Fort Bend County.

## A

[2] A plaintiff may nonsuit his case at any time prior to the close of the plaintiff's pre-rebuttal evidence. TEX. R. CIV. P. 162. "Subject to certain conditions, a plaintiff who takes a nonsuit is not precluded from filing a subsequent suit seeking the same relief." *Aetna Cas. & Sur. Co. v. Specia*, 849 S.W.2d 805, 806 (Tex.1993). The issue in this case is whether that general rule allows a plaintiff to use the procedural vehicle of nonsuiting a case to avoid unfavorable venue rulings.

[3] The plaintiff gets the first choice of venue by filing suit. *In re Masonite Corp.*, 997 S.W.2d 194, 197 (Tex.1999). The defendant, however, may challenge that venue selection, and a court must "transfer an action to another county of proper venue if ... the county in which the action is pending is not a proper county." TEX. CIV. PRAC. & REM.CODE § 15.063(1); *see* TEX.R. CIV. P. 87 (procedures for filing motions to transfer venue). In this case, the Creekmores initially filed suit in Harris County, their county of residence. Team Rocket challenged venue, asserting that the defendants did not reside there and that a substantial portion of the events giving rise to the cause of action did not occur there. *See* TEX. CIV. PRAC. & REM.CODE § 15.002(a)(1)-(2). The Harris County trial court determined that Harris County was not a proper venue, but that venue was proper in Williamson County.

[4] [5] [6] Team Rocket argues that only one venue determination may be made in a proceeding and that Texas Rule of Civil Procedure 87 specifically prohibits changes in venue after the initial venue ruling. We agree. Once a trial court has ruled on proper venue, that decision cannot be the subject of interlocutory appeal. *Id.* **\*260** § 15.064(a) ("No interlocutory appeal shall lie from the determination."); TEX.R. CIV. P. 87(6) ("There shall be no interlocutory appeals from such determination."). Moreover, Rule 87 states that "if an action has been

transferred to a proper county in response to a motion to transfer, then no further motions to transfer shall be considered." TEX.R. CIV. P. 87(5). Although a trial court's ruling transferring venue is interlocutory for the parties, and thus not subject to immediate appeal, the order is final for the transferring court as long as it is not altered within the court's thirty-day plenary jurisdiction. *See In re Sw. Bell Tel. Co.*, 35 S.W.3d 602, 605 (Tex.2000) (per curiam). Once a ruling is made on the merits, as in a summary judgment, that decision becomes final as to that issue and cannot be vitiated by nonsuiting and refiling the case. *See Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex.1995) (per curiam) ("A nonsuit sought after [a partial summary judgment] results in a dismissal with prejudice as to the issues pronounced in favor of the defendant."). This concept is rooted in the long-standing and fundamental judicial doctrines of res judicata and collateral estoppel, which "promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation" of matters that have already been decided or could have been litigated in a prior suit. *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex.1994); *accord Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex.2007). Just as a decision on the merits cannot be circumvented by nonsuiting and refiling the case, a final determination fixing venue in a particular county must likewise be protected from relitigation. *Cf. Wichita Falls & S. R.R. Co. v. McDonald*, 141 Tex. 555, 174 S.W.2d 951, 952–53 (1943) ( "[A] ruling on a plea of privilege is treated as final in so far as it disposes of the issue as to the venue of the case.... [A]n interlocutory order of court overruling a plea of privilege shall become final in so far as the venue question is concerned, within the same time and under the same circumstances that a judgment on the merits of the case would become final.").

Reading Section 15.064 of the Texas Civil Practice and Remedies Code and Rule 87 together, we conclude that once a venue determination has been made, that determination is conclusive as to those parties and claims. Because venue is then fixed in any suit involving the same parties and claims, it cannot be overcome by a nonsuit and subsequent refiling in another county. *Cf. H.H. Watson Co. v. Cobb Grain Co.*, 292 S.W. 174, 177 (Tex. Comm'n App.1927, judgm't adopted) (holding that a plaintiff's nonsuit following the trial court's hearing on a plea of privilege "unalterably fixed the venue of any suit involving any subsequent controversy between the parties, relating to the subject-matter of the original suit in the county where the defendants reside," and that "[t]he venue of such subsequent suit, if any, has become res

adjudicata."). Once the Harris County trial court transferred the cause to the proper venue of Williamson County, venue was fixed permanently in Williamson County for these causes of action between these parties. That venue was also proper in Fort Bend County does not change the result. The Fort Bend County trial court therefore abused its discretion by refusing to enforce the prior venue order issued by the Harris County trial court.

To interpret the provisions otherwise would allow forum shopping, a practice we have repeatedly prohibited. *See, e.g., In re Autonation, Inc.,* 228 S.W.3d 663, 667–68 (Tex.2007). If a plaintiff has an absolute right to nonsuit and refile, as the Creekmores contend, nothing could stop him from filing in each of Texas's 254 *261 counties until he finds a favorable venue. And, under the Creekmores' interpretation, defendants would be left with no remedy and would have to endure a trial in the wrong venue, while a plaintiff could avoid any number of venue rulings simply by nonsuiting and refiling his case. We do not believe that the Legislature intended such a situation. Indeed, the plea of privilege practice that existed before amendment of the predecessor to Section 15.064 prevented that outcome. *See H.H. Watson Co.,* 292 S.W. at 177; *Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 756–57 (Tex.1993). When a plea of privilege was sustained and a cause then transferred, a plaintiff's nonsuit became res judicata as to venue if the plaintiff asserted the same cause of action against the defendant in a subsequent suit. *See GeoChem Tech Corp. v. Verseckes,* 962 S.W.2d 541, 543 (Tex.1998) (recognizing that, under the previous plea of privilege practice, when a plaintiff took a nonsuit while a proper plea of privilege was pending, the dismissal was deemed an admission that venue was improper in the original county, and venue became fixed in the county to which transfer was sought); *Ruiz,* 868 S.W.2d at 756–57 (explaining that although referred to as "res judicata," the rule was really based on the dismissal being "deemed an admission of the merit of the plea"). Though we no longer have a plea of privilege under our statutes or rules, the rationale of "protect[ing] defendants from the harassment and expense of several contests on the issue of venue" remains. *First Nat'l Bank in Dallas v. Hannay,* 123 Tex. 203, 67 S.W.2d 215, 215 (1933) (per curiam).

The only remedy afforded by the Legislature when a party loses a venue hearing is to proceed with trial in the transferee county and appeal any judgment from that court on the basis of alleged error in the venue ruling. TEX. CIV. PRAC. & REM.CODE § 15.064(b) ("On appeal from the trial on the merits, if venue was improper it shall in no event be harmless error and shall be

reversible error."). The Creekmores chose not to avail themselves of that prescribed remedy and instead attempted to circumvent the venue ruling by nonsuiting and refiling. As we said in *Masonite,* "the plaintiffs had the first choice, *but not the second,* of a proper venue." 997 S.W.2d at 198 (emphasis added).

All three courts of appeals that have addressed the issue of voluntary nonsuiting and refiling in a different county following a transfer of venue have held that this practice violates Texas venue procedure. *Fincher v. Wright,* 141 S.W.3d 255, 260 (Tex.App.-Fort Worth 2004, orig. proceeding) ("While on its face rule 87(5) appears to apply only to venue determinations by the same trial court in the same case, the same principle should apply to prohibit a subsequent trial court—in a case involving the same parties and claims—from making its own venue determination independently of the first court."); *In re Shell Oil Co.,* 128 S.W.3d 694, 696 (Tex.App.-Beaumont 2004, orig. proceeding) ("Venue of any subsequent suit involving the same subject matter and the same parties as the initial suit is governed by the venue determination in the initial suit."); *Hendrick Med. Ctr. v. Howell,* 690 S.W.2d 42, 45–46 (Tex.App.-Dallas 1985, orig. proceeding) ("Permitting a plaintiff to avoid being bound by a venue determination simply by nonsuiting and subsequently refiling the same cause of action against the same parties in a county other than that in which venue was determined to be proper would, in effect, circumvent the legislature's intent that there be only one venue determination in a cause of action."). They differ only in their analysis of the available appellate remedy, which we address next. *Compare Shell Oil,* 128 S.W.3d at 697 (issuing writ of mandamus *262 compelling trial court to enforce original venue transfer), *with Hendrick Med. Ctr.,* 690 S.W.2d at 45–46 (denying writ of mandamus despite improper venue procedure because an adequate appellate remedy existed).

**B**

[7] [8] [9] The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments. *Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 136 (Tex.2004). In evaluating benefits and detriments, we consider whether mandamus will preserve important substantive and procedural rights from impairment or loss. *Id.* Our venue statutes create a balance: a plaintiff has the first choice of venue when he

files suit, and a defendant is restricted to one motion to transfer that venue. *See Masonite*, 997 S.W.2d at 197–98; TEX.R. CIV. P. 87(5). By defying the Harris County trial court's venue ruling by nonsuiting and refiling elsewhere, the Creekmores disrupted that balance in their favor and thereby impaired Team Rocket's procedural rights.

In addition to impairment of rights, we consider whether mandamus will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *Prudential*, 148 S.W.3d at 136. This petition involves a legal issue—the construction of Texas venue statutes and related rules in the context of voluntary nonsuit—that is likely to recur, as demonstrated by the court of appeals' decisions that have already addressed it. *See Fincher*, 141 S.W.3d 255; *Shell Oil*, 128 S.W.3d 694; *Hendrick Med. Ctr.*, 690 S.W.2d 42.

[10] Finally, we consider whether mandamus will spare litigants and the public "the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Prudential*, 148 S.W.3d at 136. Although we generally do not grant a petition for mandamus for venue determinations absent extraordinary circumstances, we have granted mandamus relief when the trial court issued an improper order transferring venue that "wrongfully burdened fourteen other courts in fourteen other counties, hundreds of potential jurors in those counties, and thousands of taxpayer dollars in those counties." *Masonite*, 997 S.W.2d at 199. When, as in this case, a trial court improperly applied the venue statute and issued a ruling that permits a plaintiff to abuse the legal system by refiling his case in county after county, which would inevitably result in considerable expense to taxpayers and defendants, requiring defendants to proceed to trial in the wrong county is not an adequate remedy. *See Prudential*, 148 S.W.3d at 137. "[A]n appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ," *Walker*, 827 S.W.2d at 842, but extraordinary relief can be warranted when a trial court subjects taxpayers, defendants, and all of the state's district courts to meaningless proceedings and trials. *See Prudential*, 148 S.W.3d at 137.

We have granted mandamus relief in the context of Rule 87 venue rulings where, as here, the trial court made no effort to follow the rule. *See Henderson v. O'Neill*, 797 S.W.2d 905, 905 (Tex.1990) (per curiam); *cf.*

*Bridgestone/Firestone, Inc. v. Thirteenth Court of Appeals*, 929 S.W.2d 440, 442 (Tex.1996) (per curiam) (explaining that, in that Rule 87 venue case, no extraordinary circumstances existed to justify mandamus relief). In this case, the Creekmores defied the Harris County trial court's venue order by attempting to have another court revisit the question of venue, *263 which had already been decided. To say that the Fort Bend County trial court, which violated statutory venue procedure and Rule 87(5), committed reversible error while declining to correct the injustice would compromise the integrity of the venue statute and result in an irreversible waste of resources. We hold that Team Rocket has no adequate appellate remedy.

## III

For the reasons described above, we conditionally grant the writ of mandamus directing the Fort Bend County trial court to vacate its venue order and transfer the Creekmores' case to Williamson County. If the court fails to do so, the writ will issue.

Justice WAINWRIGHT filed a concurring opinion, in which Chief Justice JEFFERSON and Justice O'NEILL joined.

Justice WAINWRIGHT, concurring, joined by Chief Justice JEFFERSON and Justice O'NEILL.

For the reasons expressed in my dissent in *In re McAllen Medical Center*, 2008 WL 2069837 (Tex.2008), I respectfully disagree with the Court's expansion of its mandamus jurisdiction beyond established legal tenets. Because the Court has indeed crossed that bridge, I reluctantly join the Court's opinion.

**All Citations**

256 S.W.3d 257, 51 Tex. Sup. Ct. J. 945

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Purdue Pharma L.P. v. Combs, Ky.App., February 28, 2014

827 S.W.2d 833
Supreme Court of Texas.

Charles F. WALKER and Mary Jeanette Walker et al., Relators,
v.
The Honorable Anne PACKER, Judge, Respondent.

No. C-9403. | Feb. 19, 1992. | Rehearing Overruled May 6, 1992. | Dissenting Opinion by Justice Gammage May 7, 1992.

Parents of child born with brain damage, who had brought action against obstetrician, hospital where child was born, and nurse attending at delivery, brought petition for writ of mandamus arguing that the trial court abused its discretion by refusing to order hospital to produce documents from its insurer's files and by ordering that portions of other responsive documents be stricken. The Supreme Court, Phillips, C.J., held that: (1) plaintiffs had not presented sufficient record to demonstrate that trial court clearly abused its discretion in failing to grant plaintiffs requested discovery from one of defendants, and (2) plaintiffs had adequate remedy by way of appeal as to documents they sought from nonparty for impeachment purposes.

Petition denied.

Gonzalez, J., concurred with opinion.

Doggett, J., dissented with opinion in which Mauzy, J., joined.

Gammage, J., dissented with opinion.

West Headnotes (18)

**[1]** **Mandamus**
⚖=Presumptions and Burden of Proof

Party seeking mandamus relief has burden of providing Supreme Court with sufficient record to establish right to mandamus relief.

490 Cases that cite this headnote

**[2]** **Mandamus**
⚖=Presumptions and Burden of Proof

Party seeking mandamus relief had burden of providing not only a petition and affidavit, but also a statement of facts from evidentiary hearing that had been held. Rules App.Proc., Rule 121(a)(2)(C, F).

21 Cases that cite this headnote

**[3]** **Mandamus**
⚖=Presumptions and Burden of Proof

Plaintiffs bringing motion for leave to file petition for writ of mandamus arguing that trial court clearly abused its discretion by refusing to order defendant to produce documents from insurer's files and by ordering that portions of other responsive documents be stricken failed to meet their burden of providing Court of Appeals with record upon which they could establish their right to mandamus relief; plaintiffs failed to provide Supreme Court with statement of facts from evidentiary hearing. Rules App.Proc., Rule 121(a)(2)(C, F).

831 Cases that cite this headnote

**[4]** **Pretrial Procedure**
⚖=Request, Notice, or Motion and Response or Objection

Trial court erred in mechanically applying

*Russell* decision, which disapproved of global discovery of documents merely to impeach potential witness, to deny discovery of documentary evidence by medical malpractice plaintiffs to impeach one of defendants' expert witnesses, a faculty member in obstetrics; plaintiffs presented to trial court evidence of hospital's policy restricting faculty's freedom to testify for plaintiffs, raising the possibility that the faculty member was biased, and plaintiffs' request was narrowly tailored. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 2, par. a; Rules of Civ.Evid., Rule 613(b).

9 Cases that cite this headnote

[5] **Mandamus**
Scope of Inquiry and Powers of Court

Trial court clearly abuses its discretion, for purposes of mandamus, with respect to resolution of factual issues or matters committed to trial court's discretion, only if trial court could reasonably have reached only one decision; reviewing court may not substitute its judgment for that of trial court.

800 Cases that cite this headnote

[6] **Mandamus**
Matters of Discretion

On mandamus review of trial court's determination of legal principles, clear failure by trial court to analyze or apply the law correctly will constitute abuse of discretion, and may result in appellate reversal by extraordinary writ.

1838 Cases that cite this headnote

[7] **Mandamus**

Scope of Inquiry and Powers of Court

On mandamus review of trial court's erroneous denial of requested discovery in medical malpractice case on sole basis of *Russell*, Supreme Court would consider the trial court's decision as a legal conclusion to be reviewed with limited deference.

21 Cases that cite this headnote

[8] **Mandamus**
Proceedings in Civil Actions in General

Trial court's erroneous denial of plaintiffs' requested discovery in medical malpractice case to impeach one of defendants' expert witnesses on sole basis of *Russell* constituted clear abuse of discretion, for purposes of mandamus relief.

386 Cases that cite this headnote

[9] **Mandamus**
Remedy by Appeal or Writ of Error

Requirement that person seeking mandamus relief establish lack of adequate appellate remedy is "fundamental tenet" of mandamus practice.

96 Cases that cite this headnote

[10] **Mandamus**
Remedy by Appeal or Writ of Error

Mandamus will not issue where there is adequate remedy by appeal.

293 Cases that cite this headnote

[11] **Mandamus**
⬤⟶Modification or Vacation of Judgment or Order

Party seeking review of discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate.

25 Cases that cite this headnote

[12] **Mandamus**
⬤⟶Remedy by Appeal or Writ of Error

Appellate remedy is not inadequate, for purposes of mandamus, merely because it may involve more expense or delay than obtaining an extraordinary writ.

135 Cases that cite this headnote

[13] **Mandamus**
⬤⟶Modification or Vacation of Judgment or Order

Party will not have adequate remedy by way of appeal, for purposes of mandamus, when appellate court would not be able to cure the trial court's discovery error, which occurs when trial court erroneously orders disclosure of privileged information which will materially affect the rights of the aggrieved party.

180 Cases that cite this headnote

[14] **Mandamus**
⬤⟶Remedy by Appeal or Writ of Error

Appeal will not be an adequate remedy, for purposes of mandamus, where the party's ability to present viable claim or defense at trial is vitiated or severely compromised by trial court's discovery error, but it is not enough to show merely the delay, inconvenience or expense of an appeal, rather, the relator must establish the effective denial of reasonable opportunity to develop the merits of his or her case.

392 Cases that cite this headnote

[15] **Mandamus**
⬤⟶Modification or Vacation of Judgment or Order

When trial court imposes discovery sanctions which have effect of precluding decision on merits of party's claims, party's remedy by eventual appeal is inadequate, for purposes of mandamus, unless sanctions are imposed simultaneously with rendition of final, appealable judgment.

97 Cases that cite this headnote

[16] **Mandamus**
⬤⟶Modification or Vacation of Judgment or Order

Remedy by appeal may be inadequate, for purposes of mandamus, where trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on the record before it.

49 Cases that cite this headnote

[17] **Mandamus**

⬦⇒Proceedings in Civil Actions in General

If trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on record before it, court must carefully consider all relevant circumstances, such as claims and defenses asserted, type of discovery sought, what it is intended to prove, and presence or lack of other discovery, to determine whether mandamus is appropriate. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

21 Cases that cite this headnote

[18] **Mandamus**

⬦⇒Modification or Vacation of Judgment or Order

Medical malpractice plaintiff seeking documents from defendant hospital to impeach one of defendant's expert witnesses had adequate remedy by appeal, and, thus, mandamus was inappropriate way to compel discovery, where the information was not privileged, burdensome or harassing, nor did it vitiate or severely compromise the plaintiffs' ability to present a viable claim, the materials were considered below, and there was no reason why they would not be available on appeal.

121 Cases that cite this headnote

**Attorneys and Law Firms**

*835 Les Weisbrod and Michael S. Box, Dallas, for relators.

Philipa Remington, Stephen W. Johnson, James A. Williams, Kevin J. Keith, Martha L. Strother, Gary W. Sibley, Dallas and Delmar L. Cain, Austin, for respondent.

**OPINION**

PHILLIPS, Chief Justice.

This original mandamus action involves two pre-trial discovery requests sought by *836 relators, plaintiffs in a medical malpractice lawsuit. The first discovery dispute involves documents which the plaintiffs seek from one of the defendants, while the second involves documents which they seek from a nonparty for impeachment purposes. As to the first matter, we hold that relators have not presented a sufficient record to demonstrate that the trial court clearly abused its discretion in failing to grant them all requested relief. As to the second, we hold that relators have an adequate remedy by appeal. Thus, mandamus is inappropriate, and we deny the writ.

*The St. Paul and Aetna Records*

Catherine Johanna Walker sustained brain damage at birth in January 1983. In January 1985, her parents, Charles F. and Mary Jeanette Walker, sued Dr. Paul Crider, the obstetrician, St. Paul Hospital, where Catherine was born, and Iris Jean White, a nurse attending at the delivery.

In August 1987, the Walkers served on St. Paul their third request for production of documents pursuant to Tex.R.Civ.P. 167. One request asked for:

> Any and all writings, notes, documents, letters, etc., concerning, mentioning, alluding to, or making reference to (either directly or indirectly), the tape recorded statement given by Nurse White to an Aetna adjuster, including but not limited to any notes or entries in any Aetna adjuster's file, any attorney's file, or any file or writing in possession of any employee, representative or agent of St. Paul Hospital. This request is in reference to the tape recorded

statement which you have been unable to locate, but which was previously requested....

St. Paul responded as follows:

> In an effort to respond to this request, this Defendant again checked with all appropriate personnel and files at St. Paul Hospital and the law firm of Bailey and Williams. No such statement or taped recording was found. For the third time the Aetna Casualty and Surety Company was asked to check its records and files and a partially transcribed statement was located, a copy of which is attached. No taped recording was located.

Nearly two years later, the Walkers filed a motion to compel under Tex.R.Civ.P. 215, asserting that St. Paul failed to respond completely to the request.[1] The Walkers complained that "St. Paul Hospital did not even respond to what was requested in the request for production—that is, writings, notes, and notations in the adjuster's file or attorney's file mentioning, alluding to, or making reference to the tape recorded statement of Nurse White." At about the same time, the Walkers also served on Aetna Casualty and Surety Company, St. Paul's insurer, an "Amended Notice of Intention to Take Deposition Upon Written Questions—Duces Tecum," seeking, among other things, the same documents. Aetna moved to quash the notice.

The trial judge appointed a special master to review the Walkers' motion to compel and Aetna's motion to quash. After an evidentiary hearing on September 5, 1989, the master prepared findings, which formed the basis for two extensive orders signed by the trial court on September 20, 1989. In the first order, the court found that the Walkers were "entitled to all documentation sought in [the request] from the files of Defendant St. Paul or its attorney of record, but not from the files of Aetna Insurance Company, except as they may appear in the files of St. Paul or the attorneys of record of St. Paul." The court also stated that it "has been advised that St. Paul has supplied all documentation that is responsive to [the request], but that additional documentation will be made available *837 to the Court for in camera review."

The court therefore *sustained* the Walkers' motion to compel "to the extent that on Friday, September 8, 1989 the Special Master will review in the Chambers of the 134th District Court the relevant portions of the St. Paul files and their attorney [sic] files, which may be in response to Plaintiff's request...." The court, however, did not order St. Paul to produce documents from Aetna's files for *in camera* inspection.[2]

After the master's September 8 *in camera* inspection, the court ordered discovery of three additional documents from the files of St. Paul and its attorneys, which it found "relate to the matters sought in discovery and should be supplied after irrelevant portions of such documents are stricken."

After unsuccessfully seeking relief in the court of appeals, the Walkers moved for leave to file a petition for writ of mandamus with this court, arguing that the trial court clearly abused its discretion by refusing to order St. Paul to produce the documents from Aetna's files and by ordering that portions of the other responsive documents be stricken. The Walkers contend that the order was a clear abuse of discretion because St. Paul 1) never objected to the Walkers' request for production, 2) had a superior right to the Walkers to compel production of the documents in Aetna's possession, and 3) never asked that any parts of the documents be excised.

The record before us does not include the statement of facts from the evidentiary hearing on the Walkers' motion to compel production. Without it, we cannot determine on what basis the trial judge and the special master reached their conclusions. Since we cannot assess whether or not the trial court's order was correct, we obviously cannot take the additional step of determining that the court's order, if incorrect, constituted a clear abuse of discretion.

[1] [2] [3] As the parties seeking relief, the Walkers had the burden of providing this Court with a sufficient record to establish their right to mandamus relief. Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, *see* Tex.R.App.P. 121(a)(2)(C) and (F), but also a statement of facts from the hearing. *See, e.g., Cameron County v. Hinojosa,* 760 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1988, orig. proceeding); *Greenstein, Logan & Co. v. Burgess Mktg. Inc.,* 744 S.W.2d 170, 177 (Tex.App.—Waco 1987, writ denied); *see also Western Casualty & Surety Co. v. Spears,* 730 S.W.2d 821, 822 (Tex.App.—San Antonio 1987, orig. proceeding).[3] Having failed to meet this burden, the Walkers have not

provided us with a record upon which they can establish their right to mandamus relief against St. Paul.

## The Obstetrics Faculty Records

[4] The second discovery dispute arises out of the Walkers' attempt to secure documentary evidence to impeach one of the defendants' expert witnesses, Dr. Larry Gilstrap, a faculty member in obstetrics at the University of Texas Health Science Center at Dallas ("the Center"). Gilstrap testified at his deposition that expert witness fees earned by obstetrics faculty members are deposited into a "fund" in the obstetrics "billing department"; that obstetrics faculty members get paid "indirectly" from this fund; that the fund is handled by Judy Wagers, a Center employee; and that he was unaware of any obstetrics department policy restricting faculty members from testifying for plaintiffs in medical malpractice cases.

*838 Thereafter, the Walkers noticed Wagers' deposition, requesting that she provide all documents regarding (1) the operation of the above-mentioned "fund" from 1985 to 1988; and (2) limitations placed upon obstetrics faculty members relating to their testimony in medical malpractice cases. The Center, on behalf of Wagers, moved to quash the notice, arguing that the request for documents was "vague and overly broad" and that production would be "costly and burdensome."

Two months later, in an unrelated lawsuit, the Walkers' counsel deposed Dr. Alvin L. Brekken, another obstetrics faculty member at the Center. Dr. Brekken testified that the obstetrics department's official policy, distributed in writing to all faculty members, requires a doctor to obtain authorization from other faculty members before testifying for any plaintiff in a medical malpractice case. Based on this testimony, the Walkers sought a court order to depose Wagers and obtain the requested documents.

After reviewing the Gilstrap and Brekken depositions and pleadings of counsel, the trial court ordered the Center to produce the documents for *in camera* review by the special master. Subsequently, in her September 20, 1989 order, the trial judge denied the discovery, stating in part:

> [S]uch requested discovery is improper pursuant to the Rulings of the Supreme Court of Texas in *Russell v. Young* [452 S.W.2d 434

(Tex.1970) ], as the potential witness is not a party to the suit and the records do not relate to the subject matter of the suit, but are sought solely for the purpose of impeachment, according to the Plaintiffs' pleadings.

Although noting that some of the documents "would be relevant to this cause of action," the court nevertheless denied discovery because "all such documents are controlled by the *Russell* decision."

In *Russell,* a party sought wholesale discovery of financial records of a potential medical expert witness who was not a party to the lawsuit.[4] The documents requested did not relate directly to the subject matter of the suit, but were sought solely in an attempt to impeach the potential witness by showing bias or prejudice. The credibility of the witness, however, had not yet been put in doubt. Under these circumstances, we held that the documents were not discoverable, and we directed the trial court to vacate its order allowing the requested discovery. 452 S.W.2d at 435. We reasoned that "[t]here is ... a limit beyond which pre-trial discovery should not be allowed." *Id.* at 437.

The present case is distinguishable. Here, the Walkers presented to the trial court evidence of a specific circumstance—the Center's policy restricting the faculty's freedom to testify for plaintiffs—raising the possibility that Dr. Gilstrap is biased. Thus, the Walkers are not engaged in global discovery of the type disapproved in *Russell;* rather, they narrowly seek information regarding the potential bias suggested by the witness' own deposition testimony and that of his professional colleague.

Our rules of civil procedure, and the federal rules upon which they are based, mandate a flexible approach to discovery. A party may seek any information which "appears reasonably calculated to lead to the *839 discovery of admissible evidence." Tex.R.Civ.P. 166b(2)(a). Evidence of bias of a witness is relevant and admissible. *See* Tex.R.Civ.Evid. 613(b).[5]

The trial court erred in failing to apply the foregoing rules to determine whether the documents were discoverable. Instead, the trial court simply read *Russell* as an absolute bar to discovery, even though the circumstances here are quite distinguishable. In so doing, the trial court

misapplied the *Russell* holding. We expressly disapprove such a mechanical approach to discovery rulings.[6]

Having concluded that the trial court erred in denying the discovery based solely on *Russell*, we now must determine whether the appropriate remedy lies by writ of mandamus. "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).[7] We therefore examine whether the trial court's error in the present case constituted a clear abuse of discretion and, if so, whether there is an adequate remedy by appeal.

### 1. *Clear Abuse of Discretion*

Traditionally, the writ of mandamus issued only to compel the performance of a ministerial act or duty. *See Wortham v. Walker*, 133 Tex. 255, 277, 128 S.W.2d 1138, 1150 (1939); *Arberry v. Beavers*, 6 Tex. 457 (1851); Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts*, 31 S.Tex.L.Rev. 509, 510 (1990); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available*, 32 Sw.L.J. 1283, 1288 (1979).

Since the 1950's, however, this Court has used the writ to correct a "clear abuse of discretion" committed by the trial court. *See, e.g., Joachim v. Chambers*, 815 S.W.2d 234, 237 (Tex.1991); *Jampole v. Touchy*, 673 S.W.2d 569, 574 (Tex.1984); *West v. Solito*, 563 S.W.2d 240, 244 (Tex.1978); *Womack v. Berry*, 156 Tex. 44, 50, 291 S.W.2d 677, 682 (1956). *See generally*, David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders*, 23 St. Mary's L.J. 365, 390 (1991); Cassidy, 31 S.Tex.L.Rev. at 510; Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy*, 1 Rev.Litig. 325, 326–27 (1981); Comment, 32 Sw.L.J. at 1290.

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d at 917. This standard, however, has different applications in different circumstances.

[5] With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41–42 (Tex.1989) (holding that determination *840 of discoverability under Tex.R.Civ.P. 166b(3)(d) was within discretion of trial court); *Johnson*, 700 S.W.2d at 918 (holding that trial court was within discretion in granting a new trial "in the interest of justice and fairness"). The relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 917. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Johnson*, 700 S.W.2d at 918.

[6] On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *See Joachim v. Chambers*, 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting Code of Judicial Conduct); *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes ISD v. Logue*, 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

[7] [8] In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court. This is consistent with our approach in previous mandamus proceedings arising out of the trial court's interpretation of legal rules. *Cf. Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 555 (Tex.1990); *Barnes v. Whittigton*, 751 S.W.2d 493, 495–96 (Tex.1988); *Terry v. Lawrence*, 700 S.W.2d 912, 913–14 (Tex.1985). Under this analysis, the trial court's erroneous interpretation of the law constitutes a clear abuse of discretion.

### 2. *Adequate Remedy by Appeal*

In order to determine whether the writ should issue, however, we must further decide whether the Walkers have an adequate remedy by appeal.

[9] Mandamus will not issue where there is "a clear and adequate remedy at law, such as a normal appeal." *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Mandamus is intended to be an extraordinary remedy, available only in limited circumstances. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989) (quoting James Sales, *Original Jurisdiction of the Supreme Court and the Courts of Civil Appeals of Texas* in *Appellate Procedure in Texas,* § 1.4[1] [b] at 47 (2d ed. 1979)). The requirement that persons seeking mandamus relief establish the lack of an adequate appellate remedy is a "fundamental tenet" of mandamus practice. *Holloway,* 767 S.W.2d at 684.

[10] Our requirement that mandamus will not issue where there is an adequate remedy by appeal is well-settled.[8] On a few occasions, however, we have not focused *841 on this requirement when applying mandamus review of discovery orders. For example, in *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977), the trial court refused to compel defendant's representative to answer certain deposition questions, and the plaintiff applied to this Court for a writ of mandamus. We concluded that the trial court had abused its discretion, and ordered that the writ conditionally issue. We never discussed the well-settled requirement of inadequate remedy by appeal.

A few months later, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977), the Court again conditionally issued a writ of mandamus to correct a discovery abuse without considering whether the relator had an adequate remedy by appeal. The real party in interest in *Allen* raised this argument, but the Court avoided the issue by citing *Barker. Id.* at 801.

Commentators quickly criticized the *Barker* and *Allen* opinions. *See* James Sales, *Pre–Trial Discovery in Texas,* 31 Sw.L.J. 1017, 1033 (1977); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1300 (1979) (In most cases "forcing a party to await the completion of the trial in order to seek appellate review will not endanger his substantial rights...."); Note, *Mandamus May Issue To Compel A District Judge to Order Discovery,* 9 Tex.Tech L.Rev. 782 (1978) (mandamus should not be a substitute for appeal).

In *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984), the

Court again used the extraordinary writ of mandamus to compel discovery which had been denied by the trial court. Unlike in *Barker* and *Allen,* however, the Court in *Jampole* addressed whether relator had an adequate appellate remedy. The underlying suit in *Jampole* was a products liability action, and the disputed discovery materials included alternate design and assembly documents. The Court held that relator did not have an adequate remedy by appeal because denial of this discovery effectively prevented relator from proving the material allegations of his lawsuit. 673 S.W.2d at 576. Remedy by appeal in a discovery mandamus is not adequate where a party is required "to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal...." *Id.*

Although the Court in *Jampole* recognized the need to address whether relator had an adequate remedy by appeal, it expressly refused to overrule *Barker* and *Allen. Id.* Perhaps because of this, we have on several occasions since *Jampole* used mandamus to correct discovery errors without considering whether the relator had an adequate appellate remedy. *See Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989); *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988); *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986); *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985); *Lindsay v. O'Neill,* 689 S.W.2d 400 (Tex.1985).

On many other occasions, however, we have still required a showing of inadequate *842 remedy by appeal in mandamus proceedings involving other types of pre-trial orders, even those involving discovery. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986). In *Hooks,* for example, we reaffirmed that the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate." 808 S.W.2d at 60.

[11] The requirement that mandamus issue only where there is no adequate remedy by appeal is sound, and we reaffirm it today. No mandamus case has ever expressly rejected this requirement, or offered any explanation as to why mandamus review of discovery orders should be exempt from this "fundamental tenet" of mandamus practice. Without this limitation, appellate courts would "embroil themselves unnecessarily in incidental pre-trial

rulings of the trial courts" and mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991). We thus hold that a party seeking review of a discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate. We disapprove of *Barker, Allen,* and any other authorities to the extent they might be read as abolishing or relaxing this rule.

[12] We further hold that an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. As we observed in *Iley v. Hughes,* the "delay in getting questions decided through the appellate process ... will not justify intervention by appellate courts through the extraordinary writ of mandamus. Interference is justified only when parties stand to lose their substantial rights." 158 Tex. at 368, 311 S.W.2d at 652.

On some occasions, this Court has used, or at least mentioned, the more lenient standard first articulated in *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926), that the remedy by appeal must be "equally convenient, beneficial, and effective as mandamus." *See, e.g., Jampole v. Touchy,* 673 S.W.2d 569, 576 (Tex.1984); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (Tex.1959). This standard, literally applied, would justify mandamus review whenever an appeal would arguably involve more cost or delay than mandamus. This is unworkable, both for individual cases and for the system as a whole. Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as discovery progressed and the evidence was developed at trial. Moreover, the delays and expense of mandamus proceedings may be substantial. This proceeding, for example, involving rulings on collateral discovery matters, has delayed the trial on the merits for over two years. The impact on the appellate courts must also be considered. We stated in *Braden* that "[t]he judicial system cannot afford immediate review of every discovery sanction." 811 S.W.2d 922, 928. It follows that the system cannot afford immediate review of every discovery order in general.[9] We therefore disapprove of *Cleveland, Crane, Jampole* and any other authorities to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus.

Justice Doggett's dissent argues that because discovery errors often constitute harmless errors under Tex.R.App.P. 81(b)(1), parties denied mandamus relief

will be deprived of any remedy since the *843 error will not provide a basis for appellate reversal. This is nothing more than a thinly disguised attack on the harmless error rule. Avoiding interlocutory appellate review of errors that, in the final analysis, will prove to be harmless, is one of the principal reasons that mandamus should be restricted.

Justice Doggett's dissent also suggests that we will be unable to develop a coherent body of discovery law without unrestricted mandamus review. We do not think, however, that losing parties will be reluctant to raise perceived discovery errors on appeal, nor will an appellate court be foreclosed from writing on discovery issues, even when the error may be harmless. *See, e.g., Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 652–53 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

Nor are we impressed with the dissenters' claim that strict adherence to traditional mandamus standards will signal an end to effective interlocutory review for some parties or classes of litigants. There are many situations where a party will not have an adequate appellate remedy from a clearly erroneous ruling, and appellate courts will continue to issue the extraordinary writ. In the discovery context alone, at least three come to mind.

[13] First, a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party, such as documents covered by the attorney-client privilege, *West v. Solito,* 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information. *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256 (Tex.1974). As we noted in *Crane:* "After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers." 160 Tex. at 190, 328 S.W.2d at 439. It may also occur where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 35 Tex.Sup.Ct.J. 454 (1992) (demand for tax returns); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983) (demand for information about all

vehicles for all years).

[14] [15] Second, an appeal will not be an adequate remedy where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error. It is not enough to show merely the delay, inconvenience or expense of an appeal. Rather, the relator must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources. We recently held that when a trial court imposes discovery sanctions which have the effect of *precluding a decision on the merits of a party's claims*—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 919 (Tex.1991). Similarly, a denial of discovery going to the heart of a party's case may render the appellate remedy inadequate.

[16] [17] Finally, the remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error *844 on the record before it. *See Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556, 558 (Tex.1990) ("[M]andamus is the only remedy because the protective order shields the witnesses from deposition and thereby prevents the evidence from being part of the record."); *see generally Jampole*, 673 S.W.2d at 576 ("Because the evidence exempted from discovery would not appear in the record, the appellate courts would find it impossible to determine whether denying the discovery was harmful."). If the procedures of Tex.R.Civ.P. 166b(4) are followed, this situation should only rarely arise. If and when it does, however, the court must carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.[10]

[18] In the present case, the Walkers seek documents from the Center to impeach one defendant's expert witness. This information is not privileged, burdensome or harassing, nor does it vitiate or severely compromise the Walkers' ability to present a viable claim. In fact, as we have already noted, the trial court may ultimately conclude that it is not admissible or even discoverable.

Finally, although the materials are not before us, they were considered below, and we know of no reason why they would not be available on appeal. Therefore, under our traditional standards of mandamus review, as measured by the factors we mention above, the Walkers have an adequate remedy by appeal and mandamus is inappropriate.

For the above reasons, we conclude that the Walkers have not established their right to relief by mandamus on either discovery matter. Therefore, we deny the Walkers' petition for writ of mandamus.

GONZALEZ, J., concurs and files an opinion.

DOGGETT, J., dissents and files an opinion, joined by MAUZY, J.

GAMMAGE, J., dissents and files an opinion.

GONZALEZ, Justice, concurring.

I agree with the court's disposition of this cause but disagree with the court's opinion regarding the "Obstetrics Faculty Records." Specifically, I disagree with the court's attempt to distinguish *Russell v. Young*, 452 S.W.2d 434 (Tex.1970). Nevertheless, I concur in the result.

*Russell* holds that wholesale discovery of the private records of a *non-party witness* is not permitted if the sole purpose for discovery is to impeach the credibility of the non-party.[1] 452 S.W.2d at 435. The policy considerations of *Russell* still apply today. By disapproving of *Russell* as "a mechanical approach to discovery rulings," at 839, the court forces trial courts to get further involved in discovery matters. This increases the backlog, delay, and cost of litigation by creating the need for more hearings.

In the instant case, the plaintiffs sought to discover documents from the University of Texas Health Science Center to confirm the existence of a written policy restricting faculty members from testifying for plaintiffs in medical malpractice cases. This policy was sought for use in impeaching defendant's expert witness, Dr. Gilstrap. In refusing discovery, the trial court concluded *845 that the relevance of this material was limited to

impeachment. As such, the requested documents fell squarely within the prohibition of *Russell*.

Despite the court's mischaracterization of *Russell*, the issues and type of evidence sought here and in *Russell* are identical. Just as in *Russell*, the records sought in the instant case did not relate directly to the subject matter of the suit. The only difference between the present case and *Russell* is the identity of the party seeking the information. In *Russell*, a defendant sought evidence to impeach the plaintiffs' expert; here, the plaintiff sought evidence to impeach a defendant's expert. Surely, we cannot have a rule that changes in application depending on whether the relator is a plaintiff or a defendant in the trial court.

In my opinion, the court strains to distinguish *Russell*. The court suggests that the trial judge made a mistake in her ruling by failing to read *Russell* in conjunction with the rules of civil procedure and evidence. However, when we adopted the new Texas Rules of Civil Evidence, there was no discussion whatsoever that, by their adoption, we intended to reject the settled rule that information sought solely for impeachment of a non-party is not discoverable. *Russell*, 452 S.W.2d at 435; *see also W.W. Rodgers & Sons Produce Co. v. Johnson*, 673 S.W.2d 291, 294–95 (Tex.App.—Dallas 1984, orig. proceeding). Furthermore, the scope of discovery has not changed in the twenty years since *Russell* has been on the books. When *Russell* was decided, the scope of discovery was codified in Texas Rule of Civil Procedure 186a. It provided in pertinent part that:

> [p]arties may obtain discovery regarding any matter which is relevant to the subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party.

This same text is now codified in Rule 166b(2)(a). Clearly, impeachment evidence regarding *collateral matters* would not relate to the subject matter of the pending action.

Implicitly, the court concludes that the credibility of a non-party witness alone is a relevant avenue of inquiry and, thus, is a matter properly open to discovery under some new, broader definition of relevancy.

While I agree that the definition of relevance in Rule 401 of the Texas Rules of Civil Evidence includes matters bearing on credibility, this alone does not explain or distinguish *Russell*. A witness' credibility has always been a relevant matter. As the United States Supreme Court has said: "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Yet in *Russell*, we said that a trial court lacked "authority" to order discovery from a *non-party* solely for purposes of impeachment. 452 S.W.2d at 435. We chose to withdraw all discretion in this particular area of discovery. *Russell* concedes that impeachment evidence may be relevant and admissible at trial, but holds that it cannot be discovered from a non-party for its own sake prior to trial. 452 S.W.2d at 436.

The fact that a matter may have some relevance yet not be subject to discovery is hardly a novel concept. The basic premise of the rules of discovery is to weigh the legitimate needs of litigation against the other rights and values that would be irreparably harmed by unfettered discovery. *Russell* strikes the proper balance by protecting non-party witnesses from indiscriminate invasions into their private lives where the information sought would not appreciably shed light on the issues of the case.

Furthermore, the decision in *Russell was not* grounded on whether the credibility of the witness had been placed in doubt. Instead, the court highlighted the fact that *846 the witness had not offered testimony at trial nor was his deposition introduced into evidence at trial. The court said:

> Relator has not yet taken the witness stand nor has his deposition been introduced into evidence because there has not yet been a trial; relator's records cannot possibly have impeachment value because there is nothing yet to impeach and there may never be anything to impeach, depending upon the contents of the testimony, if any, which is introduced during the trial of the lawsuit.

*Russell*, 452 S.W.2d at 437. Thus, it is evident that the

court has today reinterpreted *Russell* with little or nothing to gain in a way that further obscures the proper scope of discovery.

I am concerned that as a result of today's ruling, some *non-parties* will be subjected to harassment and intrusion into their private lives, and that trial courts will be inundated with hearings on collateral issues far afield from the merits of the cause of action or defense. The court has attempted to fix something that was not broken. This reinterpretation of *Russell* will further tax our overburdened judicial system without appreciably benefiting the litigants or the system.

Finally, for the reasons expressed in *Joachim v. Chambers*, 815 S.W.2d 234, 241 (Tex.1991) (Gonzalez, J., dissenting), I agree with the clarification of the standards for the issuance of mandamus.

DOGGETT, Justice, dissenting.

*Them that's got shall get*

*Them that's not shall lose*
—*God Bless The Child*[1]

With a double standard, the majority strikes a devastating blow at the most direct method of curbing abuses of judicial power. Many judicial excesses far beyond the scope of anything alleged in this particular case will henceforth receive only an official nod and wink from the Texas Supreme Court.

Mandamus is the legal tool by which appellate courts can promptly correct arbitrary and capricious rulings by trial judges. Today's opinion announces that this remedy will be available to support concealment of the truth but not its disclosure. Mandamus is officially declared a one-way street in the Texas courts—our judiciary can help to hide but not to detect.

Despite a determination that a "clear abuse of discretion" has occurred in this particular case, at 840, all relief is denied. Finding a wrong and denying a remedy echoes the logic of the majority's recent conclusion that a tax is unconstitutional but must be paid anyway. *See Carrollton–Farmers Branch Indep. Sch. Dist. v.*

*Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 524 (1992) (*Edgewood III* ) (Doggett, J., dissenting). Rather than correcting the abuse, the court simply gives the Walkers the same message it gave Texas taxpayers—wait. Only after a full jury trial based upon incomplete discovery will the judiciary even consider any possibility of relief.

For those who have previously sought more specific guidelines for the use of mandamus concerning discovery orders, the majority responds with not one but two standards for reviewing trial court action: orders compelling discovery may be immediately corrected; review of denied discovery is postponed indefinitely in a manner to ensure that no meaningful relief will ever be forthcoming.

## I.

What a different path this court now pursues than that so recently proclaimed in its unanimous decision that

> Discovery is ... the linchpin of the search for truth, as it makes "a trial less *847 a game of blind man's bluff and more a fair contest with the issues and facts disclosed to the fullest practicable extent."

*State v. Lowry*, 802 S.W.2d 669, 671 (Tex.1991) (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Similarly ignored are our recent, unanimous writings in *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 553, 555 (Tex.1990, orig. proceeding) ("[Discovery should provide] the fullest knowledge of the facts and issues prior to trial.... [T]he ultimate purpose of discovery ... is to seek the truth...."); and *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556, 559 (Tex.1990, orig. proceeding) ("The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed."). Without mandamus review to add meaning to these laudatory expressions, they are just hollow words. The new signal is clear—circumvent discovery and conceal information.

Today's opinion reflects the radical change in philosophy which has taken firm hold in this court—discovery is no longer a search for truth, it is merely a game of hide and seek. No longer may appellate courts intercede through mandamus even for the trial court's complete abuse of discretion in denying access to vital data; under the

newly-announced double standard, intervention can, however, be accorded for those who persevere in evasion.

When a local business is defrauded, when a community is exposed to dangerous toxic wastes, when a manufacturer ignores reports that a safety design change would reduce user injuries, when a monopoly extorts unfair gain from the public, when discrimination results in job loss, and in numerous other circumstances, the burden of proving wrongdoing is exceedingly difficult to satisfy without obtaining evidence of that wrong from the files of the perpetrator. In such situations denial of discovery effectively means denial of all relief. That reality does not go unrecognized by today's majority.

Entities that begin litigation in control of most of the relevant evidence can often defeat their adversaries simply by denying them the power of information:

> [T]hose with established positions of power are more likely to ... win by preventing their adversaries from producing evidence; they are less likely to be in the position of having to extract evidence from their opponents to make out their case.

23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5422, at 674 (1980). With its separate and unequal treatment of litigants, the majority gives yet another edge to the already advantaged. Providing immediate review for orders that start the flow of information but refusing to consider those that stop it, the majority once again expresses its preference for helping the powerful over the seemingly powerless. Those opposing meaningful discovery

> tend to be institutions rather than individuals, and tend to be among the more wealthy and powerful segments of society. A review system that gives priority (that is, immediate review) to the complaints of privilege holders, but which consigns the complaints of parties seeking discovery until after final judgment, gives an advantage to those wealthy institutional litigants. They have the power to achieve more favorable results

during the pretrial process; their opponents must wait.

Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come*, 44 Sw.L.J. 1045, 1082 (1990) (hereinafter *Review of Discovery Orders* ) (footnote omitted).[2] In this way the *848 majority ensures that the scales of justice—which at the onset of litigation are often in reality uneven—never achieve balance.

Until this court included discovery orders within the scope of mandamus review, very few reported opinions addressed this important subject. Trial judges were effectively accorded unlimited discretion with a "resulting atmosphere [that] was very hostile to discovery." *Id.* at 1071. As a practical matter, discovery battles, often both complex and time-consuming, were shunned. When the party controlling vital data exercises the power of withholding it, fighting every important request, the judicial command "go work it out" often amounts to a denial of meaningful discovery. The mud-wrestling that frequently ensues in such contests may discourage a trial judge from determining who is acting fairly and who started the fight. If mandamus is not available to correct ill-considered or hasty denials, the hope for ultimate justice in complex litigation is prematurely crushed. The majority's decision today marks a return to those dark ages when discovery was regularly denied as the path of least resistance and greatest convenience for the judiciary.

## II.

By its very nature, discovery involves a search for what is largely unknown from someone who may have an incentive to make that search as long and tortuous as possible. Efforts to prevent discovery have been limited only by the boundless imagination of the top legal talent in America. Requests are either too broad or too narrow; records produced are either minimal or in such voluminous, disorganized form as to make locating relevant information most difficult; vital documents vanish in "routine document destruction" programs or are misplaced. Accordingly, our discovery rules have required continual revision to cope with the newest ways invented by those intent on subverting the process. Each revision of the Texas Rules of Civil Procedure during the last decade has included attempted clarification and improvement of discovery procedures. This has produced

a body of law that is "complex and rapidly evolving." David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 375 (1991) (hereinafter *Mandamus of Disclosure Orders* ).

Given the creativity of those who would thwart discovery, rules of procedure cannot be drawn to provide clear guidance in every situation; judicial interpretation is essential. The more complicated the rule, the more necessary the construction and the greater the likelihood for misinterpretation. *See id.* at 386 ("Erroneous interpretations of these changes ... are likely with the absence of prior significant precedent.... [and] could have a substantial effect on the subsequent course of a lawsuit."). This court's responsibility does not and cannot end when the text of promulgated amendments appears in the *Texas Bar Journal.* Rather, the court has a duty *both* to make the rules *and* to interpret them.

Our American system of jurisprudence is founded on the precept that it is of great benefit to have a written body of case law construing controlling legal principles and applying them to particular facts. This approach is undeniably desirable in the discovery context:

> · In a system where trial court decisions are unreported and have no precedential value, the creation of a body of reported appellate case law regarding discovery has substantial value. Case law on discovery promotes uniform interpretation of the discovery rules and, in time, decreases the opportunity for individual *849 judge's biases to shape discovery outcomes. Reported decisions develop clear rules, where rules are possible, and narrow the range of judicial discretion in other areas simply by providing numerous cases finding that the trial court did or did not abuse its discretion. Such case law can be particularly helpful in a jurisdiction that has recently amended its discovery rules. Over time, the existence of discovery case law may even clarify the rules sufficiently so as to decrease the number of disputes in the trial

court.

*Review of Discovery Orders* at 1080 (footnotes omitted). Appellate opinions properly applying mandamus produce, then, both more consistency and more accuracy in trial court decisions. *See id.* at 1077.[3]

The role of this court is particularly important in answering novel or significant questions of discovery law. *See Mandamus of Disclosure Orders* at 376 ("[P]re-trial appellate review of [important discovery] questions could lend critical guidance to the development of Texas discovery practice."). Rather than avoiding its responsibility, this court should utilize mandamus review to reduce the abuse of judicial power when "a unique question of discovery" law is presented. David West, Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litigation 325, 327 (1981) (hereinafter *The Use of Mandamus* ).

Most trial court mistakes denying discovery result from the need to make repeated, quick decisions based upon limited information. Recognizing this circumstance, trial judges sometimes actually encourage litigants to raise disputed rulings affecting truly vital matters for appellate examination through mandamus by automatically staying their orders. Refusal of prompt appellate review not only denies a party its rights but may also deprive a trial court of desired guidance.

Today's opinion appropriately recognizes that "this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction." At 839 n. 7. But under the standard announced, questions of importance concerning judicially-approved concealment of facts will never be considered. The significance to the state's jurisprudence of a ruling should certainly not be controlled by whether the order granted or denied discovery.

### III.

With mandamus now severely limited, many important issues will not be reviewed. *See generally Review of Discovery Orders* at 1056; *The Use of Mandamus* at 337 & n. 94. Abuses of judicial power will go forever uncorrected when the party disallowed discovery, realizing the difficulty of proving a case with less than full information and the uphill task of maintaining a

successful appeal, is either forced to settle or forgoes a costly and extended appeal following defeat on the entire case. Nor will improper rulings ever be reviewed where one denied discovery, although severely handicapped, nonetheless prevails at trial.

Where appeals do occur, remedies will be rare even for egregious pretrial rulings. To succeed in this endeavor, one must show that

> the error complained of amounted to such a denial of the rights of appellant as *850 was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b). This standard is universally regarded as a "more difficult hurdle" than abuse of discretion. Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 512 (1990). As another commentator has aptly concluded,

> only an unusual discovery order would be dispositive enough to show the harmful error that most jurisdictions require for appellate reversal. Many appellants, therefore, would not even raise the discovery points on appeal.

*Review of Discovery Orders* at 1056; *see also Mandamus of Disclosure Orders* at 376 n. 40 (observing that, because of the harmless error rule, many discovery rulings are not pursued on appeal). In denying mandamus today, the majority closes and locks the appellate courthouse door to any meaningful consideration of numerous significant matters.

### IV.

Only with the tragic recent change in course by this court's majority has such denial of access become acceptable. Previously both this court and the courts of appeals had employed their writ power as necessary to correct the abusive refusal of discovery. Among those cases providing the foundation for appropriate mandamus review is *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977, orig. proceeding), in which the trial court had overruled a motion to complete an expert witness's deposition and to compel production of his work papers. We interceded, stating that: "It is settled that the writ of mandamus may issue in a discovery proceeding to correct a clear abuse of discretion by a trial judge." *Id.* at 42. Similarly, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977, orig. proceeding), the trial court refused to order discovery of tests, surveys and complaints by similarly affected persons. This court found an abuse of discretion and granted the writ, despite the argument that the plaintiff had "an adequate remedy via the normal appellate process." *Id.* at 801. It is difficult to perceive, in light of this argument and the court's subsequent grant of mandamus relief, how the majority can now claim that "we [had] not focused" on the requirement of an inadequate remedy by appeal in *Allen* and on, admittedly, a "few [other] occasions." At 840–841.

Following these two opinions, this court has not hesitated to consider and correct the wrongful denial of discovery. By issuing mandamus to rectify an erroneous trial court ruling refusing discovery in *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984, orig. proceeding), this court recognized that appeal is not an adequate remedy:

> [R]equiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus."

*Id.* at 576 (quoting *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (citation omitted)); *see also Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926).

A trial court's unwillingness to order the production of accident scene photographs was overturned by mandamus in *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985, orig. proceeding). In *Lindsey v. O'Neill,* 689 S.W.2d 400, 402 (Tex.1985, orig. proceeding) (per curiam), the court overturned by mandamus an order limiting the scope of a deposition and quashing the accompanying document request. A blanket order protecting hospital records was similarly vacated by mandamus in *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988, orig. proceeding). In *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988, orig. proceeding), this court again granted mandamus to

remedy a trial court's erroneous disallowance *851 of relevant discovery. *See also Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989, orig. proceeding) (correcting by mandamus wrongful denial of discovery); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986, orig. proceeding) (per curiam) (mandamus directing trial court to rescind order denying discovery of documents from insurer in subrogation action); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985, orig. proceeding) (erroneous bar of deposition by court of appeals cured by mandamus).[4]

It is only after fifteen years of repeated judicial reliance upon *Barker* and *Allen* in the issuance of numerous opinions that we learn these precedents of our court are not good law. This is all the more strange in that we had explicitly refused to overrule them. When that very request was urged in *Jampole,* 673 S.W.2d at 576, our answer was unmistakable: "We decline to do so." But the majority's new answer is simple: "Line them up against the wall." What does it matter that a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals are to the contrary? They can be disposed of in a mass execution of precedent.[5] Today's firing squad announces that it is only answering the command of Jim Sales and two law students who separately criticized the court during the period 1977–79. At 840–841. It thereby rationalizes constructing so distorted a standard on the corpses of so many prior authorities.

One of the most significant casualties is *Jampole v. Touchy,* which has formed the centerpiece for discovery in litigation over defective products and toxic substances for almost a decade. The majority, in a massive understatement, "disapproves" *Jampole* "to the extent [it implies] that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." At 842. Although leaving untouched for now this court's prior writing on the proper scope of discovery, the majority has in fact overruled that landmark precedent in its entirety. Despite a gross abuse of discretion in denying critical discovery in *Jampole,* the majority's only correction by mandamus would be to require inclusion of the disputed materials in *852 the record, to await a deferred and meaningless appellate review.

## V.

Instead of affording the relief that prior rulings demand,

the majority announces, after considerable mental gymnastics, that "at least three [discovery situations] come to mind" where mandamus is justified, at 843; then it strangely proceeds to describe six. The first three instances where remedy by appeal is inadequate stem from a trial court's wrongful allowance of discovery. First, mandamus will issue if "disclosure of privileged information ... will materially affect the rights of the aggrieved party." At 843. This requisite is easily fulfilled with discovery objections that include an assertion of privilege, the violation of which necessarily impinges on the objecting party's rights.

Second, mandamus will issue when a trial court orders the disclosure of "trade secrets without adequate protections to maintain the confidentiality of the information." At 843 (citing, without discussion, *Automatic Drilling Machs., Inc. v. Miller,* 515 S.W.2d 256 (Tex.1974, orig. proceeding)). Posing numerous problems, this hastily-drawn exception has no relevance to the instant case and was concocted by the majority without any briefing or argument by counsel. One privilege is thereby unjustifiably elevated above all others. Moreover, the writing implies an absolute protection of trade secrets from discovery when in fact this privilege is most definitely qualified, as recognized by *Automatic Drilling,* 515 S.W.2d at 259,[6] the rule itself, Tex.R.Civ.Evid. 507 (trade secrets not protected when nondisclosure conceals fraud or works injustice), and even Mr. Sales, whose writing purportedly warranted today's brash action.[7] Nor does this exception consider the availability in some cases of the interlocutory appeal mechanism provided in Tex.R.Civ.P. 76a(8) to address the adequacy of a protective order. *See Eli Lilly & Co. v. Marshall,* Order Granting Leave to File Petition for Writ of Mandamus (Doggett, J., dissenting), 829 S.W.2d 156 (Tex.1991).

The third situation requiring mandamus is an "order [that] compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." At 843. This "catch-all" exception indeed makes the extraordinary writ of mandamus an ordinary one. In almost any complex litigation, the claim of burden is essentially a form objection to discovery. It is difficult to perceive a dispute in which the party seeking to obstruct the process could not and, after today's decision, will not claim harassment or imposition of an undue burden. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992) (per curiam) (granting mandamus to preclude disclosure of corporate

tax returns on the basis of undue burden and unnecessary expense, not privilege).[8]

A fourth exception, based on *853 *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding), is described when the trial court imposes "discovery sanctions ... precluding a decision on the merits of a party's claims ... unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment." At 843 (emphasis deleted). The majority falsely suggests that today's standard creates a symmetry with *Transamerican.* Unlike *Transamerican,* which treated the striking of a petition in the same manner as the entry of a default judgment, this ruling creates a double standard. Unlike *Transamerican,* which involved a readily-perceptible wrong such as an order of dismissal, a determination of whether hidden documents "go to the heart of a party's case," at 843, involves significant uncertainties.

More importantly, *Transamerican* was issued at a time when the announced policy of this court was to deter abuses of discretion without regard to whether discovery was granted or denied. A wide spectrum of sanction orders arising from discovery rulings are immediately appealable. *See Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding). Superimposing *Transamerican* and *Braden* on today's double standard sends a clear message to the rare trial court that would impose significant penalties on those who obstruct discovery with deceit and delay—be careful. There is no real danger of immediate and genuine appellate examination of an order denying discovery, but there is a constant threat of appellate review of an order granting discovery or imposing meaningful sanctions on obstructionists. Once again the majority provides an incentive for concealment.

The remaining two situations address the wrongful denial of discovery, and constitute a narrow path in the woods compared to the expressway for resisting discovery constructed in the previous four exceptions. Mandamus is possible when

> the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error on the record

before it.

At 843–844. The quick fix of including materials in the appellate record is both ingenious and ingenuous. It has the immediate "benefit" of excluding a great number of errors in the discovery area from mandamus review. As the majority in fact recognizes, "this situation should only rarely arise." At 844.[9] And if it ever does, the majority guarantees that no relief will be forthcoming, by directing that the reviewing court

> carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.

At 844. Within these constraints, there will always be a readily available excuse to deny both discovery and mandamus.

In most cases the materials can be boxed up, file-stamped, and sent to the appellate court. How this will accomplish anything more than cluttering the judicial chambers is quite another matter. No clue is given as to how to resolve the obvious difficulties inherent in appellate determination, without any effective argument and analysis by counsel, of whether each item would have affected the result. Moreover, this approach improperly requires courts of appeals to act as juries while denying to the true fact-finder evidence that may be highly *854 relevant to the proceeding. This distrust of juries—of ordinary people resolving factual disputes—is increasingly reflected in the majority's decisions.[10]

The only hope for review of a trial court's order denying discovery is upon proof that a claim has been "vitiated or severely compromised by the trial court's discovery error." At 843. It must be shown "that the trial would be a waste of judicial resources," at 843, and that "a denial of discovery [goes] to the heart of a party's case." At 843. It is far from clear whether these encompass one or three different standards. What is clear is that few cases, if any, will satisfy whatever standard is applied.

The majority offers no example of a case in which a party has ever met such a heavy burden. Apparently an applicant for mandamus in this court must confess that, without the discovery sought, the trial court should and must direct a contrary verdict. Any semblance of a chance at prevailing prevents a determination that the trial would be a "waste of judicial resources" or that the discovery denied goes "to the heart of a party's case." While this

situation may theoretically arise in the future, it will be most unlikely. Nor is there any explanation of how a party can be expected to show such a probability without having any of the materials in question. We have previously recognized the hardship inherent in showing need for documents when their contents are unknown. *State v. Lowry*, 802 S.W.2d 669, 673 (Tex.1991) ("It is difficult for the [relators] to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

Application of today's font of mandamus law to the Walkers' situation is most revealing. The majority summarily concludes that the trial court's misapplication of the law to deprive them of relevant evidence "does [not] vitiate or severely compromise the Walkers' ability to present a viable claim." At 844. Most ironically, today's announcement imposes one type of double standard on top of another alleged double standard. The Walkers claim they have uncovered a double standard at a taxpayer-financed institution that encourages faculty to defend those accused of medical malpractice while discouraging professional advice on behalf of the alleged victim. It is the merits of this revelation that the majority so eagerly seals away from both the Walkers and the public.

Fully aware of the impact of expert credibility on the outcome of much medical malpractice litigation, the majority denies the Walkers the very information that could perhaps demonstrate the bias of a key witness. An official blessing is thus provided for trial court action that may have a material, adverse effect on their ability to present a viable case. Having now learned that the denial of impeachment evidence is never susceptible to mandamus, it remains to be seen what other critical information will next be similarly viewed as unimportant to this majority.

While the nature of the double standard approved by today's writing requires that this dissent focus on wrongful denials, I recognize that the wrong can be every bit as real from improper grants of discovery. As a practical matter there is probably less danger that a trial judge will capriciously ignore properly established objections and privileges to accord too much information instead of too little. Nevertheless, I favor the use of mandamus to control abuse without regard to how it occurs or whom is helped. What I deplore is the discrimination which the majority officially substitutes for even-handedness. Scholars viewing *855 the so-called "*Walker* mandamus standard" should recognize that it is not a standard but an excuse for ignoring wrongdoing.

After today's decision, discovery disputes will no longer be resolved on a level playing field. I believe that mandamus should be available to correct any trial court abuse concerning a subject that is important to the jurisprudence of the state and which substantially affects rights of an aggrieved party. If this requisite is satisfied, relief should be accorded without regard to whether the trial court has granted or denied discovery.

## VI.

In supporting today's opinion, Justice Gonzalez insists that we must stem what he claims is an alarming increase in the number of mandamus filings. At 844–846 (Gonzalez, J., concurring). The view that "the sky is falling" is best reflected in the gruesome statistics and conclusions of his dissenting opinion in *Joachim v. Chambers*, 815 S.W.2d 234, 241 (Tex.1991). *See also Jampole*, 673 S.W.2d at 578 (Barrow, J., dissenting); *cf.* C.L. Ray & M.R. Yogi McKelvey, *The Mandamus Explosion*, 28 S.Tex.L.Rev. 413, 413–14 (1987).

Blaming an ever-increasing caseload for the Texas courts on the advent of the discovery mandamus is wholly insupportable. These petitions most often present emergency situations requiring expedited review and, consequently, are frequently viewed as a thorn in the side of appellate courts. *See Review of Discovery Orders* at 1059 n. 99. But I cannot agree that justice should be denied or delayed solely to accommodate appellate judges.

Recent studies have debunked the myth of the mandamus explosion. The *Joachim* dissent, to which Justice Gonzalez once again points with pride today, is based upon an analysis that fails to segregate filings arising from discovery disputes. A more detailed study of Supreme Court experience during a period of more than ten years correctly concluded that:

> [I]nterlocutory review of discovery orders ... has [had] a positive effect.... The increase [in appellate caseloads] has been an extremely small and manageable one....

. . . . .

The numbers, then, suggest that while the availability

of interlocutory review of discovery orders added cases to the appellate docket, interlocutory review has not added a large or burdensome number of cases.

*Review of Discovery Orders* at 1047, 1059.

The fact is that most petitions are denied, with fewer than 3% granted by us during fiscal year 1991. Most of these were handled expeditiously, with over half resolved within one month of filing. Moreover, Justice Gonzalez completely ignored the fact that mandamus requests in this court actually decreased over the last three years. There were 202 of these in fiscal 1991, down from 257 and 258, respectively, in fiscal 1989 and 1990. Although the court's overall workload is expanding, the contribution of mandamus filings is certainly not uncontrollable.[1] "In deciding whether courts should permit interlocutory **\*856** review in specific cases, judges and commentators tend to emphasize the needs of court administration over the needs of the litigants." *Id.* at 1049. While cutting off the right to mandamus review when discovery is denied may reduce the appellate workload, the result will be a significant decline in the quality of justice. The inconvenience caused by the unexpected arrival of a petition that often demands immediate action is the price paid "to assure that ... trial proceedings are fair and equitable to *all* concerned parties.... *'[W]e must not sacrifice justice upon the altar of expediency.'* " *Mandamus Review of Disclosure Orders* at 422 (quoting David W. Holman & Byron C. Keeling, *Disclosure of Witnesses in Texas: The Evolution and Application of Rules 166b(6) and 215(5) of the Texas Rules of Civil Procedure,* 42 Baylor L.Rev. 405, 458 (1990)) (emphasis added).

### VII.

The majority announces here not a standard, but a pseudo-standard. In reality, the rule is little more than "how can we help those whom we want to help?" The only true precedent for this is *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991), where *R*epublican *r*elators in *r*edistricting were accorded relief in the Supreme Court never sought in any other forum. This "triple R exception to mandamus," *id.* at 760–61 (Mauzy, J., dissenting), only presages the continued pursuit of this goal.

If doubts remain as to the one-sidedness of the standard announced today, its application to currently pending

cases should resolve them. *See, e.g., Remington Arms Co. v. Canales,* No. D–1867, 35 Tex.S.Ct.J. 245 (Dec. 13, 1991) (trial court order which found documents relating to firearm safety relevant and required their production stayed despite no timely response or objection being made); *Eli Lilly & Co. v. Marshall,* No. D–1827, 35 Tex.S.Ct.J. 168, 354 (Dec. 3, 1991 and Jan. 23, 1992) (stays of trial court order directing production of information relating to the drug Prozac); *see id.* at 189 (Order Granting Leave to File Petition for Writ of Mandamus) (Doggett, J., dissenting); *Valley Baptist Medical Center v. Bennett,* No. D–1193, 34 Tex.S.Ct.J. 668 (June 18, 1991) (stay issued to protect hospital from disclosure of materials relating to policy of informing patients of risk of treatment), and 35 Tex.S.Ct.J. 452 (Feb. 12, 1992) (motion for leave to file granted). One interested in verifying the true meaning of the majority's carefully chosen words will do well to observe how the court actually disposes of each of these matters.

### VIII. CONCLUSION

In an apparent attempt to cope with a false "mandamus explosion," today's opinion has offered us an explosion of another type—a reverberating detonation of this court's prior rulings. True the majority has considerable experience in disregarding precedent as merely a lifeless thing of the past. *See Edgewood III,* 826 S.W.2d at 516, 517 (Doggett, J., dissenting); *Terrazas,* 829 S.W.2d at 739 (Mauzy, J., dissenting); *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting). But a dozen or more Texas Supreme Court authorities and even more rulings from the courts of appeals cut down at one time is not a modest accomplishment. Precedent, no matter how voluminous or how well-established, will clearly not restrain this majority from accomplishing its preconceived social policy objectives.

Through both deed and now word, the majority invites a true explosion in mandamus filings. What does an attorney whose client faces the possibility of a judgment for significant damages have to lose from accepting the beneficence of a majority of this court ever willing to serve as protector of the privileged? Will a deposition site other than that ordered by the trial court **\*857** be more costly and inconvenient to the claimant? Get a stay from the Texas Supreme Court, even if your petition is still pending in the court of appeals. *See Continental Can Co.*

*v. Wittig,* No. D–2015, 35 Tex.S.Ct.J. 355, 1992 WL 17415 (Jan. 29, 1992) (stay of trial court order directing engineering employee of products liability defendant to be deposed in Houston rather than Chicago even though mandamus petition was pending in court of appeals). Did the trial court resolve a conflict in deposition schedules in a manner unacceptable to an insurance company? Don't worry, the Texas Supreme Court will stay proceedings even without bothering to get a response from the affected judge. *See Cigna Corp. v. Spears,* No. D–2069, 35 Tex.S.Ct.J. 463 (Feb. 19, 1992). Any attorney whose client desires to make more difficult access to information that will jeopardize its credibility, suggest its liability or defeat its defenses would be foolish to accept a trial court discovery order. A majority of the Texas Supreme Court is ready and willing to interfere for the asking.

The ripple effect created by today's refusal to accord mandamus review to pretrial discovery orders will swell to tidal-wave proportion, and sweep before it any hope of fair and consistent application of our Texas discovery rules. In many cases it will leave buried in the sand any possibility of trials directed by the full and truthful revelation of the underlying facts. Juries will be forced to resolve critical disputes based not on truths but rather upon whatever half-truths can be discovered. Left in the wreckage on the beach will be the tattered remains of the many prior decisions of this court and others that viewed litigation as a search for truth in which fair and prompt appellate review of an order denying discovery was vital.

MAUZY, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

I dissent. Today's decision departs from previous

instances where this court has provided mandamus relief to correct a wrongful denial of discovery, and labors too hard to conclude that appeal is an adequate remedy for a party who is denied adequate discovery.

I would hold that mandamus is available to correct a trial court error which negatively and materially affects the right of aggrieved parties to adequately present their cases, whether the particular party is seeking discovery or resisting it. *See Iley v. Hughes,* 158 Tex. 362, 368, 311 S.W.2d 648, 652 (1958); *see also* Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 SW.L.J. 1045 (1990). In the case before us, the trial court's denial of discovery has a material and adverse effect on the Walkers' ability to present their case. The information they seek could impugn the credibility of key expert witnesses at trial. Because their medical malpractice claim, like all such claims, will likely stand or fall on the credibility of the expert witnesses, I would hold that the Walkers are entitled to the information they seek, and that relief by appeal is inadequate.

Discovery is the "linchpin of the search for truth," and "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary." *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Today the court removes and disposes of that "linchpin" and abandons enforcement of fair and adequate discovery. Because I believe that mandamus relief should be readily available when a court allows *either* too much *or* too little discovery, I dissent.

**All Citations**

827 S.W.2d 833

Footnotes

1    St. Paul contends that the Walkers' request for mandamus relief is barred by laches since the Walkers delayed almost two years before seeking to compel production. Because we find that the Walkers have failed to establish the requirements for mandamus relief, we do not reach this issue.

2    The court also sustained Aetna's motion to quash, holding that the discovery requested was improper under the investigation exemption, the attorney-client privilege, and the work-product privilege. The Walkers do not complain to us about this ruling.

3    Even if no evidence had been presented, the Walkers would have had the burden of filing an affidavit so stating. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988) ("The undisputed fact that no testimony was adduced at any of

the hearings, as set forth in the affidavit of relator's counsel, satisfies the relator's burden under Rule 121.").

4    The records sought in *Russell* included, among others:
    (2) All appointment books maintained by [the expert physician] during 1969;
    (3) All statements, listings, ledgers, or other books showing the accounts receivable of [the expert physician] during 1969;
    (4) All deposit slips or tickets showing deposits into bank accounts of [the expert physician] during 1969;
    (5) All statements, listings, ledgers, journals, or other books showing receipt of payments, either in cash, by check or by any other means [by the expert physician] during 1969;
    (6) All statements of account or bills for services rendered [by the expert physician] during 1969;
    (7) All accounting ledgers, journals or other books of account of [the expert physician] maintained during 1969; and
    (8) All financial statements showing income and expenses of [the expert physician] during 1969.
    452 S.W.2d at 435.

5    Evidence of bias is not admissible if the witness "unequivocally admits such bias or interest" at trial. Tex.R.Civ.Evid. 613(b). To date, however, Dr. Gilstrap has not admitted any bias, but rather has flatly denied it. In this situation, such evidence should be discoverable.

6    We do not decide whether the documents were properly discoverable, only that the trial court erred in denying discovery based solely on *Russell*. If the Walkers sought the documents solely to attack the credibility of Dr. Gilstrap by showing that his deposition testimony was untrue, for instance, the information would probably not be reasonably calculated to lead to the discovery of admissible evidence. *See* Tex.R.Civ.Evid. 608(b). ("Specific instances of the conduct of a witness [other than criminal convictions], for the purpose of attacking ... his credibility, may not be ... proved by extrinsic evidence.").

7    Additionally, this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction. *Cf.* Tex.Gov't Code § 22.001(a)(6); Tex.R.App.P. 140(b). This issue, however, is properly resolved in deciding whether to grant leave to file the petition, not in its disposition.

8    *See, e.g., TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 919 (Tex.1991) (imposition of discovery sanctions); *Schultz v. Fifth Judicial District Court of Appeals*, 810 S.W.2d 738, 739 n. 4 (Tex.1991) (refusal to enforce turnover order by contempt); *Joachim v. Chambers*, 815 S.W.2d 234, 240 (Tex.1991) (refusal to bar judicial officer from testifying as expert witness); *Hooks v. Fourth Court of Appeals*, 808 S.W.2d 56, 59–60 (Tex.1991) (refusal to grant nonsuit); *Bell Helicopter Textron, Inc., v. Walker*, 787 S.W.2d 954, 955 (Tex.1990) (refusal to dismiss for lack of subject-matter jurisdiction); *Champion Int'l Corp. v. Twelfth Court of Appeals*, 762 S.W.2d 898, 899 (Tex.1988) (grant of new trial); *Stringer v. Eleventh Court of Appeals*, 720 S.W.2d 801, 801–02 (Tex.1986) (imposition of discovery sanction); *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985) (grant of new trial); *Abor v. Black*, 695 S.W.2d 564, 566 (Tex.1985) (denial of plea in abatement); *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984) (refusal to reinstate temporary injunction); *Pat Walker & Co. v. Johnson*, 623 S.W.2d 306, 309 (Tex.1981) (refusal to extend time for filing statement of facts); *State Bar of Texas v. Heard*, 603 S.W.2d 829, 833 (Tex.1980) (refusal to suspend attorney); *Pope v. Ferguson*, 445 S.W.2d 950, 953 (Tex.1969) (refusal to dismiss criminal case pending against relator), *cert. denied*, 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Crane v. Tunks*, 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (discovery order); *Iley v. Hughes*, 158 Tex. 362, 367–68, 311 S.W.2d 648, 652 (1958) (bifurcation of trial); *Harrell v. Thompson*, 140 Tex. 1, 1, 165 S.W.2d 81, 81 (1942) (restriction of oil and gas production by Railroad Commission); *Ben C. Jones & Co. v. Wheeler*, 121 Tex. 128, 130, 45 S.W.2d 957, 958 (1932) (refusal to enter judgment nunc pro tunc); *Cleveland v. Ward*, 116 Tex. 1, 14, 285 S.W. 1063, 1068 (1926) (refusal to enter judgment); *Aycock v. Clark*, 94 Tex. 375, 376–77, 60 S.W. 665, 666 (1901) (refusal to enter injunction); *Screwmen's Benevolent Ass'n v. Benson*, 76 Tex. 552, 555, 13 S.W. 379, 380 (1890) (expulsion of member from charitable corporation).

9    We recently held that a mandamus action was never required to preserve error on appeal. *Pope v. Stephenson*, 787 S.W.2d 953 (Tex.1990). We explained: "The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal." *Id.* at 954.

10   Courts use a similar approach in determining whether a witness has properly invoked the Fifth Amendment privilege against self-incrimination. It is often impossible for a witness to prove that an answer might incriminate him without

actually answering and thereby forfeiting the privilege. Therefore, rather than requiring actual proof of the privilege, courts sustain the privilege if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer [might be incriminating]." *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

1    If the records have relevance apart from their potential for impeachment, however, *Russell* does not bar discovery. *See Ex Parte Shepperd,* 513 S.W.2d 813, 816 (Tex.1974).

1    Billie Holiday, *God Bless the Child* (Okeh Records 1941) (words and music by Arthur Herzog, Jr. & Billie Holiday).

2    These entities rarely need information to prevail:
> Even when an institutional litigant appears as a plaintiff suing an individual defendant as, for example, when a corporation sues an individual on a debt, the institutional litigant tends to already have the information needed to prove its case.
> *Review of Discovery Orders* at 1070 n. 162. They are also less likely to require information from an opponent to establish affirmative defenses. *Id.* at 1070.

3    With no appellate opinions setting forth appropriate limitations upon trial court discretion, "litigants may receive widely divergent rulings from different judges, even in the same geographical location." *Id.* at 1077. Proper use of mandamus discourages forum shopping to obtain a trial judge more likely to provide a more favorable ruling and allows for greater consistency and accountability:
> [Such] review ... even[s] out inconsistencies in trial court rulings, and ... allows trial judges to operate with a more accurate understanding of the meaning of the discovery rules.... If the appellate court is consistent, it can fix disparities and inequities produced by the trial courts and promote consistency among the trial level decisionmakers.
> *Id.* at 1047, 1077 (footnotes omitted).

4    Intermediate appellate courts have also recognized the importance of mandamus to avoid trial court abuse in improperly limiting or denying discovery. *See, e.g., Kentucky Fried Chicken Nat'l Mgmt. Co. v. Tennant,* 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (writ granted when discovery of plaintiff's psychiatric records denied); *Foster v. Heard,* 757 S.W.2d 464 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (mandamus issued against trial court's denial of discovery of post-accident investigation report); *Super Syndicate, Ltd. v. Salazar,* 762 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding) (granting mandamus against trial court's denial of discovery of claims investigator's files); *Goodspeed v. Street,* 747 S.W.2d 526 (Tex.App.—Fort Worth 1988, orig. proceeding) (trial court's denial of discovery of hospital records based on privilege without presentation of evidence overturned); *Estate of Gilbert v. Black,* 722 S.W.2d 548, 551 (Tex.App.—Austin 1987, orig. proceeding) (denial of discovery of insurer's internal communications overturned on mandamus, despite argument that "mandamus is proper only [for] improperly ordered discovery of privileged material, not when the trial court has denied discovery."); *Essex Crane Rental Corp. v. Kitzman,* 723 S.W.2d 241 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (writ granted to correct trial court's order quashing deposition); *Velasco v. Haberman,* 700 S.W.2d 729, 730 (Tex.App.—San Antonio 1985, orig. proceeding) (mandamus appropriate "not only where the trial court order improperly grants discovery, but the writ may also issue where the trial court improperly limits or denies discovery."); *Aztec Life Ins. Co. v. Dellana,* 667 S.W.2d 911 (Tex.App.—Austin 1984, orig. proceeding) (mandamus issued against trial court for denying discovery of claims files).

5    The majority identifies by name five cases in conflict with today's writing, declaring that: "We disapprove of *Barker* and *Allen,* and any other authorities," at 842, and "[we] disapprove of *Cleveland, Crane, Jampole,* and any other authorities," at 842, to the extent they conflict with the new *Walker* standard. Subsumed within the "other" designation are a great number of additional cases from this court and the courts of appeals that would grant to the Walkers relief when the trial court has clearly abused its discretion in denying discovery. The court's willingness to sweepingly erase whole unidentified categories of recent precedent is exemplified by their signing of a blank check: "any other authorities," meaning all other authorities, are now endangered.

6    The few cases citing *Automatic Drilling* do not expand its holding to that suggested by the court today. *See Jampole,* 673 S.W.2d at 574–75 ("We hold that discovery cannot be denied because of an asserted proprietary interest in the requested documents when a protective order would sufficiently preserve that interest."); *Firestone Photographs, Inc. v. Lamaster,* 567 S.W.2d 273, 278 (Tex.Civ.App.—Texarkana 1978, no writ) ("[T]he claim of trade secrets ... does not

necessarily defeat the right of discovery.").

7    James B. Sales, *Pretrial Discovery in Texas Under the Amended Rules: Analysis and Commentary*, 27 S.Tex.L.Rev. 305, 345–46 (1986), stating that:
> Trade secrets ... are not, per se, exempt from discovery. The trial court is obligated to weigh the need for discovery against the interests on secrecy.... The need to protect the confidentiality of documents does not constitute an absolute bar to discovery....

8    Although also citing *General Motors Corp. v. Lawrence*, 651 S.W.2d 732 (Tex.1983, orig. proceeding), as allowing mandamus relief from an allegedly burdensome trial court discovery order, the majority fails to note the very expansive discovery permitted in that case. The efforts of General Motors to limit discovery to results from tests performed on the particular type of truck and the particular type of impact involved in the subject incident were rejected, and it was directed to supply all impact test results for all types of trucks manufactured over a 23–year period.

9    If the trial court "refuses to make [the discovery] part of the record," At 843, presumably the only relief accorded under today's standard would be issuance of a writ directing inclusion of these materials.

10   See *Caller Times Publishing Co. v. Triad Communications*, 826 S.W.2d 576, 597–608 (Tex.1992) (Doggett, J., dissenting) (addressing court's refusal to allow evidence of predatory intent); see also *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 596 & n. 1 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn*, 804 S.W.2d 463, 488 (Tex.1990) (Doggett, J., concurring and dissenting).

11

## Supreme Court Filings

| Year | Mandamus Discovery Orders | All Mandamus Filings | Total Mandamus and Applications for Writ | Discovery as Percentage of Total |
|------|------|------|------|------|
| 1979 | 24 | 129 | 933 | 2.6% |
| 1981 | 17 | 98 | 943 | 1.8% |
| 1989 | 51 | 257 | 1078 | 4.7% |
| 1991 | 64 | 202 | 1257 | 5.1% |

*Interlocutory Review of Discovery Orders* at 1058–59; the 1989 and 1991 figures are derived from my review of court filings.

---

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

177 S.W.3d 350
Court of Appeals of Texas,
Houston (1st Dist.).

In re D'Ann Lesli WHEELER, Relator.

No. 01–04–01129–CV. | April 7, 2005.

**Synopsis**
**Background:** In post-divorce proceedings, former wife filed counter-petition to modify matters affecting parent-child relationship and a motion to transfer venue to county in which one of the parties' two children lived. The 308th District Court, Harris County, Georgia Dempster, J., denied the motion to transfer venue. Former wife filed petition for writ of mandamus.

**Holdings:** The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] trial court had duty to sever and transfer venue for proceedings affecting child who had been living in other county for past seven years, and

[2] former wife's motion to transfer venue was timely.

Petition conditionally granted.

West Headnotes (7)

[1] **Child Custody**
⟳Venue

Transferring a proceeding affecting the parent-child relationship to a county where the child has resided for more than six months is a mandatory ministerial duty under section of the Family Code governing mandatory transfer. V.T.C.A., Family Code § 155.201.

3 Cases that cite this headnote

[2] **Child Custody**
⟳Decisions Reviewable
**Mandamus**
⟳Modification or Vacation of Judgment or Order
**Mandamus**
⟳Change of Venue and Transfer of Causes

An order transferring or refusing to transfer a proceeding affecting the parent-child relationship is not subject to interlocutory appeal; therefore, mandamus is available to compel mandatory transfer in a suit affecting the parent-child relationship. V.T.C.A., Family Code § 155.204(e).

5 Cases that cite this headnote

[3] **Child Custody**
⟳Venue

Trial court, which rendered divorce decree and had continuing, exclusive jurisdiction over matters in the decree affecting the children of the marriage, had duty under statute to sever and transfer venue for proceedings affecting one of the two children to the county in which the child had been living for the past seven years, even though other child was living in trial court's county for past eight months. V.T.C.A., Family Code §§ 155.201(b), 155.207(b).

3 Cases that cite this headnote

[4] **Child Custody**
⟳Venue

A trial court having continuing, exclusive jurisdiction over matters in divorce decree

affecting children of the marriage has no discretion but to transfer venue as to one child if the child has been living in another county for at least six months prior to the proceedings affecting the parent-child relationship and a controverting affidavit has not been filed in regard to that child. V.T.C.A., Family Code §§ 155.201(b), 155.207(b).

4 Cases that cite this headnote

**[5]**    **Child Custody**
           ⟞Change of Venue

Former wife's motion to transfer venue of post-divorce proceedings affecting child was timely, where she filed the motion to transfer venue contemporaneously with her counter-petition to modify matters affecting the parent-child relationship, which were her first pleadings in regard to modifying the parent-child relationship. V.T.C.A., Family Code §§ 155.201(b), 155.204.

1 Cases that cite this headnote

**[6]**    **Child Custody**
           ⟞Venue

For purposes of statute providing that a motion to transfer venue of proceedings affecting parent-child relationship is timely if it is made at the time the initial pleadings are filed, "initial pleadings" refers to the first pleadings filed by that petitioner or movant. V.T.C.A., Family Code § 155.204.

1 Cases that cite this headnote

**[7]**    **Mandamus**
           ⟞Scope of Inquiry and Powers of Court

If a court's order is adequately reflected in the reporter's record, a formal written order is not essential to obtaining mandamus relief. Rules App.Proc., Rule 52.3(j)(1)(A).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*351** Anne Marie Cofer, Bryan, for Appellant.

Charlotte Dawn Rainwater, Houston, for Appellee.

Panel consists of Justices TAFT, KEYES, and HANKS.

**\*352 OPINION**

EVELYN V. KEYES, Justice.

Relator, D'Ann Lesli Wheeler, has filed a petition for writ of mandamus complaining about the trial court's¹ order denying her motion to transfer venue. We conditionally grant the petition for writ of mandamus.

**Background**

In 1997, the trial court entered a final decree of divorce between relator and the real party in interest, John Ingraham Wheeler III. Pursuant to the decree, relator and the real party in interest became the joint managing conservators of their two children, L.E.W. and L.L.W. The decree also gave relator the exclusive right to determine the residence of the children, but restricted relator's choice to either Brazos or Harris County.

On March 25, 2004, the real party in interest filed a petition to modify matters affecting the parent-child relationship. Relator filed a general denial and also filed a counter-petition to modify matters affecting the parent-child relationship, asking the trial court to remove

the domicile restriction. Attached to her motion to modify was a motion to transfer venue, which requested that venue be transferred from Harris County to Brazos County because L.L.W. lives in Brazos County.

On October 27, 2004, the trial court held a hearing on the motion to transfer venue. The court held that it had continuing jurisdiction over the case and that relator had previously ratified the court's jurisdiction. The trial court denied the motion to transfer venue as to both children.

Here, relator seeks relief only in regard to L.L.W. Pursuant to section 155.201 of the Texas Family Code, relator argues that the trial court had a mandatory duty to transfer venue to Brazos County because L.L.W. has lived in Brazos County for the past seven years. *See* TEX. FAM.CODE ANN. § 155.201 (Vernon 2002). On November 12, 2004, we stayed all proceedings in the trial court, pending our review of this original proceeding.

## Analysis

[1] [2] Transferring a case to a county where the child has resided for more than six months is a mandatory ministerial duty under section 155.201 of the Texas Family Code. *Proffer v. Yates,* 734 S.W.2d 671, 673 (Tex.1987); *Bollard v. Berchelmann,* 921 S.W.2d 861, 863 (Tex.App.-San Antonio 1996, no writ); *see* TEX. FAM.CODE ANN. § 155.201. An order transferring or refusing to transfer the proceeding is not subject to interlocutory appeal. TEX. FAM.CODE ANN. § 155.204(e) (Vernon 2002). Therefore, mandamus is available to compel mandatory transfer in a suit affecting the parent-child relationship. *Proffer,* 734 S.W.2d at 672–73; *In re Sanchez,* 1 S.W.3d 912, 914 (Tex.App.-Waco 1999, orig. proceeding).

When a court renders a final divorce decree, it acquires continuing, exclusive jurisdiction over the matters in the decree affecting a child of the marriage. TEX. FAM.CODE ANN. § 155.001(a) (Vernon 2002); *In re G.R.M.,* 45 S.W.3d 764, 766 (Tex.App.-Fort Worth 2001, orig. proceeding). The court retains continuing, exclusive jurisdiction over the child unless jurisdiction has been transferred under sections 155.201 to 155.207 of the Texas Family Code or an emergency exists. *See* TEX. *353 FAM.CODE ANN. §§ 155.001(c), 155.002, 155.201–.207 (Vernon 2002); *In re G.R.M.,* 45 S.W.3d at 766–67. Section 155.201 provides in pertinent part:

(b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer.

TEX. FAM.CODE ANN. § 155.201(b).

[3] No one disputes that the trial court has continuing, exclusive jurisdiction over the case. The parties primarily dispute whether the trial court was required to transfer venue to Brazos County, where one child has been living for the past seven years, while another child has been living in Harris County for the past eight months.

In *In re T.J.L.,* the Fourteenth Court of Appeals had an opportunity to address the same issue with which we are now presented. 97 S.W.3d 257 (Tex.App.-Houston [14th Dist.] 2002, orig. proceeding). The court of appeals noted, "The statute is not as clear as it could be on whether transfer as to one child is required when not all children of a marriage live in the county to which transfer is sought." *Id.* at 264. The court of appeals concluded, after construing the purpose of the statute, that the Legislature intended for the trial court to determine continuing, exclusive jurisdiction on a child-by-child basis. *Id.* It reached this conclusion because the statute consistently refers to jurisdiction over the "child," in the singular. *Id.*

The court of appeals also recognized that "the Legislature wanted matters affecting the parent-child relationship to be heard in the county where the child resides." *Id.* (citing *Cassidy v. Fuller,* 568 S.W.2d 845, 847 (Tex.1978) ("[V]enue provision was enacted for the reason that current circumstances affecting the child may usually be best shown in the county where the child resides.")). In addition, another section in the statute recognizes that the trial court can transfer venue for some, but not all, children to another court. *See* TEX. FAM.CODE ANN. § 155.207(b) (Vernon 2002) ("If the transferring court retains jurisdiction of another child who was the subject of the suit, the clerk shall send a copy of the complete files to the court to which the transfer is made and shall keep the original files.").

Thus, the court of appeals concluded, "[W]e construe the statute as requiring a court to transfer the proceedings

affecting a child to the county where the child resides, even if it retains jurisdiction over another child of the marriage who does not live in the transferee county." *In re T.J.L.*, 97 S.W.3d at 264. The Waco Court of Appeals has held similarly. *See Koether v. Morgan,* 787 S.W.2d 582, 585 (Tex.App.-Waco 1990, orig. proceeding) ("The statute does not require that all the children who have been subject to a court of continuing, exclusive jurisdiction in a particular case must live in the county to which a transfer is being sought.").

[4] The real party in interest cites *In re T.J.L.,* but does not distinguish its holding. After reviewing the statute, we agree with the Fourteenth Court of Appeals and conclude that a trial court has no discretion but to transfer venue as to one child if the child has been living in another county for at least six months prior to the proceedings and a controverting affidavit has not been filed in regard to that child.

Here, on June 8, 2004, relator filed a motion to transfer venue to Brazos County as to both of her children, even though L.E.W. had started to live with her father on February 1, 2004. Relator alleged that *354 both children had been living with her since September 15, 1997. The real party in interest filed an answer and a controverting affidavit, but contested only the current residence of L.E.W. There was no disagreement regarding the residence of L.L.W.

Because the real party in interest filed no controverting affidavit regarding the residence of L.L.W., the trial court had a ministerial duty to sever and to transfer all proceedings pertaining to L.L.W. to Brazos County. *See T.J.L.,* 97 S.W.3d at 265. Thus, the trial court's denial of relator's motion to transfer venue was an abuse of discretion.[2]

[5] The real party in interest also argues that the trial court could deny relator's motion to transfer venue because it was untimely. The trial court stated, "the Motion to Transfer is not timely and we are going to go forward."

[6] Section 155.201 provides that, "if a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall transfer the proceedings to another county...." TEX. FAM.CODE ANN. § 155.201. Section 155.204 provides, "Except as provided

by Section 262.203, a motion to transfer by a petitioner or movant is timely if it is made at the time the initial pleadings are filed." TEX. FAM.CODE ANN. § 155.204 (Vernon 2002). Here, relator filed her motion to transfer venue contemporaneously with her counter-petition to modify matters affecting the parent-child relationship. By filing a motion to modify, relator is classified as a petitioner. *See In re Simonek,* 3 S.W.3d 285, 288 (Tex.App.-Waco 1999, orig. proceeding). Thus, relator's motion to transfer venue was timely filed if it was made at the time that her initial pleadings in her suit to modify were filed. *Id.;* TEX. FAM.CODE ANN. § 155.204. Initial pleadings refers to the first pleadings filed by that petitioner. *In re Simonek,* 3 S.W.3d at 288. Here, relator's first pleadings in regard to modifying the parent-child relationship were her motion to modify and her motion to transfer venue. Because she filed her motion to transfer venue at the time that she filed her initial pleadings, relator's motion to transfer venue was timely.

[7] The real party in interest also argues that relator is not entitled to mandamus relief because the record does not contain a signed order from the trial court. We disagree. If a court's order is adequately reflected in the reporter's record, a formal written order is not essential to obtaining mandamus relief. *In re Vernor,* 94 S.W.3d 201, 206 n. 8 (Tex.App.-Austin 2002, orig. proceeding); *see also* TEX.R.APP. P. 52.3(j)(1)(A). Because the record affirmatively reflects that the trial court denied the motion to transfer as to both children, a formal written order is not necessary.

### Conclusion

We conditionally grant the petition for writ of mandamus. The writ will issue only if the trial court does not sever and transfer all proceedings pertaining to L.L.W. to Brazos County.

### All Citations

177 S.W.3d 350

### Footnotes

1     The Honorable Georgia Dempster, judge of the 308th District Court of Harris County, Texas. The underlying lawsuit is *Wheeler v. Wheeler,* No. 97–42617 (308th Dist. Ct., Harris County, Texas).

2     The real party in interest argues that relator's request to transfer venue is only an attempt to forum shop. Although forum shopping is possible here, the statute alleviates this possibility because the transferee court acquires the power to enforce previous orders entered by the transferor court. TEX. FAM.CODE ANN. § 155.206(c), (d) (Vernon 2002).

**End of Document**                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Family Code (Refs & Annos)
Title 5. The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship (Refs & Annos)
Subtitle B. Suits Affecting the Parent-Child Relationship
Chapter 155. Continuing, Exclusive Jurisdiction; Transfer (Refs & Annos)
Subchapter C. Transfer of Continuing, Exclusive Jurisdiction (Refs & Annos)

V.T.C.A., Family Code § 155.201

§ 155.201. Mandatory Transfer

Effective: June 18, 2005

Currentness

(a) On the filing of a motion showing that a suit for dissolution of the marriage of the child's parents has been filed in another court and requesting a transfer to that court, the court having continuing, exclusive jurisdiction of a suit affecting the parent-child relationship shall, within the time required by Section 155.204, transfer the proceedings to the court in which the dissolution of the marriage is pending. The motion must comply with the requirements of Section 155.204(a).

(b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155. 204, transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer.

(c) If a suit to modify or a motion to enforce an order is pending at the time a subsequent suit to modify or motion to enforce is filed, the court may transfer the proceeding as provided by Subsection (b) only if the court could have transferred the proceeding at the time the first motion or suit was filed.

**Credits**

Added by Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995. Amended by Acts 1999, 76th Leg., ch. 1135, § 1, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 916, § 14, eff. June 18, 2005.

Notes of Decisions (78)

V. T. C. A., Family Code § 155.201, TX FAMILY § 155.201

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Family Code (Refs & Annos) |
| Title 5. The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship (Refs & Annos) |
| Subtitle B. Suits Affecting the Parent-Child Relationship |
| Chapter 155. Continuing, Exclusive Jurisdiction; Transfer (Refs & Annos) |
| Subchapter C. Transfer of Continuing, Exclusive Jurisdiction (Refs & Annos) |

V.T.C.A., Family Code § 155.203

§ 155.203. Determining County of Child's Residence

Currentness

In computing the time during which the child has resided in a county, the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence during the six-month period preceding the commencement of the suit.

**Credits**

Added by Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995.

Notes of Decisions (6)

V. T. C. A., Family Code § 155.203, TX FAMILY § 155.203
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Family Code (Refs & Annos)
Title 5. The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship (Refs & Annos)
Subtitle B. Suits Affecting the Parent-Child Relationship
Chapter 155. Continuing, Exclusive Jurisdiction; Transfer (Refs & Annos)
Subchapter C. Transfer of Continuing, Exclusive Jurisdiction (Refs & Annos)

V.T.C.A., Family Code § 155.204

§ 155.204. Procedure for Transfer

Effective: June 18, 2005

Currentness

(a) A motion to transfer under Section 155.201(a) may be filed at any time. The motion must contain a certification that all other parties, including the attorney general, if applicable, have been informed of the filing of the motion.

(b) Except as provided by Subsection (a) or Section 262.203, a motion to transfer by a petitioner or movant is timely if it is made at the time the initial pleadings are filed. A motion to transfer by another party is timely if it is made on or before the first Monday after the 20th day after the date of service of citation or notice of the suit or before the commencement of the hearing, whichever is sooner.

(c) If a timely motion to transfer has been filed and no controverting affidavit is filed within the period allowed for its filing, the proceeding shall, not later than the 21st day after the final date of the period allowed for the filing of a controverting affidavit, be transferred without a hearing to the proper court.

(d) On or before the first Monday after the 20th day after the date of notice of a motion to transfer is served, a party desiring to contest the motion must file a controverting affidavit denying that grounds for the transfer exist.

(e) If a controverting affidavit contesting the motion to transfer is filed, each party is entitled to notice not less than 10 days before the date of the hearing on the motion to transfer.

(f) Only evidence pertaining to the transfer may be taken at the hearing.

(g) If the court finds after the hearing on the motion to transfer that grounds for the transfer exist, the proceeding shall be transferred to the proper court not later than the 21st day after the date the hearing is concluded.

(h) An order transferring or refusing to transfer the proceeding is not subject to interlocutory appeal.

(i) If a transfer order has been signed by a court exercising jurisdiction under Chapter 262, a party may file the transfer order with the clerk of the court of continuing, exclusive jurisdiction. On receipt and without a hearing, the clerk of the court of continuing, exclusive jurisdiction shall transfer the files as provided by this subchapter.

**Credits**

Added by Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995. Amended by Acts 1999, 76th Leg., ch. 1150, § 1, eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 1390, § 14, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 916, § 15, eff. June 18, 2005.

Notes of Decisions (55)

V. T. C. A., Family Code § 155.204, TX FAMILY § 155.204
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
Government Code (Refs & Annos)
Title 2. Judicial Branch (Refs & Annos)
Subtitle A. Courts
Chapter 22. Appellate Courts
Subchapter C. Courts of Appeals (Refs & Annos)

V.T.C.A., Government Code § 22.201

§ 22.201. Courts of Appeals Districts

Effective: September 1, 2005

Currentness

(a) The state is divided into 14 courts of appeals districts with a court of appeals in each district.

(b) The First Court of Appeals District is composed of the counties of Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Harris, Waller, and Washington.

(c) The Second Court of Appeals District is composed of the counties of Archer, Clay, Cooke, Denton, Hood, Jack, Montague, Parker, Tarrant, Wichita, Wise, and Young.

(d) The Third Court of Appeals District is composed of the counties of Bastrop, Bell, Blanco, Burnet, Caldwell, Coke, Comal, Concho, Fayette, Hays, Irion, Lampasas, Lee, Llano, McCulloch, Milam, Mills, Runnels, San Saba, Schleicher, Sterling, Tom Green, Travis, and Williamson.

(e) The Fourth Court of Appeals District is composed of the counties of Atascosa, Bandera, Bexar, Brooks, Dimmit, Duval, Edwards, Frio, Gillespie, Guadalupe, Jim Hogg, Jim Wells, Karnes, Kendall, Kerr, Kimble, Kinney, LaSalle, McMullen, Mason, Maverick, Medina, Menard, Real, Starr, Sutton, Uvalde, Val Verde, Webb, Wilson, Zapata, and Zavala.

(f) The Fifth Court of Appeals District is composed of the counties of Collin, Dallas, Grayson, Hunt, Kaufman, and Rockwall.

(g) The Sixth Court of Appeals District is composed of the counties of Bowie, Camp, Cass, Delta, Fannin, Franklin, Gregg, Harrison, Hopkins, Hunt, Lamar, Marion, Morris, Panola, Red River, Rusk, Titus, Upshur, and Wood.

(h) The Seventh Court of Appeals District is composed of the counties of Armstrong, Bailey, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Deaf Smith, Dickens, Donley, Floyd, Foard, Garza, Gray, Hale, Hall, Hansford, Hardeman, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Sherman, Swisher, Terry, Wilbarger, Wheeler, and Yoakum.

(i) The Eighth Court of Appeals District is composed of the counties of Andrews, Brewster, Crane, Crockett, Culberson, El Paso, Hudspeth, Jeff Davis, Loving, Pecos, Presidio, Reagan, Reeves, Terrell, Upton, Ward, and Winkler.

(j) The Ninth Court of Appeals District is composed of the counties of Hardin, Jasper, Jefferson, Liberty, Montgomery, Newton, Orange, Polk, San Jacinto, and Tyler.

(k) The Tenth Court of Appeals District is composed of the counties of Bosque, Burleson, Brazos, Coryell, Ellis, Falls, Freestone, Hamilton, Hill, Johnson, Leon, Limestone, Madison, McLennan, Navarro, Robertson, Somervell, and Walker.

(l) The Eleventh Court of Appeals District is composed of the counties of Baylor, Borden, Brown, Callahan, Coleman, Comanche, Dawson, Eastland, Ector, Erath, Fisher, Gaines, Glasscock, Haskell, Howard, Jones, Knox, Martin, Midland, Mitchell, Nolan, Palo Pinto, Scurry, Shackelford, Stephens, Stonewall, Taylor, and Throckmorton.

(m) The Twelfth Court of Appeals District is composed of the counties of Anderson, Angelina, Cherokee, Gregg, Henderson, Houston, Nacogdoches, Rains, Rusk, Sabine, San Augustine, Shelby, Smith, Trinity, Upshur, Van Zandt, and Wood.

(n) The Thirteenth Court of Appeals District is composed of the counties of Aransas, Bee, Calhoun, Cameron, DeWitt, Goliad, Gonzales, Hidalgo, Jackson, Kenedy, Kleberg, Lavaca, Live Oak, Matagorda, Nueces, Refugio, San Patricio, Victoria, Wharton, and Willacy.

(o) The Fourteenth Court of Appeals District is composed of the counties of Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Harris, Waller, and Washington.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 148, § 1.02, eff. Sept. 1, 1987; Acts 2003, 78th Leg., ch. 44, § 1, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 315, § 4, eff. Sept. 1, 2003; Acts 2003, 78th

Leg., ch. 662, § 1, eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 542, § 1, eff. Sept. 1, 2005.

Notes of Decisions (14)

V. T. C. A., Government Code § 22.201, TX GOVT § 22.201
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Government Code (Refs & Annos)
Title 2. Judicial Branch (Refs & Annos)
Subtitle A. Courts
Chapter 22. Appellate Courts
Subchapter C. Courts of Appeals (Refs & Annos)

V.T.C.A., Government Code § 22.221

§ 22.221. Writ Power

Currentness

(a) Each court of appeals or a justice of a court of appeals may issue a writ of mandamus and all other writs necessary to enforce the jurisdiction of the court.

(b) Each court of appeals for a court of appeals district may issue all writs of mandamus, agreeable to the principles of law regulating those writs, against a:

(1) judge of a district or county court in the court of appeals district; or

(2) judge of a district court who is acting as a magistrate at a court of inquiry under Chapter 52, Code of Criminal Procedure, in the court of appeals district.

(c) Repealed by Acts 1987, 70th Leg., ch. 148, § 2.03, eff. Sept. 1, 1987.

(d) Concurrently with the supreme court, the court of appeals of a court of appeals district in which a person is restrained in his liberty, or a justice of the court of appeals, may issue a writ of habeas corpus when it appears that the restraint of liberty is by virtue of an order, process, or commitment issued by a court or judge because of the violation of an order, judgment, or decree previously made, rendered, or entered by the court or judge in a civil case. Pending the hearing of an application for a writ of habeas corpus, the court of appeals or a justice of the court of appeals may admit to bail a person to whom the writ of habeas corpus may be granted.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 69, § 1, eff. May 6, 1987; Acts 1987, 70th Leg., ch. 148, §§ 1.35, 2.03, eff. Sept. 1, 1987; Acts 1991, 72nd Leg., ch. 58, § 1, eff. May 2, 1991; Acts 1995, 74th Leg., ch. 839, § 1, eff. Sept. 1, 1995.

**Editors' Notes**

## REVISOR'S NOTE

### 2004 Main Volume

The revised law in Subsection (b) omits "or any Justice thereof, in vacation," from the source law in V.A.C.S. Article 1824 because amendments to V.A.C.S. Article 1816 have changed the original term of the courts of appeals from the first Monday in October until the first Monday in July to a term beginning and ending with each calendar year.

Notes of Decisions (305)

V. T. C. A., Government Code § 22.221, TX GOVT § 22.221
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Three. Original Proceedings in the Supreme Court and the Courts of Appeals
      Rule 52. Original Proceedings (Refs & Annos)

TX Rules App.Proc., Rule 52.1

52.1. Commencement

Currentness

An original appellate proceeding seeking extraordinary relief--such as a writ of habeas corpus, mandamus, prohibition, injunction, or quo warranto--is commenced by filing a petition with the clerk of the appropriate appellate court. The petition must be captioned *"In re* [name of relator]."

**Credits**

Eff. Sept. 1, 1997.

Notes of Decisions (68)

Rules App. Proc., Rule 52.1, TX R APP Rule 52.1
Current with amendments received through 6/1/2015

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.